## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ABEINSA HOLDING INC. *et al.*, | Case No. 16-_10790_____ (__) |
| Debtors.[1] | (Joint Administration Requested) |

## DECLARATION OF WILLIAM H. RUNGE, III IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Abeinsa Holding Inc. (9489); Abeinsa EPC LLC (1176); Abencor USA, LLC (0184); Abener Construction Services, LLC (0495); Abener North America Construction, LP (5989); Abengoa Solar, LLC (6696); Inabensa USA, LLC (2747); Nicsa Industrial Supplies, LLC (9076); Teyma Construction USA, LLC (0362); Abeinsa Abener Teyma General Partnership (2513); Abener Teyma Mojave General Partnership (2353); Abener Teyma Inabensa Mount Signal Joint Venture (9634); Teyma USA & Abener Engineering and Construction Services General Partnership (6534).

I, William H. Runge, III, hereby declare as follows:

1.      I am a Managing Director of Alvarez & Marsal North America, LLC, ("Alvarez & Marsal") based in Atlanta, Georgia.  The above-captioned debtors and debtors in possession are collectively referred to as the "Debtors" in this declaration (the "First Day Declaration"). A complete list of the Debtors and their affiliates that have pending bankruptcy cases before this or any other court is attached hereto as **Exhibit A**.

2.      I have 35 years of experience working in industry, operations, financial and executive management, and turnaround consulting, having worked primarily with companies challenged by transitions resulting from rapid growth, acquisitions, and changes in financial structure and market environments.  As described in detail below, Alvarez & Marsal has been engaged by Abengoa S.A. ("Abengoa Parent"), the ultimate parent of the Debtors, since December 2015, providing an array of service to Abengoa Parent and its subsidiaries (collectively, "Abengoa"), including, among other things, helping to develop the Restructuring Proposal and the Viability Plan (both as defined herein) that serve as the bases of the global restructuring of Abengoa, assisting with global cash management and aiding in the coordination of the restructuring process with Abengoa's global subsidiaries.  In addition, a number of Alvarez & Marsal professionals have served as officers of Abengoa Parent throughout the restructuring process.

3.      In March 2016, the Alvarez & Marsal engagement was amended to assist Abengoa Parent in its efforts to prepare various global subsidiaries for filing under chapter 11 and chapter 15 of title 11 of the United States Code (the "Bankruptcy Code") in the United States.

4.     Since December 2015, I have been providing financial advisory services to a number of Abengoa entities, and in this capacity, I am generally familiar with the Debtors' businesses, day-to-day operations, financial matters, results of operations, cash flows, and underlying books and records.  In my capacity, I work with the Debtors' operational and financial management on a regular basis.  Except as otherwise indicated all the facts set forth in this First Day Declaration are based upon my best personal knowledge of the Debtors' businesses, operations, and related financial information gathered from my review of their books and records, relevant documents, and information supplied to me by members of the Debtors' management team and advisors.

5.     I am over the age of 18 and am authorized by the Debtors to submit this declaration.  If called upon to testify, I could and would competently testify to the facts set forth in this First Day Declaration.

6.     The Debtors have requested a variety of relief in the "first day" motions and applications (the "First Day Motions") filed concurrently with this First Day Declaration to ensure a smooth transition into chapter 11.  I am generally familiar with the contents of each of the First Day Motions, and I believe that the relief sought in them, including the ability to make certain essential payments and otherwise to continue business operations, is necessary to permit continued efficient operations of the Debtors' businesses during these chapter 11 cases.

7.     In my opinion, this Court's approval of the relief requested in the First Day Motions will preserve and maximize the value of the Debtors' estates and assist the Debtors in successfully managing their chapter 11 process.  A complete description of the relief requested under the Debtors' First Day Motions, and evidentiary support for those motions, is set forth below in Part III of this First Day Declaration.

8.     To familiarize the Court with the Debtors and the relief they are seeking, this First Day Declaration provides an overview of Abengoa, the facts and circumstances surrounding these bankruptcy cases, and the Debtors' anticipated restructuring.  The First Day Declaration is organized as follows:

- **Part I** describes Abengoa's businesses, its operations, its capital structure, and those of the Debtors;

- **Part II** describes the events that led to the commencement of these bankruptcy cases; and

- **Part III** provides an overview of the relief requested in the First Day Motions.

## I.     BUSINESSES AND CAPITAL STRUCTURE OF DEBTORS AND AFFILIATES

9.     Abengoa Parent is a Spanish company founded in 1941 and is a leading engineering and clean technology company with operations in more than 50 countries worldwide.  Abengoa provides innovative solutions for a diverse range of customers in the energy and environmental sectors.  Over the course of Abengoa's 70-year history, it has developed a unique and integrated business model that applies its accumulated engineering expertise to promoting sustainable development solutions, including delivering new methods for generating solar power, developing biofuels, producing potable water from seawater, and efficiently transporting electricity.  A cornerstone of Abengoa's business model has been investment in proprietary technologies, particularly in areas with relatively high barriers to entry.  Abengoa organizes its businesses into the following three activities:  Engineering and Construction, Concession-Type Infrastructure, and Industrial Production.

10.     For the nine month period ended on December 31, 2015, Abengoa's average number of employees was approximately 32,000 people worldwide across all Abengoa's business activities, of which the Debtors in these cases employ approximately 100.

