## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ABEINSA HOLDING INC., *et al.*, | Case No. 16-10790 (KJC) |
| Debtors.[1] | (Jointly Administered) |

### DEBTORS' DISCLOSURE STATEMENT
### PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE

DLA PIPER LLP (US)
R. Craig Martin (DE 005032)
1201 North Market Street, Suite 2100
Wilmington, Delaware 19801
Telephone: (302) 468-5700
Facsimile: (302) 394-2341
E-mail: craig.martin@dlapiper.com

Richard A. Chesley (admitted *pro hac vice*)
Oksana Koltko Rosaluk (Ill. Bar No. 6303739)
203 North LaSalle Street, Suite 1900
Chicago, Illinois 60601
Telephone: (312) 369-4000
Facsimile: (312) 236-7516
E-mail: richard.chesley@dlapiper.com
          oksana.koltko@dlapiper.com

Jamila Justine Willis (N.Y. Bar  No. 4918231)
1251 Avenue of the Americas, Floor 25
New York, New York 10020
Telephone: (212) 335-4500
E-mail: jamila.willis@dlapiper.com

*Counsel to Debtors and Debtors in Possession*

Dated:  September 26, 2016

---

[1]   The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Abeinsa Holding Inc. (9489); Abeinsa EPC LLC (1176); Abencor USA, LLC (0184); Abener Construction Services, LLC (0495); Abener North America Construction, LP (5989); Abengoa Solar, LLC (6696); Inabensa USA, LLC (2747); Nicsa Industrial Supplies LLC (9076); Teyma Construction USA, LLC (0362); Abeinsa Abener Teyma General Partnership (2513); Abener Teyma Mojave General Partnership (2353); Abener Teyma Hugoton General Partnership (7769); Abener Teyma Inabensa Mount Signal Joint Venture (9634); Teyma USA & Abener Engineering and Construction Services General Partnership (6534); Abengoa US Holding, LLC (6871); Abengoa US, LLC (9573); Abengoa US Operations, LLC (1268); Abengoa Bioenergy Biomass of Kansas, LLC (1119); Abengoa Bioenergy Hybrid of Kansas, LLC (9711); Abengoa Bioenergy Technology Holding, LLC (7434); Abengoa Bioenergy New Technologies, LLC (8466); Abengoa Bioenergy Holdco, Inc. (8864); Abengoa Bioenergy Meramec Holding, Inc. (1803). The chapter 11 case of Abengoa Bioenergy Biomass of Kansas, LLC, Case No. 16-10876, pending before the United States Bankruptcy Court for the District of Delaware (the "Court") is stayed pending further order of the Court.

**THE DEADLINE BY WHICH EACH HOLDER OF AN IMPAIRED CLAIM ENTITLED TO VOTE ON THE PLAN MUST CAST A PROPERLY COMPLETED AND DELIVERED BALLOT FOR ITS VOTE TO ACCEPT OR REJECT THE PLAN TO BE COUNTED IS [●] AT 4:00 P.M. (PREVAILING EASTERN TIME), UNLESS EXTENDED.**

---

**Summary of Important Deadlines**
**(All times are Prevailing Eastern Time)**

**Voting Deadline**:  [●], 2016 at 4:00 p.m.

**Confirmation Objection Deadline**:  [November 22], 2016 at 4:00 p.m.

**Confirmation Hearing**:  November 29, 2016 at 1:00 p.m.

These dates are subject to extension as provided in the Voting Procedures Order.

---

**Questions and Answers About the Plan**

**What are holders of Claims being asked to approve?**

Holders of Claims are being asked to vote to accept the Plan.  Pursuant to the Plan, among other things, the Debtors will (1) liquidate certain of the Debtors, (2) distribute Cash and Replacement Guarantees, and (3) restructure certain other of the Debtors to implement a global restructuring agreement of Abengoa, S.A. ("Abengoa" or the "Parent"), as sponsor of the Plan, and members of the Parent's corporate group.

**What will I receive under the Plan?**

Depending on your class of Claim, you will receive one or more of (1) Cash, (2) Replacement Guarantees or (3) interests in a liquidating trust that will hold designated assets of the Liquidating Debtors.  Section II of this Disclosure Statement, entitled "Executive Summary," summarizes the classification and treatment of Claims and Equity Interests under the Plan and also estimates the recovery for each Class.

**Who is entitled to vote?**

Only Impaired Classes of Claims that are not deemed to have rejected the Plan are entitled to vote to accept or reject the Plan.  See Section I.A of this Disclosure Statement, entitled "Holders of Claims Entitled to Vote," for a summary of which Classes of Claims and Equity Interests are entitled to vote.

**What vote is required for approval of the Plan?**

Under the Bankruptcy Code, unless the "cram down" provisions of the Bankruptcy Code are used, a plan of reorganization can only be confirmed if votes to accept the Plan are received from:  (1) two-thirds in dollar amount and a simple majority in number of claimants for each Impaired Class of Claims; and (2) two-thirds in amount for each Impaired Class of Equity Interests.  In addition, the Bankruptcy Code provides that only the votes of those holders of Claims entitled to vote who actually submit votes on a plan are counted in determining whether the necessary majorities have been received.  **YOUR VOTE IS VERY IMPORTANT.**

**How do the Debtors recommend that constituents vote?**

The Debtors urge holders of Claims to vote to accept the Plan.  The Debtors believe that confirmation and implementation of the Plan is preferable to the other alternatives available to the Debtors, which are described in Section IX, entitled "Alternatives to Confirmation and Consummation of the Plan," because the Debtors believe the Plan will provide the greatest recoveries to holders of Claims.  Other alternatives could involve consideration with a lower value, significant delay, uncertainty, and substantial additional administrative costs.

**What are the United States federal income tax consequences of the Plan for holders of Claims?**

The tax consequences of distributions under the Plan to the holders of Allowed Claims will vary based on a number of factors.  See Section VIII of this Disclosure Statement, entitled "Certain Federal Income Tax Consequences of the Plan," for a summary of the federal income tax consequences of the Plan.  However, all holders of Claims are urged to consult their own tax advisors for the federal, state, local, and other tax consequences of the transactions contemplated by the Plan.

**How do I vote?**

Please use the enclosed ballot to vote to accept or reject the Plan and return the completed ballot to Prime Clerk at the address listed below or, if your securities are held through an intermediary, to such intermediary.  To be counted, your original ballot must be received by Prime Clerk no later than 4:00 p.m. (prevailing Eastern Time) on [●], 2016. If you hold Claims in more than one Class, you must submit a separate ballot for each Class in which you are entitled to vote.  Prior to completing your ballot, please carefully read and consider the information contained in this Disclosure Statement, the Plan, any Plan Supplement, the exhibits attached thereto and the agreements and documents described therein.

**What are the risks related to the Plan?**

You should carefully review Section VI of this Disclosure Statement, entitled "Risk Factors," for a discussion of the risks relating to the Plan.

**When will the Plan become effective?**

The Plan will become effective when all of the pre-confirmation and post-confirmation conditions are satisfied or waived. The conditions to the Plan becoming effective are set forth in this Disclosure Statement. See Sections IV.E entitled "Conditions Precedent to Confirmation and Effectiveness of the Plan" for a list of certain additional conditions to confirmation and effectiveness of the Plan.

**Who can help answer my questions?**

If you have any questions regarding this Disclosure Statement or the Plan, you should contact counsel to the Debtors via telephone or email to Richard A. Chesley, (312) 369-4000 or richard.chesley@dlapiper.com, or R. Craig Martin, (302) 468-5700 or craig.martin@dlapiper.com. Debtors' counsel will attempt to respond to you in a timely manner. If you have any questions relating to voting on the Plan or if you need a new ballot, you should contact the Company's Claims Agent, Prime Clerk, at:

<div align="center">

Abeinsa Holding Inc. Ballot Processing
c/o Prime Clerk LLC
830 3rd Avenue, 3rd Floor
New York, NY 10022
855-650-7243
Abeinsaballots@primeclerk.com

</div>

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ............................................................................................................. 3

    A.     Holders of Claims Entitled to Vote ................................................................... 3

    B.     Voting Procedures .............................................................................................. 6

    C.     Confirmation Hearing ........................................................................................ 7

II.    EXECUTIVE SUMMARY ........................................................................................... 7

    A.     Overview of the Plan of Reorganization ........................................................... 7

III.   GENERAL INFORMATION ...................................................................................... 12

    A.     Overview of Chapter 11 ................................................................................... 12

    B.     Description and History of the Debtors' Businesses ........................................ 12

    C.     Events Leading to the Chapter 11 Filings ....................................................... 18

    D.     Material Events of the Chapter 11 Cases ......................................................... 26

IV.    SUMMARY OF THE PLAN OF REORGANIZATION ............................................ 32

    A.     Means of Implementation of the Plan .............................................................. 32

    B.     Claims .............................................................................................................. 41

    C.     Classification and Treatment of Claims under the Plan ................................... 45

    D.     Treatment of Executory Contracts and Unexpired Leases .............................. 56

    E.     Conditions Precedent to Confirmation and Effectiveness of the Plan ............. 57

    F.     Waiver .............................................................................................................. 57

    G.     Implementation and Effect of Confirmation of the Plan ................................. 58

V.     CONFIRMATION OF THE PLAN ............................................................................ 62

    A.     Solicitation and Voting Procedures ................................................................. 62

    B.     The Confirmation Hearing ............................................................................... 66

    C.     Confirmation .................................................................................................... 66

    D.     Consummation .................................................................................................. 70

VI.    RISK FACTORS ......................................................................................................... 70

    A.     Risk Factors Relating to the Chapter 11 Cases ............................................... 70

    B.     Risk factors and considerations Regarding the Global Restructuring ............. 73

VII.   SECURITIES LAWS MATTERS ............................................................................... 75

    A.     Applicability of the Bankruptcy Code and Federal and Other Securities Laws ........... 75

VIII.  CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ............. 76

    A.     U.S. FEDERAL INCOME TAX CONSEQUENCES TO THE DEBTORS ............. 77

    B.     U.S. Federal Income Tax Consequences to Holders of Certain Claims ............. 79

    C.     Information Reporting and Withholding ........................................................... 80

IX.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ............ 80

    A.     Liquidation Under Chapter 7 ........................................................................... 80

**TABLE OF CONTENTS**
(continued)

Page

B.      Alternative Plan of Reorganization ................................................................ 81

X.    MISCELLANEOUS PROVISIONS .................................................................................. 81

A.      Modification of Plan ....................................................................................... 81

B.      Revocation of Plan .......................................................................................... 81

C.      Binding Effect .................................................................................................. 81

D.      Successors and Assigns .................................................................................... 81

E.      United States Trustee's Fees ........................................................................... 82

F.      Governing Law ................................................................................................ 82

G.      Reservation of Rights ...................................................................................... 82

H.      Article 1146 Exemption ................................................................................... 82

I.      Section 1125(e) Good Faith Compliance ........................................................ 82

J.      Further Assurances .......................................................................................... 82

K.      Service of Documents ...................................................................................... 82

L.      Filing of Additional Documents ...................................................................... 83

M.      No Stay of Confirmation Order ....................................................................... 83

XI.   RETENTION OF JURISDICTION BY THE BANKRUPTCY COURT .......................... 83

XII.  CONCLUSION AND RECOMMENDATION .................................................................. 84

**TABLE OF CONTENTS**
(continued)

| | |
|---|---|
| EXHIBIT A | Plan of Reorganization |
| EXHIBIT B | Disclosure Statement Order |
| EXHIBIT C | The Debtors' Liquidation Analysis |
| EXHIBIT D | Debtors' Financial Projections |
| EXHIBIT E | Abengoa U.S. Corporate Organizational Chart |
| EXHIBIT F | Abengoa Global Corporate Organizational Chart |
| EXHIBIT G | Standstill Agreement |
| EXHIBIT H | Master Restructuring Agreement |
| EXHIBIT I | Abengoa Financial Data |

Nothing contained in this Disclosure Statement (this "<u>Disclosure Statement</u>") shall constitute an offer, acceptance, or a legally binding obligation of the Debtors, any of the Debtors' affiliates or any other person.  This Disclosure Statement is subject to approval by the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>") and other customary conditions.  Absent approval by the Bankruptcy Court, this Disclosure Statement is not a solicitation of acceptances or rejections of the Debtors' Plan of Reorganization under chapter 11 of the Bankruptcy Code (the "<u>Plan</u>"), as the same may be amended or modified from time to time, a copy of which is attached to this Disclosure Statement as <u>Exhibit A</u>. Acceptances or rejections with respect to the Plan may not be solicited until this Disclosure Statement has been approved by the Bankruptcy Court.  Such a solicitation will only be made in compliance with applicable provisions of securities and/or bankruptcy laws.  Future developments relating to the matters described herein may require modifications, additions, or deletions to this Disclosure Statement.

<u>IMPORTANT NOTICE</u>

Only documents, including this Disclosure Statement and its related documents that are approved by the Bankruptcy Court pursuant to section 1125(b) of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") may be used in connection with soliciting votes on the Plan.  No statements have been authorized by the Bankruptcy Court concerning Abeinsa Holding Inc. ("<u>Abeinsa</u>") and certain of its affiliates and subsidiaries that are debtors and debtors in possession (collectively, the "<u>Debtors</u>") or the value of their assets, except as explicitly set forth in this Disclosure Statement.

Please refer to the Plan (or, where indicated, certain motions filed with the Bankruptcy Court) for definitions of the capitalized terms that are used but not defined in this Disclosure Statement.

The Debtors reserve the right to file amendments to the Plan and Disclosure Statement from time to time.  The Debtors urge you to read this Disclosure Statement carefully for a discussion of voting instructions; recovery information; classification of claims; the history of the Debtors and the Chapter 11 Cases; the Debtors' businesses, properties, and results of operations, historical and projected financial results; the Parents' businesses, properties, and results of operations, historical and projected financial results; and a summary and analysis of the Plan.

The Plan and this Disclosure Statement are not required to be prepared in accordance with the requirements of federal or state securities laws or other applicable non-bankruptcy law.  This Disclosure Statement is being submitted for approval, but has not yet been approved, by the Bankruptcy Court.  Any such approval by the Bankruptcy Court of this Disclosure Statement as containing "adequate information" will not constitute endorsement of the Plan by the Bankruptcy Court, and none of the Securities and Exchange Commission (the "<u>SEC</u>"), any state securities commission or similar public, governmental or regulatory authority has approved this Disclosure Statement, the Plan or the securities offered under the Plan, or has passed on the accuracy or adequacy of the statements in this Disclosure Statement.  Any representation to the contrary is a criminal offense.  Persons trading in or otherwise purchasing, selling or transferring securities of the Parent should evaluate this Disclosure Statement in light of the purposes for which it was prepared.

This Disclosure Statement contains only a summary of the Plan and certain other documents.  It is not intended to replace a careful and detailed review and analysis of the Plan and other documents, but only to aid and supplement such review.  This Disclosure Statement is qualified in its entirety by reference to the Plan, any supplements to the Plan filed with the Bankruptcy Court subsequent to the filing date of this Disclosure Statement (collectively, the "<u>Plan Supplement</u>") and the exhibits attached hereto and thereto and the agreements and documents described herein and therein.  If there is a conflict between the Plan and this Disclosure Statement, the provisions of the Plan will govern.  You are encouraged to review the full text of the Plan and the Plan Supplement and to read carefully the entire Disclosure Statement, including all exhibits hereto, before deciding how to vote with respect to the Plan.

Except as otherwise indicated, the statements in this Disclosure Statement are made as of the date on which this Disclosure Statement was filed, and the delivery of this Disclosure Statement does not imply that the information contained in this Disclosure Statement is correct at any time after such date.  Any estimates

of claims or interests in this Disclosure Statement may vary from the final amounts of claims or interests allowed by the Bankruptcy Court.

You should not construe this Disclosure Statement as providing any legal, business, financial or tax advice, and you should consult with your own legal, business, financial and tax advisors regarding the transactions contemplated by the Plan.

> TO ENSURE COMPLIANCE WITH INTERNAL REVENUE SERVICE CIRCULAR 230, YOU ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON BY YOU, FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON YOU UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE SOLICITATION OF VOTES IN FAVOR OF THE PLAN; AND (C) YOU SHOULD SEEK ADVICE BASED ON YOUR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

As to contested matters, adversary proceedings and other actions or threatened actions, this Disclosure Statement is not, and is in no event to be construed as, an admission, or stipulation of the Debtors. Instead, this Disclosure Statement is, and is for all purposes to be construed as, solely and exclusively a statement made by the Debtors in settlement negotiations.

THE DEBTORS URGE HOLDERS OF CLAIMS TO VOTE TO ACCEPT THE PLAN.

## I.    <u>INTRODUCTION</u>

The Debtors submit this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code to holders of Claims against and Equity Interests in the Debtors in connection with:  (1) the solicitation of acceptances of the Plan, filed by the Debtors with the Bankruptcy Court; and (2) the hearing to consider confirmation of the Plan (the "<u>Confirmation Hearing</u>"), scheduled to commence on November 29, 2016 at 1:00 p.m. (prevailing Eastern time). **Unless otherwise indicated or defined herein, all capitalized terms contained herein have the meanings ascribed to them in the Plan or in the Master Restructuring Agreement.**

Attached as exhibits to this Disclosure Statement are:

- The Plan (<u>Exhibit A</u>);

- Order of the Bankruptcy Court, dated [●], 2016 (the "<u>Disclosure Statement Order</u>"), which, among other things, approves this Disclosure Statement and establishes certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan (<u>Exhibit B</u>);

- The Debtors' Liquidation Analysis (<u>Exhibit C</u>);

- Financial Projections (<u>Exhibit D</u>);

- Abengoa U.S. Corporate Organizational Chart (<u>Exhibit E</u>);

- Abengoa Global Corporate Organizational Chart (<u>Exhibit F</u>);

- Standstill Agreement (<u>Exhibit G</u>);

- Master Restructuring Agreement (<u>Exhibit H</u>); and

- Abengoa Financial Data (<u>Exhibit I</u>).

In addition, a ballot for the acceptance or rejection of the Plan and, if eligible, election of convenience class treatment, is enclosed with each copy of this Disclosure Statement that is submitted to the holders of Claims that are entitled to vote to accept or reject the Plan.

On [●], 2016, after notice and a hearing, the Bankruptcy Court entered the Disclosure Statement Order, approving this Disclosure Statement as containing adequate information of a kind, and in sufficient detail, to enable hypothetical, reasonable persons typical of the Debtors' creditors and equity holders to make an informed judgment regarding the Plan.  **APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.**

The Disclosure Statement Order sets forth in detail the deadlines, procedures and instructions for voting to accept or reject the Plan and filing objections to confirmation of the Plan, the record date for voting purposes and the applicable standards for tabulating votes.  In addition, detailed voting instructions accompany each ballot.  Each holder of a Claim entitled to vote on the Plan should read this Disclosure Statement, the Plan, the Plan Supplement, and the exhibits attached hereto and thereto and the agreements and documents described herein and therein, the Disclosure Statement Order and the instructions accompanying the ballot in their entirety before voting on the Plan. These documents contain important information concerning the classification of Claims for voting purposes and the tabulation of votes.  No solicitation of votes to accept the Plan may be made except pursuant to section 1125 of the Bankruptcy Code.

### A.    Holders of Claims Entitled to Vote

Under the Bankruptcy Code, only holders of allowed claims in impaired classes of claims that are not deemed to have rejected a proposed plan are entitled to vote to accept or reject a proposed plan of reorganization.

A class is "impaired" under a plan unless, with respect to each claim or interest of such class, the plan:

- leaves unaltered the legal, equitable or contractual rights to which the holder of the claim or interest is entitled; or

- notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment on account of a default, cures any default, reinstates the original maturity of the obligation, compensates the holder for any damages incurred as a result of reasonable reliance on such provision or law and does not otherwise alter the legal, equitable or contractual rights of such holder based on such claim or interest.

Classes of claims that are unimpaired under a chapter 11 plan conclusively are presumed to have accepted the plan and are not entitled to vote to accept or reject the plan. Classes of claims in which the holders will receive no recovery under a chapter 11 plan are deemed to have rejected the plan and are also not entitled to vote to accept or reject the plan.

---

**Which Classes of Claims and Equity Interests Are Entitled to Vote on the Plan?\***

The following Classes of Claims are Impaired and entitled to vote on the Plan:

- **EPC Reorganizing Debtor Group**[2]
  - Class 3A EPC Reorganizing Spanish Affected Debt Claims
  - Class 3B EPC Reorganizing US Debt Claims
  - Class 4 EPC Reorganizing General Unsecured Claims
  - Class 5 EPC Reorganizing Litigation Claims
  - Class 6A EPC Reorganizing Affected Debt Bonding Claims
  - Class 6B EPC Reorganizing Non-Affected Debt Bonding Claims

- **EPC Liquidating Debtor Group**
  - Class 3 EPC Liquidating General Unsecured Claims
  - Class 3A EPC Liquidating US Debt Claims

- **Bioenergy and Maple Liquidating Debtor Group**
  - Class 3 Bioenergy and Maple Liquidating General Unsecured Claims
  - Class 3A Bioenergy and Maple Liquidating US Debt Claims

- **Solar Reorganizing Debtor Group**
  - Class 3 Solar Reorganizing US Debt Claims
  - Class 4 Solar Reorganizing General Unsecured Claims
  - Class 5 Solar Reorganizing Litigation Claims
  - Class 6A Solar Reorganizing Affected Debt Bonding Claims
  - Class 6B Solar Reorganizing Non-Affected Debt Bonding Claims

---

\*    The Debtors reserve the right to classify and seek an order of the Bankruptcy Court designating these Claims (as applicable) as unimpaired and not entitled to vote, and any impairment designation contained herein shall have no probative value with respect to any request for such classification order.

---

[2]    The Debtors foresee that additional Non Material Obligors within the Abengoa Group may file voluntary petitions for relief under chapter 11 of the Bankruptcy Code prior to the Confirmation Date, and thus the Plan contains a defined term of "Future Chapter 11 Debtors" so that if any other companies within the Abengoa Group file chapter 11, they can participate in the Plan.

---

**Which Classes of Claims and Equity Interests are Not Entitled to Vote on the Plan?**

The following Classes of Claims are not Impaired:

- *Class 1 EPC Reorganizing Secured Claims*;
- *Class 2 EPC Reorganizing Priority Claims*;
- *Class 1 EPC Liquidating Secured Claims;*
- *Class 2 EPC Liquidating Priority Claims;*
- *Class 1 Solar Reorganizing Secured Claims;*
- *Class 2 Solar Reorganizing Priority Claims;*
- *Class 1 Bioenergy and Maple Liquidating Secured Claims; and*
- *Class 2 Bioenergy and Maple Liquidating Priority Claims.*

As a result, holders of Claims in these classes conclusively are presumed to have accepted the Plan and will not be entitled to vote to accept or reject the Plan.  If the Debtors obtain a Bankruptcy Court Order designating other Classes of Claims as unimpaired, those classes will also not be entitled to vote to accept or reject the Plan.

The following Claims and Equity Interests are also not entitled to vote on the Plan:

- *Class 7A EPC Reorganizing Intercompany Claims by Non-Debtor Affiliates*;
- *Class 7B EPC Reorganizing Intercompany Claims by Debtor Affiliates*;
- *Class 8 EPC Reorganizing Equity Interests*;
- *Class 4 EPC Liquidating Intercompany Claims*;
- *Class 5 EPC Liquidating Equity  Interests*;
- *Class 7A Solar Reorganizing Intercompany Claims by Non-Debtor Affiliates*;
- *Class 7B Solar Reorganizing Intercompany Claims by Debtor Affiliates*;
- *Class 8 Solar Reorganizing Equity Interests*;
- *Class 4 Bioenergy and Maple Liquidating Intercompany Claims*; and
- *Class 5 Bioenergy and Maple Liquidating Equity Interests.*

---

The Bankruptcy Code defines "acceptance" of a plan by a class of impaired Claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount and more than one-half in number of the claims that cast ballots for acceptance or rejection of the plan.  In the event that the Debtors obtain an order of the Bankruptcy Court holding that any Class of Claims is unimpaired, each holder of an Allowed Claim in any such Class will be conclusively presumed to have accepted the Plan and any votes to accept or reject the Plan submitted by holders of Claims in any such Class will be null, void, and have no effect.

A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.  See Section V.C, entitled "Confirmation."

If a Class of Claims entitled to vote on the Plan rejects the Plan, the Debtors reserve the right to amend the Plan, request confirmation of the Plan under section 1129(b) of the Bankruptcy Code, or both.  Section 1129(b) permits the confirmation of a plan of reorganization notwithstanding the non-acceptance of a plan by one or more impaired classes of claims through a procedure known as "cram-down."  See Section V.C.3, entitled "Cram Down." Under section 1129(b), a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class.  See Section V.C.3, entitled "Cram Down."

If a Class of Claims entitled to vote does not vote to accept the Plan, the Debtors will announce their determination on whether to request confirmation of the Plan under section 1129(b) of the Bankruptcy Code prior to or at the Confirmation Hearing.

B.   **Voting Procedures**

---

**Procedures for Voting on the Plan**

*How do I vote on the Plan?* For a vote to be counted, Prime Clerk, the Debtors' voting and claims agent (the "<u>Voting Agent</u>" or the "<u>Claims Agent</u>"), must receive an original, signed ballot (or, in the case of securities held through an intermediary, the master ballot cast on your behalf) in a form approved by the Bankruptcy Court.  Faxed copies and votes sent on other forms will *not* be accepted.

*When does the vote need to be received?* **The deadline for the receipt by the Voting Agent of properly completed ballots (or, in the case of securities held through an intermediary, the master ballot cast on your behalf) is 4:00 p.m. (prevailing Eastern Time) on [●], 2016 (the "<u>Voting Deadline</u>").  The Voting Deadline is subject to extension as provided in the voting procedures order.**

*Which members of the Impaired Classes may vote?* Within an Impaired Class, only holders of Allowed Claims who held their Claims on the voting record date may vote to accept or reject the Plan.  The voting record date for determining the members of Impaired Classes that may vote on the Plan is [●], 2016.  In addition, holders of Claims that are temporarily Allowed for voting purposes, pursuant to an order of the Bankruptcy Court, may vote to accept or reject the Plan.  If you hold Claims in more than one Class, you must submit a separate ballot for each Class in which you are entitled to vote.

*Whom should I contact if I have questions or need a ballot?* You may contact the Claims Agent at Prime Clerk, 855-650-7243 or abeinsaballots@primeclerk.com with questions or requests related to voting on the Plan.

---

If you are entitled to vote to accept or reject the Plan, a ballot is enclosed for voting on the Plan.  The ballots have been specifically designed for the purpose of soliciting votes on the Plan from each Class entitled to vote.  For this reason, when voting on the Plan, **please use only the ballot sent to you with this Disclosure Statement or one sent to you by Prime Clerk.  If you hold Claims in more than one Class, you <u>must</u> use a separate ballot for voting with respect to each Class of Claims that you hold.**  Please vote and return your ballot(s) in the pre-addressed envelope accompanying each ballot to the Voting Agent.

**The Debtors assume no responsibility for an intermediary's failure to timely and accurately transmit a beneficial holder's instructions.  Any executed ballot received that does not indicate either an acceptance or rejection of the Plan will not be counted.  Any ballots received after the Voting Deadline will not be counted.  All ballots must contain an original signature to be counted.  No other ballots, including those received by facsimile, will be counted.**

The Voting Agent will tabulate results of the voting on the Plan on a Class-by-Class basis and will prepare an affidavit for filing with the Bankruptcy Court detailing the methodology used in tabulating such votes, as well as the results of the voting.

**Any Claim in an Impaired Class as to which an objection or request for estimation is pending or which is scheduled by the Debtors as unliquidated, disputed or contingent and for which no proof of claim has been filed is not entitled to vote (except to the extent so indicated in any such objection or request for estimation) unless the holder has obtained an order of the Bankruptcy Court temporarily allowing such Claim for the purpose of voting on the Plan.**

If you are a holder of a Claim entitled to vote on the Plan and did not receive a ballot, received an incorrect or damaged ballot or lost your ballot, or if you have any questions concerning this Disclosure Statement, the Plan or the procedures for voting on the Plan, please contact the Claims Agent at Prime Clerk, at 855-650-7243 or abeinsaballots@primeclerk.com.

This Disclosure Statement, the Plan, the Plan Supplement, the Disclosure Statement Order and any other documents approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code and the exhibits

attached hereto and thereto and the agreements and documents described herein and therein are the only materials that you should use in determining how to vote on the Plan.

---

**Voting Recommendation**

The Debtors believe that confirmation and implementation of the Plan is preferable to any of the other alternatives available to the Debtors, which are described in Section IX, titled "Alternatives to Confirmation and Consummation of the Plan," because the Debtors believe the Plan will provide the greatest recoveries to holders of Claims. Other alternatives could involve significant delay, uncertainty, and substantial additional administrative costs. **The Debtors encourage holders of Claims to vote to _accept_ the Plan.**

---

C. Confirmation Hearing

---

**When and where is the Confirmation Hearing and what is the deadline for objections?**

- Pursuant to section 1128 of the Bankruptcy Code, the Confirmation Hearing will commence on November 29, 2016 at 1:00 p.m. (prevailing Eastern Time), before the Honorable Kevin J. Carey, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, Courtroom 5, Fifth Floor, 824 North Market Street, Wilmington, DE 19801. The Confirmation Hearing may be adjourned from time to time by the Debtors without further notice, except for the announcement of the adjournment date made at or before the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

- Any objection to confirmation of the Plan must be filed with the Bankruptcy Court and served in accordance with the Disclosure Statement Order on or before 4:00 p.m. (prevailing Eastern Time) on [November 22], 2016. Objections to confirmation of the Plan are governed by Rule 9014 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"). Any objection to confirmation must be made in writing and specify in detail the name and address of the objector, all grounds for the objection and the amount and description of the Claim or Equity Interest held by the objector.

---

## II.    EXECUTIVE SUMMARY

### A.  Overview of the Plan of Reorganization

#### 1.  Distributable Value

Although the Plan is a single document, it constitutes four different plans, of which two are plans of reorganization and two are plans of liquidation, one for each of the Debtor groups into which the Debtors have been partially[3] substantively consolidated, where applicable. A complete discussion of the partial substantive consolidation is available in Section IV.B.1 of this Disclosure Statement.

The following chart sets forth the Debtors' estimate of the value of the cash to be held by each Debtor group as of the Effective Date to be distributed to holders of Allowed General Unsecured Claims.

---

[3]    The Debtors have been partially substantively consolidated in that only certain of the Debtors have been substantively consolidated. The substantially consolidated Debtors are organized into the following distinct Debtor groups: the EPC Reorganizing Debtor Group, the EPC Liquidating Debtor Group and the Bioenergy and Maple Liquidating Debtor Group. The Solar Reorganizing Debtor Group is not substantively consolidated.

The chart lists by Debtor group the total General Unsecured Claims pending against each Debtor group and the Debtors' estimate of the likely amount of Allowed General Unsecured Claims, with and without postpetition interest.

The allocations and estimates set forth in the chart are based on a large number of assumptions and judgments both factual and legal and are subject to the Risk Factors described in Section VI below.

**Allocation to General Unsecured Claims - Reorganizing Debtor Groups:**

| Class of Claims | Estimated Distributable Value on Effective Date | Total Pending Claims | Estimate of Allowed Claims (Excluding Postpetition Interest) | Estimate of Allowed Claims (Including Postpetition Interest) |
|---|---|---|---|---|
| EPC Reorganizing | $[ ] | $[ ] | $[ ] | $[ ] |
| Solar Reorganizing | $[ ] | $[ ] | $[ ] | $[ ] |
| *Total* | $[ ] | $[ ] | $[ ] | $[ ] |

**Allocation to General Unsecured Claims – Liquidating Debtor Groups:**

| Class of Claims | Estimated Distributable Value on Effective Date | Total Pending Claims | Estimate of Allowed Claims (Excluding Postpetition Interest) | Estimate of Allowed Claims (Including Postpetition Interest) |
|---|---|---|---|---|
| EPC Liquidating | $[ ] | $[ ] | $[ ] | $[ ] |
| Bioenergy and Maple Liquidating | $[ ] | $[ ] | $[ ] | $[ ] |
| *Total* | $[ ] | $[ ] | $[ ] | $[ ] |

**Estimated Recoveries**

Under the terms of the Plan:

- Holders of Allowed Claims in *Class 1 – Secured Claims* and *Class 2 – Priority Claims* under each Debtor group will receive payment in full on the Effective Date of the Plan.

- Holders of Allowed Claims in *Class 3A – EPC Reorganizing Spanish Affected Debt* will receive no Cash distribution from the Debtors. Instead, such Holders will receive a Replacement Guaranty with respect to the remaining amount of the Spanish Affected Debt after giving effect to the Standard Restructuring Terms, which terms will write off 97% of the claims held by holders of Spanish Affected Debt and provide that the remaining 3% will be paid out over a ten (10) year period at a 0% interest rate under the terms of the Master Restructuring Agreement.

- Holders of Allowed Claims in *Class 3 – EPC Liquidating General Unsecured Claims*, *Class 3 – Bioenergy and Maple Liquidating General Unsecured Claims, Class 3A – EPC Liquidating US Debt Claims,* and *Class 3A – Bioenergy and Maple Liquidating US Debt Claims* will receive a cash distribution equal to their pro rata share of the Liquidating Trusts for the respective Debtor group.

- Holders of Allowed Claims in the following Classes of Claims will receive payment based on the estimated value of such Class of Claims:

  - *Class 3B – EPC Reorganizing US Debt Claims*

  - *Class 3 – Solar Reorganizing US Debt Claims*

  - *Class 4 – EPC Reorganizing General Unsecured Claims*

  - *Class 4 – Solar Reorganizing General Unsecured Claims*

  - *Class 5 – EPC Reorganizing Litigation Claims*

  - *Class 5 – Solar Reorganizing Litigation Claims*

  - *Class 6A – EPC Reorganizing Affected Debt Bonding Claims*

  - *Class 6B – EPC Reorganizing Non-Affected Debt Bonding Claims*

  - *Class 6A – Solar Reorganizing Affected Debt Bonding Claims*

  - *Class 6B – Solar Reorganizing Non-Affected Debt Bonding Claims*

- Holders of Allowed Claims in *Class 7A – EPC Reorganizing Intercompany Claims by Non-Debtor Affiliates* and *Class 7A – Solar Reorganizing Intercompany Claims by Non-Debtor Affiliates* will receive Standard Restructuring Terms.

- Holders of Allowed Claims in the following Class of Claims will receive no distribution on the Effective Date of the Plan:

  - *Class 4 – EPC Liquidating Intercompany Claims;*

  - *Class 4 – Bioenergy and Maple Liquidating Intercompany Claims;*

  - *Class 7B – EPC Reorganizing Intercompany Claims by Debtor Affiliates;*

  - *Class 7B – Solar Reorganizing Intercompany Claims by Debtor Affiliates*

  - *Class 5 – EPC Liquidating Equity Interests;* and

- *Class 5 – Bioenergy and Maple Liquidating Equity Interests.*

- The holders of Equity Interests in *Class 8 – EPC Reorganizing Equity Interests* and *Class 8 – Solar Reorganizing Equity Interests* shall be reinstated.

