IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>ABEINSA HOLDING INC., *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 16-10790 (KJC)<br><br>(Jointly Administered)<br><br>Re: D.I. 941 |

**DECLARATION OF SEBASTIAN FELICETTI IN SUPPORT OF CONFIRMATION OF DEBTORS' FIRST AMENDED PLANS OF REORGANIZATION AND LIQUIDATION**

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Abeinsa Holding Inc. (9489); Abeinsa EPC LLC (1176); Abencor USA, LLC (0184); Abener Construction Services, LLC (0495); Abener North America Construction, LP (5989); Abengoa Solar, LLC (6696); Inabensa USA, LLC (2747); Nicsa Industrial Supplies LLC (9076); Teyma Construction USA, LLC (0362); Abeinsa Abener Teyma General Partnership (2513); Abener Teyma Mojave General Partnership (2353); Abener Teyma Hugoton General Partnership (7769); Abener Teyma Inabensa Mount Signal Joint Venture (9634); Teyma USA & Abener Engineering and Construction Services General Partnership (6534); Abengoa US Holding, LLC (6871); Abengoa US, LLC (9573); Abengoa US Operations, LLC (1268); Abengoa Bioenergy Biomass of Kansas, LLC (1119); Abengoa Bioenergy Hybrid of Kansas, LLC (9711); Abengoa Bioenergy Technology Holding, LLC (7434); Abengoa Bioenergy New Technologies, LLC (8466); Abengoa Bioenergy Holdco, Inc. (8864); Abengoa Bioenergy Meramec Holding, Inc. (1803) (together, except for Abengoa Bioenergy Biomass of Kansas, LLC, the "Debtors"). The chapter 11 case of Abengoa Bioenergy Biomass of Kansas, LLC, Case No. 16-10876, pending before the Bankruptcy Court is stayed pending further order of the Court.

I, Sebastian Felicetti, pursuant to 28 U.S.C. § 1746, declares ("Declaration"):

### Declaration Foundation

1. I am the Treasurer of Abeinsa EPC LLC and Teyma Construction USA, LLC, as debtors and debtors in possession in the Chapter 11 Cases.[2]

2. I am familiar with the operations, business affairs, financial condition and books and records of Abeinsa EPC LLC, Teyma Construction USA, LLC, Teyma USA & Abener Engineering and Construction Services General Partnership, Abener Teyma Mojave General Partnership, Abener Teyma Hugoton General Partnership, Abeinsa Abener Teyma General Partnership and Abener Teyma Inabensa Mt. Signal Joint Venture (collectively, the "AEPC Debtors") and am also generally familiar with the rest of the Debtors and the nature of their businesses. I am authorized by the Debtors to submit this Declaration in support of confirmation of the Plan.

3. Except as otherwise noted, all matters set forth in this Declaration are based on (a) the best of my personal knowledge and belief at this time, (b) my review of the relevant documents, including the Plan and Disclosure Statement, (c) my experience and knowledge of the Debtors' business and financial condition, (d) information supplied to me by members of the Debtors' management and the Debtors' external advisors, and/or (e) for matters involving the requirements for confirmation, including, but not limited to, the substantive consolidation requirements, of the Plan under the Bankruptcy Code, my reliance on the advice of the Debtors' legal advisors. If called to testify, I could and would testify to the facts set forth herein.

---

[2] Capitalized terms used in this Declaration that are not defined in this Declaration shall have the respective meanings ascribed to such defined terms in the *Debtors' Modified First Amended Plans Of Reorganization And Liquidation* dated December 2, 2016, filed at docket number 941, as the same may be modified, amended or supplemented (the "Plan").