A.      **Overview of the Debtors' Corporate Structure and Business Operations**

11.      Abengoa initially expanded into the United States in the 1980s, creating a number of subsidiaries within the biofuels, engineering and construction, water, and solar segments of its operations.  After an operational restructuring of the U.S. subsidiaries in 2013, substantially all of the Abengoa companies with operations in the United States, except those that fall under the Bioenergy business unit (as described below), became subsidiaries of Abengoa US Operations LLC ("Abengoa Operations" or "P-3"). Abengoa Operations and the Bioenergy subsidiaries are owned 100% by Abengoa US, LLC ("Abengoa US" or "P-2"), an intermediate holding company formed under the laws of the state of Delaware.  Abengoa US Holding, LLC ("Abengoa Holding" or "P-1") is the indirect parent company of all United States-based subsidiaries, the majority of which can be organized into the following distinct business units:

- Abengoa's bioenergy companies ("Bioenergy"), specialize in the development of new technologies geared towards the production of biofuels, biochemical products, and the sustainability of raw materials;[2]

- Abengoa's engineering, procurement, and construction companies ("EPC") are dedicated to the engineering and construction of electrical, mechanical, and instrumental infrastructures in the energy, industrial, water management, and services sectors, as well as the development of innovative technology for Abengoa's businesses;

- Abengoa's water companies ("Water") specialize in the development, operation and maintenance of facilities aimed at generating, transporting, treating and managing potable water, including desalination and water treatment, as well as purification plants;

- Abengoa's solar companies ("Solar") specialize in the development, operation and maintenance of solar energy plants, mainly using solar thermal technology; and

---

[2]   Several Bioenergy entities are debtors in possession in the jointly administered chapter 11 cases of *Abengoa Bioenergy US Holding, et al*, Case No. 16-41161 in the Bankruptcy Court for the Eastern District of Missouri, which is discussed in detail below.

- Abengoa's crop companies ("Crop") specialize in the operation and maintenance of facilities aimed at producing energy from natural materials and agriculture.

12.    A simplified representation of Abengoa's U.S. corporate structure is attached hereto as **Exhibit B**. A full representation of Abengoa's global corporate structure is attached hereto as **Exhibit C**.

B.    **Debtors' Business Operations**

13.    The Debtors in these cases consist of three categories of Debtors across Abengoa's various business units: (i) U.S. entities that are party to that certain Standstill Agreement (the "Standstill Agreement") dated as of March 18, 2016 by and between Abengoa, S.A. as the Parent, the Debtors, the Creditors and the Majority Shareholders (all as defined in the Standstill Agreement), which was negotiated in Spain and approved by the Spanish court, and which serves as the basis of the chapter 15 proceedings that have been filed in this Court and (ii) other U.S. entities, certain of which are guarantors on Abengoa Parent debt obligations. Abengoa's companies operate on a decentralized basis, and have the majority of operations in the business units of EPC and Solar.  Specifically, each of the Debtors' business operations are listed below:

*Parties to the Standstill Agreement*

a)    Abengoa Solar LLC, formerly known as Solucar Inc. and Abengoa Solar Inc. ("Abengoa Solar"), is a limited liability company organized under the laws of the State of Delaware and based in Colorado.  It is the operating company for Abengoa's Solar business in the United States.  It owns and operates major solar energy projects.

b)    Abencor USA, LLC ("Abencor") is a limited liability company organized under the laws of the state of Delaware.  Abencor sells electrical materials and offers integral management service for procurement logistics.

c)    Inabensa USA, LLC ("Inabensa") is a limited liability company organized under the laws of the state of Delaware.  Inabensa provides special industrial machinery, and has operations associated with industrial

facilities and infrastructure. It joined with certain affiliates to form Mount Signal (defined below).

d)      Nicsa Industrial Supplies, LLC ("Nicsa") is a limited liability company organized under the laws of the state of Delaware. Nicsa supplies various types of electrical material, instrumentation, and communication equipment for industrial use to engineering and construction companies.

e)      Abener Construction Services, LLC, formerly Abener Engineering and Construction Services, LLC ("Abener Construction"), is a limited liability company organized under the laws of the state of Delaware. Abener Construction is a renewables and environmental company that provides biofuel engineering, project, and construction management services

f)      Teyma USA & Abener Engineering and Construction Services General Partnership ("Solana") is a general partnership organized under the laws of the state of Delaware.  Solana is responsible for the engineering, procurement, and construction of the Solana thermal solar energy power plant located near Gila Bend, Arizona (the "Solana Plant"). When commissioned, the Solana Plant was the largest parabolic trough plant in the world and the first solar plant in the United States with molten salt thermal energy storage.

g)      Abener Teyma Mojave General Partnership ("Mojave") is a general partnership organized under the laws of the state of Delaware. It holds an engineering, procurement and construction services contract for a thermal solar energy power plant located near in San Bernardino County, California.

h)      Abeinsa Abener Teyma General Partnership ("AAT") is a general partnership organized under the laws of the state of Delaware. It holds the engineering, procurement and construction services contracts for (i) a plant located in Glendale, Arizona that recycles municipal solid waste (the "Vieste Project"), (ii) a cogeneration plant located in Pasadena, Texas built to install a superheater and steam turbine generator at an existing nitrogen plant (the "Rentech Project"), (iii) a 440MW gas-fired Generation Facility with a combined cycle located in Boardman, Oregon built to provide electricity to Portland region which contract has since been terminated by the client (the "Carty Project"), and (iv) a facility that will operate Feedstock MSW to Syncrude Product processing in Reno, Nevada (the "Fulcrum Project"). The Rentech Project and the Vieste Project have been finalized.

i)      Abener Teyma Inabensa Mount Signal Joint Venture ("Mount Signal," and together with Solana, Mojave and AAT, the "Partnerships") is a joint venture between Inabensa USA LLC, Abeinsa Holding Inc. and Abener North America Construction LP.  Mount Signal was formed to design,

engineer, procure, install, construct, test, and commission a nominal power photovoltaic power plant to be located in Imperial County, California. Delaware law governs the joint venture agreement.

*Guarantors of Abengoa Parent Debt and Other U.S. Entities*

j)      Abeinsa Holding Inc. ("Abeinsa Holding"), formerly known as Teyma USA, Inc., is a corporation incorporated under the laws of the state of Delaware.  Incorporated in 2009, it was one of the first Abengoa engineering, construction and procurement related company in the United States and continues to be a regional partner in certain EPC projects in the United States.

k)      Teyma Construction USA, LLC ("Teyma Construction") is a limited liability company organized under the laws of the state of Delaware.  It is the owner of the interests in an affiliated professional management company responsible for providing project and construction management consulting services and lenders and is a partner in certain of the Partnerships.

l)      Abeinsa EPC LLC ("Abeinsa EPC") is a limited liability company organized under the laws of the state of Delaware.  Abeinsa EPC provides services to the Partnerships, including but not limited to legal, tax, accounting, and back-office services.  Abeinsa EPC also provides employees and is a partner in one of the Partnerships.

m)      Abener North America Construction, LP ("Abener North America") is a limited partnership organized under the laws of the state of Delaware. Abener North America holds general engineering contractor licenses in California and Arizona, and joined with certain of its affiliates to form Mount Signal and Mojave.