The following tables briefly summarize the classification and treatment of Claims and Equity Interests under the Plan.  The summaries also identify the Classes that are entitled to vote on the Plan under the Bankruptcy Code.  This summary is qualified in its entirety by reference to the Plan, the Plan Supplement and the exhibits attached hereto and thereto and the agreements and documents described herein and therein.

---

**Important Note on Estimates**

The estimates in the tables and summaries in this Disclosure Statement may differ materially from actual distributions under the Plan.  These differences may be due to a number of factors, including:

- the resolution through compromise or judicial determination of disputes among different stakeholders;

- the asserted or estimated amounts of Allowed Claims;

- the existence and ultimate resolution of Disputed Claims;

- the timing of distributions; and

- the timing of the Debtors' emergence from bankruptcy.

Statements regarding projected amounts of Allowed Claims or distributions (or the value of such distributions) are estimates by the Debtors based on current information and are not representations or commitments as to the accuracy of these amounts.  See Section VI, titled "Risk Factors," for a discussion of factors that may affect the value of recoveries under the Plan.

Except as otherwise indicated, these statements and estimates are made as of the date of this Disclosure Statement, and the delivery of this Disclosure Statement does not imply that the information contained in this Disclosure Statement is correct at any time after such date.

---

## SUMMARY OF CLASSIFICATION AND TREATMENT
## OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN

**1.    EPC Reorganizing Debtor Group**

| Class | Type of Claim or Equity Interest | Treatment/ Currency/Payment | Estimated Total Claims | Estimated Recovery on Effective Date | Estimated Total Recovery | Voting Status |
|---|---|---|---|---|---|---|
| 1 | Secured Claims | Paid in Full | $[ ] | 100% | 100% | Deemed to Accept |
| 2 | Priority Claims | Paid in Full | $[ ] | 100% | 100% | Deemed to Accept |
| 3A | Spanish Affected Debt Claims | Impaired; Replacement Guarantee | $[ ] | [ ]% | [ ]% | Entitled to Vote |
| 3B | US Debt Claims | Impaired | $[ ] | [ ]% | [ ]% | Entitled to Vote |
| 4 | General Unsecured Claims | Impaired | $[ ] | [ ]% | [ ]% | Entitled to Vote |
| 5 | Litigation Claims | Impaired | $[ ] | [ ]% | [ ]% | Entitled to Vote |
| 6A | Affected Debt Bonding Claims | Impaired | $[ ] | [ ]% | [ ]% | Entitled to Vote |
| 6B | Non-Affected Debt Bonding Claims | Impaired | $[ ] | [ ]% | [ ]% | Entitled to Vote |
| 7A | Intercompany Claims by Non-Debtor Affiliates | Impaired | $[ ] | [ ]% | [ ]% | Deemed to Reject |

| Class | Type of Claim or Equity Interest | Treatment/ Currency/Payment | Estimated Total Claims | Estimated Recovery on Effective Date | Estimated Total Recovery | Voting Status |
|---|---|---|---|---|---|---|
| 7B | Intercompany Claims by Debtor Affiliates | Impaired | $[ ] | 0% | 0% | Deemed to Accept |
| 8 | Equity Interests | Impaired | $[ ] | [ ]% | [ ]% | Deemed to Accept |

## 2. EPC Liquidating Debtor Group

| Class | Type of Claim or Equity Interest | Treatment/ Currency/Payment | Estimated Total Claims | Estimated Recovery on Effective Date | Estimated Total Recovery | Voting Status |
|---|---|---|---|---|---|---|
| 1 | Secured Claims | Paid in Full | $[ ] | 100% | 100% | Deemed to Accept |
| 2 | Priority Claims | Paid in Full | $[ ] | 100% | 100% | Deemed to Accept |
| 3 | General Unsecured Claims | Impaired | $[ ] | [ ]% | [ ]% | Entitled to Vote |
| 3A | US Debt Claims | Impaired | $[ ] | [ ]% | [ ]% | Entitled to Vote |
| 4 | Intercompany Claims | Impaired | $[ ] | 0% | 0% | Deemed to Reject |
| 5 | Equity Interests | Impaired; No Distribution | $[ ] | 0% | 0% | Deemed to Reject |

## 3. Solar Reorganizing Debtor Group

| Class | Type of Claim or Equity Interest | Treatment/ Currency/Payment | Estimated Total Claims | Estimated Recovery on Effective Date | Estimated Total Recovery | Voting Status |
|---|---|---|---|---|---|---|
| 1 | Secured Claims | Paid in Full | $[ ] | 100% | 100% | Deemed to Accept |
| 2 | Priority Claims | Paid in Full | $[ ] | 100% | 100% | Deemed to Accept |
| 3 | US Debt Claims | Impaired | $[ ] | [ ]% | [ ]% | Entitled to Vote |
| 4 | General Unsecured Claims | Impaired | $[ ] | [ ]% | [ ]% | Entitled to Vote |
| 5 | Litigation Claims | Impaired | $[ ] | [ ]% | [ ]% | Entitled to Vote |
| 6A | Affected Debt Bonding Claims | Impaired | $[ ] | [ ]% | [ ]% | Entitled to Vote |
| 6B | Non-Affected Debt Bonding Claims | Impaired | $[ ] | [ ]% | [ ]% | Entitled to Vote |
| 7A | Intercompany Claims by Non-Debtor Affiliates | Impaired | $[ ] | [ ]% | [ ]% | Deemed to Reject |
| 7B | Intercompany Claims by Debtor Affiliates | Impaired | $[ ] | 0% | 0% | Deemed to Accept |
| 8 | Equity Interests | Impaired | $[ ] | [ ]% | [ ]% | Deemed to Accept |

## 4. Bioenergy and Maple Liquidating Debtor Group

| Class | Type of Claim or Equity Interest | Treatment/ Currency/Payment | Estimated Total Claims | Estimated Recovery on Effective Date | Estimated Total Recovery | Voting Status |
|---|---|---|---|---|---|---|
| 1 | Secured Claims | Paid in Full | $[ ] | 100% | 100% | Deemed to Accept |
| 2 | Priority Claims | Paid in Full | $[ ] | 100% | 100% | Deemed to Accept |
| 3 | General Unsecured | Impaired | $[ ] | [ ]% | [ ]% | Entitled to |

| Class | Type of Claim or Equity Interest | Treatment/ Currency/Payment | Estimated Total Claims | Estimated Recovery on Effective Date | Estimated Total Recovery | Voting Status |
|---|---|---|---|---|---|---|
| | Claims | | | | | Vote |
| 3A | US Debt Claims | Impaired | $[  ] | [  ]% | [  ]% | Entitled to Vote |
| 4 | Intercompany Claims | Impaired | $[  ] | 0% | 0% | Deemed to Reject |
| 5 | Equity Interests | Impaired, No Distribution | $[  ] | 0% | 0% | Deemed to Reject |

## III.  GENERAL INFORMATION

### A.  Overview of Chapter 11

Chapter 11, the principal business reorganization chapter of the Bankruptcy Code, permits a debtor to reorganize or liquidate its business for the benefit of itself, its creditors, and equity interest holders.  In addition to the rehabilitation or liquidation of a debtor, another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and equity interest holders in the distribution of a debtor's assets.  The commencement of a chapter 11 case creates an estate comprised of all of the legal and equitable interests of the debtor as of the date the chapter 11 petition is filed.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a plan is the principal objective of a chapter 11 reorganization case.  A plan of reorganization and liquidation both set forth the means for satisfying claims against and equity interests in a debtor.  Confirmation of a plan by the bankruptcy court binds the debtor, any issuer of securities under the plan, any person acquiring property under the plan, any creditor or equity interest holder of a debtor, and any other person or entity subject to the terms of the Plan.  Subject to certain limited exceptions, the order approving confirmation of a plan of reorganization discharges a debtor from any debt, equity interest, or other claim that arose prior to the date of confirmation of the plan and substitutes in place of such debts and other claims the obligations specified in the confirmed plan.  Unlike a plan of reorganization, confirmation of a plan of liquidation does not discharge the debtor.  A plan of liquidation is a sub-type of a chapter 11 plan, pursuant to which a debtor sells or transfers all or substantially all of its assets and winds down all of its operations in orderly fashion under supervision of the bankruptcy court.

Certain holders of claims against, and sometimes equity interests in, a debtor are permitted to vote to accept or reject the plan.  Before soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical, reasonable claimant or holder of an equity interest to make an informed judgment regarding the plan.  The Debtors are submitting this Disclosure Statement to holders of Claims against the Debtors pursuant to section 1125 of the Bankruptcy Code.

### B.  Description and History of the Debtors' Businesses

#### 1.  Parent Company Operations and Financial Data[4]

Abengoa is a Spanish company founded in 1941 and is a leading engineering and clean technology company with operations in more than 50 countries worldwide.  Currently, Abengoa is registered in the Mercantile

---

[4]  The SEC has consistently given no-action assurance with respect to the applicability of the §1145(a) exemption to securities issued by a nondebtor affiliate of a debtor in exchange for claims against or interests in the debtor or such affiliate pursuant to a plan of reorganization where (i) the nondebtor affiliate has subjected itself to the jurisdiction of the bankruptcy court and upon confirmation of the plan was obligated to issue the securities under the plan, (ii) the securities were offered and sold pursuant to the plan and (iii) the terms of the securities were described in the disclosure statement approved by the Bankruptcy Court.  Lezak Group, Inc. (available Oct. 3, 1985); Elsinore Corporation (available April 15, 1988); Lomas Financial Corporation (available January 29, 1992).  To come within the ambit of these no-action letters, disclosure will be added to the Disclosure Statement with respect to the Parent's post-restructuring operations and management, its historical financial statements, MD&A and a pro forma balance sheet reflecting its new capital structure.

Register of Seville in volume 573, folio 69, sheet SE-1507.  As of the end of 2015, Abengoa was the parent company of approximately 700 other companies around the world, including 577 subsidiaries, 78 associates, 31 joint ventures, and 211 Spanish partnerships (*uniones temporales de empresa*) (collectively, the "Abengoa Group" or the "Company").  Abengoa provides innovative solutions for a diverse range of customers in the energy and environmental sectors.

Abengoa, together with its consolidated subsidiaries, is an industrial and technological company which provides innovative solutions for sustainable development in the infrastructure, environment, and energy sectors, aiming to deliver long-term value to its shareholders through a management model characterized by encouragement of entrepreneurship, social responsibility, and transparent and efficient management.  Abengoa determines the general strategies and corporate policies of the Abengoa Group and is responsible for overall control of the activities of the Abengoa Group.

Over the course of the Abengoa Group's 70-year history, it has developed a unique and integrated business model that applies its accumulated engineering expertise to promoting sustainable development solutions, including delivering new methods for generating solar power, developing biofuels, producing potable water from seawater, and efficiently transporting electricity, to customers in the following sectors: energy, telecommunications, transport, water, utilities, environmental, industrial, and services.  A cornerstone of Abengoa's business model has been investment in proprietary technologies, particularly in areas with relatively high barriers to entry.  The Company supplies engineering projects under the 'turnkey' contract modality and operates assets that generate renewable energy, produce biofuel, manage water resources, desalinate sea water, and treat sewage.  The Abengoa Group's business is organized under the following three activities:

- Engineering and construction:  includes the traditional engineering activities in the energy and water sectors, with more than 70 years of experience in the market and the development of solar technology.  The Abengoa Group is specialized in carrying out complex turnkey projects for thermo-solar plants, solar-gas hybrid plants, conventional generation plants, biofuels plants, and water infrastructures, as well as large-scale desalination plants, and transmission lines, among others.

- Concession-type infrastructures:  groups together the Company's extensive portfolio of proprietary concession assets that generate revenues governed by long-term sales agreements, such as take-or-pay contracts, tariff contracts, or power purchase agreements.  This activity includes the operation of electric energy generation plants (solar, cogeneration, or wind), desalination plants, and transmission lines.  These assets generate low demand risk, and the Company focuses on operating them as efficiently as possible.

- Industrial production:  covers Abengoa Group's businesses with a high technological component, such as development of biofuels technology.  The Company holds an important leadership position in these activities in the geographical markets in which it operates.

Financial data related to Abengoa is attached to this Disclosure Statement as **Exhibit I.**

### 2.   The Abengoa Group's Prepetition Capital Structure

The Abengoa Group reports its financial information on a consolidated basis and prepares its financial statements under International Financial Reporting Standards as endorsed by the European Union, with the Euro as its reporting currency.  As of December 31, 2015, the Abengoa Group' had total assets of approximately €16.6 billion.  The Abengoa Group's total liabilities as of that date were approximately €16.2 billion, of which current liabilities accounted for approximately €14.6 billion and non-current liabilities accounted for approximately €1.5 billion.  As of December 31, 2015, the Abengoa Group's current liabilities were comprised of approximately €2.6 billion of project debt, €6.2 billion in corporate financing and approximately €4.3 billion of trade payables and other current liabilities (subject to varying payment terms and conditions).  For the year ended December 31, 2015, the Abengoa Group reported revenues of approximately €5.8 billion and a total loss of about €1.3 billion.

The Parent and certain of its non-Debtor subsidiaries, including Abengoa Finance S.A.U and Abengoa Greenfield S.A., are borrowers under multiple debt facilities and Notes in the approximate amount of $6.86 billion,

as set forth in Exhibit D to the First Day Declaration.  Debtors Mojave, Solana, Hugoton and ABNT (the "<u>Guarantors</u>") are each guarantors on Notes issued by Abengoa Parent, Abengoa Finance, S.A.U., and Abengoa Greenfield, S.A. as well as certain debt facilities.  Other non-Debtor affiliates are also guarantors on the Notes and the debt facilities.

### 3.    Debtors' Corporate Structure and Management

Abengoa initially expanded into the United States in the 1980s, creating a number of subsidiaries within the biofuels, engineering and construction, water, and solar segments of its operations.  After an operational restructuring of the U.S. subsidiaries in 2013, substantially all of the Abengoa companies with operations in the United States, except those that fall under the Bioenergy business unit (as described below), became subsidiaries of Abengoa US Operations LLC ("<u>Abengoa Operations</u>" or "<u>P-3</u>").  Abengoa Operations and the Bioenergy subsidiaries are owned 100% by Abengoa US, LLC ("<u>Abengoa US</u>" or "<u>P-2</u>"), and an intermediate holding company formed under the laws of the state of Delaware.  Abengoa US Holding, LLC ("<u>Abengoa Holding</u>" or "<u>P-1</u>") is the indirect parent company of all United States-based subsidiaries.  Most of Abengoa Group's companies operate on a decentralized basis.

A simplified representation of Abengoa's U.S. corporate structure is attached hereto as **Exhibit E**.  A full representation of Abengoa's global corporate structure is attached hereto as **Exhibit F**.

### 4.    Debtors' Business Operations, Partnerships, and Joint Ventures

Abengoa initiated the expansion of its global operations in the 1960s, first to South America and then into the United States.  Since inception, Abengoa's presence in the United States has grown significantly.  Abengoa has achieved a leading position within the renewable energy construction and technology sector in the United States through its efforts in developing commercial scale concentrated solar power and producing advanced biofuels on a commercial scale.

With a total investment of $3.3 billion, the United States has become one of Abengoa's largest markets in terms of sales volume, particularly from developing solar, bioethanol, and water projects.  The United States remains one of the largest and strategically important markets for Abengoa.  The Debtors' business operations can be organized into the following distinct business units:

- Abengoa's bioenergy companies ("<u>Bioenergy</u>") specialize in the development of new technologies geared towards the production of biofuels, biochemical products, and the sustainability of raw materials;

- Abengoa's engineering, procurement, and construction companies ("<u>EPC</u>") are dedicated to the engineering and construction of electrical, mechanical, and instrumental infrastructures in the energy, industrial, water management, and services sectors, as well as the development of innovative technology for Abengoa's businesses;

- Abengoa's solar companies ("<u>Solar</u>") specialize in the development and operation and maintenance of solar energy plants, mainly using solar thermal technology; and

- Abengoa's water companies ("<u>Water</u>") specialize in the development and operation and maintenance of facilities aimed at generating, transporting, treating, and managing potable water, including desalination and water treatment, as well as purification plants.

For the twelve month period that ended on December 31, 2015, Abengoa Group's average number of employees was [28,669] people worldwide across all Abengoa's business activities.

The majority of Debtors' operations are in the business units of EPC and Solar.  Specifically, each of the Debtors' business operations is listed below:

a)      Abengoa US Holding, LLC, or "P-1," is a limited liability company organized under the laws of the state of Delaware. It is parent company of all of the U.S.-based subsidiaries, including P-2 and P-3.

b)      Abengoa US, LLC, or "P-2," is a limited liability company organized under the laws of the state of Delaware. It is the parent company of and owns 100% of P-3 and Abengoa Bioenergy US Holding, LLC, which is currently a debtor in a chapter 11 case before the United States Bankruptcy Court for the Eastern District of Missouri.

c)      Abengoa US Operations, LLC, or "P-3," is a limited liability company organized under the laws of the state of Delaware. P-3 owns all of the U.S.-based business units except Bioenergy.

d)      Abengoa Solar LLC, formerly known as Solucar Inc. and Abengoa Solar Inc. ("Abengoa Solar"), is a limited liability company organized under the laws of the State of Delaware and based in Colorado. It is the operating company for Abengoa's Solar business in the United States. Through its wholly owned subsidiaries, Abengoa Solar (i) develops and operates major solar energy projects within the United States, and (ii) researches and develops activities intended to improve Abengoa's solar technologies from a cost, efficiency, and reliability standpoint.

e)      Abencor USA, LLC ("Abencor") is a limited liability company organized under the laws of the state of Delaware. Abencor sells electrical materials and offers integral management service for procurement logistics.

f)      Inabensa USA, LLC ("Inabensa") is a limited liability company organized under the laws of the state of Delaware. Inabensa provides special industrial machinery, and has operations associated with industrial facilities and infrastructure. It joined with certain affiliates to form Mount Signal (defined below).

g)      Nicsa Industrial Supplies, LLC ("Nicsa") is a limited liability company organized under the laws of the state of Delaware. Nicsa supplies various types of electrical material, instrumentation, and communication equipment for industrial use to engineering and construction companies.

h)      Abener Construction Services, LLC, formerly Abener Engineering and Construction Services, LLC ("Abener Construction"), is a limited liability company organized under the laws of the state of Delaware. Abener Construction is a renewables and environmental company that provides biofuel engineering, project, and construction management services. It provides engineering studies and business development for Abengoa's engineering, procurement and construction projects.

i)      Teyma USA & Abener Engineering and Construction Services General Partnership ("Solana") is a general partnership organized under the laws of the state of Delaware. Solana is responsible for the engineering, procurement, and construction of the Solana thermal solar energy power plant located near Gila Bend, Arizona (the "Solana Plant"). When commissioned, the Solana Plant was the largest parabolic trough plant in the world and the first solar plant in the United States with molten salt thermal energy storage. Solana is a guarantor on the Notes, as well as other indebtedness of the Parent.

j)      Abener Teyma Mojave General Partnership ("Mojave") is a general partnership organized under the laws of the state of Delaware. It holds an engineering, procurement and construction services contract for a thermal solar energy power plant located near in Hinkley, California (the "Mojave Plant"). The Mojave Plant was completed in April 2015, but Mojave is still under certain warranty obligations and has to finalize the work

itemized on a punch list.    Mojave is a guarantor on the Notes, as well as other indebtedness of the Parent.

k)    Abeinsa Abener Teyma General Partnership ("AAT") is a general partnership organized under the laws of the state of Delaware.  It holds the engineering, procurement, and construction services contracts for (i) a plant located in Glendale, Arizona that recycles municipal solid waste (the "Vieste Project"), (ii) a cogeneration plant located in Pasadena, Texas built to install a superheater and steam turbine generator at an existing nitrogen plant (the "Rentech Project"), (iii) a 440MW gas-fired Generation Facility with a combined cycle located in Boardman, Oregon built to provide electricity to the Portland region which contract has since been terminated by the client (the "Carty Project"), and (iv) a facility that will operate Feedstock MSW to Syncrude Product processing in Reno, Nevada (the "Fulcrum Project").  The Rentech Project and the Vieste Project have been finalized.

l)    Abener Teyma Inabensa Mount Signal Joint Venture ("Mount Signal," and together with Solana, Mojave and AAT, the "Partnerships") is a joint venture between Inabensa USA LLC, Abeinsa Holding Inc. and Abener North America Construction LP.  Mount Signal was formed to design, engineer, procure, install, construct, test, and commission a nominal power photovoltaic power plant to be located in Imperial County, California. Delaware law governs the joint venture agreement.

m)    Abeinsa Holding Inc. ("Abeinsa"), formerly known as Teyma USA, Inc., is a corporation incorporated under the laws of the state of Delaware.  Incorporated in 2009, it was one of the first Abengoa engineering, constructions, and procurement related companies in the United States and continues to be a regional partner in certain EPC projects in the United States.

n)    Teyma Construction USA, LLC ("Teyma Construction") is a limited liability company organized under the laws of the state of Delaware.  It is a partner in certain of the Partnerships.

o)    Abeinsa EPC LLC ("Abeinsa EPC") is a limited liability company organized under the laws of the state of Delaware.  Abeinsa EPC provides services to the Partnerships, including but not limited to legal, tax, accounting, and back-office services.  Abeinsa EPC also provides employees and is a partner in one of the Partnerships.

p)    Abener North America Construction, LP ("Abener North America") is a limited partnership organized under the laws of the state of Delaware.  Abener North America joined with certain of its affiliates to form Mount Signal and Mojave.

q)    Abener Teyma Hugoton General Partnership ("Hugoton Partnership") is a general partnership organized under the laws of the state of Delaware.  It holds an engineering, procurement and construction services contract for the Hugoton Plant.   Hugoton Partnership is a guarantor on the Notes, as well as other indebtedness of the Parent.

r)    Abengoa Bioenergy Hybrid of Kansas, LLC ("ABHK") is a limited liability company organized under the laws of the state of Kansas.  It owns ABBK and holds the grants and equity commitments used to build the Hugoton Plant.

s)    Abengoa Bioenergy Technology Holding, LLC ("ABTH") is a limited liability company organized under the laws of the state of Missouri.  ABTH is the parent company and 100% owner of ABHK and ABTH.

t)      Abengoa Bioenergy New Technologies, LLC ("ABNT") is a limited liability company organized under the laws of the state of Missouri. ABNT is responsible for all of the research and development work in the Bioenergy business unit and owns all United States patents held by Abengoa. ABNT is a licensee for third party technology and is the business that sublicenses rights to third parties. ABNT is a guarantor on the Notes, as well as other indebtedness of the Parent.

u)      Abengoa Bioenergy Biomass of Kansas, LLC ("ABBK") is a limited liability company organized under the laws of the state of Kansas. ABBK owns a second generation, turnkey ethanol production and cogeneration plant located in Hugoton, Kansas (the "Hugoton Plant"), which produces ethanol from non-food sources. As of today, the Hugoton Plant is not operating; however, ABBK has hired an investment banker, Ocean Park Advisors, and is actively marketing this plant under a sale process supervised by the bankruptcy court in Wichita, Kansas, where ABBK's case is pending.

v)      Abengoa Bioenergy Holdco, Inc. ("AB Holdco") is a corporation organized under the laws of the state of Delaware. AB Holdco is a holding entity that owns 51 percent interest in Abengoa Bioenergy Meramec Holding, Inc.

w)      Abengoa Bioenergy Meramec Holding, Inc. ("AB Meramec") is a corporation organized under the laws of the state of Delaware. AB Meramec is a holding company that owns 20.25 percent of the interest in Abengoa Bioenergy Meramec Renewable, LLC, an Abengoa Bioenergy US entity that filed a voluntary chapter 11 petition in the United States Bankruptcy Court for the Eastern District of Missouri on June 12, 2016.

## 5.    Transfer of Certain Solar Projects to Atlantica Yield

Abengoa began its solar power activity in 1984 when it participated in the construction of the Solar Platform in Almería, Spain. Since then, multiple research, development, and innovation projects have been carried out to develop different types of receivers for tower plants and parabolic trough technology, which were partially supported by the European Union Framework Programs. These first steps were taken in the Engineering and Construction and Industrial Production business units. In 2007, with the inauguration of the first tower technology commercial plant, PS10 (11 megawatts ("MW")), as well as the world's largest low concentration photovoltaic plant, Sevilla PV, with 1.2 MW of power output capacity, Abengoa Solar was incorporated as a business unit.

### a.    Solana Project

In the United States, Arizona Solar One LLC was formed as a special purpose entity to develop and build a parabolic trough plant in Gila Bend, Arizona with a total installed capacity of 280 MW (gross) and with a thermal energy storage system capable of producing up to six hours of stored energy (the "Solana Project"). In December 2010, Arizona Solar One LLC entered into a number of agreements to provide financing for the construction of the Solana Project. The debt financing component of the Solana Project was provided by the Federal Financing Bank ("FFB"), with the U.S. Department of Energy (the "DOE") acting as (i) guarantor of the FFB project debt pursuant to what is referred to as a "Loan Guarantee Agreement" and (ii) the servicer/administrator of the various project financing agreements. The Loan Guarantee Agreement for the Solana Project is an agreement that is the functional equivalent of a loan or credit agreement in a typical project financing and is the document that contains the core duties and obligations of Arizona Solar One LLC as the borrower under the financing.

The Solana Project became fully operational in late 2013, and it now sells electricity to the Arizona Public Service Company. The Solana Project remains wholly owned by Arizona Solar One LLC, which, through its formation and continuing through the development and construction of the Solana Project, was a 100%-owned indirect subsidiary of Abengoa Solar. However, in June 2014, the ownership of Arizona Solar One LLC (and, by extension, the Solana Project) was transferred by Abengoa Solar to a subsidiary of Abengoa Yield plc, now referred to as "Atlantica Yield" ("Atlantica Yield" or "YieldCo").

### b.    Mojave Project

Mojave Solar LLC was formed as a special purpose entity to develop and build a 280 MW (gross) concentrating solar thermal project in Hinkley, California, which sells electricity to the Pacific Gas and Electric Company (the "Mojave Project"). The Mojave Project remains wholly owned by Mojave Solar LLC, which, through its formation and the development and a majority of the construction of the Mojave Project, was a 100%-owned indirect subsidiary of Abengoa Solar. The Mojave Project was also financed by the FFB, with the DOE again acting in the capacity of loan guarantor and servicer/administrator pursuant to a loan guarantee agreement. The project financing structure for the Mojave Project is substantially similar to that of the Solana Project, and as with the Solana Project, in June 2014, the ownership of Mojave Solar LLC (and, by extension, the Mojave Project) was transferred by Abengoa Solar to a subsidiary of Atlantica Yield.

**6.    Partial Divestment of YieldCo**

On June 13, 2014, the Abengoa Group completed an initial public offering ("IPO") of 28,577,500 ordinary shares of YieldCo, including the exercise in full of the underwriters' overallotment option at a price of $29.00 per share for total gross proceeds of $828.7 million (€611.1 million) before fees and expenses. YieldCo is a dividend growth-oriented company formed by the Abengoa Group that groups together renewable energy, conventional power, electric transmission lines, and other contracted, revenue generating assets previously reported in different operating segments within the concession-type infrastructures activity.

Immediately following the IPO, the Abengoa Group held 64% of the ordinary share capital of YieldCo. On December 15, 2014, the Parent's board of directors approved a plan to reduce the Abengoa Group's shareholding in YieldCo to below 50% during 2015, subject to market conditions. On January 22, 2015, the Abengoa Group completed an initial divestment of 13% of YieldCo, which brought its shareholding in YieldCo to 51%. On February 9, 2015, the Abengoa Group announced its intention to reduce its shareholding in YieldCo to below 50% by the end of the first half of 2015, with the objective of maintaining a long-term stake in the range of 40% - 49%.

On March 5, 2015, the Parent issued $279 million aggregate principal amount of exchangeable notes (the "Exchangeable Notes") exchangeable into up to approximately 7.3 million ordinary shares of YieldCo at the time of the initial offering.

On June 29, 2015, the Parent's subsidiary, Abengoa Concessions Investment Limited ("ACIL"), entered into the Margin Loan with a financial institution and related security documents pursuant to which ACIL was entitled to borrow up to $200 million. Under the terms of the Margin Loan, ACIL pledged and granted a security interest in 16,561,817 ordinary shares of YieldCo in favor of such financial institution as security for the Margin Loan. The loan had a 24-month maturity following the utilization date, but upon the occurrence of certain events, the financial institution was able to require ACIL to pre-pay the Margin Loan, post additional collateral or foreclose on, and dispose of, the pledged shares in accordance with the Margin Loan's terms. On September 30, 2015, $20 million of the loan was repaid and the remaining balance was repaid on October 1, 2015. Immediately after the final repayment, the pledged shares were released.

On July 14, 2015, the Abengoa Group sold 2,000,000 shares of Abengoa Yield for $62 million, reducing its stake in Abengoa Yield to 49.05%. From the commencement of the exchange period for the Exchangeable Notes on September 1, 2015, through September 30, 2015, $52.8 million nominal amount of Exchangeable Notes was exchanged for 1.4 million shares of YieldCo, and the Abengoa Group's shareholding in YieldCo declined to 47.63%. The outstanding principal amount of $226.2 million of Exchangeable Notes as of September 30, 2015, was exchangeable for 6.06 million YieldCo shares.

On September 24, 2015, the Abengoa Group announced an enhancement of its current asset disposal program expected to be completed by the end of 2016 that included either the monetization of some or all of the Abengoa Group's economic rights or the sale of some or all the Abengoa Group's interest in YieldCo. Between September 30, 2015, and November 2015, $23.8 million of principal amount of Exchangeable Notes was exchanged for approximately 638,307 shares of Abengoa Yield. As a result, the Abengoa Group's stake in Abengoa Yield declined to 47%, and the outstanding principal amount of Exchangeable Notes as of late November 2015 was $202.4 million, exchangeable for 5.43 million YieldCo shares.

## C.  Events Leading to the Chapter 11 Filings

### 1.  Economic Challenges and Regulatory Changes

At the height of Spain's economic crisis in early 2013, as the Spanish government struggled to pay the interest due on sovereign debt, subsidies for solar and wind power companies were dramatically curtailed.  The cutbacks devastated Spain's renewable energy sector and many companies failed.  Though Abengoa was able to survive this financial crisis, it was forced to issue substantial new debt to continue its global operations.  From 2013 onward, Abengoa entered into or issued syndicated, bilateral, and other debt instruments totaling over $5 billion.  As part of these transactions, certain Debtors and affiliates provided guarantees of this debt.

### 2.  Abengoa's Financial Position and the Gonvarri Investment Agreement

During 2015, various factors, such as an insufficient upswing in the market in which the Abengoa Group operates and the difficulty of obtaining financing, precluded compliance with the Company's business plan.  On July 31 2015, during Abengoa's results presentation for the first six months of 2015, Abengoa lowered its guidance for 2015 corporate free cash flow, which deepened existing market concerns regarding Abengoa's liquidity position, as well as raised concerns with its business partners and other shareholders regarding liquidity.  These concerns adversely affected Abengoa's cash position, had a disruptive effect on its operations, contributed to a 27% decline in engineering and construction revenues in the third quarter of 2015 compared to the same period in the prior year, and caused the trading prices of Abengoa's Class A and Class B shares and outstanding bonds to fluctuate significantly during the third quarter and the beginning of the fourth quarter of the 2015 fiscal year.

In light of these developments, on September 24, 2015, as part of its comprehensive action plan aimed at improving its liquidity position, reducing corporate leverage, and strengthening its corporate governance, Abengoa sought an equity raise to be underwritten by various financial institutions, which Abengoa was unable to secure.  Further, Abengoa sought to secure an investment from Gonvarri Corporacion Financiera, S.L. ("Gonvarri"), a Gonvarri Steel Industries group company, and Waddell & Reed Investment Management, one of the main shareholders of Abengoa.  Unfortunately, the Company was unable to consummate the Gonvarri transaction.

As no other proposal was received from any other potential subscriber that would immediately replace Gonvarri, the Company decided to initiate a refinancing process to try and reach an agreement with its main financial creditors, aimed to establish the framework to carry out such negotiations and provide the Abengoa Group with financial stability in the short and medium term.  After a careful assessment of the situation and in order to provide the stability needed to carry out such negotiations with creditors, Abengoa's Board of Directors further announced on November 25, 2015, that it would continue negotiations with its creditors with the objective of reaching an agreement that ensures the Company's financial viability, under the protection of article 5 bis of the *Ley 22/2003 de 9 de julio, Concursal* (the "Spanish Insolvency Law"), a pre-insolvency statute that permits a company to enter into negotiations with certain creditors for restructuring its financial affairs.

### 3.  The Spanish Proceedings

#### a.  *The 5 Bis Proceedings*

On November 25, 2015, December 3, 15, and 28, 2015, January 27, 2016, and February 1, 2016, Abengoa and certain of its affiliates (collectively, the "5 bis Companies") filed notice with the Mercantile Court of Seville, Spain (the "Spanish Court") that they had commenced negotiations with their principal creditors in order to reach a global agreement on the refinancing and restructuring of their liabilities to achieve the viability of the Abengoa Group in the short and long term.  The Spanish Court issued orders on December 14 and 22, 2015, and January 15, 2016, admitting the notices and granting the Article 5 bis Companies with the protection under the Spanish Insolvency Law.

The Abengoa Group commenced negotiations with a large and diverse number of its main financial creditors, including a group of lenders that formed a coordinating committee, advised by Sullivan & Cromwell LLP, Uria Menendez Abogados, S.L.P.-C., and KPMG LLP, and an ad hoc committee of bondholders, advised by Clifford Chance LLP and Houlihan Lokey, Inc.  The Abengoa Group, advised by Linklaters LLP, DLA Piper LLP (US), Alvarez & Marsal, Lazard Frères & Co., LLC and Madrid-based law firm Cortés, Abogados ("Cortés"), has

engaged with the coordinating committee and the ad hoc committee of bondholders regarding a restructuring, which led to the Parent and certain Debtors entering into the Standstill Agreement and the Master Restructuring Agreement, as described below in Section III.C.3.  Abengoa began preparing a business viability plan and the terms of a possible restructuring.  During the negotiation process, the Abengoa Group negotiated the following facilities to fund its general liquidity needs:

- A €125,000,000 syndicated facility agreement dated 23 September 2015 between the Abengoa Group, as borrower, and certain companies of its group as guarantors and certain finance entities (the "Revolving Facilities");

- A €135,000,000 secured term facility agreement dated 22 October 2015 between ACIL, as borrower, and Talos Capital Limited;

- A €106,000,000 facility agreement dated 24 December 2015 between ACIL, as borrower, certain companies its group as guarantors and certain finance entities (the "December Facility").  The December Facility was used for general corporate purposes, and the Abengoa Group granted a security interest over certain shares of YieldCo (and at this time also pledged YieldCo shares as security for the Revolving Facilities);

- A €137,226,746.96 facility agreement dated 16 March 2016 between Abengoa Concessions Investment Limited, as borrower, certain companies of its group as guarantors and certain finance entities (the "Bondholders Facilities").  The Bondholders Facilities were used for general corporate purposes, and the Abengoa Group granted a security interest over certain shares of YieldCo; and

- A $211,000,000 facility agreement dated 18 September 2016 between ACIL, as borrower, Abengoa and certain of its subsidiaries as guarantors, Lajedosa Investments S.ARL as arranger, and certain lenders party thereto.  The September 2016 facility is being used to for general corporate purposes of the Abengoa Group.  ACIL granted a security interest over certain shares of Yieldco.