I. THE PLAN

　A. **Substantive Consolidation**

　　1. **The Debtor Groups**

4. For purposes of voting, confirmation, and making Distributions under the Plan, the Plan is premised upon the "substantive consolidation" of the Debtors into separate and distinct Debtor groups, including, among others:

- The EPC Reorganizing Debtor Group
- The EPC Liquidating Debtor Group

　　2. **The Basis for Substantive Consolidation**

5. I understand that substantive consolidation is an equitable remedy that a bankruptcy court may apply in chapter 11 cases comprised of affiliated debtors. When debtors are substantively consolidated, the assets and liabilities of such debtors are pooled and essentially treated as the assets and liabilities of a single enterprise. For several reasons, the Debtors believe that the partial substantive consolidation provided for under the Plan is appropriate and necessary to ensure appropriate recoveries to their creditors.

6. First, as indicated in the Disclosure Statement, the Debtors believe that many of their major prepetition creditors effectively considered the various Debtors within the substantively consolidated groups as a single entity. This is especially true with respect to the holders of the largest claims against the Debtors, which arise out of the guarantees of the Parent's funded debt facilities and bonding lines, and well as other creditors that received Parent guarantees with respect to the obligations of one or more Debtors. In fact, this is seen by the fact that surety companies that issued bonding lines have asserted claims against most, if not all of the Debtors regardless of which specific project required the bond. Second, the Debtors believe that while they did observe appropriate corporate formalities and separateness during the

prepetition period, as a practical matter, many of the Debtors' various legal entities operated in close conjunction with other Debtor units, and ultimately reported to a single entity -- the Parent. In this respect, despite the separate legal structures, many of the major Debtors' creditors would consider the Debtors to comprise an integrated enterprise. Third, and perhaps most significantly, while the Plan provides substantial benefits for creditors, including tens of millions of dollars of consideration to be provided by Parent, under the global financial restructuring, those substantial benefits are available to creditors only if the partial substantive consolidation provided for in the Plan occurs.

7. Moreover, as a practical matter, individual restructurings of the Debtors would not be a viable option, because some of the individual Debtors have few or no material assets, and absent the New Value Contribution from the Parent, creditors of those Debtors would likely receive nothing. Put simply, absent substantive consolidation and the attendant New Value Contribution, I am not aware of any scenario under which the reorganization of the EPC Reorganizing Debtors would be possible. Accordingly, the Debtors believe that the Plan's partial substantive consolidation structure into four groups is beneficial to creditors.

### 3. Impracticality of Separate Entity Plan

8. The Debtors understand that partial substantive consolidation will avoid the onerous costs and substantial delay that would result from attempting to confirm more than twenty separate entity plans (each a "Separate Entity Plan"), and that such plans would be prone to inaccuracies that might prejudice certain creditors. Additionally, Separate Entity Plans would inevitably rest on certain assumptions. For example, implementing Separate Entity Plans would require the allocation to each Debtor of material financial obligations (like the guarantees of the funded debt facilities and bonding lines) that cannot easily be disaggregated. Attempting to determine each separate legal entity's "fair share" of these material liabilities would be a

difficult, fact-intensive process that would be subject to challenge, and likely cost more than the distributions that could be made to creditors under a Separate Entity Plan. Under these circumstances, the Debtors believe that partial substantive consolidation is warranted in these Chapter 11 Cases, in part because of this connection of assets and liabilities of certain of the Debtors.

9. Moreover, the assumptions that the Debtors would necessarily adopt to confirm over twenty Separate Entity Plans would likely be the focus of protracted and lengthy litigation. The attendant delay from such litigation could threaten the Debtors' consummation of such plans in a timely manner. Even if attempting to formulate fair Separate Entity Plans would not expose the Estates to such risks, costs, and delay, there would still be no assurances that having Separate Entity Plans would enhance creditor recoveries.

10. At bottom, I believe a Separate Entity Plan does not represent a practical alternative to the restructuring contemplated under the Plan. As discussed below, this is true for many reasons, but most significantly, because without substantive consolidation, the Parent will not make the New Value Contribution. Consequently, as a practical matter, the partial substantive consolidation of these Debtors as provided for under the Plan is a necessary part of the global restructuring being effectuated before this Court, the Spanish Court, and the English Court.