14.      Owing to the complex capital structure of Abengoa and the nature and extent of the global restructuring process, it is possible that additional Abengoa entities may require the protections of the Bankruptcy Code.

## C.      **Debtors' Capital Structure**

15.      Abengoa reports its financial information on a consolidated, condensed basis. As of December 31, 2015, Abengoa had total assets of approximately €16.6 billion, including its goodwill, with revenues of approximately €5.8 billion, and a total loss for 2015 of about €1.3 billion.  The company's current liabilities total approximately €14.6 billion, comprised of

approximately €6.2 billion in corporate financing (project debt of €2.6 billion, borrowings of about €2.3 billion, various notes and bonds of €3.3 billion, financial lease liabilities of about €17 million, and other loans and borrowings of approximately €557 million). Abengoa also has trade payables and other current liabilities as of December 31, 2015 of approximately €4.3 billion.

16.     Abengoa Parent and certain of its subsidiaries, including Abengoa Finance S.A.U and Abengoa Greenfield S.A., are parties to multiple debt facilities in the approximate amount of $6.86 billion, as set forth in **Exhibit D** hereto. Debtors Mojave and Solana (the "Guarantors") are each guarantors on notes issued by Abengoa Parent, Abengoa Finance, S.A.U., and Abengoa Greenfield, S.A. Other non-debtor affiliates are also guarantors on the debt facilities.

## II.    THE EVENTS LEADING TO THE BANKRUPTCY CASES

### A.    History of the U.S. Debtors

17.     Abengoa initiated the expansion of its global operations in the 1960s, first to South America and then into the United States. Since inception, Abengoa's presence in the United States has grown significantly. Abengoa has achieved a leading position within the renewable energy construction and technology sector in the United States through its efforts in developing commercial scale concentrated solar power and producing advanced biofuels on a commercial scale.

18.     With a total investment of $3.3 billion, the United States has become Abengoa's largest market in terms of sales volume, particularly from developing solar, bioethanol, and water projects. Abengoa's investments have been recognized within the United States through various agreement programs. The United States remains one of the largest and strategically important markets for Abengoa.

B.      **Cancellation of Subsidies and Investment Agreements**

19.      At the height of Spain's economic crisis in early 2013, as the Spanish government struggled to pay the interest due on sovereign debt, subsidies for solar and wind power companies were dramatically curtailed.  The cutbacks devastated Spain's renewable energy sector and many companies failed.  Though Abengoa was able to survive this financial crisis, it was forced to issue substantial new debt to continue its global operations.  Since 2013, Abengoa entered into or issued syndicated, bilateral, and other debt instruments totaling over $5 billion.  As part of these transactions, and as set forth above, the Guarantors provided guarantees for certain of this debt.

C.      **Abengoa's Financial Position and The Gonvarri Investment Agreement**

20.      On July 31 2015, during Abengoa's results presentation for the first six months of 2015, Abengoa lowered its guidance for 2015 corporate free cash flow, which deepened existing market concerns regarding Abengoa's liquidity position, as well as raised concerns with its business partners and other shareholders regarding liquidity.  These concerns adversely affected Abengoa's cash position, had a disruptive effect on its operations, contributed to a 27% decline in engineering and construction revenues in the third quarter of 2015 compared to the same period in the prior year, and caused the trading prices of Abengoa's Class A and Class B shares and outstanding bonds to fluctuate significantly during the third quarter and the beginning of the fourth quarter of the 2015 fiscal year.

21.      In light of these developments, on September 24, 2015, Abengoa announced a comprehensive action plan aimed at improving its liquidity position, reducing corporate leverage and strengthening its corporate governance.  A key element of this plan was an equity raise to be underwritten by various financial institutions, which Abengoa was unable to secure.  Further, Abengoa sought to secure an investment from Gonvarri Corporacion Financiera, S.L.

("Gonvarri"), a Gonvarri Steel Industries group company and one of the main shareholders of Abengoa. Unfortunately, the Company was unable to consummate the Gonvarri transaction.

D.      **5BIS and Abengoa's Reorganization Efforts**

22.     Upon the termination of the Gonvarri transaction, Abengoa was left without sufficient capital to operate. On Wednesday, November 25, 2015 in Spain, Abengoa announced its intention to seek protection under article 5bis of the *Ley 22/2003, de 9 de julio, Concursal* (the "Spanish Insolvency Act"), a pre-insolvency statute that permits a company to enter into negotiations with certain creditors for restructuring its financial affairs. On several dates thereafter (November 25, 2015, December 3, 15, and 28, 2015, January 27, 2016, and February 1, 2016), Abengoa Parent and certain affiliates (the "5bis Companies")[3] filed notices with the Mercantile Court of Seville, Spain (the "Spanish Court") that they had commenced negotiations with their principal creditors in order to reach a global agreement on the refinancing and restructuring of their liabilities to achieve the viability of Abengoa in the short and long term. The Spanish Court issued orders on December 14 and 22, 2015, and January 15, 2016, admitting the notices and granting the 5bis Companies the protection of Spanish law.