Alvarez & Marsal prepared a Viability Plan based on a preliminary review of specific projects, the existing project pipelines, and the most recent information and thinking with respect to asset disposals and financial debt.  As part of this evaluation, Alvarez & Marsal evaluated (i) 200 projects, each above €2.5 million that covered 90% of the Abengoa Group's €8.6 billion backlog as of December 31, 2015, and (ii) each business line by region and operating division with the head of each business line.

On December 30, 2015 and January 25, 2016, Alvarez & Marsal presented the Board of Directors of the Abengoa Group with viability plans that defined the structure of the future activity of the Abengoa Group.  This Viability Plan was presented to the public in a conference call held on Wednesday, February 17, 2016.  In broad general terms, this Viability Plan analyzed the old Abengoa Group, proposed a new business model for a new Abengoa Group, presented both valuation and cash flows, risks and opportunities, and set forth certain recommendations and conclusions as to the viability of the proposed new Abengoa Group.  This plan did not contain a financial restructuring proposal, but was an operational plan.

In relation to the negotiations between the Company and a group of its creditors comprised of banks and holders of bonds issued by the Abengoa Group, the Company announced on March 10, 2016, that it had agreed with the advisers of such creditors on the basis of an agreement to restructure the financial indebtedness and recapitalize the group (the "Restructuring Proposal").  The Company further announced that it believed that the Restructuring Proposal contained the essential elements to achieve a future restructuring agreement that, in any event, would be subject to reaching the percentage of accessions required by Spanish law.  The fundamental principles of the Restructuring Proposal announced on March 10 were the following:

i)   New money would be lent to the company in a range between €800 million and €1.5 billion for a maximum term of 5 years.  Lenders of the new money would be entitled to 55% of the share capital. This financing would rank senior with respect to the existing debt and would be guaranteed by certain assets, including unpledged shares of YieldCo.

ii)   The amount of the old debt that would be capitalized would correspond to 70% of its nominal value. Such capitalization would grant the right to subscribe 35% of the new share capital.

iii)  The financial indebtedness corresponding to Revolving Lines and the December Facilities (a total amount of €231 million (plus accrued financial expenses)) would be subject to refinancing by extending the term by 2 years. This indebtedness would be secured by the shares of YieldCo and would be prepaid in case of sale of the shares of YieldCo.

iv)   The amount of the share capital increase that would be reserved to those creditors that provided €800 million of the bank guarantees requested would be 5% of the new share capital.

On March 16, 2016, the Abengoa Group presented its Business Plan & Financial Restructuring Plan in Madrid and permitted public participation by telephone. At this presentation, Alvarez & Marsal presented the Viability Plan, and Lazard presented the Restructuring Proposal. The Banks' advisor, KPMG, and the Bondholders' advisor, Houlihan Lokey, presented their key conclusions regarding the Viability Plan and Restructuring Proposal. The Abengoa Group's Spanish law firm, Cortés, set forth the Abengoa Group's plan for presenting a standstill agreement to all financial creditors between March 18 and 27, 2016.

### b.   *The Standstill Agreement Homologation Proceeding*

While the Restructuring Proposal presented on March 16, 2016 sets forth the framework for the restructuring of the Abengoa Group, in order for the Spanish Court to give judicial approval, or "homologate," the Standstill Agreement (as defined below) in accordance with the Spanish Insolvency Law, 75% of the requisite creditors need to accede to such agreement. In order to provide the Abengoa Group with sufficient time to solicit and obtain the requisite supermajority votes with respect to the Restructuring Proposal, several Abengoa Group companies requested its financial creditors to adhere to a standstill agreement (the "Standstill Agreement") under which the Abengoa Group companies that were signatories to the Standstill Agreement requested their financial creditors to stay certain rights and actions vis-à-vis the relevant Abengoa companies during a period of seven months from the date of the Standstill Agreement. The following Debtors are signatories to the Standstill Agreement: (i) Abengoa Solar, (ii) Abencor, (iii) Inabensa, (iv) Nicsa, (v) Abener Construction, (vi) Solana, (vii) Mojave, (viii) AAT, (ix) Mount Signal, (x) Hugoton Partnership, and (xi) ABNT.

The Abengoa Group advised creditors that once the Standstill Agreement was signed by at least 60% of the company's various financial creditors, the Abengoa Group intended to apply for judicial approval (*homologación judicial*) of the Standstill Agreement pursuant to the Spanish Insolvency Law, so that the Standstill Agreement would become binding upon all the relevant financial creditors of the 5 bis Companies, including those that did not enter into the Standstill Agreement in Spain.

The Company requested that the beneficial owners of the affected series of the Abengoa Group's outstanding debt securities[5] indicate their accession to the Standstill Agreement through a standstill accession notice

---

[5]   Those affected series of debt securities were the following: (a)      Abengoa, S.A.'s €500,000,000 8.50 per cent Notes due 2016 (ISIN: XS0498817542); (b) Abengoa, S.A.'s €250,000,000 4.50% Senior Unsecured Convertible Notes due 2017 (ISIN: XS0481758307); (c) Abengoa, S.A.'s €400,000,000 6.25% Senior Unsecured Convertible Notes due 2019 (Rule 144A Notes ISIN: XS0875624925; Regulation S Notes ISIN: XS0875275819); (d)      Abengoa, S.A.'s US$279,000,000 5.125% Exchangeable Notes due 2017 (Rule 144A Notes ISIN: US00289RAD44, CUSIP: 00289RAD4; Regulation S Notes ISIN: XS1196424698); (e) Abengoa Finance, S.A.U.'s US$650,000,000 8.875% guaranteed Senior Notes due 2017 (Rule 144A Notes ISIN: US00289RAA05, CUSIP: 00289RAA0; Regulation S Notes ISIN: USE0002VAC84, CUSIP: E0002VAC8); (f) Abengoa Finance, S.A.U.'s €550,000,000 8.875% guaranteed Senior Notes due 2018 (Rule 144A Notes ISIN: XS0882238024; Regulation S Notes ISIN: XS0882237729); (g) Abengoa Greenfield, S.A.'s €265,000,000 5.500% guaranteed Senior Notes due 2019 (Rule 144A Notes ISIN: XS1113024563; Regulation S Notes ISIN: XS1113021031); (h) Abengoa Greenfield, S.A.'s US$300,000,000 6.500% guaranteed Senior Notes due 2019 (Rule 144A Notes ISIN: US00289WAA99, CUSIP: 00289WAA9; Regulation S Notes ISIN: USE00020AA01, CUSIP: E00020AA0); (i) Abengoa Finance, S.A.U.'s US$450,000,000 7.750% guaranteed Senior Notes due 2020 (Rule 144A Notes ISIN: US00289VAB99, CUSIP: 00289VAB9; Regulation S Notes ISIN: USE0000TAE13, CUSIP: E0000TAE1); (j) Abengoa Finance, S.A.U.'s €375,000,000 7.000% guaranteed Senior Notes due 2020 (Rule 144A Notes ISIN: XS1219439137; Regulation S Notes ISIN: XS1219438592); and (k) Abengoa Finance, S.A.U.'s €500,000,000 6.000% guaranteed Senior Notes due 2021 (Rule 144A Notes ISIN: XS1048658105; Regulation S Notes ISIN: XS1048657800) (collectively, the "Notes").

(the "Standstill Accession Notice") that was made available for the beneficial owners of the Notes through Lucid Issuer Services Limited. The Standstill Accession Notice established the deadline of 12 p.m. (Spanish time) on 23 March 2016, unless extended, for submission by the beneficial owners of instructions to enter into, and therefore, sign and execute, the Standstill Agreement. The Abengoa Group indicated that, with respect to the remaining financial creditors, execution of the agreement would commence on March 18, 2016, before a Spanish notary public, and remain open until March 27, between 9:30 a.m. and 7 p.m. every business day and up until 2 p.m. during bank holidays in Madrid. As of March 28, 2016, more than the necessary consents by value of creditors holding the debt affected by the Standstill Agreement had been obtained to permit commencement of a Judicial Confirmation Request to apply the Standstill Agreement to all of the holders of that debt.

On March 28, 2016, certain other members of the Abengoa Group filed the Judicial Confirmation Request for homologation of the Standstill Agreement. On that same day, the clerk of the Spanish Court published a resolution (*Providencia*) of the Spanish Court accepting the jurisdiction over the Judicial Confirmation Request and imposing a moratorium on enforcement actions against the Foreign Debtors.

On April 6, 2016, the Spanish Court entered a ruling (the "Homologation Order") homologating the Standstill Agreement. The Spanish Court found that the request for judicial homologation satisfied the requirements set forth in Additional Provision Four of the Spanish Insolvency Law, including that the judicial homologation request was accompanied by a qualifying viability plan, it was certified by the debtors' auditor as having been accepted by the relevant majorities under the Spanish Insolvency Law and it had been duly executed as a public deed before a Spanish notary. The Homologation Order was published in the Public Insolvency Register on April 6, 2016 in relation to certain of the Homologation Parties. The fifteen day period during which creditors could challenge the Homologation Order commenced upon the publication in the Official State Gazette on April 22, 2016. Consequently dissenting creditors had until May 16, 2016 to file objections. While the order has been challenged by different creditors and these challenges have not yet been resolved, the Homologation Order became effective as an order by the Spanish Court and the Standstill Agreement remains effective and enforceable by its terms.

### c. *The Chapter 15 Filing*

As contemplated by the Standstill Agreement, on March 28, 2016, Abengoa and twenty-four affiliated Spanish companies[6] (the "Chapter 15 Debtors") filed petitions for relief under chapter 15 of the Bankruptcy Code in the Bankruptcy Court seeking recognition of the proceeding in the Spanish Court as a foreign main proceeding. On that same day, the Chapter 15 Debtors filed a motion for joint administration and an emergency motion for provisional relief. On March 31, 2016, the Bankruptcy Court entered an order, allowing the joint administration, and also granted the provisional relief, staying commencement or continuation of any legal proceeding or action against the Chapter 15 Debtors within the territorial jurisdiction of the United States, entrusting the Chapter 15 Debtors with the administration and realization of all of their assets located in the United States, prohibiting the right or power to transfer, encumber, or otherwise dispose of any assets of the Chapter 15 Debtors, and scheduled a final hearing for April 27, 2016.

Several sureties, Liberty Mutual Insurance Company, Zurich American Insurance Company and Fidelity & Deposit Company of Maryland, AIG Insurance Company—Puerto Rico, and Specialty Insurance Company and its affiliates (collectively, the "Sureties") objected to recognition of the Spanish Proceeding, arguing, among other things, that the Spanish Proceeding commenced under the Spanish Insolvency Law is not a "foreign proceeding"

---

[6] The following entities are Chapter 15 Debtors: Abengoa, S.A.; Abeinsa Asset Management, S.L. (formerly Abener Inversiones, S.L.); Abeinsa Inversiones Latam, S.L. (formerly Dimange Inversiones 2009, S.L.); Abeinsa, Ingeniería y Construcción Industrial, S.A.; Abencor Suministros S.A.; Nicsa, Negocios Industriales y Comerciales, S.A.; Abener Energía, S.A.; Abengoa Bioenergía, S.A.; Abeinsa Infraestructuras Medio Ambiente, S.A. (formerly Befesa Agua); Abengoa Finance, S.A.; Abengoa Concessions, S.L.; Abengoa Solar España, S.A. (formerly Solúcar Energía, S.A.); Abengoa Solar New Technologies S.A. (formerly Solúcar, Investigación y Desarrollo (Solúcar, R&D), S.A.); Abentel Telecomunicaciones, S.A.; Asa Desulfuración, S.A. (formerly Befesa Desulfuración, S.A.); Bioetanol Galicia, S.A.; Ecoagrícola, S.A.; Instalaciones Inabensa, S.A.; Eucomsa, Europea de Construcciones Metálicas, S.A.; Siema Technologies, S.L. (formerly Telvent Corporation) ; Teyma, Gestión De Contratos De Construcción E Ingeniería, S.A.; Abengoa Water, S.L. (formerly Befesa Water Projects S.L); Abengoa Solar S.A. (formerly Solúcar Solar); Abengoa Greenfield S.A.U.; and Abengoa Greenbridge, S.A.U.

under section 101(23) of the Bankruptcy Code.  On April 27, 2016, however, the Bankruptcy Court overruled the Sureties' objections and entered a final order recognizing the Spanish Proceeding as a foreign main proceeding and granting the additional relief requested (the "Recognition Order").  On May 11, 2016, certain Sureties filed a notice of appeal, appealing the Recognition Order to the United States District Court for the District of Delaware.  On July 29, 2016, the appellants dismissed their appeal and the Recognition Order became a final order no longer subject to any challenge.

### d.  The Master Restructuring Agreement[7]

In the weeks and months following the Restructuring Proposal in mid-March and the entry into the Standstill Agreement, Abengoa and its creditors have been engaged in a near-constant series of negotiations toward a consensual restructuring that would substantially de-lever the Abengoa Group's consolidated balance sheet, reorganize operations and provide critical liquidity needed to ensure the Abengoa Group's future viability as a going concern.  These negotiations resulted in a revised viability plan that updated the terms on which the Abengoa Group, including certain of the Debtors, might be reorganized, which was followed by a Term Sheet that contemplated the Master Restructuring Agreement and new money financing and new bonding facilities.  Finally, on September [●], 2016, Abengoa and its key creditor groups announced that they had entered into the Master Restructuring Agreement.

The Master Restructuring Agreement contemplates that holders of Affected Debt and Non-Spanish Debt To Be Restructured which approach, in face amount, $7 billion, may elect Alternate Restructuring Terms.  If this election is made, those claims will not be included in the pool of General Unsecured Claims against the Debtors but will instead be compromised under the terms and conditions of the Master Restructuring Agreement, which compromise the Debtors intend to implement through the Plan.  The Master Restructuring Agreement provides for Standard Restructuring Terms to be applied to holders of Bonding Claims, such that those creditors who do not elect the Alternate Restructuring Terms available under the Master Restructuring Agreement will nonetheless have their Claims compromised under the terms of the Plan and the amount of the Claims of any non-consenting creditors will likewise not be included in the pool of General Unsecured Claims.  Under the Master Restructuring Agreement, the Parent, as the sponsor of the Plan, will issue stock to creditors that accede to its terms.  Finally, the Master Restructuring Agreement provides that the creditor parties will (1) not take any action in the Debtors' Chapter 11 Cases that are inconsistent with the Master Restructuring Agreement, including filing any objection to the Plan or to this Disclosure Statement; and (2) upon receipt of this Disclosure Statement and the Plan and approved solicitation materials, vote to support any Plan that is consistent with the Master Restructuring Agreement.[8]

On September 26, 2016, the Debtors filed the *Debtors' Motion for Authority to Enter into Master Restructuring Agreement and Related Power of Attorney* [D.I. ●], for which a hearing was scheduled for October 18, 2016.  In order to fully implement the Master Restructuring Agreement as efficiently as possible, it is contemplated that the following steps have already or will occur in the near future:

- As soon as reasonably practicable after the execution of the Master Restructuring Agreement, the Debtors agreed to file a motion to seek authority to enter into the Master Restructuring Agreement;

- To the extent any company that currently is not a Debtor enters into the Master Restructuring Agreement prior to the time it becomes an additional debtor in these cases, those companies will file a motion to approve the assumption of the Master Restructuring Agreement within 30 days after the commencement of any future chapter 11 case;

- As noted in Article 9.18 of the Master Restructuring Agreement, a Debtor has the right to terminate its obligations under the Master Restructuring Agreement if its continued support of the Master Restructuring Agreement would be inconsistent with fiduciary duties of such Debtor's board of directors or board of managers or such Debtor receives an alternate proposal the rejection

---

[7]  Capitalized terms used in this section III.C.3.d of this Disclosure Statement but not otherwise defined in this Disclosure Statement or the Plan shall have the meanings ascribed to them in the Master Restructuring Agreement.

[8]  Article 20.8 of the Master Restructuring Agreement provides however that the Master Restructuring Agreement itself is not a solicitation.

of which would be contrary to the fiduciary duties of such Debtor's board of directors or board of managers;

- In order to permit the Debtors to enter into the Master Restructuring Agreement in accordance with Spanish law, the Debtors propose to enter into and execute any necessary power of attorney so that specified members of the Company's management may execute the necessary documents before a Spanish Notary in person on behalf of the Debtors to implement the Master Restructuring Agreement; and

- Under Article 17.2 of the Master Restructuring Agreement, the Debtors will accede to the Master Restructuring Agreement with respect to intercompany claims against other members of the Abengoa Group and that all such intercompany claims will receive the same treatment, namely the Standard Restructuring Terms.

The Bankruptcy Court shall have and retain exclusive jurisdiction to settle any dispute in relation to the Plan.

### 4.    Non-Debtor Proceedings

On February 1, 2016, Gavilon Grain, LLC, Farmers Cooperative Association, and The Andersons, Inc. commenced a case in the United States Bankruptcy Court for the District of Nebraska against the Debtors' affiliate Abengoa Bioenergy of Nebraska ("ABNE") by filing an involuntary petition for relief under chapter 7 of the Bankruptcy Code (the "Nebraska Proceeding"). Subsequently, on February 11, 2016, Gavilon Grain, LLC, Farmers Cooperative, and Central Valley Ag Cooperative commenced a case in the United States Bankruptcy Court for the District of Kansas (Kansas City) against the Debtors' affiliate Abengoa Bioenergy Company, LLC ("ABC") by filing an involuntary petition for relief under chapter 7 of the Bankruptcy Code (the "Kansas Proceeding," and together with the Nebraska Proceeding, the "Involuntary Cases"). No interim chapter 7 trustee was appointed in the Involuntary Cases.

On February 24, 2016, ABNE and ABC filed motions to convert the Involuntary Cases to cases under chapter 11 in the United States Bankruptcy Court for the District of Kansas (Kansas City) and the United States Bankruptcy Court for the District of Nebraska, respectively. Contemporaneously, ABNE and ABC filed motions to transfer venue from the United States Bankruptcy Court for the District of Kansas (Kansas City) and the United States Bankruptcy Court for the District of Nebraska, respectively, to the United States Bankruptcy Court for the Eastern District of Missouri. The motions to convert the Involuntary Cases and the motions to transfer venue were granted.

Also on February 24, 2016, the Debtors' affiliates Abengoa Bioenergy US Holding, LLC, Abengoa Bioenergy Outsourcing, LLC, Abengoa Bioenergy Trading US, LLC, Abengoa Bioenergy Engineering & Construction, LLC, ABNE, and ABC (the "Missouri Bioenergy Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States District Court for the Eastern District of Missouri, commencing the chapter 11 cases jointly administered under case number 16-41161 (the "Missouri Cases").

On March 23, 2016, Brahma Group, Inc., CRB Builders, L.L.C., and Summit Fire Protection Co. filed an involuntary petition for relief under chapter 7 of the Bankruptcy Code commencing an involuntary bankruptcy case against ABBK in the United States Bankruptcy Court for the District of Kansas. No interim chapter 7 trustee was appointed. On April 6, 2016, ABBK filed (i) a motion to convert the ABBK Involuntary to a case under chapter 11 of the Bankruptcy Code and (ii) a motion to transfer the case to the United States Bankruptcy Court for the District of Delaware (the "Transfer Motion"). Following a hearing on April 7, 2016, the United States Bankruptcy Court for the District of Kansas entered an order converting the ABBK involuntary chapter 7 case to a case under chapter 11 of the Bankruptcy Code but, on April 13, 2016, denied the Transfer Motion. On May 2, 2016, ABBK filed a motion for certification of direct appeal to the United States Court of Appeals for the Tenth Circuit (the "Certification Motion"). ABBK also filed a motion to stay the chapter 11 case pending appeal (the "Stay Motion") before both the bankruptcy court and bankruptcy appellate panel; both courts, however, denied the motion. On May 6, 2016, the United States Bankruptcy Court for the District of Kansas entered an order denying the motion to stay pending appeal. On May 8, 2016, ABBK filed a supplement to its emergency motion to stay the case pending appeal. On May 16, 2016, the Tenth Circuit Bankruptcy Appellate Panel denied ABBK's emergency motion for stay of the case

pending appeal. On September [●], 2016, ABBK filed the *Motion of the Debtors and Debtors in Possession for Order Dismissing the Chapter 11 Case of In Re Abengoa Bioenergy Biomass of Kansas, LLC (Bankr. D. Del. Case No. 16-10876)*.

In implementing Abengoa's Restructuring Proposal and Viability Plan, the Debtors', with assistance from their advisors, determined that it would be beneficial to the Debtors' entire business enterprise for Abengoa Bioenergy Holdco, Inc.; Abengoa Bioenergy Meramec Holding, Inc.; Abengoa Bioenergy Meramec Renewable, LLC; Abengoa Bioenergy Funding, LLC; Abengoa Bioenergy Maple, LLC; Abengoa Bioenergy of Indiana, LLC; Abengoa Bioenergy of Illinois, LLC; and Abengoa Bioenergy Operations, LLC to be included in the administration of the chapter 11 cases administered in Missouri and Delaware. On June 12, 2016, Abengoa Bioenergy Meramec Renewable, LLC; Abengoa Bioenergy Funding, LLC; Abengoa Bioenergy Maple, LLC; Abengoa Bioenergy of Indiana, LLC; Abengoa Bioenergy of Illinois, LLC; and Abengoa Bioenergy Operations, LLC filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Eastern District of Missouri, which cases are jointly administered for procedural purposes with the chapter 11 cases of the Missouri Bioenergy Debtors.

In an exercise of due diligence and following extensive consultation with their advisors, the Missouri Bioenergy Debtors determined that maximizing the value of their estates would be best accomplished through a sale, free and clear of liabilities, of one or more of the Missouri Bioenergy Debtors' assets. To that end, the Missouri Bioenergy Debtors retained Carl Marks Advisory Group LLC ("Carl Marks") as an investment banker effective March 10, 2016. Carl Marks entered the market on April 16, 2016 and contacted a wide range of strategic and financial investors in connection with the potential sale. As of the May 25, 2016 deadline to secure a stalking horse bidder, Carl Marks had contacted 220 potential buyers, of which 67 executed a non-disclosure agreement with the Missouri Bioenergy Debtors to gain access to confidential and supplemental diligence information in a virtual data room established by the Missouri Bioenergy Debtors.

Carl Marks' retention was subsequently expanded to include the sale of Meramec Renewable and the assets of all Missouri Bioenergy Debtors whose cases were all jointly administered as the Missouri Cases. Carl Marks received stalking horse bid packages, including a credit bid for certain assets, from seven different parties. In consultation with the Missouri Bioenergy Debtors and its other professionals, Carl Marks analyzed and presented the bid packages, as well as negotiated extensively with the various parties to enter into three distinct stalking horse purchase agreements (collectively, the "Stalking Horse Purchase Agreements"), all dated June 12, 2016: (i) between Abengoa Bioenergy of Illinois, LLC ("ABIL") and Abengoa Bioenergy of Indiana, LLC ("ABI"), on the one hand, and Maize Acquisition Sub LLC (the "Maple Stalking Horse Purchaser"), on the other hand, for certain assets of ABIL and ABI (the "Maple Assets") in an amount no less than $200 million (the "Maple Stalking Horse Bid"); (ii) between ABNE and KE Holdings, LLC (the "Ravenna Stalking Horse Purchaser") for certain assets of ABNE (the "Ravenna Assets") in an amount no less than $115 million (the "Ravenna Stalking Horse Bid"); and (iii) between ABC and BioUrja Trading, LLC (the "York Stalking Horse Purchaser," and together with the Maple Stalking Horse Purchaser and the Ravenna Stalking Horse Purchaser, the "Stalking Horse Purchasers," and each a "Stalking Horse Purchaser") for certain assets of ABC (the "York Assets") in an amount no less than $45 million.

The *Debtors' Motion for Entry of an Order (I) (A) Approving and Authorizing Bidding Procedures in Connection with the Sale of One or More of the Debtors' Assets, (B) Approving Stalking Horse Protections, (C) Approving Procedures Related to the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (D) Approving the Form and Manner of Notice Thereof, and (II) (A) Authorizing the Sale of One or More of the Debtors' Assets Free and Clear of All Liens, (B) Approving The Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (C) Granting Related Relief* [Bankr. E.D.MO., Case No. 16-41161, D.I. 378] set forth certain bidding procedures that would govern: (i) the bidding process for the sale of certain tangible and intangible assets related to the business of the Missouri Bioenergy Debtors and (ii) procedures for the assumption and assignment of certain of the Missouri Bioenergy Debtors' executory contracts and unexpired leases. On June 15, 2016, the United States Bankruptcy Court for the Eastern District of Missouri entered an Order (the "Bid Procedures Order") approving, among other things, the bidding procedures requested in the Sale Motion.

Following entry of the Bid Procedures Order, Carl Marks led an exhaustive re-marketing process ahead of the final bid deadline of August 18, 2016. The re-marking process included contacting over 275 additional parties,

which led to thirty-four distinct site visits from potential bidders at the various production facilities. Ultimately, six additional bid packages were submitted by the August 18, 2016 bid deadline, including credit bids. Of these bid packages, the Missouri Bioenergy Debtors determined that four were qualified bid packages and invited each party to attend the auction on August 22, 2016. No qualified bids were received for the Maple Assets, and the qualified bidder for the Ravenna Assets withdrew its bid in advance of the auction.

On August 24, 2016, at the close of the auction, the following parties had submitted bids that were named the successful bidders:

- With respect to the Maple Assets, Green Plains Inc. was determined to be the successful bidder at $200 million;

- With respect to the Ravenna Assets, KE Holdings, LLC was determined to be the successful bidder at $115 million;

- With respect to the York Assets, Green Plains Inc. was determined to be the successful bidder at $35 million; and

- With respect to the Colwich Assets,[9] ICM, Inc. was determined to be the successful bidder at $3.15 million.

On August 30, 2016, the Missouri Court entered four orders, approving the sale and successful bids of the Missouri Bioenergy Debtors. The Missouri Bioenergy Debtors anticipate that these sales will close by the end of September.

### D.    Material Events of the Chapter 11 Cases

#### 1.    Chapter 11 Filings

In furtherance of Abengoa's global restructuring efforts, on March 29, 2016 (the "Petition Date"), Abeinsa Holding Inc.; Abengoa Solar, LLC; Abeinsa EPC LLC; Abencor USA, LLC; Inabensa USA, LLC; Nicsa Industrial Supplies, LLC; Abener Construction Services, LLC; Abener North America Construction, LP; Abeinsa Abener Teyma General Partnership; Abener Teyma Mojave General Partnership; Abener Teyma Inabensa Mount Signal Joint Venture; Teyma USA & Abener Engineering and Construction Services General Partnership; and Teyma Construction USA, LLC (collectively, the "Original Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. On April 6 and 7, 2016, the Abener Teyma Hugoton General Partnership; Abengoa Bioenergy Hybrid of Kansas, LLC; Abengoa Bioenergy New Technologies, LLC; Abengoa Bioenergy Biomass of Kansas, LLC; Abengoa Bioenergy Technology Holding, LLC; Abengoa US Holding, LLC; Abengoa US, LLC; and Abengoa US Operations, LLC (collectively, the "Additional Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. On June 12, 2016, Abengoa Bioenergy Holdco, Inc. and Abengoa Bioenergy Meramec Holding, Inc. (collectively, the "Maple Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The chapter 11 cases of the Original Debtors, the Additional Debtors and the Maple Debtors are jointly administered for procedural purposes.

#### 2.    Retention of Professionals by the Debtors

On April 4, 2016, the Bankruptcy Court entered an order [D.I. 37], authorizing the Debtors to retain Prime Clerk LLC ("Prime Clerk") to perform certain claims and noticing functions in the Chapter 11 Cases. The order retaining Prime Clerk further provided that the fees and expenses incurred pursuant to Prime Clerk's provision of services would be treated as administrative expenses of the Debtors' estates.

On May 25, 2016, the Bankruptcy Court authorized the Debtors to retain DLA Piper LLP (US) as their attorneys pursuant to section 327(a) of the Bankruptcy Code in connection with these Chapter 11 Cases [D.I. 281].

---

[9] The "Colwich Assets" include an ethanol plant located on 73 acres of land in Colwich, Kansas together with all proceeds and products therefrom and from any and all attachments, accession, additions, enhancements, and replacements thereto

### 3.   Formation of the Creditors Committee

The Office of the United States Trustee formed an Official Committee of Unsecured Creditors (the "Creditors Committee") on April 13, 2016 [D.I. 74]. The Creditors Committee is currently comprised of (i) Société Générale, as Agent to the 2014 €1.4 Billion Syndicated Loan Facility, (ii) Deutsche Trustee Company Limited, as trustee under certain series of Notes, (iii) Deutsche Bank Trust Company Americas, as trustee under certain of the Notes, (iv) FHI Plant Services, and (v) Archer Daniels Midland Co. On May 25, 2016, the Creditors Committee retained Hogan Lovells US LLP [D.I. 276] and Morris, Nichols, Arsht & Tunell as counsel [D.I. 318], and FTI Consulting, Inc.as financial advisors [D.I. 277].

### 4.   First Day Relief

#### a.   *Joint Administration*

On March 31, 2016, the Bankruptcy Court entered a final order allowing the joint administration of the Original Debtors solely for procedural purposes to reduce the financial and other resources spent on administering their Chapter 11 Cases [D.I. 21]. After the Additional Debtors and the Maple Debtors filed for chapter 11 bankruptcy, they were made subject to the previously entered orders in the Chapter 11 Cases of the Original Debtors, including the joint administration order, with the exception of the chapter 11 case of Additional Debtor Abengoa Bioenergy Biomass of Kansas, LLC, Case No. 16-10876, which has been stayed until the resolution of the dual proceedings issue described below. Therefore, with the aforementioned limited exception, all Debtors are being administered jointly.

At a hearing held on April 27, 2016, the Bankruptcy Court requested that the Debtors stay Case No. 16-10876 of ABBK pending resolution of the dual proceedings before the United States Bankruptcy Court for the District of Kansas and the Bankruptcy Court. On May 2, 2016, the Bankruptcy Court entered the *Order Directing that Certain Orders Entered in the Chapter 11 Case of Abeinsa Holding Inc. Be Made Applicable to Additional Debtors in Subsequently Filed Cases* [D.I. 155] and ordered the chapter 11 case of ABBK and all deadlines associated therewith stayed pending further order of the Bankruptcy Court. On June 13, 2016, the Bankruptcy Court entered the *Order Modifying Case Caption*, reflecting the stay of the ABBK chapter 11 case on the case caption. [D.I. 353].

#### b.   *Cash Management*

On March 31, 2016 [D.I. 23] and April 27, 2016 [D.I. 134], the Bankruptcy Court entered an interim and final order, respectively, authorizing the Debtors to continue using their established cash management system, bank accounts, and documents related to the bank accounts, in lieu of closing existing accounts and establishing an entirely new post-petition cash management system, to avoid disruption.

#### c.   *Employee Wages*

The Debtors sought the Bankruptcy Court's authority to pay prepetition wages and related benefits in the ordinary course of business, believing that it was critical for them to retain their current employees as their knowledge and understanding of the Debtors' operations is essential for the Debtors to continue to operate during the Chapter 11 Cases. Any delay in paying pre-petition or post-petition compensation or benefits to the Debtors' employees would destroy the Debtors' relationship with their employees and irreparably harm employee morale at a time when the dedication, confidence and cooperation of the Debtors' employees is most critical. On March 31, 2014 [D.I. 24] and April 27, 2016 [D.I. 135], the Bankruptcy Court entered interim and final orders, respectively, granting the Debtors the authority to pay prepetition compensation and benefits owed employees (including, but not limited to, vacation pay, health insurance and other benefits) in the ordinary course of the Debtors' businesses.

#### d.   *Utilities*

The Bankruptcy Court entered an interim and then final order on March 31, 2014 [D.I. 26] and April 27, 2016 [D.I. 131], prohibiting the Debtors' utility providers from discontinuing, altering, or refusing service, and authorizing the Debtors to provide each utility provider with adequate assurance of future performance in the form of a cash deposit. The proposed aggregate amount of such deposits was to be $3,000.00, an amount equal to the

Debtors' calculation of two-week worth of utility services, excluding any amounts that were prepaid to the utility companies.  On April 27, 2016, the Bankruptcy Court entered the *Final Order (i) Approving Debtors' Proposed Form of Adequate Assurance of Payment, (ii) Establishing Procedures for Resolving Objections by Utility Companies, (iii) Prohibiting Utility Companies from Altering, Refusing or Discontinuing Service*, which authorized the Debtors to establish the utility deposit account in their discretion.

### 5.  Other Significant Motions

#### a.  *Ordinary Course Professionals*

The Debtors have a number of professionals that provide financial, real estate, technology, legal, tax and other services in the ordinary course of the Debtors' business.  As these ordinary course professionals are already familiar with the Debtors and their business, the Debtors requested authority to continue paying each such professional for services rendered and disbursements actually incurred.  On May 25, 2016, the Bankruptcy Court granted the motion [D.I. 283], authorizing the Debtors to pay each of their respective professionals up to a cap of $50,000 per month and $250,000 in the aggregate per each ordinary course professional over the life of the Chapter 11 Cases, without further approval of the Bankruptcy Court.  The Bankruptcy Court also approved the requested procedures for approval and payment of fees in excess of these limits.

#### b.  *Sale of the Ashalim Project*

On May 3, 2016, the Bankruptcy Court authorized Abengoa Solar to consent to and take reasonably necessary actions in order to permit a non-ordinary course of business sale of its indirect interest in a concentrated solar energy thermal power station plant with a guaranteed rated net power output of 110 MW currently under construction in the Ashalim area of the Negev Desert in Israel (the "Ashalim Project") [D.I. 162].  Specifically, Abengoa Solar consented to a sale of substantially all of the assets of its non-debtor indirect subsidiaries NEA Solar Power Ltd. and NEA Solar Operation and Maintenance Ltd. to a group of nonaffiliated purchasers.  The transaction was expected to bring between proximately €32 million and €37.9 million into Abengoa Solar's estate from the proceeds of the sale by virtue of funds flowing upstream to Abengoa Solar, as a second generation holding company (the "Ashalim Consideration").

The difference of €5.9 million in the Ashalim Consideration that Abengoa Solar received is due to a determination of a character of certain amounts owed downstream, by NEA Solar Power Ltd., one of the direct owners of the Ashalim Project, to Abengoa.  This amount was subject to a holdback (the "Holdback Amount"), the proper characterization and disposition of which was agreed upon by the Creditors Committee and Abengoa Solar.

Pursuant to the relevant sale agreement and related instruments, there were various conditions precedent that needed to be satisfied prior to closing, including obtaining approval from the State of Israel.  On or around August 4, 2016, the necessary conditions precedent to the closing of the sale took effect and the sale of the Ashalim Project closed.  On or around August 8, 2016, the proceeds of the sale were transferred to NEA Solar Power Ltd.  In consultation with the Creditors Committee, the Holdback Amount was resolved and approximately €2.7 million was paid to Abengoa Solar, S.A. while the remaining €3.2 million was transferred to Debtor Abengoa Solar.