### 4. Basis for Partial Substantive Consolidation

11. Given the significant roadblocks to the proposal of confirmable Separate Entity Plans, the Debtors' and their advisors reviewed the Debtors' organizational, operational, and financial history in order to determine the substantive consolidation structure that best meets the application of the existing case law governing substantive consolidation. The partial substantive consolidation structure in the Plan is the result of that lengthy and wide-ranging analysis, which

revealed that many of the significant creditors conducted business (including extending credit) with certain groups of Debtors as consolidated entities, while other creditors extended credit to a single entity. The substantive consolidation of the Debtor groups as proposed under the Plan is designed to give effect to the reasonable expectations that the Debtors' creditors had when they engaged in business with the various members of those groups. As indicated in the Disclosure Statement, the various Debtor groups' distinct inter-related operational and business functions provides further support for the Plan's substantive consolidation of the various Debtors into substantively consolidated units.

### 5. Legal Ownership

12. In order to ensure that the substantive consolidation structure under the Plan is consistent with the legal rights of third parties and is not materially inconsistent with the recoveries attainable under a Separate Entity Plan, the Plan's partial substantive consolidation structure respects the Debtors' prepetition ownership structure. Thus, the residual equity of each Debtor group inures to the benefit of the Debtor group that owned the Debtor group prior to the Petition Date.

### 6. Third Party Expectations

13. The partial substantive consolidation structure provided for under the Plan is also designed to respect the reasonable third party expectations of creditors and third parties. The Debtors identified three principal sets of expectations that they sought to preserve in the partial substantive consolidation structure: (a) the expectations of the lenders under the Debtors' credit agreements, (b) the expectations of purchasers of Notes, and (c) the expectations of creditors of those Debtors that are project companies. The composition of certain Debtor groups is motivated as well by adherence to the expectations of more than one set of creditors.

### 7. Prepetition Guarantee Obligations

14. The Debtors' prepetition credit agreements are each based on the credit of different sets of legal entities. I understand the lenders under these credit agreements received combined financial reports from the Debtors as to all obligors that were parties to the applicable credit agreements, and calculated financial covenant compliance based on the assets and liabilities of those entities. The restrictions imposed on the obligors by these credit facilities (e.g., restrictions on the ability to incur additional indebtedness, make certain payments, sell certain assets, and grant certain security Equity Interests to third parties) indicate that the lenders under each of these facilities relied upon the collective identity of their respective borrowers and guarantors when extending credit.

### 8. Consolidation Due to Operational Entanglement

15. Additional considerations support the Debtors' contention that certain Debtors are operationally entangled and present a level of integration that adds further support to the proposed partial consolidation structures. For example, although the Debtors had individual management teams and professional resources, the Debtors' management teams ultimately reported to a single entity -- the Parent. Moreover, the AEPC Debtors, whose assets and operations comprise the bulk of the substantively consolidating EPC Reorganizing Debtors, while always under the ultimate control of Parent in Spain, in the U.S. were locally controlled out of the AEPC Debtors' offices in Phoenix, Arizona.

16. Additionally, with respect to certain Debtor groups, certain of the Debtors operated under very similar names and certain of the Debtors were formed as general partnerships under which the general partners are jointly and severally liable for certain obligations. Such prepetition operational entanglements would also impede the formulation of

Separate Entity Plans, and further justify the proposed partial substantive consolidation structure provided for under the Plan.

### 9. The Effect of Substantive Consolidation

17. I understand that substantive consolidation of the several estates of multiple debtors in a bankruptcy case effectively combines the assets and liabilities of the multiple debtors for certain purposes under a plan. Also, I understand that the effect of substantive consolidation is the pooling of the assets of, and claims against, consolidated debtors, satisfying liabilities from a common fund and combining the creditors of consolidated debtors for purposes of voting on the reorganization plan.