23.     Abengoa commenced negotiations with a large and diverse number of its main financial creditors, including (a) a group of lenders that formed a coordinating committee, advised by Sullivan & Cromwell LLP, Uria Menendez Abogados, S.L.P.-C., and KPMG LLP, and (b) an *ad hoc* committee of bondholders, advised by Clifford Chance LLP and Houlihan Lokey, Inc. Throughout this process, Abengoa has been advised by Linklaters LLP, Alvarez & Marsal, Lazard Frères & Co., LLC and Madrid-based law from Cortés, Abogados ("Cortés"), and began preparing a business viability plan and the terms of a possible restructuring

---

[3] The 5 bis Companies are forty-seven Abengoa companies listed in Schedule C of the Standstill Agreement.

agreement.  During this period, Abengoa negotiated several interim debt facilities to address

immediate general liquidity needs:

- A €165,000,000 syndicated facility agreement dated September 23, 2015 between Abengoa Parent, as borrower, and certain Abengoa companies as guarantors and certain finance entities (the "Revolving Facilities");

- A €106,000,000 facility agreement dated December 24, 2015 between Abengoa Concessions Investment Limited ("ACIL"), as borrower, certain companies its group as guarantors and certain finance entities (the "December Facility").  The December Facility was used for general corporate purposes, and Abengoa granted a security interest in shares of Abengoa Yield PLC, doing business as Atlantica Yield PLC  ("YieldCo") held by Abengoa, and also pledged YieldCo shares as security for the Revolving Facilities)[4];

- A €135,000,000 secured term facility agreement dated October 22, 2015 between ACIL, as borrower, and Talos Capital Limited; and

- A €137,226,746.96 facility agreement dated March 16, 2016 between ACIL, as borrower, certain Abengoa companies as guarantors, and certain finance entities (the "Bondholders Facilities").  The Bondholders Facilities was used for general corporate purposes, and Abengoa granted a security interest over certain shares of YieldCo.

24.     Subsequently, Alvarez & Marsal assisted in the preparation and revision of a

viability plan (the "Viability Plan")[5] that was announced on February 16, 2016, and which was

based on a preliminary review of specific projects, the existing project pipelines, and the most

recent information and thinking with respect to asset disposals and financial debt.  As part of

its evaluation and in connection with the preparation of the Viability Plan, Alvarez & Marsal

evaluated (i) 200 projects, each above €2.5 million in investment that covered 90% of the

Abengoa €8.6 billion backlog as of December 31, 2015, and (ii) each business line by region

and operating division with the head of each business line.

---

[4] YieldCo was formed in 2014 as a result of the contribution by Abengoa of a number of on-going assets and liabilities.  YieldCo currently trades on NASDAQ under the symbol "ABY".

[5] The Viability Plan is available on the internet at:
http://www.abengoa.com/export/sites/abengoa_corp/resources/pdf/gobierno_corporativo/hr_y_otras_comunicacio nes_cnmv/hechos_relevantes/2016/20160216_en_0.pdf.

25.     In relation to the negotiations between Abengoa and a group of its creditors comprised of banks and bondholders, Abengoa announced on March 10, 2016 that it had reached an agreement with the advisers of such creditors to restructure the financial indebtedness and recapitalize the group.  Abengoa believes that such agreement contains the essential elements to achieve a future restructuring agreement that, in any event, will be subject to reaching the percentage of accessions required under the Spanish Insolvency Act.   The fundamental principles of the agreement announced on March 10, 2016 were as follows:

i)   Creditors would extend a new senior loan to Abengoa in an amount ranging between €1.5 billion - €1.8 billion for a maximum term of five years, under the terms of which creditors would be entitled to 55% of the share capital.  Such loan would rank senior with respect to existing debt and would be guaranteed by certain assets, including free shares of YieldCo.

ii)   70% of the nominal value of the existing debt would be capitalized, granting the right to subscribe 35% of the new share capital.

iii)   The financial indebtedness corresponding to Revolving Lines and the December Facilities, a total amount of €231 million plus accrued financial expenses, will be subject to refinancing by extending the term by an additional two years, which indebtedness would be secured by the shares of YieldCo and would be prepaid in case of a sale of the shares of YieldCo.

iv)   The amount of the share capital increase that would be reserved to those creditors who provide €800 million of the bank guarantees requested, would be 5% of the new capital.

26.     On March 16, 2016, Abengoa presented its Business Plan & Financial Restructuring Plan (the "Restructuring Proposal") in Madrid.

*i.     The Standstill Agreement Homologation Proceeding*

27.     The Restructuring Proposal presented on March 16, 2016 sets forth the framework for the restructuring of Abengoa's financial obligations. In order for the Spanish Court to homologate, or approve, the Restructuring Proposal in accordance with the Spanish Insolvency Act, 75% of the requisite creditors must consent to the agreement.  In order to

provide Abengoa with sufficient time to solicit and obtain the requisite supermajority votes with respect to the Restructuring Proposal, Abengoa requested its financial creditors to agree to the Standstill Agreement, pursuant to which the company requested its financial creditors to stay certain rights and actions vis-à-vis the relevant Abengoa companies during a period of seven months from the date of the Standstill Agreement.

28.    Abengoa requested that the beneficial owners of the affected bond issues indicate their accession to the Standstill Agreement through the standstill accession notice (the "Standstill Accession Notice") that will be available for the beneficial owners of the bond issues through Lucid Issuer Services Limited.  The Standstill Accession Notice established the deadline of 12 p.m. (GMT +1) on March 23, 2016, unless extended, for submission by the beneficial owners of instructions to enter into, and therefore, sign and execute, the Standstill Agreement.

29.    With the Standstill Agreement having obtained consent by more than 70% of financial creditors, on March 28, 2016, Abengoa sought judicial approval (*homologación judicial*) of the Standstill Agreement by filing the Judicial Confirmation Request with the Spanish Court pursuant to the Spanish Insolvency Act, which will have the effect of binding the Standstill Agreement upon all financial creditors, including those who are not party to it.

E.    **The Chapter 15 Filing**

30.    As contemplated by the Standstill Agreement, on March 28, 2016, Abengoa Parent and approximately twenty affiliated Spanish companies (the "Chapter 15 Debtors")[6] filed petitions for relief under chapter 15 of the Bankruptcy Code in this Court to extend the Standstill Agreement.

---

[6] The Chapter 15 Debtors, listed on Exhibit A attached hereto, have requested the joint administration of their cases under *In re Abengoa, S.A.*, Case No. 16-10754.