#### c.  *Sale of the SAWS Project*

On May 25, 2016, the Bankruptcy Court authorized Teyma Construction and Abeinsa EPC (the Chapter 11 Debtors that are general partners in a non-Debtor general partnership, Abeinsa Abeima Teyma, General Partnership) and Abengoa Parent, Abengoa Water SL, and Abengoa Greenbridge, S.A.U (Chapter 15 Debtors) to consent to and take reasonably necessary actions in order to permit a non-ordinary course of business sale of membership interests in non-Debtor Abengoa Vista Ridge, LLC, held by another non-Debtor Abengoa Water to Garney P3 LLC [D.I. 240].  Abengoa Vista Ridge, LLC is a special purpose project development company that entered into a Water Transmission and Purchase Agreement dated November 4, 2014 with the City of San Antonio, Texas, acting by and through the San Antonio Water System Board of Trustees, to construct a regional water supply project, consisting of the production, treatment, delivery and sale of up to 50,000 acre-feet per year of potable water for a 30-year period starting in 2020 (the "SAWS Project").

The transaction consisted of a sale of 80% of the membership interests of Abengoa Vista Ridge, LLC under a Membership Interest and Purchase Agreement, as well as a transfer of the engineering, procurement, and construction agreement and various related agreements. The SAWS Transaction closed on or around June 15, 2016.

The SAWS Transaction relieved Abeinsa Abeima Teyma G.P. of certain obligations and provide it with releases, which releases inured to the benefit of the Chapter 11 Debtors, who as general partners of Abeinsa Abeima Teyma G.P., could have ultimately shared liability for those obligations in the approximate amount of $119 million. Additionally, upon closing, Abengoa was granted the right to obtain a release of guaranty obligations under existing financial debt.

#### d.    *Assumption and Assignment of Certain Management Agreements*

On May 25, 2016, the Bankruptcy Court entered an order, approving the assumption and assignment of certain executory contracts [D.I. 284], which relief will allow Abengoa Solar to collect approximately $3,374,981.90 (the "Management Fees") on or before June 1, 2018. Specifically, Abengoa Solar was a party to (i) a Project Management Services Agreement, dated as of December 20, 2010 (the "Solana MSA"), under which the Debtor was retained to perform post-construction administrative and management services functions to Arizona Solar One LLC with respect to the Solana Project, (ii) a Project Management Agreement, dated as of September 12, 2011 (the "Mojave MSA"), under which Abengoa Solar was retained to perform post-construction administrative and management services functions to Mojave Solar LLC with respect to the Mojave Project, and (iii) a Management Services Agreement, dated as of September 30, 2013 (the "ASO MSA" and together with the Solana MSA and the Mojave MSA, the "MSAs") with ASO Holdings Company LLC ("ASO"), in which Abengoa Solar agreed to provide certain management and administrative services to ASO, an entity formed by Abengoa Solar US Holdings Inc. and Liberty Solar Energy, LLC under the Second Amended and Restated Limited Liability Company Agreement.

Under the Solana MSA and Mojave MSA, Abengoa Solar is entitled to receive a management fee for the services it provides to Arizona Solar One LLC (equal to 1.0% of gross operating revenues) and to Mojave Solar LLC (equal to 1.25% of gross operating revenues). Payment of the management fees, however, is subject to certain restrictions, including the requirement that the fees are only payable out of funds available if equity distributions are permitted to be made by Arizona Solar One LLC and Mojave Solar LLC to its upstream equity owners under certain loan guarantee agreement executed with the DOE. To date, Abengoa Solar has not received payment of any of the Management Fees.

As consideration for the assignment of the MSAs to Atlantica Yield's affiliate, ASHUSA Inc. ("Ashusa"), Atlantica Yield has agreed to pay to Abengoa Solar an amount equal to the unpaid portion of the Management Fees by June 1, 2018. According to this arrangement, Abengoa Solar has not assigned the rights that it currently has under the MSAs to collect the Management Fees, and, thus, if the Management Fees under the MSAs are paid at any time prior to June 1, 2018, Abengoa Solar will be entitled to payment of the Management Fees from Ashusa.

#### e.    *Motions for Relief from Stay*

Prior to the Petition Date, Portland General Electric ("PGE") selected AAT, Abeinsa EPC, Abener Construction, and Teyma Construction (collectively, the "Carty Debtor-Contractors") as a general turnkey contractor for construction of a combined cycle combustion turbine and related facility for the generation of energy near Boardman, Oregon (the "Carty Project"). The Parties entered into that certain *Turnkey Engineering, Procurement & Construction Agreement for Carty Generating Station*, dated June 3, 2013, under which the Carty Debtor-Contractors would furnish certain labor, services, equipment, and materials for the construction of the Carty Project (the "Carty EPC Contract").

On or about November 27, 2015, PGE sent the Sureties and the Carty Debtor-Contractors (as defined below) a "Notice of Owner Consideration of Declaring Contractor Default" under the terms of the Carty Performance Bond (as defined below). In the November 27 letter, PGE stated that it had determined that the Carty Debtor-Contractors may be in default under the terms of the Carty EPC Contract, including Section 29.1 of the Carty EPC Contract. PGE's justification for the notice was the appearance of reports in the financial press indicating that Abengoa had sought protection under article 5 bis of the Spanish Insolvency Law. The Carty Debtor-Contractors informed PGE that Abengoa's seeking protection under article 5 bis was not an actual admission of

insolvency, and therefore not a default under the Carty EPC Contract or the Carty Guaranty Agreement. Additionally, the Carty Debtor-Contractors informed PGE that it was dedicated to completing the Carty Project, and the Carty Debtor-Contractors sought an expedited payment of funds owed under the EPC Agreement (which were already due) in order to shore-up the effects of the funding crush resulting from Abengoa's 5 bis pre-insolvency proceedings in Spain. The Carty Debtor-Contractors and PGE began negotiating a revised payment schedule. PGE and the Carty Debtor-Contractors negotiated two payment agreements whereby PGE would provide the Carty Debtor-Contractors partial payments. On or about December 18, 2015, PGE refused to abide by the terms of the payment agreements and the EPC Contract and abruptly terminated the EPC Contract based on Articles 29.1 and 7.10 of the EPC Contract.

Without payment of the necessary funds from PGE that were rightly due, the Carty Debtor-Contractors were unable to pay subcontractors that had previously been engaged. A number of subcontractors (the "Carty Subcontractors") filed liens against PGE and the Carty Debtor-Contractors pre-petition. With the exception of one lien (which was filed shortly before), all such liens were filed after PGE terminated the EPC Agreement. Under Oregon law, in order to perfect their liens, the Carty Subcontractors were required to commence litigation and file a summons and complaint against PGE and the Carty Debtor-Contractors. The Carty Debtor-Contractors entered into multiple stipulations granting relief from stay to the Carty Subcontractors in order to allow the Carty Subcontractors to perfect their liens under Oregon law. Additional information regarding the Carty Project is set forth in Section III.D.7.b – Carty Litigation.

### 6.  Significant Projects

#### a.  *The Fulcrum Project*

On or about May 5, 2015, Fulcrum BioEnergy, Inc. ("Fulcrum"), a company unaffiliated with Abengoa, announced that it awarded a $200 million fixed-price engineering, procurement and construction contract (the "Fulcrum EPC Contract") to AAT for the Fulcrum Project, consisting of the construction of the Sierra BioFuels Plant in McCarran, Nevada, the first municipal solid waste to transportation fuels facility. The Sierra BioFuels Plant utilizes Fulcrum's process of converting household garbage that would otherwise be landfilled into renewable syncrude that will be upgraded to jet fuel.

Fulcrum and AAT entered into the Fulcrum EPC Contract on or about May 20, 2015. Parties to the Fulcrum EPC Contract continue to negotiate annexes and amendments to such Contract. Two limited notices to proceed were issued by Fulcrum. As of September 2016, many conditions under the Fulcrum EPC Contract needed to be satisfied, including project financing, bonding and guarantees and exhibits to the Fulcrum Contract. In an effort to secure approvals to move forward with the Fulcrum Project, the Debtors provided certain financial information to the Creditors Committee.

#### b.  *The Mojave Project*

On or about September 12, 2011, Mojave and its partners, Teyma Construction and Abener North America, entered into an engineering, procurement and construction services agreement with Mojave Solar LLC to construct the Mojave Plant, which produces and sells electricity to the Pacific Gas and Electric Company. The Mojave Project remains wholly owned by Mojave Solar LLC, which, through its formation and the development and a majority of the construction of the Mojave Project, was a 100%-owned indirect subsidiary of Abengoa Solar. Mojave Solar (and by extension, the Mojave Project) were transferred to YieldCo in connection with its IPO in June 2014.

Mojave completed construction of the Mojave Plant on or about April 20, 2015. Mojave is still under certain warranty obligations and has to finalize the work listed on the "punch list." Prior to the Petition Date, Mojave's operations at the Mojave Plant were significantly reduced.

#### c.  *The Solana Project*

On December 20, 2010, Arizona Solar One LLC, Abeinsa EPC, Abener Construction, as partners of Solana, and Solana as "Contractor," entered into a Turnkey Engineering, Procurement and Construction Contract (the "Solana EPC Contract") to design, engineer, procure, construct, start-up and test the Solana Plant. The Solana

Plant is a 280 MW (gross) concentrating solar power plant located near the town of Gila Bend in Maricopa County, Arizona. On June 30, 2014, Abeinsa EPC transferred its participation in Solana to its affiliate, Teyma Construction.

The Solana Plant remains wholly owned by Arizona Solar One LLC which, through its formation and the development and a majority of the construction of the Solana Plant, was a 100%-owned indirect subsidiary of Abengoa Solar. Arizona Solar One LLC (and by extension, the Solana Plant) were transferred to YieldCo in connection with its IPO in June 2014.

The Solana Plant is under a Performance Warranty (and certain limited items are still under a Construction Warranty). Arizona Solar One LLC requested that Solana to perform additional works to improve the operation and performance of the Solana Plant, including the design and build of an additional water treatment plant. Currently, Solana is working with Arizona Solar One LLC as a project manager and on a cost reimbursable basis (no fees). Arizona Solar One LLC pays directly suppliers and subcontractors that are needed to perform these works.

### 7.  Significant Litigation

#### a.  *ARB Litigation*

Prior to the Petition Date, on September 15, 2014, contractor ARB, Inc. ("ARB") sued Mojave, Abeinsa, Abener North America, Mojave Solar LLC, and Abengoa Solar, as well as, Liberty Mutual Insurance Company and Zurich American Insurance Company (collectively, the "Sureties") in San Bernardino Superior Court, Case No. CIVDS1500245. The litigation pending before San Bernardino Superior Court was halted pending the resolution of parallel arbitration before the ICC. On March 29, 2016, when Mojave filed a voluntary petition for relief, the San Bernardino litigation became subject to the automatic stay as it was entering into the discovery phase. ARB moved to lift the automatic stay against the Sureties in San Bernardino Superior Court, a decision on which motion was delayed until September 2016 in order to determine if the Parties would stipulate to or otherwise receive relief from the stay. The arbitration before the ICC has been continued. On July 6, 2016, the arbitrators issued a procedural order vacating the hearing scheduled for October 2016 and setting a new tentative revised procedural timetable. On August 17, 2016, the arbitrators issued a procedural order vacating the tentative revised procedural timetable and suspending the arbitration before the ICC. The Debtors dispute their liability on account of these claims.

#### b.  *Carty Litigation*

Prior to the Petition Date, Portland General Electric ("PGE") determined that it would need to build a combined cycle combustion turbine and related facility for the generation of energy near Boardman, Oregon (the "Carty Project") to provide additional generating capacity to meet its customers' anticipated needs. PGE commenced a competitive bidding process to solicit bids for contractor services, and as a result, selected AAT, Abeinsa EPC, Abener Construction, and Teyma Construction (the "Carty Debtor-Contractors") as a general turnkey contractor for construction of the Carty Project. PGE and the Carty Debtor-Contractors entered into that certain *Turnkey Engineering, Procurement & Construction Agreement for Carty Generating Station*, dated June 3, 2013 (the "Carty EPC Contract"), under which the Carty Debtor-Contractors would furnish certain labor, services, equipment, and materials for the construction of the Carty Project.

Abengoa guaranteed the obligations of the Carty Debtor-Contractors under the Carty EPC Contract pursuant to an agreement with PGE (the "Carty Guaranty Agreement") signed on or about July 30, 2013. Under Article 10 of the Carty Guaranty Agreement, Abengoa and PGE agreed that an arbitration before the International Chamber of Commerce International Court of Arbitration would be the exclusive forum in the event of a dispute under the Carty Guaranty Agreement.

In connection with the Carty EPC Contract, PGE required the Carty Debtor-Contractors to obtain a performance bond, for the benefit of PGE, guaranteeing the performance of the Carty EPC Contract. Liberty Mutual Insurance Company and Zurich American Insurance Company (collectively, the "Sureties") executed and posted a performance bond (the "Carty Performance Bond"), No. 17150884/9130851 in the amount of $145,611,779.60, naming AAT as principal.

Upon execution of the Carty EPC Contract, works were initiated for the engineering and erection of the Carty Project. By November 2015, sixteen out of the twenty progress and payment milestones set forth in the EPC

Contract had been achieved.  The Carty Debtor-Contractors were able to certify that the seventeenth of twenty milestones had been met in November 2015, representing that the construction of the Carty Project was 90% complete.  PGE failed to acknowledge the progress made by the Debtor-Contractors, and refused to certify or produce payment on the seventeenth milestone.  PGE, after its failure to certify the seventeenth milestone, was not willing to approve or pay invoices, which were worth more than $10,000,000, to the Carty Debtor-Contractors. PGE also failed to compensate the Carty Debtor-Contractors for other concepts, including approximately $2,000,000 in change order works which had been completed and approved by PGE.  By this time, the Carty Debtor-Contractors had a right to receive payments totaling in excess of $14,000,000 for work performed under the Carty EPC Contract.

On or about November 27, 2015, PGE notified the Carty Debtor-Contractors that it was considering placing the Carty Debtor-Contractors into default under the terms of the Carty EPC Contract.  PGE's justification for the notice was the appearance of reports in the financial press indicating that Abengoa had sought protection under article 5 bis of the Spanish Insolvency Law.  The Carty Debtor-Contractors informed PGE that Abengoa's seeking of protection under article 5 bis was not an actual admission of insolvency, and therefore not a default under the Carty EPC Contract or the Carty Guaranty Agreement.  On or about December 18, 2015, PGE terminated the EPC Contract.

In December 2015, PGE approached the Sureties seeking to recover under the Carty Performance Bond. Following their investigation, the Sureties denied PGE's claim in part on the basis that the Carty Debtor-Contractors and Abengoa had raised a proper and viable wrongful termination claim, that PGE had not disproven the wrongful termination claim, and that, as a result, PGE had not satisfied the conditions precedent to seeking recovery under the Carty Performance Bond.

On December 31, 2015, Abengoa commenced arbitration against PGE with the International Chamber of Commerce International Court of Arbitration, ICC Case No. 215620/RD.  Abengoa joined the Carty Debtor-Contractors and the Sureties as impleaded parties under the terms of the Carty Guaranty Agreement and in accordance with the rules of the International Chamber of Commerce International Court of Arbitration.  The Carty Debtor-Contractors and the Sureties consented to join in the arbitration and assume the ruling of the ICC Tribunal and subsequently participated in the arbitration.  On March 28, 2016, the Carty Debtor-Contractors filed an answer and claim in the arbitration requesting, among other things, an order directing PGE to pay damages for all losses and damages suffered by the Carty Debtor-Contractors as a result of PGE's termination of the Carty EPC Contract, in an amount not less than $78,000,000.

On February 29, 2016, PGE commenced an action in the United States District Court for the District of Oregon against Abengoa, accompanied by a motion for preliminary injunction in an attempt to bar Abengoa from pursuing the arbitration.  The action in the United States District Court is currently subject to the automatic stay, which was imposed on a provisional basis and was continued on a final basis under the *Order Granting Interim and Provision Relief*, *In re Abengoa, S.A.*, Case No. 16-10754 (KJC) (Bankr. D. Del. Mar. 31, 2016) [D.I. 20] and *Order Recognizing Spanish Proceeding As a Foreign Main Proceeding and Granting Relief in Aid Thereof*, *In re Abengoa, S.A.*, Case No. 16-10754 (KJC) (Bankr. D. Del. Apr. 27, 2016) [D.I. 71].  *Portland General Electric Company v. Abengoa, S.A.*, Case No. 3:16-cv-00375-HZ (D. Or.).

On March 23, 2016, PGE commenced a separate action before the United States District Court for the District of Oregon against the Sureties seeking to recover under the Performance Bond.  *Portland General Electric Company v. Liberty Mutual Ins. Co. and Zurich American Ins. Co.*, Case No. 3:16-cv-00495-HZ (D. Or.).  The Sureties moved to stay the action, and PGE then moved to enjoin the Sureties from pursuing claims in the arbitration.  The United States District Court for the District of Oregon issued an opinion and order on July 28, 2016, denying the Sureties' motion to stay the action and granting PGE's motion to enjoin the Sureties from participating in the arbitration before the International Chamber of Commerce International Court of Arbitration.  On August 5, 2016, the Sureties appealed the July 28, 2016 opinion and order to the United States Court of Appeals for the Ninth Circuit.  The Sureties have requested the District Court to stay the action pending appeal.

On May 25, 2016, PGE filed the *Motion of Portland General Electric for Relief from Stay* [D.I. 286] seeking relief from the automatic stay of section 362 of the Bankruptcy Code to commence and prosecute to final judgment an action against AAT, Abeinsa EPC, Abener Construction, and Teyma Construction in the United States District Court for the District of Oregon.  The Debtors filed the *Debtors' Objection to Motion of Portland General Electric for Relief from Stay [D.I. 286]*.  The Bankruptcy Court held an initial hearing on the *Motion of Portland*

*General Electric for Relief from Stay* on July 7, 2016, and a status conference on July 14, 2016, during which the Bankruptcy Court continued the hearing to August 9, 2016, indicating a desire to consider the ruling of the United States District Court for the District of Oregon on motions pending before it.  On August 5, 2016, following the entry of the opinion and order of the United States District Court for the District of Oregon PGE and the Debtors filed supplemental briefs describing their respective interpretations of the effect of the July 28 opinion and order issued by the United States District Court for the District of Oregon.  On August 9, 2016, a hearing was held.  As of the date hereof, the Bankruptcy Court has not entered or otherwise issued an order resolving PGE's motion for relief from stay.

## IV.    SUMMARY OF THE PLAN OF REORGANIZATION

**This Disclosure Statement contains only a summary of the Plan, a copy of which is included herein as <u>Exhibit A</u>.  It is not intended to replace the careful and detailed review and analysis of the Plan, but only to aid and supplement such review.  This Disclosure Statement is qualified in its entirety by reference to the Plan, the Plan Supplement and the exhibits attached thereto and the agreements and documents described therein.  If there is a conflict between the Plan and this Disclosure Statement, the provisions of the Plan will govern.  You are encouraged to review the full text of the Plan and the Plan Supplement and to read carefully the entire Disclosure Statement, including all exhibits, before deciding how to vote with respect to the Plan.**

### A.    Means of Implementation of the Plan

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies resolved pursuant to the Plan.

### 1.    Spanish Master Restructuring Agreement[10]

As set forth below, an agreement was reached by Abengoa, the New Financing Backstoppers, and the Steering Committee for the overall restructuring of the Affected Debtor and the Non-Spanish Debt to be restructured, as required in accordance with the Viability Plan for the continuity of the of the Abengoa Group as a going concern.

The Plan is sponsored by the Parent and is part of an integrated global restructuring in which the Parent has negotiated with the holders of Spanish Affected Debt for the compromise of their claims in exchange for the treatment provided them and others under the Master Restructuring Agreement, namely, either the Standard Restructuring Terms, or the Alternate Restructuring Terms.  As such, the Plan implements the Master Restructuring Agreement with respect to the Debtors.  The Master Restructuring Agreement also provides that the Parent and the Chapter 15 Companies will seek approval of the Spanish Homologation in their Chapter 15 cases, which are also pending before this Bankruptcy Court.  Additionally, the Master Restructuring Agreement provides that ACIL will propose the ACIL CVA, which will also be submitted to this Bankruptcy Court for recognition and to permit ACIL to seek additional assistance and appropriate relief from this Bankruptcy Court.  The Master Restructuring Agreement further provides that certain other of the Parent's subsidiary companies may file local recognition proceedings in relevant jurisdictions in respect of the Extension of the Standard Restructuring Terms or may pursue other Non-Spanish Compromise Proceedings (as applicable).

The Master Restructuring Agreement provides similar treatment, namely the Standard Restructuring Terms, to creditors around the globe while respecting the laws and regulations of the relevant jurisdictions.  As a matter of private contract law, however, creditors that qualify may accede to the Master Restructuring Agreement and elect the Alternate Restructuring Terms, which include, among other Alternative Restructuring Entitlements, the issuance of such creditors of new equity securities of the Parent.  The Plan has not proposed and does not provide the Alternate Restructuring Terms; rather, as a means of implementing the Global Restructuring, the Go-Forward Chapter 11 Companies will provide the Replacement Guarantees and may participate in additional transactions contemplated by the Master Restructuring Agreement.

---

[10]  The capitalized terms used in Section IV.A.1 and Section IV.A.2 of the Disclosure Statement but not otherwise defined in this Disclosure Statement or the Plan shall have the meanings ascribed to them in the Master Restructuring Agreement.

The Master Restructuring Agreement, as sponsored by Parent, has provided for appropriate treatment under US law while at the same time facilitating the framework of the Master Restructuring Agreement to occur under and in accordance with Spanish law.  The Debtors do not seek approval of the Master Restructuring Agreement or any of its terms; however, the Parent's global restructuring is closely integrated with the Chapter 11 Cases and creditors voting in favor of the Plan will be deemed to have accepted the treatment under the Plan notwithstanding any treatment that may be available under the Master Restructuring Agreement; provided, however, that holders of Claims in Classes 3 and 6 of each of the EPC Restructuring Debtors' Plan and the Solar Restructuring Debtor's Plan may be entitled to participate in additional transactions under the Master Restructuring Agreement.  The Go-Forward Chapter 11 Companies are authorized under the Plan to facilitate the implementation of the Master Restructuring Agreement.  The Confirmation Order will provide them with the authority to do so and will provide certain additional terms and protections to the Parent and the other Abengoa Group companies to further facilitate the Master Restructuring Agreement, including, but not limited to, providing for application of the exemption under section 1145 of the Bankruptcy Code from the registration requirements of the Securities Act in favor of the equity securities of the Parent as a sponsor of the Plans to be issued pursuant to the Master Restructuring Agreement.

## 2.  Distributions Under the Plan

### a.  Plan of Reorganization: Responsible Person

#### (1)  Appointment of the Responsible Person

From and after the Effective Date, the Plan and the Reorganized Debtors will be administered and actions will be taken in the name of the Reorganized Debtors through the Responsible Person.  The Responsible Person will act for the Reorganized Debtors in a fiduciary capacity as applicable to a board of directors, subject to the Plan.  All distributions under the Plan will also be made by the duly appointed Responsible Person.

The Plan provides that the Creditors Committee will consult with the Reorganizing Debtors on the selection of the Person who will serve as the Responsible Person.  Not less than fifteen (15) days prior to the Confirmation Hearing, the Creditors Committee will designate the Person to initially serve as the Responsible Person, subject to the Reorganizing Debtors' consent.  The Creditors Committee will provide the Reorganizing Debtors with such diligence information regarding the designee as the Reorganizing Debtors may reasonably request.  Subject to the receipt of such diligence information, the Reorganizing Debtors' consent to the designee will not be unreasonably withheld or delayed.  The Reorganizing Debtors will file a notice with the Bankruptcy Court not less than ten (10) days prior to the Confirmation Hearing setting forth the Person selected to be Responsible Person pursuant to the foregoing procedures and seeking approval of such designation.  The Creditors Committee shall provide such information as shall be reasonably requested in connection with such notice, including the qualifications and experience of the designated Person.  Upon the approval by the Bankruptcy Court and the occurrence of the Effective Date, the designated Person shall assume the position of Responsible Person.

#### (2)  Rights and Powers of the Responsible Person

In furtherance of and consistent with the purpose of the Plan, the Responsible Person shall, among other things, have the rights, powers and duties, subject to the limitations set forth in the Plan:

- To hold, manage, dispose of, sell, convert to Cash, and distribute the Debtors' assets, including investigating, prosecuting and resolving the Causes of Action of the Debtors, if any;

- To hold the Debtors' assets for the benefit of the Creditors that are entitled to Distributions therefrom under the Plan, whether their Claims are Allowed on or after the Effective Date;

- In the Responsible Person's reasonable business judgment, to investigate, prosecute, settle, liquidate, dispose of, or abandon the Debtors' assets, including rights, Causes of Action, or litigation;

- To monitor and enforce the implementation of the Plan;

- To file all tax and regulatory forms, returns, reports and other documents and financial information required with respect to the Debtors;

- In the Responsible Person's reasonable business judgment, to reconcile and object to Claims and Equity Interests, and manage, control, prosecute and/or settle on behalf of the Estates objections to Claims and Equity Interests on account of which the Responsible Person (as Disbursing Agent) will be responsible (if Allowed) for making Distributions under the Plan;

- To take all actions necessary, and create any documents necessary, to wind up the affairs and effect a dissolution of the Debtors and implement the Plan;

- To hold, manage, and distribute the Debtors' assets obtained through the exercise of its power and authority;

- To act as a signatory of the Debtors and for all purposes, including those associated with the novation of contracts or other obligations arising out of the sales of any remaining assets;

- To dispose of the Books and Records transferred to the Responsible Person in a manner deemed appropriate by the Responsible Person; provided, however, that the Responsible Person shall not dispose of any Books and Records that are reasonably likely to pertain to pending litigation in which the Debtors or their current or former officers or directors are a party or that may pertain to General Unsecured Claims without further order of the Bankruptcy Court;

- To take all necessary action and file all appropriate motions to obtain an order and a Final Decree closing the Chapter 11 Cases;

- To enter into and exercise rights under contracts that are necessary or desirable to the administration of the Debtors and execute any documents or pleadings related to the liquidation of the assets;

- To establish and maintain bank accounts and terminate such accounts as the Responsible Person deems appropriate;

- To bring suits or defend itself against such suits, if any, as the Responsible Person determines in connection with any matter arising from or related to the Plan that affects in any way the rights or obligations of Creditors or holders of Equity Interests;

- To take such other and further actions as are permitted by the Plan and are not inconsistent with the Plan. In all circumstances, the Responsible Person shall use reasonable best efforts to maximize the value of the assets of the Debtors' Estates in the best interests of all Creditors.

(3)  Resignation or Termination of the Responsible Person

The Responsible Person may resign by giving at least thirty (30) days prior written notice thereof to the Bankruptcy Court.  Such resignation shall become effective on the later to occur of (i) the date specified in such written notice and (ii) the effective date of the appointment of a successor Responsible Person in accordance with the terms hereof and such successor's acceptance of such appointment in accordance with the terms hereof.

The Responsible Person may be removed, with cause, and replaced by the Bankruptcy Court upon motion by any holder of an Allowed Claim duly noticed to the Responsible Person and all holders of Claims, who shall have the right to appear and be heard with respect to such motion.  Such removal shall become effective on the date specified in such action by the Bankruptcy Court.

The resignation, removal, incompetency, bankruptcy or insolvency of the Responsible Person shall not operate to revoke any existing agency created by the Plan, or the Confirmation Order or invalidate any action theretofore taken by the Responsible Person.  All fees and expenses incurred by the Responsible Person prior to the resignation, incompetency or removal shall be paid from the assets, unless such fees and expenses are Disputed by the successor Responsible Person, in which case the Bankruptcy Court shall resolve the dispute and any disputed fees and expenses of the predecessor Responsible Person that are subsequently Allowed by the Bankruptcy Court shall be paid from the assets.  In the event of the resignation or removal of the Responsible Person, Responsible Person shall:  (a) promptly execute and deliver such documents, instruments and other writings as may be

reasonably requested by the successor Responsible Person or directed by the Bankruptcy Court to effect the termination of such Responsible Person's capacity under the Plan and Confirmation Order; (b) promptly deliver to the successor Responsible Person all documents, instruments, records and other writings related to the administration of the assets as may be in the possession of such Responsible Person; provided, however, that such Responsible Person may retain one copy of each of such documents for its purposes, subject to the terms of any joint prosecution and common interest agreement to which the Responsible Person is party; and (c) otherwise assist and cooperate in effecting the assumption of its obligations and functions by such successor Responsible Person.

Any successor Responsible Person appointed hereunder shall execute an instrument accepting its appointment and shall deliver one counterpart thereof to the Bankruptcy Court for filing and, in case of the Responsible Person's resignation, to the resigning Responsible Person. Thereupon, such successor Responsible Person shall, without any further act, become vested with all the liabilities, duties, powers, rights, title, discretion and privileges of its predecessor with like effect as if originally named Responsible Person and shall be deemed appointed under Bankruptcy Code section 1123(b)(3)(B). The resigning or removed Responsible Person shall duly assign, transfer and deliver to such successor Responsible Person all property and money held by such resigning or removed Responsible Person hereunder and shall, as directed by the Bankruptcy Court or reasonably requested by such successor Responsible Person, execute and deliver an instrument or instruments conveying and transferring to such successor Responsible Person, all the liabilities, duties, powers, rights, title, discretion and privileges of such resigning or removed Responsible Person.

The Responsible Person may resign by giving at least thirty (30) days prior written notice thereof to the Reorganized Debtors and the Bankruptcy Court, and any party in interest may apply to the Bankruptcy Court at any time to remove the Responsible Person upon a showing of cause or that such removal is otherwise appropriate. In the event of any such resignation or removal, or the death or incapacity of a Responsible Person, the Reorganized Debtors will appoint a new Responsible Person and will obtain Bankruptcy Court approval of such appointment, which approval may be obtained prior to or as soon as reasonably practicable after such appointment. No successor Responsible Person hereunder will in any event have any liability or responsibility for the acts or omissions of any of his/her predecessors. Every successor Responsible Person appointed pursuant hereto will execute, acknowledge and deliver to his/her predecessor an instrument in writing accepting such appointment hereunder, and thereupon such successor Responsible Person, without any further act, will become fully vested with all of the rights, powers, duties and obligations of his/her predecessor.

### (4) Exculpation; Indemnification

The Indemnified Persons shall be held harmless and shall not be liable for actions taken or omitted in their capacity as, or on behalf of, the Responsible Person or the Liquidating Trustee (as applicable), except those acts that are determined by Final Order of the Bankruptcy Court to have arisen out of their own intentional fraud, willful misconduct, or gross negligence, and each shall be entitled to be indemnified, held harmless, and entitled to advancement (and indemnification for the same amounts if the Indemnified Persons do not seek or receive advancement) for fees and expenses including, without limitation, reasonable attorney's fees, which such Persons and Entities may incur or may become subject to or in connection with any action, suit, proceeding or investigation that is brought or threatened against such Persons or Entities in respect of that Person's or Entity's or the Responsible Person's or Liquidating Trustees' actions or inactions regarding the implementation or administration of the Plan, or the discharge of their duties hereunder, except for any actions or inactions that are determined by Final Order of the Bankruptcy Court to have arisen from intentional fraud, willful misconduct or gross negligence. Any Claim of the Indemnified Persons to be indemnified, held harmless, advanced, or reimbursed shall be satisfied from the Debtors' assets, or any applicable insurance coverage.

### (5) Manner and Timing of Distributions

The Responsible Person will make distributions on account of Allowed Claims as provided by the Plan. Any payment of cash made under the Plan may, at the option of the Responsible Person, be made by check drawn on a domestic bank or wire transfer.

If any payment, distribution, or act under the Plan is required to be made or performed on a date that is not a Business Day, then such payment or distribution or the performance of such act may occur on or as soon as

reasonably practicable after the next succeeding Business Day, but will be deemed to have been completed as of the required date.

### b.    *Plans of Liquidation: Liquidating Trustee*

#### (1)    Formation of the Liquidating Trusts

By the Effective Date, the EPC Liquidating Debtors and the Bioenergy and Maple Liquidating Debtors, on their own behalf and on behalf of the beneficiaries, shall execute the respective Liquidating Trust Agreements, in a form reasonably acceptable to the Creditors Committee, and all other necessary steps shall be taken to establish the Liquidating Trusts.  The Liquidating Trusts shall be established for the sole purpose of adjudicating General Unsecured Claims and US Debt Claims and distributing the Liquidating Trusts' assets for the benefit of the beneficiaries of the Liquidating Trusts with no objective to continue or engage in the conduct of a trade or business. The Liquidating Trusts shall be deemed to be a party in interest for purposes of contesting, settling or compromising objections to General Unsecured Claims, US Debt Claims or Causes of Action.  The Liquidating Trusts shall be vested with all the powers and authority set forth in the Plan and the Liquidating Trust Agreements.  The Liquidating Trustee shall be the sole entity responsible for reconciling and objecting to General Unsecured Claims and US Debt Claims, and making Distributions to Allowed General Unsecured Claims and Allowed US Debt Claims.

#### (2)    Appointment of the Liquidating Trustee

The Liquidating Trust Agreement provides for appointment of the Liquidating Trustee.  On the Effective Date, the Liquidating Trustee shall be appointed through execution of the Liquidating Trust Agreement.

#### (3)    Funding of the Liquidating Trust

On the Effective Date, (i) $[●] will be paid from the respective Liquidating Debtors' Estates, and (ii) $[●] will be funded from the Parent, to the Liquidating Trusts for the benefit of holders of Allowed General Unsecured Claims and Allowed US Debt Claims for the Liquidating Debtors. The Liquidating Trusts shall handle reconciliation of Claims for General Unsecured Claims and US Debt Claims for the Liquidating Debtors only, with the Liquidating Trustees selected by the Creditors Committee.

In connection with the transfer of the Liquidating Trust Assets, any attorney-client privilege, work product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the Liquidating Trust will vest in the Liquidating Trust and its representatives, and the Debtors and the Liquidating Trust are authorized to take all necessary actions to effectuate the transfer of such privileges.

#### (4)    Role of the Liquidating Trustees

The duties and powers of each Liquidating Trustee will include the following:

- To exercise all power and authority that may be exercised, commence all proceedings that may be commenced and take all actions that may be taken, by any officer, director or shareholder of the Reorganizing Debtors with like effect as if authorized, exercised and taken by unanimous action of such officers, directors and shareholders;

- To continue to maintain accounts, make Distributions and take other actions consistent with the Plan, including the establishment, re-evaluation, adjustment and maintenance of appropriate reserves or escrows required or advisable in connection with the Plan;

- To monitor and advise the Liquidating Debtors with regard to the administration, collection and, if necessary, liquidation, of any or all assets of the Reorganizing Debtors;

- To compromise or settle any Claims (Disputed or otherwise);

- To make decisions regarding the retention or engagement of professionals, employees and consultants;

- To pursue or defend Causes of Action;

- To provide written reports on a quarterly basis (or such other information as may be requested by the Creditors Committee) of cash receipts and disbursements, asset sales or other dispositions, Claims reconciliation and Plan Distributions;

- To take all other actions not inconsistent with the provisions of the Plan which the Plan Administrator deems reasonably necessary or desirable with respect to administering the Plan; and

- To pay fees incurred under 28 U.S.C. § 1930(a)(6) and to file with the Bankruptcy Court and serve on the United States Trustee monthly financial reports until the Final Decree is entered closing these Chapter 11 Cases or the Cases are converted or dismissed, or the Bankruptcy Court orders otherwise.