18. Under the Plan, on the Effective Date each of the Debtor groups will be deemed consolidated for the following purposes under the Plan:

- all assets and liabilities of the applicable Debtors within each Debtor group will be treated as though they were merged with the assets and liabilities of the other Debtors within such Debtor group,

- no distributions will be made under the Plan on account of any Claim held by a Debtor against any other Debtor within its Debtor group,

- except as otherwise set forth in the Plan, no distributions will be made under the Plan on account of any Equity Interest held by a Debtor in any other Debtor within its Debtor group,

- all guaranties of any Debtor of the obligations of any other Debtor within its Debtor group will be eliminated so that any Claim against any Debtor and any guaranty thereof executed by any other Debtor and any joint or several liability of any of the Debtors within a Debtor group will be one obligation of the Debtors within such Debtor group, and

- each and every Claim filed or to be filed in the Chapter 11 Cases against any of the Debtors within a Debtor group will be deemed filed against all of the Debtors within such Debtor group, and will be one Claim against, and obligation of, the Debtors within such Debtor group.

19. The Plan provides that intercompany claims held by Debtors against other Debtors will be discharged and receive no distribution. Accordingly, substantive consolidation

under the Plan will not affect any Claims held by a Debtor in or against a Debtor in a separate Debtor group, which creates a greater opportunity for recoveries by the Debtors' creditors. Alternatively, if substantive consolidation is not approved, the intercompany claims held by Debtors against other Debtors would not be discharged and such claims would need to be addressed along with all other claims against the applicable Debtor. As shown in the liquidation analyses submitted in connection with the Plan, the magnitude of these intercompany claims is significant. Consequently, in the absence of the substantive consolidation provided for under the Plan, the presence of, and need to treat, such claims would substantially dilute creditor recoveries, or create extensive litigation with resulting costs and time delays.

## II.    SATISFACTION OF PLAN CONFIRMATION REQUIREMENTS.

### A.    Compliance with Section 1129(a)(11) of the Bankruptcy Code.

20.    The following facts support the Court's determination that the Plan satisfies the requirements of section 1129(a)(11) of the Bankruptcy Code, commonly known as "feasibility". My understanding of the feasibility requirement is that in order for the Plan to be confirmed, the Court must find that the reorganized debtor is not likely to need further reorganization or liquidation. Feasibility is not a guaranty that the Plan will succeed; rather, the test is satisfied if the Court determines that the reorganized debtor's projections are reasonable.

21.    Based on the information available to me, including the sources referenced in paragraph 3 of this Declaration, I believe that the EPC Reorganizing Plan complies with the requirements of section 1129(a)(11) of the Bankruptcy Code, assuming that the Debtors operate the projects associated with the Go Forward Chapter 11 Companies according to their respective budgets.

22.    Moreover, the Debtors believe that they will be able to satisfy their obligations to creditors under the Plan, since the distributions required to be made to creditors entitled to

participate in the EPC Reorganizing Distribution, are not contingent upon the Debtors' future operations.

23. The Debtors also believe that they have or will have the resources necessary to carry on their operations post-Effective Date, and will not be forced to liquidate. Moreover, and to the extent that revenues from the EPC Reorganizing Debtors' operations prove insufficient to support the post-Effective Date operations of the Debtors, the EPC Reorganizing Debtors have the ability to call on the Parent for support.

24. As indicated in the Disclosure Statement, the EPC Reorganizing Plan and supporting cash flow projections assume that the reorganized EPC Reorganizing Debtors, as a group, will continue to design and build projects. Further, as of the date hereof, the Debtors intend to assume the Fulcrum EPC Contract, and assign it to a non-debtor affiliate of Parent, under the Plan, or pursuant to a separate motion. That being said, even if the Debtors did not seek to assume the Fulcrum EPC Contract, distributions to creditors under the Plan would remain unaffected, because, among other things, the Plan does not rely on future operations for distributions; rather, distributions will come from the New Value Contribution, including the Litigation Trust Proceeds.

25. Based on the foregoing, I believe that the Plan satisfies the feasibility requirement of Section 1129(a)(11) of the Bankruptcy Code.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is correct.

_____
Sebastian Felicetti
Treasurer of Abeinsa EPC LLC and
Teyma Construction USA, LLC