F.      **Chapter 11 Filing of Certain Bioenergy Entities**

31.      On February 1, 2016, Gavilon Grain, LLC, Farmers Cooperative Association, and The Andersons, Inc. commenced a case in the United States Bankruptcy Court for the District of Nebraska against the Debtors' affiliate Abengoa Bioenergy of Nebraska, LLC ("ABNE") by filing an involuntary petition for relief under chapter 7 of the Bankruptcy Code (the "Nebraska Proceeding").   Subsequently, on February 11, 2016, Gavilon Grain, LLC, Farmers Cooperative, and Central Valley Ag Cooperative commenced a case in the United States Bankruptcy Court for the District of Kansas (Kansas City) against the Debtors' affiliate Abengoa Bioenergy Company, LLC ("ABC") by filing an involuntary petition for relief under chapter 7 of the Bankruptcy Code (the "Kansas Proceeding," and together with the Nebraska Proceeding, the "Involuntary Cases").   No interim chapter 7 trustee was appointed in the Involuntary Cases.

32.      On February 24, 2016, ABNE and ABC filed motions to convert the Involuntary Cases to cases under chapter 11 in the United States Bankruptcy Court for the District of Kansas (Kansas City) and the United States Bankruptcy Court for the District of Nebraska, respectively. Contemporaneously, ABNE and ABC filed motions to transfer venue from the United States Bankruptcy Court for the District of Kansas (Kansas City) and the United States Bankruptcy Court for the District of Nebraska, respectively, to the United States Bankruptcy Court for the Eastern District of Missouri.

33.      Also on February 24, 2016, the Debtors' affiliates Abengoa Bioenergy US Holding, LLC; Abengoa Bioenergy Outsourcing, LLC; Abengoa Bioenergy Trading US, LLC; Abengoa Bioenergy Engineering & Construction, LLC; ABNE and ABC (the "Bioenergy Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States District Court for the Eastern District of Missouri, commencing the chapter 11

cases jointly administered under case number 16-41161 (the "Missouri Cases"). Through the Missouri Cases, the Bioenergy Debtors seek to reorganize through a sale of all or substantially all of their assets or a stand-alone restructuring.

## III.    OVERVIEW OF FIRST DAY RELIEF

34.    The Debtors have filed or expect to file a number of First Day Motions,[7] customary in large bankruptcy cases such as these, designed to minimize the adverse effects of the commencement of the bankruptcy cases on their ongoing business operations.  I believe that this Court's approval of the relief requested in the First Day Motions is essential to providing the Debtors with an opportunity to successfully meet their obligations by maintaining baseline operations, providing for a smooth transition into the bankruptcy cases, and minimizing any loss of value to the Debtors' businesses.

35.    The First Day Motions seek authority to, among other things, continue to pay employee compensation and benefits in order to maintain morale and retention as the Debtors transition into chapter 11, thus avoiding the potential for catastrophic "brain drain"; ensure the continuation of the Debtors' cash management systems and other business operations without interruption; provide the Debtors the ability to make certain critical payments; and to provide adequate assurance of future performance to their utility providers, as detailed below:

### A.    Joint Administration Motion

36.    The Debtors seek entry of an order directing joint administration of these bankruptcy cases for procedural purposes only.  I believe that joint administration will also save time and money and avoid duplicative and potentially confusing filings by permitting counsel for all parties in interest to (a) use a single caption on the numerous documents that

---

[7] Capitalized terms used but not otherwise defined in this declaration shall have the meanings given them in the respective First Day Motion.

will be served and filed herein and (b) file the papers in one case rather than in multiple cases. I understand that joint administration will also protect parties in interest by ensuring that parties in each of the Debtors' respective bankruptcy cases will consist of the various matters before the Court in these cases.

37.     I have also been advised that rights of the respective creditors and stakeholders of each of the Debtors will not be adversely affected by joint administration of these cases inasmuch as the relief sought is purely procedural and is in no way intended to affect substantive rights or permit substantive consolidation of the separate Debtors' estates.

B.     **Consolidated Creditors List Motion**

38.     The Debtors request that the Court (a) authorize them to prepare a consolidated list of creditors in the format currently maintained in the ordinary course of business in lieu of submitting any required mailing matrix and to file a consolidated list of the Debtors' 50 largest unsecured creditors and (b) approve the form and manner of notice of notifying creditors of the commencement of these bankruptcy cases through the mailing of the Notice of Commencement by Prime Clerk, LLC.

39.     The Debtors estimate that they have over 5,000 creditors on a consolidated basis. Contemporaneously with the filing of this motion, the Debtors have filed an application to retain Prime Clerk LLC (the "Claims Agent" or "Prime Clerk") as their notice and claims agent in these bankruptcy cases. The Debtors believe that using the Claims Agent for this purpose will maximize administrative efficiency in these bankruptcy cases and reduce the administrative burdens that would otherwise fall upon this Court and the Clerk of the Court. As Prime Clerk has been retained as the claims agent in the Missouri Cases, their retention in these cases will greatly promote efficiency in the administration of these cases.

40.     The Debtors believe that preparing the consolidated list in the format or formats currently maintained by the Debtors in the ordinary course of business will be sufficient to permit the Claims Agent to promptly provide notices to all applicable parties.  Accordingly, the Debtors believe that maintaining their lists of creditors and equity holders in an electronic format rather than preparing and filing separate matrices will maximize efficiency, increase accuracy, and reduce costs to the benefit of these estates.

C.     **Cash Management Motion**

41.     Prior to the Petition Date, the Debtors employed a cash management system to efficiently collect, transfer, and disburse the funds generated by its business operations (the "Cash Management System").  The Cash Management System facilitates the Debtors' cash forecasting and reporting and enables the Debtors to monitor and record the collection and disbursement of funds and maintain control over the administration of their Bank Accounts (as defined in the Cash Management Motion).

42.     In the ordinary course of business, the Debtors and their non-debtor affiliates receive funds from Abengoa Parent to fund their operations and meet their financial obligations, and would on occasion transfer funds to a "central treasury" held in Madrid and managed by Abengoa Parent. As set forth in further detail in the motion, over the course of these chapter 11 cases, the Debtors request authorization to continue to receive intercompany transfers from Abengoa Parent to continue their business operations and meet their financial obligations, which postpetition intercompany transfers will be afforded administrative priority, *provided, however*, that the Debtors will not transfer funds during the chapter 11 cases to the Abengoa Parent managed central treasury. The Debtors submit that receiving funds from Abengoa Parent is necessary to meet their obligations and fund the chapter 11 cases.