<center>(5) <u>Liquidating Trust Implementation</u></center>

On the Effective Date, the Liquidating Trust will be established and become effective for the benefit of the holders of Allowed General Unsecured Claims and Allowed US Debt Claims for the EPC Liquidating Debtor Group and the Bioenergy and Maple Liquidating Debtor Group. The Liquidating Trust Agreement shall contain provisions customary to trust agreements utilized in comparable circumstances, including, but not limited to, any and all provisions necessary to ensure the continued treatment of the Liquidating Trust as a grantor trust and the holders of Allowed General Unsecured Claims and Allowed US Debt Claims for the EPC Liquidating Debtor Group and the Bioenergy and Maple Liquidating Debtor Group as the grantors and owners thereof for federal income tax purposes. The Debtors and the Liquidating Trustee shall execute any documents or other instruments as necessary to cause title to the Liquidating Trust Assets to be transferred to the Liquidating Trust.

<center>(6) <u>Termination of the Liquidating Trust</u></center>

The Liquidating Trust will terminate as soon as practicable, but in no event later than the fifth anniversary of the Effective Date; provided, on or after the date six months prior to such termination, the Bankruptcy Court, upon motion by a party in interest, may extend the term of the Liquidating Trust for a finite period if such an extension is necessary to liquidate the Liquidating Trust Assets or to complete any liquidation or distribution required under the Plan. Notwithstanding the foregoing, multiple extensions may be obtained so long as Bankruptcy Court approval is obtained no more than six months prior to the expiration of each extended term; provided that the Liquidating Trustee receives an opinion of counsel or a favorable ruling from the Internal Revenue Service that any further extension would not adversely affect the status of the Liquidating Trust as a grantor trust for federal income tax purposes.

<center>(7) <u>Termination of the Liquidating Trustee</u></center>

The duties, responsibilities, and powers of the Liquidating Trustee shall terminate in accordance with the terms of the Liquidating Trust Agreement.

<center>(8) <u>Exculpation; Indemnification</u></center>

The Liquidating Trustee, the Liquidating Trust, and their representatives shall be exculpated and indemnified pursuant to the terms of the Liquidating Trust Agreement.

<center>(9) <u>Rights and Powers of the Liquidating Trustee</u></center>

The Liquidating Trustee shall be deemed the Estate's representative in accordance with section 1123 of the Bankruptcy Code and shall have all the rights and powers set forth in the Liquidating Trust Agreement, including, without limitation, the powers of a trustee under section 704 and 1106 of the Bankruptcy Code and Bankruptcy Rule 2004, including without limitation, the right to: (a) effect all actions and execute all agreements, instruments and other documents necessary to implement the provisions of the Plan and the Liquidating Trust Agreement; (b) liquidate any Liquidating Trust Assets in one or more transactions; (c) prosecute, settle, abandon or compromise any Causes of Action, and pay any contingency or other fees of the Liquidating Trustee's professionals relating to same; (d) make distributions contemplated herein, (e) establish and administer any necessary reserves for Disputed Claims

that may be required; (f) object to Disputed Claims and prosecute, settle, compromise, withdraw or resolve such objections; (g) employ and compensate professionals and other agents, on an hourly, contingency fee, or other basis as the Liquidating Trustee deems appropriate, without further order of the Bankruptcy Court, to the extent not inconsistent with the status of the Liquidating Trust as a liquidating trust within the meaning of Treas. Reg. § 301.7701-4(d) for federal income tax purposes; (h) abandon or destroy Estate records without notice to any party; (i) destroy property of the Estate constituting confidential customer information without notice to any party; and (j) make, in good faith, determinations of the value of all Liquidating Trust Assets for consistent use by all parties to the Liquidating Trust Agreement for all federal tax purposes.

(10) <u>Fees and Expenses of the Liquidating Trust</u>

Except as otherwise ordered by the Bankruptcy Court, the costs and expenses of the Liquidating Trust incurred on or after the Effective Date shall be paid in accordance with the Liquidating Trust Agreement without further order of the Bankruptcy Court.

(11) <u>Manner and Timing of Distribution, Withholding</u>

The Liquidating Trust will make distributions to the Beneficiaries as provided by the Plan and pursuant to the Liquidating Trust Agreement. The Liquidating Trust may withhold from amounts distributable to any Entity any and all amounts, determined in the Liquidating Trustee's sole discretion, required by the Plan, or applicable law, regulation, rule, ruling, directive, or other governmental requirement.

(12) <u>Reports to Be Filed by the Liquidating Trust</u>

The Liquidating Trust will file and distribute reports regarding the liquidation or other administration of property comprising the Liquidating Trust, the distributions made by it, and other matters required to be included in such report in accordance with the Liquidating Trust Agreement. In addition, the Liquidating Trust will file tax returns as a grantor trust pursuant to United States Treasury Regulation Article 1.671-4(a).

### c. *Distributions to Specific Classes*

Subject to Bankruptcy Rule 9010, all distributions under the Plan to holders of Allowed Claims will be made to the holder of each Allowed Claim at the address of such holder as listed on the Debtors' Schedules of Assets and Liabilities as of the Distribution Record Date, unless the Debtors or, on and after the Effective Date, the Reorganized Debtors or the Responsible Person or the Liquidating Trustee, as applicable, have been notified in writing of a change of address, including, without limitation, by the timely filing of a proof of claim by such holder that provides an address for such holder different from the address reflected on the Schedules. In the event that any distribution to any such holder is returned as undeliverable, the Responsible Person or Liquidating Trustee, as applicable, shall use reasonable efforts to determine the current address of such holder, but no distribution to such holder shall be made unless and until it has been determined the then-current address of such holder, at which time such distribution shall be made to such holder without interest. If the Responsible Person or Liquidating Trustee, as applicable, is still unable to determine the address of such holder after the expiration of 1 year from the distribution thereof, then such distributions will be deemed unclaimed property and will be treated in accordance with Section IV.A.2.d of this Disclosure Statement and Article V.F of the Plan.

### d. *Unclaimed Property*

In the event that any Distribution to any holder of an Allowed Claim made by the Responsible Person is returned as undeliverable, the Disbursing Agent shall use commercially reasonable efforts to determine the current address of each holder, but no Distribution to such holder shall be made unless and until the Disbursing Agent has determined the then current address of such holder; *provided, however,* that all Distributions to holders of Allowed Claims made by the Responsible Person that are unclaimed for a period of one (1) year after Distribution thereof shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and revested in the Debtors' Estates and any entitlement of any holder of any Claims to such Distributions shall be extinguished and forever barred. The Responsible Person shall have no further obligation to make any Distribution to the holder of such Claim on account of such Claim, and any entitlement of any holder of such Claim to any such Distributions shall be

extinguished and forever barred; *provided*, *however*, that the holder of such Claim may receive future Distributions on account of such Claim by contacting the Responsible Person or the prior to the final Distribution.

In the event that any Distribution to any holder of an Allowed General Unsecured Claim is returned as undeliverable to the Liquidating Trust, no further Distribution to such holder shall be made unless and until the Disbursing Agent has been notified in writing with evidence satisfactory to the Liquidating Trust of the current address of such holder prior to the time that Distributions are made by the Liquidating Trust. All Distributions to holders of Allowed General Unsecured Claims that are unclaimed for a period of sixty (60) days after any interim Distribution or forty-five (45) days after the final Distribution shall be deemed unclaimed property and revested in the Liquidating Trust. After such time period, any entitlement of the applicable holder of an Allowed General Unsecured Claim to such Distribution shall be extinguished and forever barred and the Liquidating Trustee shall have no further obligation to make any Distribution to such holder of any unclaimed Distribution on account of such Allowed General Unsecured Claim.

### e.    Distribution Record Date

The "Record Date" under the Plan is, with respect to all Claims, the date that the Disclosure Statement is approved by the Bankruptcy Court. Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims that are transferred under Bankruptcy Rule 3001 on or prior to the Record Date will be treated as the holders of those Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to the transfer may not have expired by the Record Date. The Responsible Person and the Liquidating Trustee (as applicable) shall have no obligation to recognize any transfer of any Claim occurring after the Record Date. In making any Distribution with respect to any Claim, the Responsible Person and the Liquidating Trustee (as applicable) shall be entitled instead to recognize and deal with, for all purposes hereunder, only the Entity that is listed on the proof of Claim filed with respect thereto or on the Schedules as the holder thereof as of the close of business on the Record Date and upon such other evidence or record of transfer or assignment that was known to the Debtors as of the Record Date and is available to the Responsible Person and the Liquidating Trustee (as applicable).

### f.    Interest on Claims

To the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, the distribution will be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

Unless otherwise specifically provided for in the Plan or the Confirmation Order, interest will not accrue or be paid on Claims from and after the Commencement Date, and no holder of a Claim will be entitled to interest accruing on or after the Commencement Date on any Claim. Additionally, and without limiting the foregoing, interest will not accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final distribution is made when and if such Disputed Claim becomes an Allowed Claim. Nothing in the Plan will prejudice (i) any party in interest in seeking any other, further or different rate of postpetition interest, or in seeking post-Effective Date interest, upon its allowed claim on or prior to the date set for filing objections to the Plan, or (ii) any other party in interest in timely opposing such request or any rate of postpetition interest set forth in the Plan.

### 3.    Corporate Action

Upon the Effective Date, the terms of all directors and officers of all Debtors shall be deemed to have expired, all such directors and officers shall be released of their duties, and all actions contemplated by the Plan shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by the Debtors, holders of Claims or Interests, directors, managers, or officers of the Debtors, or any other Entity or Person, including the transfer of assets of the Liquidating Debtors to the Liquidating Trust and the dissolution or winding up of the Debtors. The officers and directors of the Debtors and the Liquidating Trustee, as applicable, shall be authorized to execute, deliver, file, or record such contracts, instruments, release, and other agreements or documents and take such other actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan. The authorizations and approvals contemplated by this Article IV.4 shall be effective notwithstanding any requirements under non-bankruptcy law.

#### 4.    Discharge of Debtors' Professionals

On the Effective Date, the Debtors' Professionals and agents shall be released and discharged from any further duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code, except with respect to: (i) obligations arising under confidentiality agreements, joint interest agreements and protective orders entered during the Chapter 11 Cases which shall remain in full force and effect according to their terms; (ii) applications for Professional Fee Claims; (iii) requests for compensation and reimbursement of expenses pursuant to section 503(b) of the Bankruptcy Code for making a substantial contribution in any of the Chapter 11 Cases; and (iv) any pending motions, or any motions or other actions seeking enforcement or implementation of the provisions of the Plan or the Confirmation Order. The Professionals retained by the Debtors and the respective members thereof shall not be entitled to compensation and reimbursement of expenses for services rendered to or on behalf of the Debtors after the Effective Date, except for services rendered in connection with applications for allowance of compensation and reimbursement of expenses pending on the Effective Date or filed after the Effective Date.

#### 5.    Dissolution of the Creditors Committee

On the Effective Date, the Creditors Committee shall dissolve automatically, whereupon its members, Professionals and agents shall be released and discharged from any further duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code, except with respect to: (i) obligations arising under confidentiality agreements, joint interest agreements and protective orders entered during the Chapter 11 Cases, which shall remain in full force and effect according to their terms; (ii) applications for Professional Fee Claims and expense reimbursement requests for members of the Creditors Committee; (iii) requests for compensation and reimbursement of expenses pursuant to section 503(b) of the Bankruptcy Code for making a substantial contribution in any of the Chapter 11 Cases; and (iv) any pending motions, or any motions or other actions seeking enforcement or implementation of the provisions of the Plan or the Confirmation Order. The Professionals retained by the Creditors Committee and the respective members thereof shall not be entitled to compensation and reimbursement of expenses for services rendered to the Creditors Committee after the Effective Date, except for services rendered in connection with applications for allowance of compensation and reimbursement of expenses pending on the Effective Date or filed after the Effective Date.

### B.    Claims

#### 1.    Substantive Consolidation

##### a.    *The Debtor Groups*

For purposes of voting, confirmation, and distribution under the Plan, the Plan is premised upon the "substantive consolidation" of the Debtors into the following separate and distinct Debtor groups:

(1)    The EPC Reorganizing Debtor Group

(2)    The EPC Liquidating Debtor Group

(3)    The Bioenergy and Maple Liquidating Debtor Group

(4)    The Solar Reorganizing Debtor Group

The Solar Reorganizing Debtor Group consists of a single legal entity.  A list of the legal entities comprising each of the Debtor groups is included in the Schedules to the Plan, which is included as <u>Exhibit A</u> to this Disclosure Statement.

##### b.    *The Basis for Substantive Consolidation*

Partial substantive consolidation of the Debtors into four distinct Debtor groups is an important element of the Debtors' successful implementation of a plan of reorganization.  The Debtors' proposed partial substantive consolidation structure is supported by the applicable legal standards, practical considerations, and available information regarding the Debtors' prepetition financial affairs.

Substantive consolidation is an equitable remedy that a bankruptcy court may apply in the chapter 11 cases of affiliated debtors, among other instances. When debtors are substantively consolidated, the assets and liabilities of such debtors are pooled and essentially treated as the assets and liabilities of a single debtor. The United States Court of Appeals for the Third Circuit (the "Third Circuit Court of Appeals"), the circuit in which the Chapter 11 Cases are pending, articulated a test in *In re Owens Corning*, 419 F.3d 195 (3d Cir. 2005) for determining whether substantive consolidation is warranted. In setting forth the test, the Third Circuit Court of Appeals looked to five principles behind substantive consolidation: (i) limiting the cross-creep of liability by respecting entity separateness is a fundamental ground rule; (ii) the harms substantive consolidation addresses are nearly always those caused by debtors; (iii) mere benefit of administration of the case is hardly a harm calling for substantive consolidation into play; (iv) substantive consolidation should be a rare remedy and one of last resort after considering and rejecting other remedies; and (v) while substantive consolidation may be used defensively to remedy the identifiable harms caused by entangled affairs, it may not be used offensively. *Id.* at 211. Based on these principles, the Third Circuit Court of Appeals held that, in the Third Circuit, the party calling for substantive consolidation must prove: (i) that prepetition, the entities to be consolidated disregarded separateness so significantly that their creditors relied on the breakdown of entity borders and treated them as one legal entity or (ii) that postpetition, their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors. *Id.* Substantive consolidation is appropriate if either factor is justified. *Id.*

### c.    Impracticality of Separate Entity Plan

Partial substantive consolidation will avoid the onerous costs and substantial delay that would result from attempting to confirm more than twenty separate entity plans of reorganization (each a "Separate Entity Plan"). A Separate Entity Plan will be prone to inaccuracies that may prejudice certain creditors. A Separate Entity Plan will inevitably rest on certain assumptions; for instance, as the Debtors were not managed operationally on an individual entity basis, it is difficult to allocate value and operational costs and benefits on a legal entity basis. In addition, many financial obligations of the Debtors are based on Debtor groups or other combinations of entities that make allocation to legal entities difficult, fact-intensive and subject to challenge. Seeking to overcome the inherent limitations of a Separate Entity Plan would entail the Debtors' dedication of enormous resources and significant time to the project – and it cannot be assured, even after such an endeavor, that a Separate Entity Plan would be free of such assumptions, or free of potential prejudice to certain creditors resulting from such assumptions.

The assumptions that the Debtors would necessarily adopt to confirm over twenty separate plans of reorganization would likely be the focus of protracted and lengthy litigation. The attendant delay from such litigation could threaten the Debtors' consummation of the plans of reorganization in a timely manner. Even if the estates were exposed to such a risk and cost, there would still be no assurances that the information contained therein would be accurate on an entity-by-entity basis (if even available at such time). The Debtors believe that partial substantive consolidation is warranted in this case because of the connection of assets and liabilities of certain of the Debtors.

### d.    Basis for Partial Substantive Consolidation

Given the significant roadblocks to the proposal of confirmable Separate Entity Plans, the Debtors reviewed their organizational, operational, and financial history in order to determine the substantive consolidation structure that best meets the application of the existing case law governing substantive consolidation. The Debtor groups' partial substantive consolidation structure is a result of that lengthy and wide-ranging analysis, which revealed that significant creditors conducted business (including extending credit) with certain groups of Debtors as consolidated entities, while other creditors extended credit to a single entity. (The Solar Reorganizing Debtor Group consists of a single legal entity, and therefore, is not subject to a substantive consolidation analysis.)

The factors supporting substantive consolidation are satisfied as to each of the three partially substantively consolidated Debtor groups. The *Owens Corning* court specifically found that entanglement among affiliated debtors provides a basis for substantive consolidation, where, as here, creditors disregarded entity separateness and separating debtor entities would harm creditors. Certain Debtor groups have unique acquisition or operational histories which substantiates substantive consolidation of such Debtors into a single unit. In applying the standards of *Owens Corning*, the Debtors sought to preserve the prepetition chain of ownership, with each entity entitled to the residual equity of the entities that it owned and seek substantive consolidation of those entities whose assets and liabilities are so entangled that substantive consolidation was warranted under the *Owens Corning* test.

### e.  Legal Ownership

In order to ensure that the substantive consolidation structure is consistent with the legal rights of third parties and is not materially inconsistent with the recoveries attainable under a Separate Entity Plan, the partial substantive consolidation structure respects the Debtors' prepetition ownership structure.  Thus, the residual equity of each Debtor group inures to the benefit of the Debtor group that owned the Debtor group prior to the Petition Date.

### f.  Third Party Expectations

The partial substantive consolidation structure is designed to respect the reasonable third party expectations of creditors and third parties.  The Debtors identified three principal set of expectations that they sought to preserve in the partial substantive consolidation structure:  (a) the expectations of the lenders under the Debtors' credit agreements, (b) the expectations of purchasers of Notes, and (c) the expectations of creditors of those Debtors that are project companies.  The composition of certain Debtor groups is motivated by adherence to the expectations of more than one set of creditors.

#### (1)  Prepetition Guarantee Obligations

The Debtors' prepetition credit agreements are each based on the credit of different sets of legal entities. The lenders under these credit agreements received combined financial reports from the Debtors as to all obligors party to the applicable credit agreement, and calculated financial covenant compliance based on the assets and liabilities of those entities.  The restrictions imposed on the obligors by these credit facilities (e.g., restrictions on the ability to incur additional indebtedness, make certain payments, sell certain assets, and grant certain security interests to third parties) indicate that the Lenders under each of these facilities relied upon the collective identity of their respective borrowers and guarantors when extending credit.  The members of a Debtor group based upon the expectations of lenders under the credit agreements are not necessarily subject to the same legal ownership.  For example, the partners of Debtor-Guarantors Teyma USA & Abener Engineering and Construction Services General Partnership and Abener Teyma Hugoton General Partnership are Teyma Construction USA, LLC and Abener Construction Services, LLC, whereas the parents of Abener Teyma Mojave General Partnership are Abeinsa Holding Inc. and Abener North America Construction, LP.

### g.  Consolidation Due to Operational Entanglement

Different considerations support the Debtors' contention that certain groups of Debtors are operationally entangled and pose a level of cohesiveness that adds further support to the proposed partial consolidation structure. For example, with respect to certain Debtor groups, certain of the Debtors were not premised on management at the individual legal entity level; most aspects of management were consolidated and centralized, including accounting, legal, marketing, and negotiation of various contracts.  Such prepetition operational entanglement impedes the formulation of a Separate Entity Plan, and justifies the proposed partial substantive consolidation structure under the applicable legal standards.

### h.  The Effect of Substantive Consolidation

Substantive consolidation of the estates of multiple debtors in a bankruptcy case effectively combines the assets and liabilities of the multiple debtors for certain purposes under a plan.  The effect of substantive consolidation is the pooling of the assets of, and claims against, consolidated debtors, satisfying liabilities from a common fund and combining the creditors of consolidated debtors for purposes of voting on the reorganization plan.

Pursuant to Article IV.BB of the Plan, on and after the Effective Date, each of the Debtor groups will be deemed consolidated for the following purposes under the Plan:

- all assets and liabilities of the applicable Debtors within each Debtor group will be treated as though they were merged with the assets and liabilities of the other Debtors within such Debtor group,

- no distributions will be made under the Plan on account of any Claim held by a Debtor against any other Debtor within its Debtor group,

- except as otherwise set forth in the Plan, no distributions will be made under the Plan on account of any Equity Interest held by a Debtor in any other Debtor within its Debtor group,

- all guaranties of any Debtor of the obligations of any other Debtor within its Debtor group will be eliminated so that any Claim against any Debtor and any guaranty thereof executed by any other Debtor and any joint or several liability of any of the Debtors within a Debtor group will be one obligation of the Debtors within such Debtor group, and

- each and every Claim filed or to be filed in the Chapter 11 Cases against any of the Debtors within a Debtor group will be deemed filed against all of the Debtors within such Debtor group, and will be one Claim against, and obligation of, the Debtors within such Debtor group.

Substantive consolidation under the Plan will not affect any Claims held by a Debtor in or against a Debtor in a separate Debtor group. The Plan provides that such intercompany claims held by Debtors against other Debtors will be discharged and receive no distribution. The Plan further provides that Equity Interests are accorded the treatment provided for such Claims in Article IV.C of this Disclosure Statement.

On the Effective Date, the Intercompany Claims will be discharged and/or satisfied under the Plan by means of: (1) the restructuring transactions contemplated by the Plan (a dissolution or winding up of the corporate or other legal existence of a Debtor, the conversion of the organizational form of a Debtor to a different organizational form or the consolidation, merger, contribution of assets, transfer of equity interests, or other transaction in which a Reorganized Debtor merges with or transfers substantially all of its assets and liabilities to a Reorganized Debtor or any of its Affiliates, on or after the Confirmation Date) or (2) allocations of plan consideration pursuant to Section III of the Plan (and any order of the Bankruptcy Court sought thereunder). All Intercompany Claims held by any Debtor against any Non-Debtor Affiliate will be reviewed by the Reorganized Debtors and adjusted, continued, or discharged, as determined by the Reorganized Debtors in their sole discretion. All Intercompany Claims held by any Non-Debtor Affiliate against a Debtor will receive the treatment provided for such Claims in Section III of the Plan.

Pursuant to the Plan, this Disclosure Statement and the Plan are deemed a motion requesting that the Bankruptcy Court approve the substantive consolidation provided for in the Plan as well as any additional consolidation that may be proposed by the Debtors in connection with confirmation and consummation of the Plan. The Debtors reserve the right to file appropriate alternative pleadings in support of the proposed substantive consolidation in connection with the Confirmation Hearing. Unless an objection to consolidation is made in writing by any creditor affected by the Plan on or before 4:00 p.m. prevailing Eastern Time, on the date fixed by the Bankruptcy Court for objections to confirmation of the Plan, the substantive consolidation proposed by the Plan may be approved by the Bankruptcy Court at the Confirmation Hearing.

## 2. Disputed Claims Procedures

### a. *Disputed Claims Reserve*

After the Effective Date, separate Disputed Claims Reserves shall be created for each of the following: (i) the EPC Reorganizing Debtors; (ii) the Solar Reorganizing Debtor; (iii) the Bioenergy and Maple Liquidating Debtors; and (iv) the EPC Liquidating Debtors. The Disputed Claims Reserves for the Reorganizing Debtors shall be managed by the respective Reorganizing Debtors or Responsible Person, as applicable, and the Disputed Claims Reserves for the Liquidating Debtors shall be managed by the respective Liquidating Trustee. On each Distribution date after the Effective Date, in which the respective Responsible Person or respective Liquidating Trustee (as applicable) makes Distributions to holders of Claims (including without limitation, General Unsecured Claims), the respective Responsible Person or the respective Liquidating Trustee (as applicable) shall retain on account of Disputed Claims an amount the respective Responsible Person or the respective Liquidating Trustee (as applicable) estimates is necessary to fund the Pro Rata Share of such Distributions to holders of Disputed Claims if such Claims were Allowed, with any Disputed Claims that are unliquidated or contingent being reserved in an amount reasonably determined by the respective Responsible Person or the respective Liquidating Trustee (as applicable); *provided, however*, that in no event shall the Disputed Claims Reserve managed by the (i) EPC Reorganizing Debtors' Responsible Person exceed $[•]; (ii) Solar Reorganizing Debtor's Responsible Person exceed $[•]; (iii) the Bioenergy and Maple Liquidating Trustee exceed $[•]; and (iv) the EPC Liquidating Trustee exceed $[•]. Cash

retained on account of such Disputed Claims shall be retained in the respective Disputed Claims Reserve for the benefit of the holders of Disputed Claims pending a determination of their entitlement thereto under the terms of the Plan. If any Disputed Administrative or Priority Claim is disallowed or Allowed in an amount that is lower than the aggregate assets retained on account of such Disputed Claim, then the respective Responsible Person or the Liquidating Trustee (as applicable) shall within fifteen (15) days after such disallowance or allowance return the assets that exceed the Allowed amount of such Claim to the Debtors' Estates.

### b. *Resolution of Disputed Claims*

On and after the Effective Date, the respective Responsible Person, in the case of all Claims in the Plan of Reorganization and the respective Liquidating Trustee in the Plan of Liquidation, shall have the authority to compromise, settle, otherwise resolve or withdraw any objections to Claims, and to compromise, settle, or otherwise resolve any Disputed Claims without approval of the Bankruptcy Court. The respective Responsible Person, in the case of all Claims in the Plans of Reorganization and the respective Liquidating Trustee in the Plans of Liquidation, shall also have the right to make and file objections to Claims in the Bankruptcy Court. Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, all Disputed Claims shall be subject to the exclusive jurisdiction of the Bankruptcy Court.

### c. *Objection Deadline*

All objections to Disputed Claims shall be filed no later than the Claims Objection Bar Date, unless otherwise ordered by the Bankruptcy Court after notice and a hearing, with notice only to those parties entitled to notice in the Chapter 11 Cases pursuant to Bankruptcy Rule 2002.

### d. *Estimation of Claims*

At any time, the respective Responsible Person, in the case of all Claims in the Plan of Reorganization and the respective Liquidating Trustee in the Plan of Liquidation, may request that the Bankruptcy Court estimate any contingent or unliquidated Claim to the extent permitted by section 502(c) of the Bankruptcy Code regardless of whether the Responsible Person, the Liquidating Trustee or the Debtors (as applicable) have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall have jurisdiction to estimate any Claim at any time during litigation concerning any objection to such Claim, including during the pendency of any appeal relating to any such objection. If the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on the Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the Claim, the Responsible Person or the Liquidating Trustee (as applicable) may elect to pursue supplemental proceedings to object to the ultimate allowance of the Claim. All of the aforementioned Claims objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

### e. *No Distributions Pending Allowance*

Notwithstanding any other provision in the Plan, if any portion of a Claim is disputed, no payment or Distribution provided under the Plan shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, Distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan. Upon allowance, a holder of the Allowed Disputed Claim shall receive any Distributions that would have been made up to the date of allowance to such holder under the Plan had the Disputed Claim been allowed on the Effective Date.

## C. **Classification and Treatment of Claims under the Plan**

The Plan classifies Claims and Equity Interests separately and provides different treatment for different Classes of Claims and Equity Interests in accordance with the requirements of the Bankruptcy Code. As described more fully below, the Plan provides, separately for each Class, that holders of certain Claims will receive various

amounts and types of consideration, thereby giving effect to the different rights of holders of Claims and Equity Interests in each Class.

The following description summarizes the classification and treatment of Claims and Equity Interests and the consideration contemplated to be distributed to the holders of such Claims and Equity Interests under the Plan. Unless otherwise provided, these estimates are as of the date of this Disclosure Statement and are subject to the Risk Factors provided on Section VI, titled "Risk Factors."

1. **Unclassified Claims Under the Plan**

a. *__Administrative Expense Claims__*

Administrative Expense Claims are Claims constituting a cost or expense of administration of any of the Chapter 11 Cases under sections 503(b) and 507(a)(1) of the Bankruptcy Code (other than Fee Claims), including, without limitation, any actual and necessary costs and expenses of preserving the estates of the applicable Debtor, any actual and necessary costs and expenses of operating the business of such Debtor, any indebtedness or obligations incurred or assumed by such Debtor in connection with the conduct of its business, including, without limitation, for the acquisition or lease of property or an interest in property or the rendition of services, and all compensation and reimbursement of expenses under section 330 or 503 of the Bankruptcy Code. Any fees or charges assessed against the estates of the Debtors under section 1930 of chapter 123 of title 28 of the United States Code will be excluded from the definition of Administrative Expense Claim and will be paid in accordance with Section III of the Plan.

Allowed Administrative Expense Claims (except for those representing liabilities incurred in the ordinary course of business during the Chapter 11 Cases and certain liabilities under loans and advances in the Chapter 11 Cases) will be paid in full, in cash, on the later of the Effective Date and the date the Administrative Expense Claim becomes an Allowed Claim, or as soon thereafter as is practicable, except to the extent any entity entitled to payment of an Allowed Administrative Expense Claim agrees to less favorable treatment. Allowed Administrative Expense Claims representing obligations incurred in the ordinary course of business by the Debtors in Possession (including, without limitation, amounts owed to vendors and suppliers that have sold goods or furnished services to the Debtors in Possession since the Commencement Date) or non-ordinary course liabilities approved by the Bankruptcy Court, will be paid in full and performed by the applicable Reorganized Debtor in the ordinary course of business (or as otherwise approved by the Bankruptcy Court,) in accordance with the terms and conditions of the agreements, instruments or other documents relating thereto. The Debtors estimate that Allowed Administrative Expense Claims payable on the Effective Date, exclusive of compensation and reimbursement of expenses payable to professionals retained in the Chapter 11 Cases, will be approximately $[●] million. For purposes of the bar date described below, the Debtors expect to reserve not less than $[●] million for such Administrative Expense Claims.

<div style="border:1px solid black; padding:1em;">

**DEADLINE FOR FILING ADMINISTRATIVE CLAIMS**

**PROOFS OF ADMINISTRATIVE EXPENSE CLAIMS AND REQUESTS FOR PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS MUST BE FILED AND SERVED, PURSUANT TO THE PROCEDURES SET FORTH IN THE CONFIRMATION ORDER OR NOTICE OF ENTRY OF CONFIRMATION ORDER, NO LATER THAN 45 DAYS AFTER THE EFFECTIVE DATE.**

Notwithstanding anything to the contrary, no proof of Administrative Expense Claim or application for payment of an Administrative Expense Claim need be filed for the allowance of any:

- expense or liability incurred in the ordinary course of the Reorganized Debtors' businesses on or after the Effective Date;

- Administrative Expense Claim held by a trade vendor (other than Retained Claims), which administrative liability was incurred in the ordinary course of business of the Debtor and such creditor after the Commencement Date;

- expenses, liabilities or obligations of the type described in Section II of the Plan;

- Fee Claims; or

- fees of the United States Trustee arising under 28 U.S.C. § 1930.

</div>

Administrative Expense Claims described in the first three bullets above will be paid by the Reorganized Debtors in the ordinary course of business. Fees of the United States Trustee arising under 28 U.S.C. § 1930 shall be paid in accordance with Section V.N of the Plan. Any Person that fails to timely file a proof of Administrative Expense Claim or request for payment thereof as required by the Plan, as described above, will be forever barred from asserting such Administrative Expense Claim against any of the Debtors, the Reorganized Debtors or their property and the holder thereof will be enjoined from commencing or continuing any action, employment of process or act to collect, offset or recover such Administrative Expense Claim.

### b. *Fee Claims*

Fee Claims are Claims for compensation, for services rendered or reimbursement of expenses incurred in connection with the Chapter 11 Cases during the period from the Commencement Date through the Effective Date pursuant to sections 503(b)(2), 502(b)(3), 502(b)(4) or 502(b)(5) of the Bankruptcy Code.

All entities seeking an award by the Bankruptcy Court of Fee Claims will:

- be required to file their respective final applications for allowances of compensation for services rendered, and reimbursement of expenses incurred through the Effective Date by no later than the date that is 60 days after the Effective Date or such other date as may be fixed by the Bankruptcy Court upon request of the Debtors or the Creditors Committee; and

- if granted such an award by the Bankruptcy Court, be paid in full in cash in such amounts as are Allowed by the Bankruptcy Court (1) on the date such Fee Claim becomes an Allowed Fee Claim, or as soon thereafter as is practicable or (2) upon such other terms as may be mutually agreed upon between such holder of a Fee Claim and the Responsible Person; provided, however, that no ordinary course professional retained pursuant to an order of the Bankruptcy Court will be required to file any fee application unless required to do so pursuant to such order.

The Debtors estimate that the amount of Allowed Fee Claims that have not previously been paid pursuant to an order of the Bankruptcy Court will aggregate approximately $[●] million.

### 2.  Classified Claims Under the Plans

#### a.  *Secured Claims*

Secured Claims are Claims against a Debtor:

- to the extent reflected in the Schedules or in a proof of claim as Secured Claims, which are secured by a lien on collateral to the extent of the value of such Collateral, as determined in accordance with section 506(a) of the Bankruptcy Code, or

- to the extent that the holder thereof has a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

The Debtors estimate that the amount of Allowed Secured Claims, other than Claims as to which holders assert rights of setoff, that have not previously been paid pursuant to an order of the Bankruptcy Court will aggregate approximately $[●].

Except to the extent that a holder of an Allowed Secured Claim agrees to a different treatment, each holder of an Allowed Secured Claim shall receive on or as soon as reasonably practicable after the later of the Effective Date and the date that is 30 calendar days after an Secured Claim becomes Allowed, one of the following in full and complete satisfaction of such Allowed Secured Claim:  (x) cash in an amount equal to 100% of the unpaid amount of such Claim; (y) the proceeds of the sale or disposition of the Collateral securing such Claim to the extent of the value of the holder's secured interest in such Claim; or (z) such other distribution as necessary to satisfy the requirements of the Bankruptcy Code; or

The Debtors' failure to object to any Secured Claim during the pendency of the Chapter 11 Cases will not prejudice, diminish, affect or impair the Reorganized Debtors' right to contest or defend against a Secured Claim in any lawful manner or forum when and if such Claim is sought to be enforced by its holder.  Each Secured Claim and all Liens lawfully granted or existing on any property of the Debtors on the Commencement Date as security for a Secured Claim will, until the Allowed amount of such Claim is satisfied, subject to Section III of the Plan, survive the confirmation and consummation of the Plan, the Debtors' discharge under section 1141(d) of the Bankruptcy Code, and remain subject to avoidance by the Reorganized Debtors under the Bankruptcy Code.

Unless otherwise ordered by the Bankruptcy Court, each Allowed Secured Claim will be considered to be a separate subclass within Class 1 of each of the Debtor groups, included in the Debtor group in which the Collateral securing such Claim is held, and each such subclass will be deemed to be a separate Class for purposes of the Plan.

Class 1 is unimpaired by the Plan.  Each holder of an Allowed Other Secured Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

#### b.  *Priority Claims*

Priority Claims are Claims against a Debtor (other than Administrative Expense Claims) that are entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.  Such Claims include:

- Claims against a Debtor of a governmental unit of the kind specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code;

- Claims for accrued employee compensation earned within 180 days prior to commencement of the Chapter 11 Cases to the extent of $12,475, or $12,850,[11] per employee; and

- Claims for contributions to employee benefit plans arising from services rendered within 180 days prior to the commencement of the Chapter 11 Cases, but only for each such plan to the extent of (1) the number of employees covered by such plan multiplied by $12,475, less (2) the aggregate amount paid to such

---

[11]  The maximum dollar amount for priority expenses and claims under section 507(a) of the Bankruptcy Code is $12,850 for all Debtors that filed voluntary petitions for relief after April 1, 2016, which include Abengoa Bioenergy Meramec Holding, Inc. and Abengoa Bioenergy Holdco., Inc., and any subsequently filed affiliate entities.

employees from the estates for wages, salaries or commissions during the ninety days prior to the Commencement Date.