43.     The Cash Management System, with the modifications set forth in the Cash Management Motion, is an ordinary course, essential business practice of the Debtors.  The Cash Management System enables the Debtors to (a) closely control and monitor corporate funds, (b) ensure cash availability, and (c) reduce administrative expenses by facilitating the efficient movement of funds.  Altering the Cash Management System may disrupt payments to key vendors and employees.  Therefore, it is essential that the Debtors be permitted to continue to use their Cash Management System in accordance with their existing cash management procedures.

44.     The Debtors maintain several Bank Accounts in the ordinary course of operating their businesses. I believe that changing the Bank Accounts could significantly and negatively impact Debtors' cash flow as it takes a substantial amount of time to open new accounts. To protect against the unauthorized payment of prepetition obligations, the Debtors represent that if they are authorized to continue to use the Bank Accounts, they will not pay, and each Bank in which the Debtors hold a Bank Account will be directed not to pay, any debts incurred before the Petition Date, other than as authorized by this Court.

45.     To minimize expenses to their estates, the Debtors also request authority to use all checks and other business forms, including electronic forms and paper forms, preprinted letterhead and related documents (collectively, the "Business Forms") that were in existence immediately before the Petition Date.  Given that the Business Forms were used prepetition, they do not include references to the Debtors' current status as debtors in possession.  As is the case with the existing Cash Management System, I believe that requiring the Debtors to change existing Business Forms would unnecessarily distract the Debtors from their efforts to administer these bankruptcy cases and impose needless expenses on the estates, without any

meaningful corresponding benefit. Due to the nature and scope of the Debtors' business operations and the large number of suppliers of goods and services with whom the Debtors deal on a regular basis, it is important that the Debtors be permitted to continue to use the Business Forms without alteration or change and without the "Debtor in Possession" designation.

46.     Accordingly, the Debtors believe that it is in the best interests of their creditors, stakeholders and estates to continue to maintain and use their existing Cash Management System, Bank Accounts, and Business Forms.

**D.     Utilities Motion**

47.     In connection with the operation of their businesses and the management of their properties, the Debtors obtain water, gas, electricity, telephone, and similar utility products and services (collectively, the "Utility Services") from various utility companies (the "Utility Companies") covering a number of utility accounts.  The relief requested in the First Day Motion related to utilities is for all Utility Companies providing Utility Services to the Debtors and is not limited to those listed on the list attached to the motion, except for the Debtors' non-debtor affiliate Simosa IT US, LLC, to which the Debtors will not provide any additional adequate assurance.

48.     Uninterrupted Utility Services are essential to the Debtors' business operations during the pendency of these cases.  Should any Utility Company alter, refuse or discontinue service, even for a brief period, the Debtors' business operations could be severely disrupted, and such disruption would jeopardize the Debtors' efforts.  It is essential that the Utility Services continue uninterrupted.

E.      **Employee Wage Motion**[8]

49.     The Debtors' workforce is comprised of full-time salaried employees, full-time hourly employees, hourly employees who work in the Debtors' plants and projects, regular part-time hourly employees (together, the "Employees").  As of the Petition Date, the Debtors employ approximately 100 Employees.

50.     All Employees are paid biweekly, except for certain hourly plant employees who are paid weekly, by either check or direct deposit.  All Employees are paid through and including the previous Sunday.  For the last payroll, paid on March 25, 2016, the amount was approximately $350,000.  The Debtors' next scheduled payroll date is April 1, 2016, some of which has been prefunded.

51.     The Debtors request that the Court enter an order, authorizing, but not directing, the Debtors:  (a) to pay and/or perform, as applicable, prepetition obligations to current employees, retirees and independent contractors, including accrued prepetition wages, salaries and other cash and non-cash compensation claims, except as otherwise set forth therein (collectively, the "Employee Claims"); (b) to honor and continue in the ordinary course of business until further notice (but not assume), certain of the Debtors' vacation, sick time and holiday time policies, workers' compensation, employee and retiree benefit plans and programs (collectively, the "Employee Benefit Obligations") and to pay all fees and costs in connection therewith, except as otherwise set forth in the motion; (c) to reimburse Employees for prepetition expenses that Employees incurred on behalf of the Debtors in the ordinary course of business (the "Employee Expense Obligations"); (d) to pay all related prepetition

---

[8] The Debtors anticipate that they may need to file an employee retention program or key executive incentive program in order to ensure that the remaining employees stay with the company to assist it with its objectives in chapter 11; however, at this time, the First Day Motion related to employees seeks only to maintain existing employee programs and to ensure all outstanding employee obligations that may have arisen pre-petition may be paid post-petition.

withholdings, and payroll-related taxes associated with the Employee Claims and the Employee Benefit Obligations (the "Employee Taxes"); and (e) to pay all administrative fees and employee contributions to Employee 401(k) plan (the "401(k) Obligations" and, together with the Employee Claims, the Employee Benefit Obligations, the Employee Expense Obligations and the Employee Taxes collectively, the "Prepetition Employee Obligations"), all as described in detail in the Employee Wage Motion.

52.     The Debtors believe, in the exercise of their business judgment, that relief is necessary to avoid immediate and irreparable harm to the Debtors' estates.  Paying prepetition wages, employee benefits and similar items will benefit the Debtors' estates and their creditors by maintaining the Debtors' workforce and allowing the Debtors to conduct the post-petition restructuring process effectively.  Indeed, the Debtors believe that without the relief requested in the Employee Wage Motion being granted, their Employees may seek alternative opportunities before these bankruptcy cases are complete.  Such a development would deplete the Debtors' already small workforce, thereby hindering the Debtors' ability to conduct an orderly restructuring.

53.     Accordingly, the Debtors believe that it is in the best interests of their creditors, stakeholders and estates to continue to honor and pay the Prepetition Employee Obligations.

F.     **Claims Agent Application**

54.     The Debtors request that Prime Clerk be appointed as the claims and noticing agent for the Debtors, including assuming full responsibility for the distribution of notices and the maintenance, processing and docketing of proofs of claim filed in these bankruptcy cases.