The Debtors believe that certain Priority Claims previously have been paid pursuant to orders of the Bankruptcy Court.  The Debtors estimate that the amount of Allowed Priority Claims that have not previously been paid pursuant to an order of the Bankruptcy Court will aggregate approximately $[●] million

Pursuant to the Plan, except to the extent that a holder of an Allowed Priority Claim has been paid by the Debtors before the Effective Date or agrees to a different treatment, holders of any Allowed Priority Claims will be paid in full, in cash, on the later of the Effective Date and the date such Priority Claims become Allowed Claims, or as soon thereafter as is practicable.

Class 2 is unimpaired by the Plan.  Each holder of an Allowed Priority Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

### c. *Intercompany Claims*

An Intercompany Claim is a Claim relating to an intercompany transfer of value to a Debtor by another Debtor in these jointly administered Chapter 11 Cases (a "<u>Debtor Affiliate</u>") or an affiliated non-Debtor entity within the Abengoa Group (a "<u>Non-Debtor Affiliate</u>").  The Intercompany Claims are calculated by netting intercompany payables and receivables against each other.

There are multi-million dollar Intercompany Claims between and among the Debtors and between the Debtors and their Non-Debtor Affiliates or Debtor Affiliates.  How these Claims are treated can alter dramatically the recovery to the stakeholders.  Prior to the Petition Date, the Abengoa Group maintained a complex corporate structure consisting of hundreds of entities, which engaged in numerous and often complex intercompany transactions.  The Debtors reviewed and analyzed intercompany transactions prior to the Petition Date.  Further, the Debtors, in order to provide detail on the components of the intercompany balances, made significant efforts to identify intercompany journal entries made prior to the Petition Date.

Holders of Intercompany Claims shall have the treatment set forth below under subsections g and h of Section IV.C.3.

### 3. **Classification and Treatment of Claims Under the Plans of Reorganization**

### a. *Spanish Affected Debt Claims*

A Spanish Affected Debt Claim is a Claim relating to the guarantee obligations of the Debtors in respect of the Compromised Debt and Non-Compromised Debt, as those terms are used in the Master Restructuring Agreement.

Pursuant to the Plan, on or as soon practicable after the Effective Date, each holder of an Allowed Spanish Affected Debt Claim will receive a Replacement Guarantee based upon the Standard Restructuring Terms.  Holders of Spanish Affected Debt Claims hold impaired Claims and therefore are entitled to vote to accept or reject the Plan.

### b. *U.S. Debt Claims*

A US Debt Claim is any Claim of a holder of Non-Spanish Debt To Be Restructured under the Master Restructuring Agreement that is not a Spanish Affected Debt Claim or an Affected Debt Bonding Claim.  The Allowed Amount of the US Debt Claims will be reduced by the write off afforded those Claims under and in accordance with the Master Restructuring Agreement.

Pursuant to the Plan, on or as soon as practicable after the Effective Date, each holder of an Allowed US Debt Claim will receive a Pro Rata share of the Reorganization Distribution for the respective Debtor group.  Holders of US Debt Claims hold impaired Claims and therefore are entitled to vote to accept or reject the Plan.

### c. *General Unsecured Claims*

A General Unsecured Claim is a Claim against any Debtor that arose or accrued before the Petition Date and is not an Administrative Claim, Accrued Professional Compensation Claim, Secured Claim, Priority Claim, Spanish Affected Debt Claim, US Debt Claim, Litigation Claim, Affected Debt Bonding Claim, Non-Affected Debt Bonding Claim, Intercompany Claim Against Non-Debtor Affiliates, Intercompany Claim Against Debtor Affiliates or Equity Interest.

Pursuant to the Plan, on or as soon as practicable after the Effective Date, each holder of an Allowed General Unsecured Claim of the EPC Reorganizing Debtor Group or the Solar Reorganizing Debtor Group will receive a Pro Rata share of the Reorganization Distribution for such Debtor group, except to the extent that a holder of an Allowed General Unsecured Claim has been paid prior to the Effective Date or agrees to a less favorable classification and treatment.  Holders of General Unsecured Claims hold impaired Claims and therefore are entitled to vote to accept or reject the Plan.

### d. *Litigation Claims*

A Litigation Claim is a Claim against any Debtor related to a lawsuit, arbitration or legal proceeding commenced pre-petition.

Pursuant to the Plan, on or as soon as practicable after the Effective Date, each holder of an Allowed Litigation Claim of the EPC Reorganizing Debtor Group or the Solar Reorganizing Debtor Group will receive a Pro Rata share of the Reorganization Distribution for such Debtor group, except to the extent that a holder of an Allowed Litigation Claim has been paid prior to the Effective Date or agrees to a less favorable classification and treatment.  Holders of Litigation Claims hold impaired Claims and therefore are entitled to vote to accept or reject the Plan.

### e. *Affected Debt Bonding Claims*

An Affected Debt Bonding Claim relates to debt arising from bonding lines described in Part C of Schedule 6 of the Master Restructuring Agreement, which is comprised of bonding lines defined in the Master Restructuring Agreement as the "Uncalled Existing Bonding Facilities" and the "Called Existing Bonding Facilities".

Pursuant to the Plan, on or as soon as practicable after the Effective Date, each holder of an Allowed Affected Debt Bonding Claim will receive a 3% recovery applicable to all outstanding amounts, including, without limitation, principal, interest, default interest, fees and contingent claims or amounts such as guarantees, for any given entity or class subject to the Standard Restructuring Terms, calculated as of the Effective Date.  Holders of Allowed Affected Debt Bonding Claims hold impaired Claims and therefore are entitled to vote to accept or reject the Plan.

### f. *Non-Affected Debt Bonding Claims*

A Non-Affected Debt Bonding Claim is any Allowed Claim against any Debtor arising with respect to a bonding claim that is not an Affected Debt Bonding Claim.

Pursuant to the Plan, on or as soon as practicable after the Effective Date, each holder of an Allowed Non-Affected Debt Bonding Claim of the EPC Reorganizing Debtor Group or the Solar Reorganizing Debtor Group will receive a Pro Rata share of the Reorganization Distribution, except to the extent that a holder of an Allowed Non-Affected Debt Bonding Claim has been paid prior to the Effective Date or agrees to a less favorable classification and treatment.  Holders of Non-Affected Debt Bonding Claims hold impaired Claims and therefore are entitled to vote to accept or reject the Plan.

### g. *Intercompany Claims by Non-Debtor Affiliates*

An Intercompany Claim by Non-Debtor Affiliates is a Claim relating to an intercompany transfer of value to a Debtor by a Non-Debtor Affiliate.

There are multi-million dollar Intercompany Claims between the Debtors and the Non-Debtor Affiliates. How these Claims are treated can alter dramatically the recovery to the stakeholders.  Prior to the Petition Date, the Abengoa Group maintained a complex corporate structure consisting of hundreds of entities, which engaged in numerous and often complex intercompany transactions.  The Debtors reviewed and analyzed the intercompany transactions prior to the Petition Date.

The charts below set forth the amounts of *Class 7A – EPC Reorganizing Intercompany Claims by Non-Debtor Affiliates* and *Class 7A – Solar Reorganizing Intercompany Claims by Non-Debtor Affiliates*:

| DEBTOR | AMOUNT OF INTERCOMPANY CLAIM | HOLDERS OF CLAIMS |
|---|---|---|
| Abeinsa Abener Teyma General Partnership | $508,500.00 | Abengoa Water USA, LLC |
| Abeinsa Abener Teyma General Partnership | $340,000.00 | Abeinsa Engineering, S.L. |
| Abeinsa Abener Teyma General Partnership | $147,691.01 | Instalaciones Inabensa, S.A. |
| Abeinsa Abener Teyma General Partnership | $921.36 | Simosa IT, S.A. |
| Abeinsa Abener Teyma General Partnership | $776.73 | Abeinsa Business Development, S.A. |
| Abeinsa Abener Teyma General Partnership | $274,197.21 | Negocios Industriales y Comerciales |
| Abeinsa Abener Teyma General Partnership | $164,865.62 | Abeinsa Engineering, S.L. |
| Abeinsa Abener Teyma General Partnership | $24,676.20 | Construcciones Metalicas Mexicanas |
| Abeinsa Abener Teyma General Partnership | $0.40 | Abengoa, S.A. |
| Abener Teyma Hugoton General Partnership | $225,921.61 | Negocios Industriales y Comerciales |
| Abener Teyma Hugoton General Partnership | $85,161.29 | Abengoa Water, S.L.U |
| Abener Teyma Hugoton General Partnership | $20,306.39 | Abengoa Research SL |
| Abener Teyma Hugoton General Partnership | $2,862.01 | Simosa IT, S.A. |
| Abener Teyma Mojave General Partnership | $75,538.35 | Abencor Suministros, S.A. |

| DEBTOR | AMOUNT OF INTERCOMPANY CLAIM | HOLDERS OF CLAIMS |
|---|---|---|
| Abener Teyma Mojave General Partnership | $54,897.97 | Instalaciones Inabensa, S.A |
| Abener Teyma Mojave General Partnership | $25,432.38 | Abengoa Research S.L. |
| Abener Teyma Mojave General Partnership | $18,408.54 | Abeinsa Engineering, S.L. |
| Abener Teyma Mojave General Partnership | $13,556.93 | Abeinsa Ingenieria y Construccion |
| Abener Teyma Mojave General Partnership | $12,201.24 | Abengoa T&D |
| Abeinsa EPC LLC | $788,520.73 | Abener Energia, S.A. |
| Abeinsa EPC LLC | $240,061.90 | Simosa IT, S.A. |
| Abeinsa EPC LLC | $83,521.18 | Teyma, Gestion de Contratos de Construccion e Ingenieria, S.A. |
| Abeinsa EPC LLC | $52,283.29 | Abengoa Solar, S.A. |
| Abeinsa EPC LLC | $48,790.00 | Teyma Sociedad de Inversion Total |
| Abeinsa EPC LLC | $34,436.00 | Teyma Uruguay, S.A. |
| Abeinsa EPC LLC | $23,399.70 | Abeinsa Ingenieria y Construccion |
| Abeinsa EPC LLC | $15,452.44 | Abeinsa Engineering, S.L. |
| Abeinsa EPC LLC | $10,941.87 | Abeinsa Business Development, S.A. |
| Abeinsa EPC LLC | $9,757.20 | Abeinsa EPC Mexico, SA de CV |
| Abeinsa EPC LLC | $2,801.29 | Gestion Integral Recursos |
| Abeinsa EPC LLC | $2,106.27 | Instalaciones Inabensa, S.A. |
| Abeinsa EPC LLC | $110.31 | Teyma Abengoa, S.A. |
| Abeinsa EPC LLC | $9,342.02 | Abeinsa Abeima Teyma General Partnership |
| Teyma Construction USA, LLC | $496,758.59 | Abeinsa Abeima Teyma General Partnership |
| Teyma Construction USA, LLC | $73,360.35 | Instalaciones Inabensa, S.A. |
| Teyma Construction USA, LLC | $1,945.32 | Simosa IT, S.A. |

Pursuant to the Plan, on the Effective Date, each Intercompany Claim by Non-Debtor Affiliates will receive Standard Restructuring Terms. Holders of Intercompany Claims by Non-Debtor Affiliates hold impaired Claims and therefore are entitled to vote to accept or reject the Plan.

h.  *Intercompany Claims by Debtor Affiliates*

An Intercompany Claim by Debtor Affiliates is a Claim relating to an intercompany transfer of value to a Debtor by a Debtor Affiliate or Subsidiary of a Debtor.  The Intercompany Claims are calculated by netting each entities intercompany payables and receivables against each other.

There are multi-million dollar Intercompany Claims between and among the Debtors and their Debtor Affiliates.  How these Claims are treated can alter dramatically the recovery to the stakeholders.  Prior to the Petition Date, the Abengoa Group maintained a complex corporate structure consisting of hundreds of entities, which engaged in numerous and often complex intercompany transactions.  The Debtors reviewed and analyzed the intercompany transactions prior to the Petition Date.

The charts below set forth the amounts of *Class 7B – EPC Reorganizing Intercompany Claims by Debtor Affiliates* and *Class 7B – Solar Reorganizing Intercompany Claims by Debtor Affiliates*:

| DEBTOR | AMOUNT OF INTERCOMPANY CLAIM | HOLDERS OF CLAIM |
|---|---|---|
| Abeinsa Abener Teyma General Partnership | $6,377,636.27 | Abeinsa EPC LLC |
| Abeinsa Abener Teyma General Partnership | $3,535,028.69 | Teyma USA & Abener Engineering and Construction Services General Partnership |
| Abeinsa Abener Teyma General Partnership | $1,684,280.25 | Abacus Project Management LLC |
| Abeinsa Abener Teyma General Partnership | $1,902.39 | Simosa IT US, LLC |
| Abeinsa Abener Teyma General Partnership | $1,851,152.95 | NICSA Industrial Supplies Corp. |
| Abeinsa Abener Teyma General Partnership | $697,836.06 | Abencor USA, LLC |
| Teyma USA & Abener Engineering and Construction Services General Partnership | $905,027.67 | Abeinsa EPC LLC |
| Teyma USA & Abener Engineering and Construction Services General Partnership | $702,478.52 | Abacus Project Management LLC |
| Teyma USA & Abener Engineering and Construction Services General Partnership | $298,629.91 | Abencor USA, LLC |
| Teyma USA & Abener Engineering and Construction Services General Partnership | $60,000.00 | Nicsa Industrial Supplies Corp. |
| Abener Teyma Hugoton General Partnership | $4,491,062.88 | Abeinsa EPC LLC |
| Abener Teyma Hugoton General | $1,412,778.54 | Abacus Project Management LLC |

| DEBTOR | AMOUNT OF INTERCOMPANY CLAIM | HOLDERS OF CLAIM |
|---|---|---|
| Partnership | | |
| Abener Teyma Hugoton General Partnership | $447,244.19 | Nicsa Industrial Supplies Corp. |
| Abener Teyma Hugoton General Partnership | $272,887.87 | Abeinsa Engineering Inc. |
| Abener Teyma Hugoton General Partnership | $9,512.20 | Simosa IT US, LLC |
| Abener Teyma Mojave General Partnership | $14,397,631.30 | Abacus Project Management, Inc. |
| Abener Teyma Mojave General Partnership | $6,925,651.97 | Abeinsa EPC LLC |
| Abener Teyma Mojave General Partnership | $161,294.21 | Nicsa Industrial Supplies Corp. |
| Abener Teyma Mojave General Partnership | $76,017.12 | Abener North America Construction LP |
| Abener Teyma Mojave General Partnership | $41,533.46 | Simosa IT US, LLC |
| Abener Teyma Mojave General Partnership | $18,408.54 | Abeinsa Engineering Inc. |
| Abener Teyma Mojave General Partnership | $115,543.28 | Inabensa USA LLC |
| Abener Teyma Mojave General Partnership | $125,184.53 | Abencor USA LLC |
| Abeinsa EPC LLC | $12,602,831.46 | Teyma Construction USA LLC |
| Abeinsa EPC LLC | $1,896,954.31 | Abener Teyma Mojave General Partnership |
| Abeinsa EPC LLC | $1,316,812.55 | Abeinsa Abener Teyma General Partnership |
| Abeinsa EPC LLC | $515,715.89 | Simosa IT US, LLC |
| Abeinsa EPC LLC | $98,385.57 | Abeinsa Business Development LLC |
| Teyma Construction USA, LLC | $4,369,400.79 | Abener Teyma Mojave General Partnership |
| Teyma Construction USA, LLC | $894,525.43 | Abener Teyma Hugoton General Partnership |
| Teyma Construction USA, LLC | $596,284.18 | Abeinsa Abener Teyma General Partnership |
| Teyma Construction USA, LLC | $491,670.21 | Abener Teyma Inabensa Mount Signal Joint Venture |

| DEBTOR | AMOUNT OF INTERCOMPANY CLAIM | HOLDERS OF CLAIM |
|---|---|---|
| Teyma Construction USA, LLC | $7,925.02 | Abacus Project Management, LLC |

Pursuant to the Plan, on or as soon as practicable after the Effective Date, Allowed Intercompany Claim by Debtor Affiliates will be reduced to zero.

### i. *Equity Interest Claims*

Equity Interests refer to any equity interest in a Debtor that existed immediately prior to the Petition Date. *Class 8 EPC Reorganizing Equity Interests* and *Class 8 Solar Reorganizing Equity Interests* shall be reinstated upon the Effective Date. The "absolute priority rule" of the Bankruptcy Code requires senior classes of creditors to be paid in full before value can be provided to or retained by a junior class. *See* 11 U.S.C. § 1129(b)(2)(B) and (C). The holders of Claims against the Solar Reorganizing Debtor Group will be paid in full, thereby complying with the absolute priority rule. Under the "new value exception" to the absolute priority rule, a subordinate class may pay or transfer to or for a debtor's estate new value in order to retain that existing interest or receive a payment if senior classes are not expected to receive full payment under the plan of reorganization. *See In re Armstrong World Indus.*, 348 B.R. 111, 121 (D. Del. 2006). The new value exception requires a junior interest holder to provide "(1) new, (2) substantial (3) money or money's worth (4) necessary for a successful reorganization (5) reasonably equivalent to the value or interest received" in order to retain its property. *In re Brown*, 498 B.R. 486, 497 (E.D.Pa. 2013). The holders of Equity Interests of the EPC Reorganizing Debtor Group will provide new value in the form of a Cash contribution of up to $[●] (the "New Value Contribution") from which the EPC Reorganizing Debtor Group and the Solar Reorganizing Debtor Group may each request up to an amount of $[●] in their discretion for a period for [●] months after the Effective Date in order to fund their operations or satisfy Claims pursuant to the Plan. The New Value Contribution meets the standard articulated by the *Brown* court and will provide the Reorganizing Debtors with sufficient funds to satisfy Claims and implement the Plan. Equity Interests are deemed to have accepted the Plan and not entitled to vote to accept or reject the Plan.

### 4.   Classification and Treatment of Claims Under the Plans of Liquidation

### a. *General Unsecured Claims*

A General Unsecured Claim is a Claim against any Debtor that arose or accrued before the Petition Date and is not an Administrative Claim, Accrued Professional Compensation Claim, Secured Claim, Priority Claim, Spanish Affected Debt Claim, US Debt Claim, Litigation Claim, Affected Debt Bonding Claim, Non-Affected Debt Bonding Claim, Intercompany Claim Against Non-Debtor Affiliates, Intercompany Claim Against Debtor Affiliates or Equity Interest.

Pursuant to the Plan, on or as soon as practicable after the Effective Date, each holder of an Allowed General Unsecured Claim under the Plans of Liquidation will receive a Pro Rata share to be paid out of the Liquidating Trust of the respective Debtor, except to the extent that a holder of an Allowed General Unsecured Claim has been paid prior to the Effective Date or agrees to a less favorable classification and treatment. Holders of General Unsecured Claims hold impaired Claims and therefore are entitled to vote to accept or reject the Plan.

### b. *U.S. Debt Claims*

A US Debt Claim is any Claim of a holder of Non-Spanish Debt to be Restructured under the Master Restructuring Agreement that is not in Class 3A of the EPC Reorganizing Debtor Group or Class 6A of each Plan of Reorganizing; provided, that the Allowed Amount of the US Debt Claims will be reduced by the write off afforded those Claims under and in accordance with the Master Restructuring Agreement. The Allowed Amount of the US Debt Claims will be reduced by the write off afforded those Claims under and in accordance with the Master Restructuring Agreement.

Pursuant to the Plan, on or as soon as practicable after the Effective Date, each holder of an Allowed US Debt Claim will receive a Pro Rata share of the respective Liquidating Distribution.  Holders of US Debt Claims hold impaired Claims and therefore are entitled to vote to accept or reject the Plan.

### c. *Intercompany Claims*

An Intercompany Claim is a Claim relating to an intercompany transfer of value to a Debtor by an Affiliate of a Debtor.  The Intercompany Claims are calculated by netting each Debtor's intercompany payables and receivables against each other and then, within a Debtor group, adding together the Intercompany Claims of Debtors within the Debtor group with positive net balances and separately adding together the Intercompany Claims of Debtors within the Debtor group with negative net balances.  These two sets of balances are not offset against each other.

There are substantial Intercompany Claims between and among the Liquidating Debtors and their affiliates. How these Claims are treated can alter dramatically the recovery to the stakeholders, principally the EPC Liquidating Debtor Group.  Prior to the Petition Date, the Debtors maintained a complex corporate structure consisting of hundreds of entities, which engaged in numerous and often complex intercompany transactions.  The Debtors reviewed and analyzed the intercompany transactions prior to the Petition Date.

The charts below set forth the amount of Intercompany Claims held against the Liquidating Debtors:

| LIQUIDATING DEBTOR | AMOUNT OF INTERCOMPANY CLAIM | HOLDER OF CLAIM |
|---|---|---|
| Abener Teyma Inabensa Mount Signal Joint Venture | $443,891.42 | Abeinsa EPC LLC |
| Abener Teyma Inabensa Mount Signal Joint Venture | $58,182.99 | Inabensa USA LLC |
| Abengoa Bioenergy Meramec Holding, Inc. | $500 | Abengoa Bioenergy Meramec Renew, LLC |
| Abengoa Bioenergy Holdco, Inc. | $1000.00 | ASA Bioenergy Holding AH |
| Abengoa Bioenergy Holdco, Inc. | $1000.00 | Abengoa Bioenergy US Holding, LLC |
| Abengoa Bioenergy Holdco, Inc. | $296,188.48 | Abengoa Bioenergy Corporation, LLC |

Pursuant to the Plan, on the Effective Date, each Intercompany Claim as against the Liquidating Debtors shall be discharged and released.  Holders of Intercompany Claims will not be entitled to vote to accept or reject the Plan.

### D.  Treatment of Executory Contracts and Unexpired Leases

The Bankruptcy Code grants the Debtors the power, subject to the approval of the Bankruptcy Court, to assume or reject executory contracts and unexpired leases.  If an executory contract or unexpired lease is rejected, the counterparty to such contract or lease agreement may file a claim for prepetition damages incurred by reason of the rejection.  In the case of rejection of leases of real property, such damage claims are subject to certain limitations imposed by the Bankruptcy Code.

### 1.  Rejection of Remaining Executory Contracts and Unexpired Leases

On the Confirmation Date, except for any Executory Contract that (i) was previously assumed or rejected by an order of the Bankruptcy Court pursuant to section 365 of the Bankruptcy Code entered prior to the Effective Date, or (ii) as to which a motion for approval of the assumption of such executory contract or unexpired lease has been filed and served prior to the Effective Date, shall be deemed rejected pursuant to sections 365 and 1123 of the

Bankruptcy Code, effective as of the Confirmation Date. The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejection pursuant to Bankruptcy Code sections 365 and 1123 as of the Confirmation Date.

### 2. Rejection Damages Bar Date

Except to the extent another Bar Date applies pursuant to an order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts under the Plan must be filed with the Voting and Claims Agent at the following applicable address:

> Abeinsa Holding Inc. Ballot Processing
> c/o Prime Clerk LLC
> 830 3rd Avenue, 3rd Floor
> New York, NY 10022
> 855-650-7243
> Abeinsaballots@primeclerk.com

and a copy served on counsel to the Debtors, counsel for the Creditors Committee, and the Liquidating Trustee, within **thirty (30) days from the entry of the Confirmation Order**, or such Claim shall be forever barred and shall not be entitled to a Distribution or be enforceable against the Debtors, their Estates, the Liquidating Trustee, their successors, their assigns, the Liquidating Trusts, the assets of the Liquidating Debtors or the assets of the Reorganizing Debtors.  Any Claim arising from the rejection of an Executory Contract shall be treated as a Claim in the applicable General Unsecured Class of the applicable Debtor group.  Nothing in the Plan extends or modifies any previously applicable Bar Date.

### 3. Assumption and Assignment of Executory Contracts

Subject to the occurrence of the Effective Date, entry of the Confirmation Order shall constitute approval of rejection under section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such rejection is in the best interests of the Debtors, their Estates, and all parties in interest in the Chapter 11 Cases. Notwithstanding anything to the contrary in this Article VII.A, any Reorganizing Debtor may identify any contract to be assumed, together with a proposed cure amount, if any, in the Plan Supplement, and any objection with respect to assumption and cure by the respective Reorganizing Debtor must be filed by the deadline for objecting to confirmation of the Plan.

### E. Conditions Precedent to Confirmation and Effectiveness of the Plan

The Plan will not be **confirmed** unless and until the following conditions are satisfied or waived in accordance with the Plan:

- The Bankruptcy Court has approved this Disclosure Statement in an order in form and substance acceptable to the Debtors, in their sole and absolute discretion;

- The Confirmation Order is in form and substance acceptable to the Debtors, in their sole and absolute discretion;

- In each case subject to the occurrence of the Effective Date to the extent necessary or appropriate, the Plan Documents to be entered into (rather than assumed) by the Reorganized Debtors have been entered and delivered, all actions, documents, and agreements necessary to implement the Plan have been effected or executed and the Debtors shall have received all material authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions, or documents that are reasonably necessary to implement the Plan and that are required by law, regulation, or order.

The Plan will not become **effective** unless and until the following conditions are satisfied or waived in accordance with the Plan:

- The Bankruptcy Court shall have entered the Confirmation Order;

- There shall be no stay or injunction in effect with respect to the Confirmation Order, which such Confirmation Order shall contain approval of the releases provided for herein;

- The appointment of the Responsible Person and the Liquidating Trustee shall have been confirmed by order of the Bankruptcy Court;

- All invoiced and unpaid fees and expenses of Professionals have been paid in full in Cash;

- All agreements and instruments that are exhibits to the Plan shall be in a form reasonably acceptable to the Debtors and the Creditors Committee and have been duly executed and delivered; provided, however, that no party to any such agreements and instruments may unreasonably withhold its execution and delivery of such documents to prevent this condition precedent from occurring;

- The payments payable to the Liquidating Trust on the Effective Date shall have been made; and

- The conditions precedent to the "Restructuring Effective Date," as listed on Schedule 5 of the Master Restructuring Agreement, shall have been satisfied or waived in accordance with the Master Restructuring Agreement.

### F.   Waiver

Notwithstanding the foregoing conditions, the Debtors reserve, in their sole discretion, the right to waive the occurrence of any condition precedent or to modify any of the foregoing conditions precedent.  Any such written waiver of a condition precedent set forth in this Article may be effected at any time, without notice, without leave or order of the Bankruptcy Court or without any other formal action other than proceeding to consummate the Plan. Any actions required to be taken on the Effective Date or Confirmation Date (as applicable) shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

### 1.   Revocation, Withdrawal or Non-Consummation of The Plan

If, after the Confirmation Order is entered, each of the conditions precedent to the Effective Date have not been satisfied or duly waived on or by thirty (30) days after the Confirmation Date, then upon motion by the Debtors, the Confirmation Order may be vacated by the Bankruptcy Court; provided, however, that notwithstanding the filing of such a motion, the Confirmation Order shall not be vacated if each of the conditions precedent to the Effective Date is either satisfied or duly waived in accordance with Section VIII.B of the Plan before the Bankruptcy Court enters an order granting the relief requested in such motion. Thus, if the Plan does not become effective after the entry of the Confirmation Order:

- The Confirmation Order will be vacated immediately after such termination;

- No distributions under the Plan will be made;

- The Debtors and all holders of Claims and Equity Interests will be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred; and

- The Debtors' obligations with respect to Claims and Equity Interests will remain unchanged and nothing contained herein or in the Plan will constitute or be deemed a waiver or release of any Claims by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors.

### G.   Implementation and Effect of Confirmation of the Plan

#### 1.   Binding Effect

From and after the Confirmation Date, but subject to the occurrence of the Effective Date, the Plan will be binding and inure to the benefit of the Debtors, all present and former holders of Claims and their respective assigns, including the Reorganized Debtors.

#### 2.   Vesting of Assets

On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, the Reorganized Assets shall be released from the custody and jurisdiction of the Bankruptcy Court, and all of Reorganized Assets shall vest in corresponding Reorganized Debtors free and clear of all Claims, Liens, encumbrances, charges and other interests, except as provided in the Plan.  From and after the Effective Date, Reorganized Debtors may operate their business and may use, acquire and dispose of property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules or the Local Bankruptcy Rules, subject to the terms and conditions of the Plan.

On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, the Liquidating Assets shall be released from the custody and jurisdiction of the Bankruptcy Court, and all of the Liquidating Assets shall vest in the Liquidating Trust free and clear of all Claims, Liens, encumbrances, charges and other interests, except as provided in the Plan.  From and after the Effective Date, the Liquidating Trust may operate its business and may use, acquire and dispose of property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules or the Local Bankruptcy Rules, subject to the terms and conditions of the Plan and the Liquidating Trust.

Further, upon the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all designated litigation will vest in the Liquidation Trust, free and clear of all Claims, Liens, encumbrances, charges, and other interests, except as otherwise provided in the Plan or in the Confirmation Order.

Nothing in the Plan shall prejudice any party in interest in objecting to the vesting or revesting of assets in the Reorganized Debtors or Liquidating Trustee seeking inclusion in the Confirmation Order of provisions to protect the parties entitled to distributions under the Plan from the risks otherwise associated with the revesting of assets in the Reorganized Debtors.

#### 3.   Discharge

Upon the Effective Date and in consideration of the rights afforded in the Plan and the payments and distributions to be made in the Plan, except as otherwise provided in the Plan or in the Confirmation Order, each holder (as well as any trustees and agents on behalf of each holder) of a Claim or Equity Interest and any affiliate of such holder will be deemed to have forever waived, released, and discharged the Debtors, of and from any and all Liens, Claims, Equity Interests, Liabilities, Encumbrances, rights, and Liabilities that arose prior to the Effective Date of any kind, nature, or description whatsoever, including any accrued interest, which holder, in exchange for the treatment afforded to such Claims and Equity Interests under the Plan, will be deemed to have granted, and shall grant to the Debtors the waiver, release and discharge described in the Plan.  Except as otherwise provided in the Plan, upon the Effective Date, all such holders of Liens, Claims, Liabilities, Encumbrances and Equity Interests and their affiliates shall be forever precluded and enjoined, pursuant to sections 105, 524, 1141 of the Bankruptcy Code, from prosecuting or asserting any discharged Lien, Claim, Liability or Encumbrance against or terminated Equity Interest in the Debtors, Reorganized Debtors, Liquidating Trustee, as appropriate, or against any of their assets or properties, any other or further Claim, Liabilities, Encumbrances or Equity Interest based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder has filed a proof of Claim or proof of Equity Interest.

#### 4.   Term of Pre-Confirmation Injunctions or Stays

Unless otherwise provided in the Plan, the Confirmation Order, or a separate order from the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Cases in accordance with sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date shall remain in full force and effect until the later of the Effective Date and the date indicated in such applicable order.

### 5.    Injunction Against Interference with Plan

Upon the entry of the Confirmation Order, all holders of Claims and Equity Interests and other parties in interest, along with their respective present or former affiliates, employees, agents, officers, directors, or principals, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.

### 6.    Injunction

*From and after the Effective Date, all Entities are permanently enjoined from commencing or continuing in any manner against the Debtors, the Estates, the Creditors Committee, the Liquidating Trust, the Liquidating Trustee, the Parent, their successors and assigns, and their assets and properties, as the case may be, any suit, action or other proceeding, on account of or respecting any Claim or Equity Interest, demand, liability, obligation, debt, right, Cause of Action, interest or remedy released or satisfied or to be released or satisfied under the Plan or the Confirmation Order.*

*Except as otherwise expressly provided for in the Plan or in obligations issued under the Plan, from and after the Effective Date, all Entities shall be precluded from asserting against the Debtors, the Estates, the Creditors Committee, the Liquidating Trust, the Liquidating Trustee, the Parent, or their successors and assigns and their assets and properties, any other Claims or Equity Interests based upon any documents, instruments, or any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date, solely to the extent that (a) such Claims or Equity Interests have been released or satisfied under the Plan or the Confirmation Order or (b) such Claims, Equity Interests, actions or assertions of Liens relate to property that will be distributed under the Plan or the Confirmation Order.*

*The rights afforded in the Plan and the treatment of all Claims and Equity Interests in the Plan shall be in exchange for and in complete satisfaction of Claims and Equity Interests against the Debtors or any of their assets or properties solely to the extent that (a) such Claims or Equity Interests have been released or satisfied under the Plan or the Confirmation Order or (b) such Claims, Equity Interests, actions, or assertions of Liens relate to property that will be distributed under the Plan or the Confirmation Order.  On the Effective Date, all such Claims against, and Equity Interests in, the Debtors shall be satisfied and released in full.*

*Except as otherwise expressly provided for in the Plan or in obligations issued under the Plan, all Persons and Entities are permanently enjoined, on and after the Effective Date, on account of any Claim or Equity Interest satisfied and released under the Plan or Confirmation Order, from:*

- *commencing or continuing in any manner any action or other proceeding of any kind against any Debtor, the Creditors Committee, the Liquidating Trust, the Liquidating Trustee, the Parent, their successors and assigns, and their assets and properties;*

- *enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against any Debtor, the Creditors Committee, the Liquidating Trust, the Liquidating Trustee, the Parent, their successors and assigns, and their assets and properties;*

- *creating, perfecting or enforcing any encumbrance of any kind against any Debtor, or the property or estate of any Debtor, the Creditors Committee, the Liquidating Trust, the Liquidating Trustee, or the Parent;*

- *commencing or taking any enforcement action against any assets of the Parent;*

- *commencing or continuing in any manner any action or other proceeding of any kind in respect of any Claim or Equity Interest or Cause of Action released or settled hereunder; and*

- *taking any action inconsistent with Article IX.D of the Plan.*

*Withdrawal and Release of Certain Spanish Affected Debt and Injunction against the Enforcement Thereof. Upon the Effective Date, the holders of Spanish Affected Debt and any agent or indenture trustee, shall be deemed to have waived any Claim against any of the Go-Forward Chapter 11 Companies other than with*

*respect to a Replacement Guarantee. Additionally, consistent with the Master Restructuring Agreement, including, but not limited to, Section 9.1 thereof, holders of Claims in Classes 3 and 6 of each of the EPC Reorganizing Debtors and the Solar Reorganizing Debtor shall take no action against any of the property of the Parent that would be inconsistent with the Plan or the Master Restructuring Agreement. These creditors also recognize that as part of the global restructuring of the Abengoa Group, they have agreed to settle and compromise their claims against the Parent, as sponsor of the Plan, and all of the Parent's subsidiaries and that they shall take no action against the Parent, as sponsor, or any member of the Abengoa Group, and the terms of the injunction in Article IX.F of the Plan may be enforced against them in the Bankruptcy Court should they act in a manner inconsistent with the Plan or the Master Restructuring Agreement, including, but not limited to, Article IX of the Plan or Section 9.1 of the Master Restructuring Agreement.*

## 7. Releases

*Releases by the Debtors and their Estates. Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, for the good and valuable consideration provided by each of the Released Parties, each of the Debtors and their current and former affiliates and Representatives and the Estates shall be deemed to have provided a full, complete, unconditional and irrevocable release to the Released Parties (and each such Released Party so released shall be deemed released by the Debtors and their current and former affiliates and Representatives, the Estates and the Creditors Committee and its members but solely in their capacity as members of the Creditors Committee and not in their individual capacities), from any and all Causes of Action and any other debts, obligations, rights, suits, damages, actions, remedies and liabilities whatsoever, whether accrued or unaccrued, whether known or unknown, foreseen or unforeseen, existing before the Effective Date, as of the Effective Date or arising thereafter, in law, at equity, whether for tort, contract, violations of statutes (including but not limited to the federal or state securities laws), or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtors, including, without limitation, those that any of the Debtors would have been legally entitled to assert or that any holder of a Claim or Equity Interest or other Entity would have been legally entitled to assert for or on behalf of any of the Debtors or the Estates, including those in any way related to the Chapter 11 Cases or the Plan; provided, however, that the foregoing release shall not prohibit the Responsible Person or Liquidating Trust from asserting any and all defenses and counterclaims in respect of any Disputed Claim asserted by any Released Parties.*

*Releases by Holders of Claims. Except as otherwise provided in Article XI.B of the Plan, each Person, other than any of the Debtors, who votes to accept the Plan and does not mark such ballot to indicate their refusal to grant the release provided for in this paragraph, shall be deemed to fully, completely, unconditionally, irrevocably, and forever release the Released Parties of and from any and all Claims and Causes of Action and any other debts, obligations, rights, suits, damages, actions, remedies and liabilities whatsoever, whether accrued or unaccrued, whether known or unknown, foreseen or unforeseen, existing before the Effective Date, as of the Effective Date or arising thereafter, in law, at equity, whether for tort, contract, violations of statutes (including but not limited to the federal or state securities laws), or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtors and their current and former affiliates and Representatives, whether direct, derivative, accrued or unaccrued, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, known or unknown, foreseen or unforeseen, in law, equity or otherwise.*

*Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the releases set forth in Article IX.B of the Plan pursuant to Bankruptcy Rule 9019 and its finding that they are: (a) in exchange for good and valuable consideration, representing a good faith settlement and compromise of the Claims and Causes of Action released by the Plan; (b) in the best interests of the Debtors and all holders of Claims and Equity Interests; (c) fair, equitable and reasonable; (d) approved after due notice and opportunity for hearing; and (e) a bar to the assertion of any Claim or Cause of Action thereby released.*

The Debtors believe the non-debtor releases proposed under the Plan are reasonable and appropriate under existing legal precedent. In *In re Continental Airlines*, the Third Circuit explained that non-debtor releases are permissible when they are fair and necessary to a plan of reorganization. *In re Continental Airlines*, 203 F.3d 203, 215 (3d Cir. 2000). The Debtors believe the non-debtor releases proposed under the Plan are fair and necessary and

therefore meet the Third Circuit, as well as other applicable, legal standards. Many of the released parties have indemnification rights against the Debtors and Reorganized Debtors that may constitute valid administrative expense obligations.[12] Thus, in the absence of a release of these Persons, the Debtors will be required to create a significant reserve of funds to satisfy future liabilities of these types.