55.     Prior to the Petition Date, the Debtors obtained and reviewed engagement proposals from two other court-approved claims and noticing agents to ensure selection through a competitive process.  After initial proposals were received from all three claims and

noticing agents, each of the claims agents were asked to improve those bids and provide proposed budgets. The Debtors submit, based on all proposals obtained and reviewed, that the Claims Agent's rates are competitive and reasonable given the quality of its services and expertise. Moreover, the fact that Prime Clerk has been retained in the Missouri Cases provides additional benefits to their retention in these cases.

56.     Accordingly, the Debtors believe that it is in the best interests of their creditors, stakeholders and estates to retain the Claims Agent for these bankruptcy cases.

## G.     Insurance Motion

57.     In the ordinary course of business, the Debtors maintain various insurance programs providing coverage for, among other things, property, workers' compensation liability, automobile liability, general and umbrella liability and property. As of the Petition Date, the Debtors believe that they are current on their payment obligation under the Insurance Policies.[9] Out of an abundance of caution, the Debtors seek authorization to make payments of Insurance Obligations plus any unforeseen deductible payment amounts for prepetition claims. I have been advised that the payment of Insurance Obligations and maintenance of the Insurance Programs is necessary to comply with the requirements set forth by the U.S. Trustee for this District. The Debtors believe that it is in the best interest of their estate, and therefore the best interest of their creditors, to continue to make payments on the Insurance Obligations, as provided in this motion.

## H.     Tax Motion

58.     Prior to the Petition Date, the Debtors in their ordinary course of business, incurred various Taxes, including corporate franchise taxes, real property taxes, personal

---

[9] Except for as provided in this motion.

property taxes, inventory tax on ethanol and sales and use taxes. The Debtors estimate that they may be liable for approximately $75,000 in Taxes, as of the Petition Date or shortly after the Petition Date.

59.     As of the Petition Date, the Debtors were substantially current in the payment of assessed and undisputed Taxes; however, certain Taxes attributable to the pre-petition period were not yet due. Further, the Debtors believe they may have outstanding checks that were sent to Taxing Authorities but have not yet cleared before the Petition Date. Out of an abundance of caution, the Debtors are also seeking authority to pay any other pre-petition Taxes that may remain outstanding.

60.     Payment of the Taxes is necessary to avoid disruption to the Debtors' business operations. Delayed payment of the Taxes may cause the Taxing Authorities to take precipitous action, including a marked increase in state audits, a flurry of lien filings, and significant administrative maneuvering at the expense of the Debtors' time and resources. Prompt and regular payment of the Taxes will avoid this unnecessary governmental action. Accordingly, the Debtors seek authorization to pay the Taxes as it is in the best interests of their estates and creditors.

I.     **Motion to Extend Time to File SOFAs and Schedules**

61.     The Debtors seek an extension of time to file the required Schedules and Statement of Financial Affairs (the "Schedules and SOFAs") until May 27, 2016. The Debtors provided a list to the Claims Agent of over 5,000 creditors. The preparation of the Schedules and SOFAs will require much time and human resources. During the days leading up to the Petition Date, the Debtors have worked tirelessly to address critical operational matters and meet the demands and pressures incident to the commencement of a chapter 11 case. Given the volume of material that must be compiled and reviewed by the Debtors' limited staff and

professionals and the work required to stabilize the Debtors' business operations, the Debtors

believe that they should be granted an extension to file their Schedules and SOFAs.


[*REMAINDER OF PAGE LEFT INTENTIONALLY BLANK*]

I have reviewed each of the First Day Motions, the facts stated in them, and the descriptions of the relief they request. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the contents of the First Day Motions and the contents of the foregoing declaration are true and correct to the best of my information and belief.

March 29, 2016

_____

William H. Runge, III
Managing Director, Alvarez & Marsal North America, LLC

**EXHIBIT A**

**LIST OF DEBTORS AND AFFILIATES IN BANKRUPTCY**

## ABENGOA COMPANIES IN BANKRUPTCY

On the date hereof, each of the affiliated entities listed below (each, a "Debtor" and, collectively, the "Debtors") filed a voluntary petition in this Court for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors have moved for joint administration of these cases under the case number assigned to the chapter 11 case of Abeinsa Holding Inc.

1. Abeinsa Holding Inc.
2. Abengoa Solar, LLC
3. Abeinsa EPC LLC
4. Abencor USA, LLC
5. Inabensa USA, LLC
6. Nicsa Industrial Supplies LLC
7. Abener Construction Services, LLC
8. Abener North America Construction, LP
9. Abeinsa Abener Teyma General Partnership
10. Abener Teyma Mojave General Partnership
11. Abener Teyma Inabensa Mount Signal Joint Venture
12. Teyma USA & Abener Engineering and Construction Services General Partnership
13. Teyma Construction USA, LLC

On March 28, 2016, each of the affiliated entities listed below filed respective petitions in this Court for relief under chapter 15 of the Bankruptcy Code, seeking recognition of the foreign proceeding pending in Spain as a foreign main proceeding.

14. Abengoa, S.A.
15. Abeinsa Asset Management, S.L. (formerly Abener Inversiones, S.L.)
16. Abeinsa Inversiones Latam, S.L. (formerly Dimange Inversiones 2009, S.L.)
17. Abeinsa, Ingeniería y Construcción Industrial, S.A.
18. Abencor Suministros S.A.
19. Nicsa, Negocios Industriales y Comerciales, S.A.
20. Abener Energía, S.A.
21. Abengoa Bioenergía, S.A.
22. Abeinsa Infraestructuras Medio Ambiente, S.A. (formerly Befesa Agua)
23. Abengoa Finance, S.A.
24. Abengoa Concessions, S.L.
25. Abengoa Solar España, S.A. (formerly Solúcar Energía, S.A.)
26. Abengoa Solar New Technologies S.A. (formerly Solúcar, Investigación y Desarrollo (Solúcar, R&D), S.A.)
27. Abentel Telecomunicaciones, S.A.
28. Asa Desulfuración, S.A. (formerly Befesa Desulfuración, S.A.)
29. Bioetanol Galicia, S.A.
30. Ecoagrícola, S.A.
31. Instalaciones Inabensa, S.A.
32. Eucomsa, Europea de Construcciones Metálicas, S.A.
33. Siema Technologies, S.L. (formerly Telvent Corporation)

34. Teyma, Gestión De Contratos De Construcción E Ingeniería, S.A. Abengoa Water, S.L. (formerly Befesa Water Projects S.L)
35. Abengoa Solar S.A. (formerly Solúcar Solar)
36. Abengoa Greenfield S.A.U.
37. Abengoa Greenbridge, S.A.U.