## 8. Exculpation and Limitation of Liability

*Notwithstanding anything contained in the Plan to the contrary, the Released Parties, the Creditors Committee, the Creditors Committee's members (solely in their capacity as members), and the Creditors Committee's Professionals shall neither have nor incur any liability relating to these Chapter 11 Cases to any Entity for any and all Claims and Causes of Action arising after the Petition Date and through the Effective Date, including any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or consummating the Plan, the Disclosure Statement, or any other contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other postpetition act taken or omitted to be taken in connection with the Chapter 11 Cases; provided, however, that the foregoing provisions of Article IX.C of the Plan shall have no effect on the liability of any entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct.*

*Nothing in the foregoing exculpation and limitation of liability will (1) be construed as a release of any entity's fraud, gross negligence or willful misconduct with respect to any of the foregoing acts or omissions, (2) limit the liability of attorneys for the Debtors, the Reorganized Debtors, the Creditors Committee and their members and the Liquidating Trustees to their respective clients under the Code of Professional Responsibility or (3) limit or abrogate the obligations of the Debtors.*

## 9. Release and Retention of Causes of Action / Reservation of Rights

### a. *Vesting of Causes of Action*

Except as otherwise provided in the Plan or Confirmation Order, in accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that the Debtors and the Estates may hold against any Entity shall remain with the Debtors and the Estates on and after the Effective Date.

Except as otherwise provided in the Plan or Confirmation Order, after the Effective Date, the Responsible Person shall have the exclusive right to institute, prosecute, abandon, settle or compromise any Causes of Action that were held by the Debtors and the Estates, in its sole discretion and without further order of the Bankruptcy Court, in any court or other tribunal, including, without limitation, in an adversary proceeding filed in one or more of the Chapter 11 Cases.

### b. *Preservation of All Causes of Action Not Expressly Settled or Released*

Unless a Cause of Action against a holder or other Entity is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order (including the Confirmation Order) of the Bankruptcy Court, the Debtors and their Estates expressly reserve such Cause of Action for later adjudication or administration by the Responsible Person (including, without limitation, Causes of Action not specifically identified or described in the Plan or elsewhere or of which the Debtors may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances which may change or be different from those the Debtors now believe to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such Causes of Action upon or after the entry of the Confirmation Order or Effective Date based on the Disclosure Statement, Plan or Confirmation Order, except where such Causes of Action have been released in the Plan (including, without limitation, and for the avoidance of doubt, the releases contained in this Disclosure Statement or any other Final Order (including the Confirmation Order). In addition, the Debtors and their Estates expressly reserve the right of the Responsible Person to pursue or adopt any

---

[12] The indemnification provision contained in Article IV.U of the Plan, however, carves out those acts that arise out of intentional fraud, willful misconduct or gross negligence.

claims alleged in any lawsuit in which the Debtors are a defendant or an interested party, against any Entity, including, without limitation, the plaintiffs, or co-defendants in such lawsuits.

Subject to the immediately preceding paragraph, any Entity to whom the Debtors have incurred an obligation (whether on account of services, purchase or sale of goods or otherwise), or who has received services from the Debtors or a transfer of money or property of the Debtors, or who has transacted business with the Debtors, or leased equipment or property from the Debtors should assume that any such obligation, transfer, or transaction may be reviewed by the Responsible Person subsequent to the Effective Date and may be the subject of an action after the Effective Date, regardless of whether:  (i) such Entity has filed a proof of Claim against the Debtors in the Chapter 11 Cases; (ii) the Debtors have objected to any such Entity's proof of Claim; (iii) any such Entity's Claim was included in the Schedules; (iv) the Debtors have objected to any such Entity's scheduled Claim; or (v) any such Entity's scheduled Claim has been identified by the Debtors as disputed, contingent or unliquidated.

### 10.  Release of Liens

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against property of the Estates distributed under the Plan shall be fully released and discharged and all of the right, title and interest of any holder of such mortgages, deeds of trust, Liens, pledges or other security interest shall revert to the Debtors.

## V.    CONFIRMATION OF THE PLAN

### A.  Solicitation and Voting Procedures

On [●], 2016, the Bankruptcy Court entered the Solicitation Procedures Order [Docket No. [●]].  For purposes of this Article V, capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Solicitation Procedures Order.  The procedures and instructions for voting on the Plan are set forth in the exhibits annexed to the Solicitation Procedures Order.  **The Solicitation Procedures Order is incorporated herein by reference and should be read in conjunction with this Disclosure Statement and in formulating a decision to vote to accept or reject the Plan**.

**THIS DISCUSSION OF THE SOLICITATION AND VOTING PROCEDURES SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY.  PLEASE REFER TO THE SOLICITATION PROCEDURES ORDER [D.I. [●]] FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.**

### 1.  A. Solicitation Packages

Pursuant to the Solicitation Procedures Order, holders of Claims who are eligible to vote to accept or reject the Plan will receive appropriate solicitation materials (the "General Solicitation Package"), including:

- a copy of the Solicitation Procedures;

- the Confirmation Hearing Notice;

- a cover letter, describing the contents of the General Solicitation Package and urging the holders of Claims in each of the Voting Classes to vote to accept the Plan;

- an appropriate form of Ballot for holders of Claims;

- the approved Disclosure Statement (with all exhibits attached thereto, including the Plan and the exhibits attached thereto); and

- any supplemental documents the Debtors file with the Bankruptcy Court and any documents that the Bankruptcy Court orders to be made available.

The General Solicitation Packages will provide the Disclosure Statement and Plan in electronic format (i.e., CDROM or flash drive) and all other contents of the General Solicitation Packages, including Ballots and Master Ballots, in paper format.  Any holder of a Claim or Equity Interest may obtain, at no charge, a paper copy of the documents otherwise provided by (a) accessing Prime Clerk's website at https://cases.primeclerk.com/Abeinsa/, (b) writing to Prime Clerk, via first-class or overnight mail, at Abeinsa Ballot Processing, c/o Prime Clerk LLC, 830 Third Avenue, 3rd Floor, New York, New York 10022, (c) calling Prime Clerk at 855-650-7243 within the United States or Canada or, or (d) e-mailing abeinsaballots@primeclerk.com.

## 2.    Voting Rights

**Classes Entitled to Vote.**  Under the provisions of the Bankruptcy Code, not all holders of Claims against, or Equity Interests in, a debtor are entitled to vote on a chapter 11 plan.  The following Classes (the "Voting Classes") for each Debtor, as applicable, are the only Classes entitled to vote to accept or reject the Plan.  The holders of Claims in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan.  Accordingly, holders of Claims in the Voting Classes have the right to vote to accept or reject the Plan.  If your Claim or Equity Interest is not included in one of these Classes, you are not entitled to vote and you will not receive a General Solicitation Package.  Each holder entitled to vote on the Plan and each of the Voting Classes will vote separately on each Plan of Reorganization and Plan of Liquidation.  Each of the Voting Classes will have accepted the Plan if: (1) the holders of at least two-thirds in dollar amount of the Allowed Claims actually voting in each Class for each Debtor, as applicable, have voted to accept the Plan; and (2) the holders of more than one half in number of the Allowed Claims actually voting in each Class for each Debtor, as applicable, have voted to accept the Plan.  Additionally, if Prime Clerk receives no votes to accept or reject the Plan with respect to any particular Class of Claims, that Class will be deemed to have voted to accept the Plan.

Any creditor in an Impaired Class (1) whose Claim has been listed by the Debtors in the Schedules filed with the Bankruptcy Court (provided that such Claim has not been scheduled as contingent, unliquidated or disputed) or (2) who filed a proof of claim on or before the Bar Date or any proof of claim filed within any other applicable period of limitations or with leave of the Bankruptcy Court, which Claim is not the subject of an objection and has not been estimated for voting purposes pursuant to an order of the Bankruptcy Court, is entitled to vote on the Plan.  For a discussion of the procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, see the Disclosure Statement Order, attached to this Disclosure Statement as Exhibit B.

| CLASS | DEBTOR GROUP | CLAIM / INTEREST | STATUS UNDER PLAN | VOTING RIGHTS |
|---|---|---|---|---|
| 3A | EPC Reorganizing | Spanish Affected Debt Claims | Impaired | Entitled to Vote |
| 3B | EPC Reorganizing | US Debt Claims | Impaired | Entitled to Vote |
| 4 | EPC Reorganizing | General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | EPC Reorganizing | Litigation Claims | Impaired | Entitled to Vote |
| 6A | EPC Reorganizing | Affected Debt Bonding Claims | Impaired | Entitled to Vote |
| 6B | EPC Reorganizing | Non-Affected Debt Bonding Claims | Impaired | Entitled to Vote |
| 3 | Solar Reorganizing | US Debt Claims | Impaired | Entitled to Vote |
| 4 | Solar Reorganizing | General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | Solar Reorganizing | Litigation Claims | Impaired | Entitled to Vote |
| 6A | Solar Reorganizing | Affected Debt Bonding Claims | Impaired | Entitled to Vote |
| 6B | Solar Reorganizing | Non-Affected Debt Bonding Claims | Impaired | Entitled to Vote |
| 3 | EPC Liquidating | General Unsecured Claims | Impaired | Entitled to Vote |
| 3A | EPC Liquidating | US Debt Claims | Impaired | Entitled to Vote |

| | | | | |
|---|---|---|---|---|
| 3 | Bioenergy and Maple Liquidating | General Unsecured Claims | Impaired | Entitled to Vote |
| 3A | Bioenergy and Maple Liquidating | US Debt Claims | Impaired | Entitled to Vote |

**Classes Not Entitled to Vote.** Under the Bankruptcy Code, holders of Claims or Interests are not entitled to vote if such Claims or Interests are Unimpaired under the Plan or if they will receive no distribution of property under the Plan. Based on this standard, the following Classes of Claims and Interest for each Debtor, as applicable, will not be entitled to vote on the Plan and the holders of such Claims will **not** be solicited to vote on the Plan.

| CLASS | DEBTOR GROUP | CLAIM / INTEREST | STATUS UNDER PLAN | VOTING RIGHTS |
|---|---|---|---|---|
| 1 | EPC Reorganizing | Secured Claims | Unimpaired | Deemed to Accept |
| 2 | EPC Reorganizing | Priority Claims | Unimpaired | Deemed to Accept |
| 7A | EPC Reorganizing | Intercompany Claims by Non-Debtor Affiliates | Impaired | Deemed to Reject |
| 7B | EPC Reorganizing | Intercompany Claims by Debtor Affiliates | Impaired | Deemed to Accept |
| 8 | EPC Reorganizing | Equity Interests | Impaired | Deemed to Accept |
| 1 | Solar Reorganizing | Secured Claims | Unimpaired | Deemed to Accept |
| 2 | Solar Reorganizing | Priority Claims | Unimpaired | Deemed to Accept |
| 7A | Solar Reorganizing | Intercompany Claims by Non-Debtor Affiliates | Impaired | Deemed to Reject |
| 7B | Solar Reorganizing | Intercompany Claims by Debtor Affiliates | Impaired | Deemed to Accept |
| 8 | Solar Reorganizing | Equity Interests | Impaired | Deemed to Accept |
| 1 | EPC Liquidating | Secured Claims | Unimpaired | Deemed to Accept |
| 2 | EPC Liquidating | Priority Claims | Unimpaired | Deemed to Accept |
| 4 | EPC Liquidating | Intercompany Claims | Impaired | Deemed to Reject |
| 5 | EPC Liquidating | Equity Interests | Impaired | Deemed to Reject |
| 1 | Bioenergy and Maple Liquidating | Secured Claims | Unimpaired | Deemed to Accept |
| 2 | Bioenergy and Maple Liquidating | Priority Claims | Unimpaired | Deemed to Accept |
| 4 | Bioenergy and Maple Liquidating | Intercompany Claims | Impaired | Deemed to Reject |
| 5 | Bioenergy and Maple Liquidating | Equity Interests | Impaired | Deemed to Reject |

Additionally, the Solicitation Procedures Order provides that certain holders of Claims in the Voting Classes, such as those holders whose Claims have been disallowed or are subject to a pending objection, are not entitled to vote to accept or reject the Plan.

Any Class of Claims that does not have a holder of an Allowed Claim or Equity Interest or a Claim or Equity Interest temporarily allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be

deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to Section 1129(a)(8) of the Bankruptcy Code.

A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

### 3.    Voting Procedures

**The Voting Record Date is [●], 2016.**  The Solicitation Procedures Order established Voting Record Date for purposes of determining, among other things, which holders of Claims are eligible to vote on the Plan and whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee can vote as the holder of a Claim.

**The Voting Deadline is [●], 2016 at 4:00 p.m. (prevailing Eastern Time).**  The Solicitation Procedures Order also established the Voting Deadline as the deadline for submitting Ballots and Master Ballots, as applicable. To have votes to accept or reject the Plan counted, every registered holder of a Claim, or such holder's Nominee, must properly execute, complete, and deliver the Ballot or Master Ballot (as applicable) sent to it by (i) first-class mail, (ii) overnight courier, or (iii) personal delivery, in each case so that Prime Clerk **actually receives** the Ballot or Master Ballot (as applicable) no later than the Voting Deadline.  holders of Claims, or their Nominees, should send their Ballots to Prime Clerk on or before the Voting Deadline, as indicated in the chart below.  Delivery of a Ballot to Prime Clerk by facsimile, e-mail, or any other electronic means will render the corresponding vote invalid.  If a holder received a reply envelope addressed to its Nominee, such holder should allow sufficient time for its Nominee to receive, process and submit its vote on a Master Ballot that must be actually received by Prime Clerk by the Voting Deadline.  It is important to follow the specific instructions provided on each Ballot or Master Ballot. Ballots and Master Ballots should be sent to:

> Abeinsa Holding Inc. Ballot Processing
> c/o Prime Clerk LLC
> 830 3rd Avenue, 3rd Floor
> New York, NY 10022
> 855-650-7243
> Abeinsaballots@primeclerk.com

### 4.    Ballots and Master Ballots Not Counted

Except as otherwise provided by the Solicitation Procedures Order, no Ballot or Master Ballot will be counted toward Confirmation if, among other things: (i) it is illegible or contains insufficient information to permit the identification of the holder of the Claim; (ii) it was transmitted by facsimile, email, or other electronic means; (iii) it was cast by an entity that is not entitled to vote on the Plan; (iv) it was cast for a Claim listed in the Schedules as contingent, unliquidated, or disputed for which the applicable bar date has passed and no proof of claim was timely filed; (v) it was cast for a Claim that is subject to an objection pending as of the Voting Record Date (unless temporarily allowed in accordance with the Solicitation Procedures Order); (vi) it was sent to the Debtors, the Debtors' agents (other than Prime Clerk), the Debtors' financial or legal advisors, the Official Committee, or the Official Committee's advisors; (vii) it is unsigned; (viii) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan; or (ix) it is not received by Prime Clerk before the Voting Deadline.

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT PRIME CLERK TOLL-FREE AT 1-855-650-7243 WITHIN THE UNITED STATES OR CANADA OR, OUTSIDE OF THE UNITED STATES OR CANADA, BY CALLING +1-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 OR E-MAIL ABEINSABALLOTS@PRIMECLERK.COM. ANY BALLOT OR MASTER BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE SOLICITATION PROCEDURES ORDER WILL NOT BE COUNTED.**

### B.  The Confirmation Hearing

Before the Debtors may implement the Plan, the Bankruptcy Code requires that the Bankruptcy Court, after notice, hold a confirmation hearing with respect to the Plan if the required majorities have approved after solicitation.  The Confirmation Hearing in respect of the Plan has been scheduled to commence on November 29, 2016 at 1:00 p.m. (prevailing Eastern Time) before the Honorable Kevin J. Carey, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, Courtroom 5, Fifth Floor, 824 North Market Street, Wilmington, DE 19801.  The Confirmation Hearing may be adjourned from time to time by the Debtors without further notice except for an announcement of the adjourned date made at the Confirmation Hearing.  Any objection to confirmation must be made in writing and specify in detail the name and address of the objector, all grounds for the objection and the amount and description of the Claim and/or Equity Interest held by the objector. Any such objection must be filed with the Bankruptcy Court and served in accordance with the Disclosure Statement Order on or before [November 22], 2016 at 4:00 p.m. (prevailing Eastern Time).  Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014.

### C.  Confirmation

Notwithstanding the fact that the Plan is a single document, the Plan constitutes four (4) separate plans – two plans of liquidation and two plans of reorganization – under the Bankruptcy Code.  Subject to the satisfaction or waiver of the conditions set forth in Article VIII of the Plan, the Debtors may choose to confirm and consummate all or less than all of such plans of reorganization without any further amendment of the Plan.

At the confirmation hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are satisfied.  Among the requirements for confirmation of a plan are that the plan is:

- accepted by all impaired classes of claims and equity interests or, if rejected by an impaired class, that the plan "does not discriminate unfairly" and is "fair and equitable" as to such class;

- feasible; and

- in the "best interests" of creditors and stockholders that are impaired under the plan.

#### 1.  Acceptance

Acceptance of the Plan need only be solicited from holders of Claims whose Claims belong to a Class that is impaired and not deemed to have rejected the Plan.  For a discussion on voting and voting procedures, see Sections I.A and I.B, entitled "Holders of Claims and Equity Interests Entitled to Vote" and "Voting Procedures," respectively.

If any impaired Class of Claims entitled to vote does not accept the Plan by the requisite statutory majority provided in sections 1126(c) and (d) of the Bankruptcy Code, the Debtors reserve the right to amend the Plan in accordance with section 1127 of the Bankruptcy Code or to seek Bankruptcy Court confirmation of the Plan under section 1129(b) of the Bankruptcy Code (a procedure known as "cram down"), or both.  The determination as to whether to seek confirmation of the Plan under such circumstances will be announced before or at the Confirmation Hearing.  With respect to Impaired Classes of Claims that are deemed to reject the Plan, the Debtors will request that the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code.  See Section V.C.3, entitled "Cram Down."

#### 2.  Confirmation Standards

##### a.  Overview

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of section 1129(a) of the Bankruptcy Code have been satisfied with respect to the Plan.  Confirmation of a plan under section 1129(a) of the Bankruptcy Code requires, among other things, that:

- the plan complies with the applicable provisions of the Bankruptcy Code;

- the proponent of the plan has complied with the applicable provisions of the Bankruptcy Code;

- the plan has been proposed in good faith and not by any means forbidden by law;

- any payment made or to be made by the proponent under the plan for services or for costs and expenses in, or in connection with, the chapter 11 case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the bankruptcy court as reasonable;

- the proponent has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in the plan with the debtor, or a successor to the debtor under the plan.  The appointment to, or continuance in, such office of such individual, must be consistent with the interests of creditors and equity security holders and with public policy, and the proponent must have disclosed the identity of any insider that the reorganized debtor will employ or retain and the nature of any compensation for such insider;

- with respect to each impaired class of claims or interests, either each holder of a claim or interest of such class has accepted the plan, or will receive or retain under the plan on account of such claim or interest, property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated on such date under chapter 7 of the Bankruptcy Code;

- each class of claims or interests has either accepted the plan or is not impaired under the plan;

- except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that allowed administrative expenses and priority claims (other than priority tax claims) will be paid in full on the Effective Date (except that if a class of priority claims has voted to accept the plan, holders of such claims may receive deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amounts of such claims) and that holders of priority tax claims may receive on account of such claims deferred cash payments, over a period not exceeding six years after the date of assessment of such claims, of a value, as of the effective date, equal to the allowed amount of such claims;

- if a class of claims is impaired, at least one impaired class of claims has accepted the plan, determined without including any acceptance of the plan by any insider holding a claim in such class; and

- confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

- Subject to receiving the requisite votes in accordance with section 1129(a)(8) of the Bankruptcy Code and the "cram down" of Classes not receiving any distribution under the Plan, the Debtors believe that:

- the Plan satisfies all of the statutory requirements of chapter 11 of the Bankruptcy Code;

- the Debtors have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and

- the Plan has been proposed in good faith.

Set forth below is a more detailed summary of the relevant statutory confirmation requirements.

### b.    Best Interests of Holders of Claims and Interests

The "best interests" standard requires that the Bankruptcy Court find either:

- that all members of each Impaired Class have accepted the Plan; or

- that each holder of an allowed Claim or Equity Interest of each Impaired Class of Claims will receive or retain on account of such Claim or Equity Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would so receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

The first step in ascertaining whether the Debtors meet this standard is to determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties in a chapter 7 liquidation case. The gross amount of cash available in such a liquidation would be the sum of the proceeds from the disposition of the Debtors' assets and the cash held by the Debtors at the time of the commencement of the chapter 7 case. This gross amount would be reduced by the amount of any Allowed Claims secured by such assets, the costs and expenses of the liquidation, and such additional administrative expenses and priority claims that may result from the liquidation of the Debtors' business and the use of chapter 7 for the purposes of liquidation. Any remaining net cash would be allocated to creditors and shareholders in strict accordance with the order of priority of claims contained in section 726 of the Bankruptcy Code.

As discussed in the Debtors' Liquidation Analysis attached to this Disclosure Statement as <u>Exhibit C</u>, the Debtors have determined that confirmation of the Plan will provide each creditor and interest holder with a recovery that is not less than it would receive pursuant to a liquidation of the Debtors under chapter 7 of the Bankruptcy Code. See <u>Exhibit C</u> for a further discussion of how the Plan satisfies the "best interests" test.

### c.  *Financial Feasibility*

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successor to the Debtors unless such liquidation or reorganization is proposed in the Plan.

The Plan complies with this requirement assuming that the Debtors operate the Going Forward Projects, which the Debtors estimate will provide $[●] and $[●] in revenue annually, and litigate the Litigation Claims, which the Debtors estimate will provide $[●] and $[●] in recovery to the EPC Reorganizing Debtor Group and the Solar Reorganizing Debtor Group, respectively. Under the terms of the Master Restructuring Agreement, Abengoa has agreed to provide a Cash contribution of up to $[●] (the "<u>New Value Contribution</u>"). The EPC Reorganizing Debtor Group and the Solar Reorganizing Debtor Group may each request up to an amount of $[●] in their discretion for a period for 18 months after the Effective Date in order to fund its operations or satisfy Claims pursuant to the Plan. As a result, as of the Effective Date, the Debtors believe they will have sufficient funds to satisfy Claims pursuant to the treatment set forth in the Plan as well as to implement the Plan.

### 3.  Cram Down

**The Debtors intend to seek to cram down the Plan on any Class of Claims in Impaired Classes that vote against or are deemed to reject the Plan.**

The Bankruptcy Code contains provisions for confirmation of a plan even if the plan is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted the plan. The "cram down" provisions of the Bankruptcy Code are set forth in section 1129(b) of the Bankruptcy Code.

Under the "cram down" provisions, on the request of a plan proponent the bankruptcy court will confirm a plan despite the lack of acceptance by an impaired class or classes if the bankruptcy court finds that:

- the plan does not discriminate unfairly with respect to each non-accepting impaired class;

- the plan is fair and equitable with respect to each non-accepting impaired class; and

- at least one impaired class has accepted the plan.

These standards ensure that holders of junior interests, such as common stockholders, cannot retain any interest in the debtor under a plan of reorganization that has been rejected by a senior impaired class of claims or interests unless the claims or interests in that senior impaired class are paid in full.

As used by the Bankruptcy Code, the phrases "discriminate unfairly" and "fair and equitable" have narrow and specific meanings unique to bankruptcy law.  A plan does not discriminate unfairly if claims or interests in different classes but with similar priorities and characteristics receive or retain property of similar value under a plan.  By establishing separate Classes for the holders of each type of Claim or Equity Interest and by treating each holder of a Claim or Equity Interest in each Class similarly, the Plan has been structured in order to satisfy the "unfair discrimination" test of section 1129(b) of the Bankruptcy Code.

The Bankruptcy Code sets forth different standards for establishing that a plan is "fair and equitable" with respect to a dissenting class, depending on whether the class is comprised of secured claims, unsecured claims .  In general, section 1129(b) of the Bankruptcy Code permits confirmation of a plan despite non-acceptance by an impaired class if that class and all junior classes are treated in accordance with the "absolute priority" rule.  This rule requires that the dissenting class be paid in full before a junior class may receive anything under the plan.  The Bankruptcy Code establishes "cram down" tests for secured creditors, unsecured creditors and equity holders as follows:

- Secured Creditors.  Either:  (1) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim; (2) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim; or (3) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as described in clauses (1) and (2) above.

- Unsecured Creditors.  Either:  (1) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim; or (2) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

- Equity Interests.  Either:  (1) each holder of an equity interest will receive or retain under the plan property of a value equal to the greater of the fixed liquidation preference to which such holder is entitled, or the fixed redemption price to which such holder is entitled or the value of the interest; or (2) the holder of an interest that is junior to the nonaccepting class will not receive or retain any property under the plan.

**In addition, the Bankruptcy Code requires that a debtor demonstrate that no class senior to a non-accepting impaired class will receive more than payment in full on its claims.**

If all of the applicable requirements for confirmation of the Plan are satisfied as set forth in sections 1129(a)(1) through (13) of the Bankruptcy Code, except that one or more Classes of Impaired Claims have failed to accept the Plan under section 1129(a)(8) of the Bankruptcy Code, the Debtors will request that the Bankruptcy Court confirm the Plan under the "cram down" procedures in accordance with section 1129(b) of the Bankruptcy Code.  The Debtors believe that the Plan satisfies the "cram down" requirements of the Bankruptcy Code, but there can be no assurance that the Bankruptcy Court will determine that the Plan meets the requirements of section 1129(b) of the Bankruptcy Code or that at least one Impaired Class of Claims will vote to accept the Plan, as required for confirmation of a Plan under the "cram down" procedures.  The Debtors have retained the right to exclude one or more Debtors or Debtor groups from the Plan, which they may choose to do in the event that they are unable to "cram down" a dissenting Class.

### D.  Consummation

The Plan will become effective and be consummated on the Effective Date.  As used in this Disclosure Statement, the "Effective Date" means the first Business Day on or after the Confirmation Date specified by the Debtors on which the conditions precedent to the effectiveness of the Plan, as set forth in Section VII of the Plan, have been satisfied or waived pursuant to Section VIII.B of the Plan.  For a more detailed discussion of the

conditions precedent to the Plan and the consequences of the failure to meet these conditions, see Section IV, entitled "The Plan of Reorganization."

From and after the occurrence of the Effective Date, the Plan will be implemented pursuant to its terms, consistent with the provisions of the Bankruptcy Code.

## VI.   RISK FACTORS

**Before voting to accept or reject the Plan, holders of Claims against the Debtors should read and consider carefully the following risk factors and the other information in this Disclosure Statement, the Plan and the other documents delivered with or incorporated by reference in this Disclosure Statement and the Plan.   These risk factors should not, however, be regarded as constituting the only risks involved in connection with the Plan, its implementation, or the Debtors' businesses and operations following the Effective Date.**

### A.   Risk Factors Relating to the Chapter 11 Cases

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of holders of Claims in such Impaired Classes.   If the Plan is not consummated, any settlement, compromise, or release embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims), the assumption or rejection of executory contracts or unexpired leases affected by the Plan, and any document or agreement executed pursuant to the Plan, shall be null and void.

#### 1.   Parties in Interest May Object to the Plan's Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims in such class.   The Debtors believe that the classification of the Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Equity Interests, each encompassing Claims and Equity Interests that are substantially similar to the other Claims and Equity Interests in each such Class.   Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

#### 2.   Failure to Satisfy Vote Requirements

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.   In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan.   There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the holders of Allowed Claims as those proposed in the Plan.

#### 3.   The Debtors May Not Be Able to Secure Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.   Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.   A non-accepting holder of an Allowed Claim or an Allowed Interest might challenge either the adequacy of this

Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determined that this Disclosure Statement, the balloting procedures and voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met.  If the Plan is not confirmed, it is unclear what distributions, if any, holders of Allowed Claims and Allowed Interests would receive with respect to their Allowed Claims and Allowed Interests.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation.  Any such modifications could result in a less favorable treatment of any Class than the treatment currently provided in the Plan.  Such less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.  Changes to the Plan may also delay the confirmation of the Plan and the Debtors' emergence from bankruptcy.

### 4.  Nonconsensual Confirmation

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes.  The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.  In addition, the pursuit of nonconsensual Confirmation of the Plan may result in, among other things, increased expenses and the expiration of any commitment to provide support for the Plan, financially or otherwise.

### 5.  The Debtors May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied upon by any holder of a Claim where such Claim is or may be subject to an objection.  Any holder of a Claim that is or may be subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 6.  Risk of Non-Occurrence of the Effective Date

The Debtors can provide no assurance as to the timing or as to whether the Effective Date will, in fact, occur.  The occurrence of the Effective Date is subject to certain conditions precedent as described in Article VIII of the Plan, including, among others, those relating to consummation of the Plan, as well as the receipt of any necessary regulatory approvals.  Failure to meet any of these conditions could result in the Plan not being consummated or the Confirmation Order being vacated.

### 7.  Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan

The distributions available to holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims and Allowed Interests to be subordinated to other Allowed Claims and Allowed Interests.  The occurrence of any and all such contingencies, which could affect distributions available to holders of Allowed Claims and Allowed Interests under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

8.  **The Actual Amount of Allowed Claims May Differ From the Estimated Claims and Adversely Affect the Percentage Recovery of Claims**

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates.  Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement.  Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed.  Such differences may materially and adversely affect, among other things, the percentage recoveries to holders of Allowed Claims under the Plan.

9.  **Release, Injunction, and Exculpation Provisions May Not Be Approved**

Article IX of the Plan provides for certain releases, injunctions, and exculpations.  All of the releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.  If they are not approved, the Plan likely cannot be confirmed and likely cannot go effective.

10.  **Certain Liabilities May Not Be Fully Extinguished as a Result of the Confirmation of the Plan**

Although a significant amount of the Debtors' current liabilities will be discharged pursuant to the Plan upon emergence from the Chapter 11 Cases, a number of obligations may remain in effect following the Effective Date.  Various agreements and liabilities may remain in place, such as potential employee benefit and pension obligations, and other contracts or leases that, even if modified during the Chapter 11 Cases, may still subject the Debtors to substantial obligations and liabilities.

11.  **The Debtors may choose to exclude a Debtor or Debtor Group from the Plan, if one or more Impaired Classes of Claims do not accept the Plan**

If one or more Impaired Classes of Claims entitled to vote does not vote to accept the Plan, the Debtors may choose to exclude the Debtor group to which such Class relates or one or more Debtors in such Debtor group from the Plan.  If one or more Debtors or Debtor groups were excluded from the Plan, none of the creditors of such Debtors or Debtor groups would receive a distribution under the Plan.  The exclusion of a Debtor or Debtor group could have a material adverse effect on the creditors of such Debtor or Debtor group, would prolong the Chapter 11 Case as it related to those Entities, and would delay the distribution to such Debtor groups' creditors.

B.  **Risk factors and considerations Regarding the Global Restructuring**

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of holders of Claims in such Impaired Classes.

1.  **The Abengoa Group cannot predict the length of time required for the Restructuring Completion Date to occur.**

The Abengoa Group cannot predict or ascertain the length of time required for the Restructuring Completion Date to occur.  Similarly, the Abengoa Group cannot predict or ascertain the outcome of the Restructuring or any corresponding impact on the obligors, their business, results of operations, financial condition and prospects, the Notes or the rights of the Beneficial Owners of the Notes.  So long as the processes related to the Restructuring continue, the Abengoa Group's senior management will be required to expend a significant amount of time and effort on the Obligors' restructuring instead of focusing on the Abengoa Group's business and operations.  The Abengoa Group will also be required to incur substantial costs for professional fees and other expenses and costs associated with the Restructuring, which, if it is unable to fund, could jeopardize the restructuring of the Abengoa Group and its business.