On February 24, 2016, each of the affiliated entities listed below filed a voluntary petition in the United States Bankruptcy Court for the Eastern District of Missouri for relief under chapter 11 of title 11 of the United States Code. The bankruptcy cases of the affiliates listed below are jointly administered under the chapter 11 case of Abengoa Bioenergy US Holding LLC [Case No. 16-41161].

38. Abengoa Bioenergy US Holding, LLC                          Case No. 16-41161
39. Abengoa Bioenergy of Nebraska, LLC                        Case No. 16-41163
40. Abengoa Bioenergy Company, LLC                            Case No. 16-41165
41. Abengoa Bioenergy Engineering & Construction, LLC         Case No. 16-41168
42. Abengoa Bioenergy Trading US, LLC                         Case No. 16-41167
43. Abengoa Bioenergy Outsourcing, LLC                        Case No. 16-41171

Finally, involuntary petitions were filed against the three affiliated entities listed below under chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Nebraska and the United States Bankruptcy Court for the District of Kansas. The bankruptcy cases for affiliate Abengoa Bioenergy of Nebraska, LLC and Abengoa Bioenergy Company, LLC were converted to cases under chapter 11 of the Bankruptcy Code and transferred to the United States Bankruptcy Court for the Eastern District of Missouri as set forth below.

44. Abengoa Bioenergy of Nebraska, LLC                Bankr. E.D.MO, Case No. 16-41336
45. Abengoa Bioenergy Company, LLC                    Bankr. E.D. MO, Case No. 16-41364
46. Abengoa Bioenergy Biomass of Kansas, LLC          Bankr. D. KS, Case No. 16-10446

# EXHIBIT B

## ABENGOA US ORGANIZATIONAL CHART



**EXHIBIT C**

**ABENGOA GLOBAL CORPORATE CHART**



**EXHIBIT D**

**NOTES**

| Financial Instrument | Principal Amount | Issuer or Borrower | Debtor Guarantor(s) |
|---|---|---|---|
| 8.5% Senior Unsecured Notes due 2016 under a fiscal agency agreement dated as of March 31, 2010 | €500 millior | Abengoa, S.A. | Teyma USA & Abener Engineering and Construction Services General Partnership and Abener Teyma Mojave General Partnership |
| 8.875% Senior Notes due 2017 under an indenture dated as of October 28, 2010 | $650 million | Abengoa Finance, S.A.U | Teyma USA & Abener Engineering and Construction Services General Partnership and Abener Teyma Mojave General Partnership |
| 8.875% Senior Notes due 2018 under an indenture dated as of February 5, 2013 | €550 millior | Abengoa Finance, S.A.U | Teyma USA & Abener Engineering and Construction Services General Partnership and Abener Teyma Mojave General Partnership |
| 5.5% Senior Notes due 2019 issued under an indenture dated as of September 30, 2014 | €265 millior | Abengoa Greenfield, S.A. | Teyma USA & Abener Engineering and Construction Services General Partnership and Abener Teyma Mojave General Partnership |
| 6.5% Senior Notes due 2019 issued under an indenture dated as of September 30, 2014 | $300 million | Abengoa Greenfield, S.A. | Teyma USA & Abener Engineering and Construction Services General Partnership and Abener Teyma Mojave General Partnership |
| 6.25% Senior Unsecured Convertible Notes due 2019 issued under and indenture dated as of January 17, 2013 | $400 million (approx.. $160 million outstanding) | Abengoa, S.A. | Teyma USA & Abener Engineering and Construction Services General Partnership and Abener Teyma Mojave General Partnership |
| 7.75% Senior Notes due 2020 issued under an indenture dated as of December 13, 2013 | $450 million | Abengoa Finance, S.A.U | Teyma USA & Abener Engineering and Construction Services General Partnership and Abener Teyma Mojave General Partnership |
| 7.0% Senior Notes due 2020 issued under an indenture dated as of April 21, 2015 | €375 millior | Abengoa Finance, S.A.U | Teyma USA & Abener Engineering and Construction Services General Partnership and Abener Teyma Mojave General Partnership |
| 6.0% Senior Notes due 2021 issued under an indenture dated as of March 27, 2014 | €500 millior | Abengoa Finance, S.A.U | Teyma USA & Abener Engineering and Construction Services General Partnership and Abener Teyma Mojave General Partnership |
| $279 million 5.125% Exchangeable Notes due 2017 | $279 million ($1 million outstanding) | Abengoa, S.A. | Teyma USA & Abener Engineering and Construction Services General Partnership and Abener Teyma Mojave General Partnership |

| Financial Instrument | Principal Amount | Issuer or Borrower | Debtor Guarantor(s) |
|---|---|---|---|
| That certain syndicated credit facility dated September 30, 2014 | €1,321.0 million | Abengoa, S.A. and related companies | Teyma USA & Abener Engineering and Construction Services General Partnership and Abener Teyma Mojave General Partnership |
| That certain revolving credit agreement dated September 23, 2015 | €165 million (€125 million drawn) | Abengoa, S.A. and related companies | Teyma USA & Abener Engineering and Construction Services General Partnership and Abener Teyma Mojave General Partnership |
| That certain finance contract dated July 6, 2015 | €125 million | Abengoa , S.A. | Teyma USA & Abener Engineering and Construction Services General Partnership and Abener Teyma Mojave General Partnership |
| That certain emergency credit facility dated December 24, 2015 | €106 million | Abengoa Concession Investment Limited | Teyma USA & Abener Engineering and Construction Services General Partnership and Abener Teyma Mojave General Partnership |
| That certain ICO credit agreement dated July 30, 2015 | €30 million | Abengoa, S.A. and related companies | Teyma USA & Abener Engineering and Construction Services General Partnership and Abener Teyma Mojave General Partnership |