Even if the Restructuring is resolved on a timely basis, the Restructuring itself could materially adversely affect the Abengoa Group's business, results of operations and financial condition. Due to the uncertainty about the prospects and future viability of the Abengoa Group, the Abengoa Group is subject to the increased risk that, among other things, the Abengoa Group's customers could move to competitors (including competitors with comparatively greater financial resources or that are in comparatively less financial distress) the Abengoa Group's employees and key management and technical personnel may be distracted from business operations performance of duties and/or may be easily attracted to other career opportunities, the Abengoa Group's liquidity and cash position could be significantly or irreparably harmed, and business partners and counterparties could terminate their relationship with the Abengoa Group or demand financial assurances or enhanced performance, any of which could impair the Abengoa Group's business, results of operations, financial condition and prospects. Moreover, these risks may be exacerbated by any prolonged duration to or delay of resolution of the Restructuring.

**2.    Under Spanish law, the Homologation is subject to appeal and may be overturned.**

Under Spanish law, a challenge to a Homologation may be filed with the Mercantile Court of Seville that approved such Homologation up to fifteen court days after the judicial decision approving the Homologation is published. Matters that may be challenged include an insufficient percentage of creditors of financial indebtedness required to approve the Restructuring Agreement, the imposition of a disproportionate sacrifice on non-consenting/dissenting creditors holding financial claims, and any judicial rulings, orders or decisions therefrom. If any such challenge is resolved adversely to the relevant Obligor, the Homologation in relation to such Obligor may be revoked, which could materially adversely affect the Obligor's business, financial condition, results of operations and prospects.

**3.    Under English law, the ACIL CVA may be challenged by ACIL's members.**

A CVA also requires the approval of more than 50% in value of a company's members present in person or by proxy and voting at a meeting on the resolution to approve that CVA, so ACIL's members will be required to vote on the ACIL CVA resolution at a members' meeting. However, in accordance with section 4(A)(2) of the Insolvency Act, if the outcome of the members' meeting differs from the outcome of the CVA Creditors' Meeting, the decision of the creditors will prevail, subject to the right of any member to apply to the English Court to challenge the approval of a CVA.

Any ACIL Guarantee Creditor entitled to vote at the CVA Creditors' Meeting to approve the ACIL CVA may apply to the English Court on one or both of the following grounds:

- that the ACIL CVA unfairly prejudices the interests of that member; or

- that there has been some material irregularity at or in relation to the members' meeting called to approve the ACIL CVA.

Any such application must be made by a creditor within 28 days of the ACIL CVA Nominee reporting the result of the CVA Creditors' Meeting to the English Court or, if the creditor was not given notice of the CVA Creditors' Meeting, such application must be made within 28 days of the creditor becoming aware that the CVA Creditors' Meeting had taken place.

**4.    Even if the ACIL CVA is approved by a majority in excess of 75% in value of the ACIL Guarantee Creditors who voted at the CVA Creditors' Meeting, the resolution approving the ACIL CVA will be invalid if more than half of Unconnected ACIL Guarantee Creditors vote against the resolution.**

A resolution approving a CVA will be invalid if those creditors voting against it include more than half in value of the creditors, for these purposes counting only those creditors:

- to whom notice of the CVA Creditor's Meeting was sent;

- whose votes were not left out of account due to no written notice of claim having been received at or prior to the CVA Creditors' Meeting, or where the claim or part of it is being secured; and

- who are not, to the best of the chairman of the CVA Creditors' Meeting's belief, persons connected with that company.

The effect of the rule described above is that even if the ACIL CVA is approved by a majority in excess of 75% in value of the ACIL Guarantee Creditors who voted at the CVA Creditors' Meeting, the resolution approving the ACIL CVA will be invalid if more than half of the Unconnected ACIL Guarantee Creditors who had notice of the CVA Creditors' Meeting and whose votes were validly cast voted against the resolution.

> **5. The Restructuring Invitation may not be completed or may be terminated or amended.**

Until the Issuers announce whether they have decided to accept the Electronic Instructions and/or Forms of Sub-Proxy, as applicable, validly delivered by the Expiration Time (unless extended by the Issuers in their sole discretion), no assurance can be given that the Restructuring Invitation will be completed. In addition, subject to applicable law and as provided in this Restructuring Accession Notice, the Issuers may, in their sole discretion, extend, re-open, amend or terminate the Restructuring Invitation at any time before such announcement and may, in their sole discretion, waive any of the conditions to the Restructuring Invitation either before or after such announcement.

> **6. The Global Restructuring will result in the restructuring of financial obligations owed to creditors, but it is uncertain or whether the Abengoa Group will become financially profitable or operationally viable.**

The Global Restructuring will involve the restructuring of the financial obligations owed by each of the Issuers and the other Obligors to their Existing Creditors and will result in significant changes to those obligations and to the business, operations, and structure of the Abengoa Group. These changes have as their aim the attainment of operational viability and financial profitability for the Abengoa Group. Because of the residual risks and uncertainties associated with the Restructuring, the ultimate impact of rulings, orders, decisions, agreements and events that occurred during, or that may occur subsequent to, the Restructuring on the Abengoa Group's business, financial condition, results of operations and prospects cannot be accurately predicted or quantified.

The continuation of the Abengoa Group as a going concern is contingent upon the renegotiation and agreement of its obligations with its creditors, approval of such renegotiation and agreement by the Mercantile Court of Seville pursuant to the Homologation (although the Homologation becoming final and non-appealable shall not be deemed a condition for the Restructuring Completion Date to occur), approval of the ACIL CVA and the Chapter 11 Plan, approval by other relevant regulators and governmental bodies, compliance with the terms of existing and future loan agreements, bonds and other debt instruments and financial obligations, a return to profitability, the generation of sufficient cash flows from operations to service indebtedness and to pay suppliers and trade creditors, and the obtaining of financing sources to meet future obligations. There can be no assurance given that the Abengoa Group will be successful in any of these aspects and any such failure may materially adversely affect the Abengoa Group's business, financial condition, results of operations and prospects.

## VII.  SECURITIES LAWS MATTERS

### A.  Applicability of the Bankruptcy Code and Federal and Other Securities Laws

**The initial issuance and the resale of Class A shares and Class B shares by the Parent under the Plan raise certain securities law issues under the Bankruptcy Code and federal and state securities laws that are discussed in this section. The information in this section should not be considered applicable to all situations or to all holders of Claims receiving Class A shares and Class B shares of the Parent. Holders of Claims should consult their own legal counsel concerning the facts and circumstances relating to the transfer of the Class A shares and Class B shares of the Parent.**

The Parent does not intend to file a registration statement under the Securities Act or any state securities laws relating to the initial issuance on the Effective Date of its Class A shares and Class B shares pursuant to the Plan.  The Debtors believe that the provisions of section 1145(a)(1) of the Bankruptcy Code exempt the initial issuance of the Class A shares and Class B shares of the Parent to holders of Claims on the Effective Date from federal and state securities registration requirements.

## 1.    Initial Issuance and Delivery of Securities

The Parent will issue the Class A shares and Class B shares under and in accordance with the Master Restructuring Agreement.

Section 1145(a)(1) of the Bankruptcy Code exempts the issuance of securities under a plan of reorganization from registration under the Securities Act and under state securities laws if three principal requirements are satisfied:

- the securities must be issued "under a plan" of reorganization and must be securities of the debtors, of an affiliate "participating in a joint plan" with the debtors or of a successor to the debtors under the plan;

- the recipients of the securities must hold a prepetition or administrative expense claim against the debtors or an interest in the debtors or such affiliate; and

- the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtors, or "principally" in such exchange and "partly" for cash or property.

The Debtors believe that the issuance of Class A shares and Class B shares of the Parents satisfies the requirements of section 1145(a)(1) of the Bankruptcy Code and is therefore exempt from registration under the Securities Act and state securities laws.

## 2.    Subsequent Transfers Under Federal Securities Laws

In general, all resales and subsequent transactions involving Class A shares and Class B shares of the Parent will be exempt from registration under the Securities Act under section 4(1) of the Securities Act, *unless* the holder is deemed to be an "underwriter" with respect to such securities, an "affiliate" of the issuer of such securities or a "dealer."  Section 1145(b)(1) of the Bankruptcy Code defines four types of "underwriters":

- persons who purchase a claim against, an interest in, or a claim for administrative expense against the debtors with a view to distributing any security received or to be received in exchange for such a claim or interest ("accumulators");

- persons who offer to sell securities offered or sold under a plan for the holders of such securities ("distributors");

- persons who offer to buy securities offered or sold under a plan from the holders of the securities, if the offer to buy is (1) with a view to distributing such securities and (2) made under an agreement in connection with the plan or with the issuance of securities under the plan; and

- a person who is an "issuer" with respect to the securities, as the term "issuer" is defined in section 2(11) of the Securities Act.

Under section 2(11) of the Securities Act, an "issuer" includes any "affiliate" of the issuer, which means any person directly or indirectly controlling, or controlled by, the issuer, or any person under direct or indirect common control with the issuer.  Under section 2(12) of the Securities Act, a "dealer" is any person who engages either for all or part of his or her time, directly or indirectly, as agent, broker or principal, in the business of offering, buying, selling or otherwise dealing or trading in securities issued by another person.  The determination of whether a particular person would be deemed to be an "underwriter" or an "affiliate" with respect to any security to be issued under the Plan, or would be deemed a "dealer," would depend on various facts and circumstances applicable to that

person. Accordingly, the Debtors express no view as to whether any person would be an "underwriter" or an "affiliate" with respect to any security to be issued under the Plan or would be a "dealer."

**Any person intending to rely on such exemption is urged to consult his or her own counsel as to the applicability thereof to his or her circumstances.**

### 3.    Subsequent Transfers Under State Law

The state securities laws generally provide registration exemptions for subsequent transfers by a bona fide owner for his or her own account and subsequent transfers to institutional or accredited investors. Such exemptions are generally expected to be available for subsequent transfers of the Class A shares and Class B shares of the Parent.

**Any person intending to rely on these exemptions is urged to consult his or her own counsel as to their applicability to his or her circumstances.**

**The foregoing summary discussion is general in nature and has been included in this Disclosure Statement solely for informational purposes. We make no representations concerning, and do not provide, any opinions or advice with respect to the securities or the bankruptcy matters described in this disclosure statement. In light of the uncertainty concerning the availability of exemptions from the relevant provisions of federal and state securities laws, we encourage each holder and party-in-interest to consider carefully and consult with its own legal advisors with respect to all such matters. Because of the complex, subjective nature of the question of whether a security is exempt from the registration requirements under the federal or state securities laws or whether a particular holder may be an underwriter, we make no representation concerning the ability of a person to dispose of the securities issued under the Plan.**

### VIII.        CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain federal income tax consequences of the implementation of the Plan to the Debtors and certain holders of Claims and Equity Interests. The discussion only addresses such consequences to the holders entitled to vote on the Plan.

The following summary is based on the Internal Revenue Code pf 1986, as amended (the "Tax Code"), Treasury Regulations promulgated thereunder, judicial decisions and published administrative rules and pronouncements of the Internal Revenue Service (the "IRS") as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the federal income tax consequences described below.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Debtors have not requested a ruling from the IRS with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to the interpretation that the IRS or a court of law will adopt. In addition, this summary does not generally address foreign, state, local or non-U.S. estate or gift-tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as foreign taxpayers, broker dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations and investors in pass-through entities). In addition, this discussion does not address the U.S. alternative minimum tax rules.

This discussion assumes that the various third-party debt and other arrangements to which the Debtors are a party will be respected for federal income tax purposes in accordance with their form and that Claims and Equity Interests are held as capital assets. Furthermore, this discussion assumes that all separate plans of reorganization under the Bankruptcy Code constituting the Plan will be consummated. If less than all of such plans of reorganization will be consummated, their federal income tax consequences may be materially different than the consequences described below. Accordingly, the following summary of certain federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a holder of a Claim or an Equity Interest.

**All holders of Claims should seek tax advice based on their particular circumstances from an independent tax advisor regarding the federal, state, local, and other tax consequences of the transactions contemplated by the Plan.**

## A.    U.S. FEDERAL INCOME TAX CONSEQUENCES TO THE DEBTORS

### 1.    Gain or Loss Pursuant to the Plan

In general, if a debtor conveys appreciated (or depreciated) property (i.e., property having an adjusted tax basis less (or greater) than its fair market value) to a creditor in cancellation of debt, the debtor must recognize taxable gain or loss (which may be ordinary income or loss, capital gain or loss, or a combination of each) equal to the excess or shortfall, respectively, of such fair market value over the debtor's adjusted tax basis in such property. For federal income tax purposes, the Debtors will treat the transfer of the Liquidating Trust Assets to the Liquidating Trusts as a distribution of such assets by the Debtors to the holders of Claims that receive interests in the Liquidating Trusts in a taxable transaction followed by a transfer of such assets by such holders to the Liquidating Trusts. These deemed distributions for federal income tax purposes will generally cause the Debtors to recognize gain or loss equal to the fair market value of the distributed assets less the tax basis of the Debtors in such assets. Such gain from the deemed distributions or actual conveyances of property to the holders of Claims (or gain from other asset dispositions) may be offset by operating losses from the current year or the Debtor's net operating loss ("NOL") and/or capital loss carryforwards from prior years subject to certain limitations. To the extent a Debtor uses NOLs to offset gain, it may be subject to a federal alternative minimum tax, charged at effective rate of 2% of the income offset by the NOL. However, the Debtors expect to not have any federal income tax liability with respect to their taxable years ending December 31, 2016.

### 2.    Cancellation of Debt Income

In general, the discharge of a debt obligation by a debtor for an amount less than the adjusted issue price (generally, the amount received upon incurring the obligation plus the amount of any previously amortized original issue discount ("OID") and less the amount of any previously amortized bond premium) gives rise to cancellation of indebtedness ("COD") income which must be included in a debtor's income for federal income tax purposes, unless, in accordance with Section 108(e)(2) of the Tax Code, payment of the liability would have given rise to a deduction. A corporate debtor that issues its own stock or its own debt in satisfaction of its debt is treated as realizing COD income to the extent the fair market value of the stock or the issue price of new debt instrument is less than the adjusted issue price of the old debt. COD income is not recognized by a taxpayer that is a debtor in a title 11 (bankruptcy) case if a discharge is granted by the court or pursuant to a plan approved by the court (the "bankruptcy exception"). When the debtor in a bankruptcy case is a partnership for federal income tax purposes, the bankruptcy exception is applied at the partner level, not at the partnership level.

The Tax Code provides that where COD income is excluded because of this bankruptcy exception, the debtor must reduce certain of its tax attributes – such as net operating losses ("NOLs"), current year losses, tax credits and tax basis in property – by the amount of any excluded COD income after the determination of the federal income tax for the year of the discharge of the debt. The amount of the COD income will equal the amount by which the indebtedness discharged (reduced by any unamortized discount) exceeds any consideration given in exchange therefor, subject to certain statutory or judicial exceptions that can apply to limit the amount of COD income (such as where the payment of the cancelled debt would have given rise to a tax deduction). To the extent the amount of COD income exceeds the tax attributes available for reduction; the remaining COD income is without further current or future tax cost to the debtor. If, however, nonrecourse debt is satisfied with the underlying collateral, generally the debtor recognizes a gain from the disposition of property based on an amount realized equal to the nonrecourse debt satisfied, as opposed to COD income.

Special rules apply where the excluded COD income is recognized by a debtor that is a member of a consolidated group. Under these rules, the tax attributes of the debtor member (including consolidated tax attributes attributable to the debtor member) are first subject to reduction. To the extent that the excluded discharge of indebtedness income exceeds the tax attributes of the debtor member (including consolidated tax attributes attributable to the debtor member), the regulations generally require the reduction of certain consolidated tax attributes attributable to other members of the group. If one of the attributes of the debtor member reduced under the above rules is the basis of stock of another member of the group, a "look-through rule" applies requiring that

certain corresponding reductions be made to the tax attributes of the lower-tier member (including consolidated tax attributes attributable to such lower-tier member).

The Debtors anticipate that some of them will recognize COD income as a result of the discharge of Claims pursuant to the Plan. The amount of the COD will depend, in part, on the amount of cash and the value of the Liquidating Trust Assets, the interests in Causes of Action or other assets, or in the case of Claims receiving the Standard Restructuring Terms, the value of the new debt and/or equity, issued pursuant to the Plan. Under the rules discussed above, the NOLs available to a Debtor may be substantially reduced or eliminated as a result of this COD income. Other tax attributes may also be reduced.

The Liquidating Debtors do not expect to hold material non-cash assets at the end of the taxable year in which the discharge of Claims occurs. In such case, the attribute reductions should not result in a substantial tax cost to such Debtors. To the extent the Reorganizing Debtors hold material non-cash assets at the end of the taxable year in which the discharge of Claims occurs, their attributes would be reduced, reducing their ability to use such tax attributes to offset future income.

### 3.  Utilization of Net Operating Loss Carryovers.

In general, when there is a fifty percent (50%) ownership change of a loss corporation during a three-year period, the ownership change rules in Section 382 of the Tax Code limit the utility of NOLs on an annual basis to the product of the fair market value of the corporate equity immediately before the ownership change, multiplied by a hypothetical interest rate published monthly by the IRS called the "long-term tax-exempt rate." In any given year, this limitation may be increased by certain built-in gains realized after, but accruing economically before, the ownership change and the carryover of unused Section 382 limitations from prior years. On the other hand, if at the date of an ownership change, the adjusted basis for federal income tax purposes of a debtor's assets exceeds the fair market value of such assets by prescribed amounts (a "net unrealized built-in loss") then, upon the realization of such net unrealized built-in losses during a five-year period beginning on the date of the ownership change, such losses are treated as if they were part of the NOL, rather than the current deduction, and are also subject to the Section 382 limitation.

The NOLs of a Reorganizing Debtor that is classified as a corporation for U.S. federal income tax purposes will be subject to the Section 382 limitation if, as anticipated under the Master Restructuring Agreement, more than fifty (50%) of the equity of Parent is issued to creditors. The Section 382 limitation would severely limit such Debtor's ability to use its NOL to offset its future income. Since the Parent is not in bankruptcy under Title 11, the so-called "Section 382 (l)(5) Bankruptcy Exception" would not be available to such Debtor. The harsh effects of the ownership change rules can be ameliorated by an exception that applies in the case of reorganization under the Bankruptcy Code. Under Section 382 (l)(5) of the Tax Code, if a reorganization under the Bankruptcy Code results in an exchange by qualifying creditors and stockholders of their claims and interests for at least fifty percent (50%) of the debtor's stock (by vote and value), or parent's stock (if parent is also in bankruptcy under title 11, then the general ownership change rules will not apply and a more liberal NOL reduction rule applies. The Debtors do not believe that a Reorganizing Debtor will qualify for relief under Section 382(l)(5) of the Tax Code.

### B.  U.S. Federal Income Tax Consequences to Holders of Certain Claims

### 1.  Distribution in Discharge of Claims or Equity Interests

The federal income tax consequences of the implementation of the Plan to a holder of a Claim or Equity Interest will depend, among other things, upon the origin of the holder's Claim or Equity Interest, when the holder receives payment in respect of such Claim or Equity Interest, whether the holder reports income using the accrual or cash method of tax accounting, whether the holder acquired its Claim at a discount, or whether the holder has taken a bad debt deduction or worthless security deduction with respect to such Claim or Equity Interest.

Generally, the holder of an Allowed Claim will realize gain or loss on the exchange under the Plan of its Allowed Claim for other property (such as Cash, new debt, Liquidating Trust Assets) in an amount equal to the difference between (i) the sum of the amount of any Cash, the issue price of any debt instrument, and the fair market value on the date of the exchange of any other property received by the holder (other than any consideration attributable to a Claim for accrued but unpaid interest), and (ii) the adjusted tax basis of the Allowed Claim

exchanged therefor (other than basis attributable to accrued but unpaid interest previously included in the U.S. Holder's taxable income). With respect to the treatment of accrued but unpaid interest and amounts allocable thereto, see section X.C.4. — "Distributions in Discharge of Accrued Interest or OID" below.

Because the holders of Claims or Equity Interests will not receive new equity or debt instruments issued by the Debtors, this discussion assumes that any gain or loss realized by the holders of Claims of Equity Interests will be recognized. Such gain or loss may be long-term capital gain or loss if the Claim or Equity Interest disposed of is a capital asset in the hands of the holder and has been held for more than one year. Each holder of an Allowed Claim or Equity Interest should consult its own tax advisor to determine whether gain or loss recognized by such holder will be long-term capital gain or loss and the specific tax effect thereof on such holder.

## 2.    Market Discount

Where gain is recognized by a holder in respect of its Claim, the character of such gain as capital gain or ordinary income will be determined by a number of factors, including whether the Claim was acquired at a market discount. A holder that purchased its Claim from a prior holder at a market discount may be subject to the market discount rules of the Tax Code.

Under the market discount rules, assuming that the holder has made no election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the exchange of such Claim (subject to a *de minimis* rule) generally would be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange.

Any market discount will be considered to accrue on a straight-line basis during the period from the date of acquisition of such Claims to their maturity date, unless the holder irrevocably elected to compute the accrual on a constant yield basis.

## 3.    Distributions in Discharge of Accrued Interest or OID

In general, to the extent that any distribution to a holder of a Claim is received in satisfaction of accrued interest or amortized original issue discount ("OID") during its holding period, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income). Conversely, a holder will generally recognize a loss to the extent any accrued interest or amortized OID was previously included in its gross income and is not paid in full.

Pursuant to the Plan, all distributions in respect of any Claim will be allocated first to the principal amount of such Claim, as determined for federal income tax purposes, and thereafter, to the remaining portion of such Claim, if any. However, there is no assurance that such allocation will be respected by the IRS or a court of law for federal income tax purposes.

Each holder of a Claim is urged to consult its tax advisor regarding the allocation of consideration and the deductibility of unpaid interest for tax purposes.

## 4.    Taxation of the Puerto Rico Liquidating Trust and Its Interest Holders

Absent definitive administrative or judicial guidance to the contrary, the Debtors and the Liquidating Trustees will treat the Liquidating Trusts as grantor trusts for federal income tax purposes and, to the extent permitted by applicable law, for state and local income tax purposes. If such treatment is respected, the Liquidating Trusts will not be subject to the federal income tax. Instead, the holders of Claims that receive interests in the Liquidating Trusts will be taxed on their allocable shares of income and gain of the trusts for a taxable year as their grantors and deemed owners, whether or not they received any distributions from the trusts in such taxable year. Under the Plan, the holders of Claims that receive interests in the Liquidating Trusts are required to follow such treatment for federal income tax purposes. There can be no assurance that the IRS will agree with the classification of the Liquidating Trusts as grantor trusts and a different classification of the trusts could result in its being subject to income taxes and in a different income tax treatment of its interest holders.

The holding period of a holder of Claims that receives an interest in a Liquidating Trust, in such holders's *pro rata* share of the assets held by such Liquidating Trust, will begin on the day following their deemed distribution to the holder and their tax basis will be equal to their fair market value on the day of the distribution.

## C.  Information Reporting and Withholding

All distributions to holders of Allowed Claims under the Plan are subject to any applicable withholding obligations (including employment tax withholding).  Under federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the rate of 28%.  Backup withholding generally applies if the holder:  (1) fails to furnish its social security number or other taxpayer identification number ("TIN"); (2) furnishes an incorrect TIN; (3) fails properly to report interest or dividends; or (4) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is a United States person that is not subject to backup withholding.  Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax.  Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

Treasury Regulations generally require a taxpayer to disclose certain transactions on its federal income tax return, including, among others, certain transactions that result in a taxpayer claiming a loss in excess of a specified threshold.  Holders are urged to consult their tax advisors as to whether the transactions contemplated by the Plan would be subject to these or other disclosure or information reporting requirements.  The foregoing summary is provided for informational purposes only.  U.S. Holders of Claims are urged to consult their tax advisors concerning the federal, state, local, and foreign tax consequences of the Plan.

**The foregoing summary has been provided for informational purposes only.  All holders of Claims and Equity Interests are urged to consult their tax advisors concerning the federal, state, local, and other tax consequences applicable under the Plan.**

## IX.  ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed and consummated, the Debtors' alternatives include (i) the liquidation of the Debtors under chapter 7 of the Bankruptcy Code and (ii) the preparation and presentation of an alternative plan or plans of reorganization.

### A.  Liquidation Under Chapter 7

If no chapter 11 plan can be confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code.  In such event, a trustee would be elected or appointed to liquidate the assets of the Debtors.  A discussion of the effect that a chapter 7 liquidation would have on recoveries of holders of Claims and Equity Interests is set forth in Section V.C.2, entitled "Confirmation Standards," of this Disclosure Statement.  The Debtors believe that liquidation under chapter 7 would result in, among other things: (1) smaller distributions being made to creditors and interest holders than those provided for in the Plan, due to, among other things, the additional administrative expenses attendant to the appointment of a trustee and the trustee's employment of financial and legal advisors; (2) additional expenses and claims, some of which would be entitled to priority, that would be generated during the liquidation; and (3) the failure to realize the greater, going concern value of the Debtors' assets.  See the Debtors' Liquidation Analysis, attached to this Disclosure Statement as Exhibit C.

### B.  Alternative Plan of Reorganization

If the Plan is not confirmed, the Debtors or, assuming exclusivity is terminated or lapses, any other party in interest may attempt to formulate a different plan of reorganization.  Such a plan could involve either a reorganization and continuation of the Debtors' business or an orderly liquidation of the Debtors' assets.  The Debtors have concluded that the Plan represents the best alternative to protect the interests of creditors and other parties in interest.

The Debtors believe that the Plan allows creditors and interest holders to realize the highest recoveries under the circumstances.  In a liquidation under chapter 11 of the Bankruptcy Code, a trustee would not need to be

appointed and the assets of the Debtors could be sold in an orderly fashion, which could occur over a more extended period of time than in a liquidation under chapter 7. Accordingly, creditors likely would receive greater recoveries in a chapter 11 liquidation than in a chapter 7 liquidation. Although a chapter 11 liquidation is preferable to a chapter 7 liquidation, the Debtors believe that liquidation under chapter 11 is a much less attractive alternative to creditors because a greater return to creditors is provided for in the Plan.

# X.    MISCELLANEOUS PROVISIONS

## A.    Modification of Plan

Subject to the limitations contained in the Plan and provided that the Creditors Committee shall have the right to be consulted on any proposed modification of the Plan, (1) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code; provided, however, that any pre-Confirmation Date amendments shall not materially or adversely affect the interests, rights or treatment of any Allowed Claims under the Plan; and (2) after the entry of the Confirmation Order, the Debtors, the Responsible Person, or Liquidation Trustee, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

## B.    Revocation of Plan

The Debtors reserve the right to revoke or withdraw the Plan for one or all Debtor groups prior to the entry of the Confirmation Order, and to file subsequent chapter 11 plans. If the Debtors revoke or withdraw the Plan or if entry of the Confirmation Order or the Effective Date does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of executory contracts effected by the Plan, and any document or agreement executed pursuant hereto shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, such Debtor or any other Entity; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission of any sort by the Debtors or any other Entity.

## C.    Binding Effect

On the Effective Date, the provisions of the Plan shall bind any holder of a Claim against, or Equity Interest in, a Debtor and such holder's respective successors and assigns, whether or not the Claim or Equity Interest of such holder is Impaired under the Plan, whether or not such holder has accepted the Plan and whether or not such holder is entitled to a Distribution under the Plan.

## D.    Successors and Assigns

The rights, benefits, and obligations of any Entity named or referred to herein shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such Entity.

## E.    United States Trustee's Fees

On the Effective Date, and thereafter as may be required, the Debtors and/or Reorganized Debtors, as applicable, will pay all fees payable pursuant to section 1930 of chapter 123 of title 28 of the United States Code through the entry of a final decree closing the applicable Debtors' and Reorganized Debtors' cases.

## F.    Governing Law

Except to the extent that the Bankruptcy Code or Bankruptcy Rules apply, unless otherwise stated, and subject to the provisions of any contract, instrument, release, or other agreement or document entered into in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the state of Delaware without giving effect to the principles of conflict of laws thereof.

### G.   Reservation of Rights

Except as expressly set forth herein, the Plan shall have no force or effect unless and until the Effective Date occurs.  Neither the filing of the Plan, any statement or provision contained herein, nor the taking of any action by a Debtor or any Entity with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of: (a) any Debtor with respect to the holders of Claims or other parties-in-interest; or (b) any holder of a Claim or other party-in-interest prior to the Effective Date.

### H.   Article 1146 Exemption

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment.

### I.   Section 1125(e) Good Faith Compliance

Confirmation of the Plan shall act as a finding by the Bankruptcy Court that the Debtors and each of their respective Representatives have acted in "good faith" under section 1125(e) of the Bankruptcy Code.

### J.   Further Assurances

The Debtors, the Responsible Person, the Liquidating Trustee, and all holders of Claims receiving Distributions hereunder and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

### K.   Service of Documents

Any pleading, notice, or other document required by the Plan to be served on or delivered to the Debtors shall be sent by first class U.S. mail, postage prepaid as follows:

**To the Debtors' Counsel:**

DLA Piper, LLP (US)
Attn: Richard A. Chesley
203 N. LaSalle Street, Suite 1900
Chicago, Illinois 60601
Email: richard.chesley@dlapiper.com
- and -

DLA Piper, LLP (US)
Attn: R. Craig Martin
1201 North Market Street, Suite 2100
Wilmington, Delaware 19801
Email: craig.martin@dlapiper.com

**To the Responsible Person:**

[•]

**To the Liquidating Trustee:**

[•]

**L.  Filing of Additional Documents**

On or before the Effective Date, the Debtors may file with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

**M.  No Stay of Confirmation Order**

The Debtors shall request that the Bankruptcy Court waive stay of enforcement of the Confirmation Order otherwise applicable, including pursuant to Federal Rules of Bankruptcy Procedure 3020(e), 6004(h), and 7062.

## XI.    RETENTION OF JURISDICTION BY THE BANKRUPTCY COURT

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Cases and all Entities with respect to all matters related to the Chapter 11 Cases, the Debtors, the Parent, and the Plan as is legally permissible, including, without limitation, jurisdiction to:

1.    allow, disallow, determine, liquidate, classify, estimate, or establish the priority or secured or unsecured status of any Claim or Equity Interest against the Debtors, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of Claims;

2.    grant, deny, or otherwise resolve any and all applications of Professionals or Persons retained in the Chapter 11 Cases by the Debtors or the Creditors Committee for allowance of compensation or reimbursement of expenses authorized by the Bankruptcy Code or the Plan, for periods ending by the Effective Date;

3.    resolve any matters related to the assumption, assignment, or rejection of any executory contract or unexpired leases to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine and, if necessary, liquidate, any Claims arising therefrom;

4.    ensure that Distributions to holders of Allowed Claims are accomplished under the provisions of the Plan, including by resolving any disputes regarding the Debtors' entitlement to recover assets held by third parties and the use of Cash held under the Escrow Agreement;

5.    decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving a Debtor that may be pending on the Effective Date or instituted by the Responsible Person after the Effective Date;

6.    enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all other contracts, instruments, releases, indentures, and other agreements or documents adopted in connection with the Plan or the Disclosure Statement;

7.    resolve any cases, controversies, suits, or disputes that may arise in connection with the Effective Date, interpretation or enforcement of the Plan, or any Entity's obligations incurred in connection with the Plan;

8.    issue injunctions, enforce them, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the Effective Date or enforcement of the Plan, except as otherwise provided in the Plan;

9.    enforce Article IX.A, Article IX.B, Article IX.C, and Article IX.D of the Plan;

10.  enforce the Injunction set forth in Article IX.F of the Plan;

11.  resolve any cases, controversies, suits, or disputes with respect to the releases, injunction, and other provisions contained in Article IX of the Plan, and enter such orders as may be necessary or appropriate to implement or enforce all such releases, injunctions, and other provisions of the Plan;

12. enter and implement such orders as necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked, or vacated;

13. resolve any other matters that may arise in connection with or related to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document adopted in connection with the Plan or the Disclosure Statement; and

14. enter an order and a Final Decree closing the Chapter 11 Cases.

## XII.  CONCLUSION AND RECOMMENDATION

The Debtors believe that confirmation and implementation of the Plan is preferable to any of the alternatives described above because it will provide the greatest recoveries to holders of Claims.  Other alternatives could involve significant delay, uncertainty, and substantial additional administrative costs.  The Debtors urge holders of Impaired Claims entitled to vote on the Plan to accept the Plan and to evidence such acceptance by returning their ballots so that they will be received by the Voting Agent no later than 4:00 p.m. (prevailing Eastern Time) on [●], 2016 (or, in the case of beneficial holders who hold their securities through intermediaries, please provide voting instructions to such intermediaries by [●], 2016 at 4:00 p.m. or such other date as specified by the intermediaries).

Dated:  Wilmington, Delaware
September 26, 2016

**Solar Reorganizing Debtor**

Abengoa Solar LLC

_____
By:
Its:

**EPC Reorganizing Debtors**

Abener Teyma Mojave General Partnership

_____
By:
Its:

Abeinsa Abener Teyma General Partnership

_____
By:
Its:

Teyma Construction USA, LLC

_____
By:
Its:

Teyma USA & Abener Engineering and Construction Services General Partnership

_____
By:

Its:

Abeinsa EPC LLC

_____
By:
Its:

*Abeinsa Business Development, LLC*

_____
By:
Its:

Abeinsa Holding Inc.

_____
By:
Its:

Abener Construction Services, LLC

_____
By:
Its:

*Abengoa Transmission & Infrastructure LLC*

_____
By:
Its:

*Abacus Project Management of Arizona LLC*

_____
By:
Its:

*Abacus Project Management Inc.*

_____
By:
Its:

*Abeinsa Engineering Inc.*

_____
By:
Its:

Abener Teyma Hugoton General Partnership

_____
By:
Its:

Abengoa Bioenergy New Technologies, LLC

_____
By:
Its:

Abengoa US Holding, LLC

_____
By:
Its:

Abengoa US, LLC

_____
By:
Its:

Abengoa US Operations, LLC

_____
By:
Its:

Abener North America Construction, LP

_____
By:
Its:

**EPC Liquidating Debtors**

Abencor USA, LLC

_____
By:
Its:

Inabensa USA, LLC

_____
By:
Its:

Nicsa Industrial Supplies, LLC

_____
By:
Its:

Abener Teyma Inabensa Mount Signal Joint
Venture

_____
By:
Its:


**Bioenergy and Maple Liquidating Debtors**

Abengoa Bioenergy Hybrid of Kansas, LLC

_____
By:
Its:

Abengoa Bioenergy Technology Holding, LLC

_____
By:
Its:

Abengoa Bioenergy Meramec Holding, Inc.

_____
By:
Its:

Abengoa Bioenergy Holdco, Inc.

_____
By:
Its:

Counsel:

DLA PIPER LLP (US)
R. Craig Martin (DE 005032)
1201 North Market Street, Suite 2100
Wilmington, Delaware 19801
Telephone: (302) 468-5700
Facsimile: (302) 394-2341
E-mail: craig.martin@dlapiper.com

Richard A. Chesley (admitted *pro hac vice*)
Oksana Koltko Rosaluk
203 North LaSalle Street, Suite 1900
Chicago, Illinois 60601
Telephone: (312) 369-4000
Facsimile: (312) 236-7516
E-mail: richard.chesley@dlapiper.com
          oksana.koltko@dlapiper.com

Jamila Justine Willis
1251 Avenue of the Americas, Floor 25
New York, New York 10020
Telephone: (212) 335-4500
E-mail: jamila.willis@dlapiper.com

*Counsel to Debtors and Debtors in Possession*