## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ABEINSA HOLDING INC., *et al.*, | Case No. 16-10790 (KJC) |
| Debtors.[1] | (Jointly Administered)<br>Related Docket Nos: 746, 747, 748, 882, 941, 942, 944, 945, 947 |

## DECLARATION OF WILLIAM H. RUNGE III IN SUPPORT OF CONFIRMATION OF DEBTORS' MODIFIED FIRST AMENDED PLANS OF REORGANIZATION AND LIQUIDATION

I , William H. Runge III, pursuant to 28 U.S.C. § 1746, declares ("Declaration"):

1.      I am a Managing Director with Alvarez & Marsal North America, LLC ("A&M NA"). A&M NA's affiliate, Alvarez & Marsal Europe Limited ("A&M Europe" and together with A&M NA and its other professional service provider affiliates, "Alvarez & Marsal") is engaged by Abengoa, S.A. ("S.A.") to provide certain services to in support of its efforts to effect a global restructuring (the "A&M/Abengoa Engagement") with respect to S.A.'s various subsidiaries, including but not limited to these Debtors (collectively, "Abengoa"). I and other

---

[1]     The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Abeinsa Holding Inc. (9489); Abeinsa EPC LLC (1176); Abencor USA, LLC (0184); Abener Construction Services, LLC (0495); Abener North America Construction, LP (5989); Abengoa Solar, LLC (6696); Inabensa USA, LLC (2747); Nicsa Industrial Supplies LLC (9076); Teyma Construction USA, LLC (0362); Abeinsa Abener Teyma General Partnership (2513); Abener Teyma Mojave General Partnership (2353); Abener Teyma Hugoton General Partnership (7769); Abener Teyma Inabensa Mount Signal Joint Venture (9634); Teyma USA & Abener Engineering and Construction Services General Partnership (6534); Abengoa US Holding, LLC (6871); Abengoa US, LLC (9573); Abengoa US Operations, LLC (1268); Abengoa Bioenergy Biomass of Kansas, LLC (1119); Abengoa Bioenergy Hybrid of Kansas, LLC (9711); Abengoa Bioenergy Technology Holding, LLC (7434); Abengoa Bioenergy New Technologies, LLC (8466); Abengoa Bioenergy Holdco, Inc. (8864); Abengoa Bioenergy Meramec Holding, Inc. (1803). The chapter 11 case of Abengoa Bioenergy Biomass of Kansas, LLC, Case No. 16-10876, pending before the Bankruptcy Court is stayed pending further order of the Court.

A&M NA personnel are assisting A&M Europe with the A&M/Abengoa Engagement as it relates to these Debtors.

2.     I am familiar with the operations, business affairs, financial condition and books and records of the Debtors.[2]

3.     Except as otherwise noted, all matters set forth in this Declaration are based on (a) my personal knowledge and belief, (b) my review of the relevant documents, including the Plan (including the Plan Supplement) and Disclosure Statement (and the exhibits to the Disclosure Statement), (c) my experience and knowledge of the Debtors' business and financial condition, (d) information supplied to me by members of the Debtors' or S.A.'s management, employees of A&M NA and/or its affiliates and the Debtors' and/or S.A.'s advisors and counsel, (e) the *Declaration of William H. Runge, III in Support of Chapter 11Petitions and First Day Pleadings* (the "Runge First Day Declaration") [D.I. 3]and/or (f) for matters involving the requirements for confirmation of the Plan under the Bankruptcy Code, my reliance on the advice of the Debtors' legal advisors.  If called to testify, I could and would testify to the facts set forth herein.

4.     My Declaration is being provided in support of the Debtors' Plan.  In this regard, I have reviewed and am generally familiar with the terms and provisions of the Plan, the Disclosure Statement, and the various ancillary documents related to the Plan, including the Plan Supplement filed November 22, 2016 [D.I. 882].  I am also familiar with exhibits to the Disclosure Statement [D.I. 748]:

- The Debtors' Liquidation Analysis (Exhibit C);

- Financial Projections (Exhibit D);

---

[2]    Capitalized terms used in this Declaration that are not defined in this Declaration shall have the respective meanings ascribed to such defined terms in the *Debtors' Modified First Amended Plans Of Reorganization And Liquidation* dated December 2, 2016, filed at docket number 941,  as the same may be modified, amended or supplemented (the "Plan").

- Abengoa U.S. Corporate Organizational Chart (<u>Exhibit E</u>);

- Abengoa Global Corporate Organizational Chart (<u>Exhibit F</u>);

- Standstill Agreement (<u>Exhibit G</u>);

- Master Restructuring Agreement (<u>Exhibit H</u>);

- Abengoa, S.A. Historical Financial Statements (<u>Exhibit I-1</u>);

- Abengoa, S.A. Management's Discussion and Analysis of Financial Condition and Results of Operations (<u>Exhibit I-2</u>); and

- Abengoa, S.A. Board of Directors and Management (<u>Exhibit I-3</u>).

## Abengoa Group History

5.      S.A. is a Spanish company founded in 1941 and is a leading engineering and clean technology company, which together with its consolidated subsidiaries, has operations in more than 50 countries worldwide.  Currently, S.A. is registered in the Mercantile Register of Seville in volume 573, folio 69, sheet SE-1507.  As of the end of 2015, S.A. was the parent company of approximately 700 other companies around the world, including 577 subsidiaries, 78 affiliates, 31 joint ventures, and 211 Spanish partnerships (*uniones temporales de empresa*) (collectively, the "<u>Abengoa Group</u>" or the "<u>Company</u>").   The Abengoa Group provides innovative solutions for a diverse range of customers in the energy and environmental sectors.

6.      Over the course of the Abengoa Group's 70-year history, it has developed a unique and integrated business model that applies its accumulated engineering expertise to promoting sustainable development solutions, including delivering new methods for generating solar power, developing biofuels, producing potable water from seawater, and efficiently transporting electricity, to customers in the following sectors: energy, telecommunications, transport, water, utilities, environmental, industrial, and services.  A cornerstone of the Abengoa Group's business model has been investment in proprietary technologies, particularly in areas

with relatively high barriers to entry.  The Company develops engineering projects under a 'turnkey' contract modality and operates assets that generate renewable energy, produce biofuel, manage water resources, desalinate sea water, and treat sewage.  The Abengoa Group's businesses are organized under the following three activities:

    i.    Engineering and construction:  includes the traditional engineering activities in the energy and water sectors, with more than 70 years of experience in the market and the development of solar technology.  The Abengoa Group is specialized in carrying out complex turnkey projects for thermo-solar plants, solar-gas hybrid plants, conventional generation plants, biofuels plants, and water infrastructures, as well as large-scale desalination plants, and transmission lines, among others.  The EPC Reorganizing Debtors and the EPC Liquidating Debtors are involved in this business line.

    ii.    Concession-type infrastructures:  groups together the Company's extensive portfolio of proprietary concession assets that generate revenues governed by long-term sales agreements, such as take-or-pay contracts, tariff contracts, or power purchase agreements.  This activity includes the operation of electric energy generation plants (solar, cogeneration, or wind), desalination plants, and transmission lines.  These assets generate low demand risk, and the Company focuses on operating them as efficiently as possible.  The Solar Reorganizing Debtor is involved in this line of business.

    iii.    Industrial production:  covers Abengoa Group's businesses with a high technological component, such as development of biofuels technology.  The Company holds an important leadership position in these activities in the

geographical markets in which it operates.   The Bioenergy and Maple Liquidating Debtors are involved in this line of business.

7.      The Abengoa Group reports its financial information on a consolidated basis and prepares its financial statements under International Financial Reporting Standards as endorsed by the European Union, with the Euro as its reporting currency.  As of December 31, 2015, the Abengoa Group reported total assets of approximately €16.6 billion.  The Abengoa Group's total reported liabilities as of that date were approximately €16.2 billion, of which current liabilities accounted for approximately €14.6 billion and non-current liabilities accounted for approximately €1.5 billion.  As of December 31, 2015, the Abengoa Group's current reported liabilities comprised approximately €2.6 billion of project debt, €6.2 billion in corporate financing and approximately €4.3 billion of trade payables and other current liabilities (subject to varying payment terms and conditions).  For the year ended December 31, 2015, the Abengoa Group reported revenues of approximately €5.8 billion and a total loss of about €1.3 billion.

8.      S.A. and certain of the non-Debtor subsidiaries, including Abengoa Finance S.A.U. and Abengoa Greenfield S.A., are borrowers under multiple debt facilities and Notes in the approximate amount of approximately $6.86 billion, as set forth in Exhibit D to the Runge First Day Declaration.  Debtors Mojave, Solana, Hugoton and ABNT (each as defined in the Runge First Day Declaration and collectively, the "Guarantors") are each guarantors on Notes issued by Abengoa, Abengoa Finance, S.A.U., and Abengoa Greenfield, S.A., as well as certain other debt facilities.  Other non-Debtor affiliates are also guarantors on the Notes and the other debt facilities.

9.    With a total investment of $3.3 billion, the United States has become one of the Abengoa Group's largest markets in terms of sales volume, particularly from developing solar, bioethanol and water projects.

10.    The Debtors' business operations, the majority of which are in the business units of EPC and Solar, are organized into the following distinct business units:

- The Company's bioenergy companies:    Abengoa Bioenergy Hybrid of Kansas, LLC, Abengoa Bioenergy Technology Holding, LLC, Abengoa Bioenergy Meramec Holding, Inc., and Abengoa Bioenergy Holdco, Inc. (collectively, "Bioenergy") specialize in the development of new technologies geared towards the production of biofuels, biochemical products, and the sustainability of raw materials.    Substantially all of the operating assets of these companies were sold during the administration of the Bioenergy Chapter 11 Cases and the remaining assets are to be liquidated under the Plan;

- The Company's engineering, procurement, and construction companies:    (a) EPC Liquidating Debtors:    Abencor USA LLC, Abener Teyma Inabensa Mount Signal Joint Venture, Inabensa USA, LLC, and Nicsa Industrial Supplies LLC; and (b) EPC Reorganizing Debtors:    Abener Teyma Mojave General Partnership, Abener North America Construction, LP, Abeinsa Abener Teyma General Partnership, Teyma Construction USA, LLC, Teyma USA & Abener Engineering and Construction Services General Partnership, Abeinsa EPC LLC, Abeinsa Holding Inc., Abener Teyma Hugoton General Partnership, Abengoa Bioenergy New Technologies, LLC, Abener Construction Services, LLC, Abengoa US Holding, LLC, Abengoa US, LLC,

and Abengoa US Operations, LLC ("<u>EPC</u>").[3]  These Debtors are dedicated to the engineering and construction of electrical, mechanical, and instrumental infrastructures in the energy, industrial, water management, and services sectors, as well as the development of innovative technology for Abengoa's businesses.  Substantially all of the operating assets of the EPC Liquidating Debtors are to be liquidated under the Plan, whereas the assets and operations of the EPC Reorganizing Debtors will be reorganized under the Plan.  It is my understanding that the assets and operations of the EPC Reorganizing Debtors will constitute a stand-alone business enterprise and will support the reorganized Solar Reorganizing Debtor's post-Effective Date operations.

- The Company's solar company:  Abengoa Solar, LLC ("<u>Solar</u>") specializes in the development, operation and maintenance of solar energy plants, mainly using solar thermal technology.  The assets and operations of the Solar Reorganizing Debtor will be reorganized under the Plan.

## I.    THE PLAN

11.    The Plan is four plans in one document.  Under the Plan, certain Debtors that are involved in the same business line are grouped together as joint Plan proponents and under the Plan each group of Debtors is to be partially substantively consolidated.  The four groups of Debtors and Plans are: (i) EPC Reorganizing Debtors as the proponents of the EPC Reorganizing Plan; (ii) Solar Reorganizing Debtor as the proponents of the Solar Reorganizing Plan; (iii) EPC Liquidating Debtors as the proponents of the EPC Liquidating Plan; and (iv) Bioenergy and Maple Liquidating Debtors as the proponents of the Bioenergy and Maple Liquidating Plan (each group of Debtors proposing such Plan and collectively the Debtors, the "<u>Proponents</u>", and each

---

[3]    Certain of the EPC Debtors are parent holding companies.

such Plan, a "Sub-Plan" and use of the term Proponents or Debtors, and Plan in this Declaration shall refer collectively to the Proponents and Plan, or to each or any Proponents and Sub-Plan as applicable in the context).

### A.    Classification and Treatment of Claims under the Plan

12.    The Plan classifies Claims and Equity Interests by each of the four groups of Debtors separately and provides different treatment for different Classes of Claims and Equity Interests in accordance with the requirements of the Bankruptcy Code.  The Plan provides, separately for each Class, that Holders of certain Claims will receive various amounts and types of consideration, thereby giving effect to the different rights of Holders of Claims and Equity Interests in each Class.

13.    Each Sub-Plan classifies the Claims against and Equity Interests in the Proponents.  Each Sub-Plan states whether each Class is Impaired or Unimpaired.

#### 1.    Administrative Claims

14.    Under the Plan, Administrative Claims will be paid by the Reorganizing Debtors in the ordinary course of business.  The Debtors expect that Administrative Claims exclusive of Professional Compensation Claims, will be as follows: EPC Reorganizing Debtors (estimated to be less than $500,000); Solar Reorganizing Debtor (estimated to be less than $100,000); EPC Liquidating Debtors (estimated to be less than $50,000); and Bioenergy/Maple Liquidating Debtors (estimated to be less than $10,000).  Fees of the United States Trustee arising under 28 U.S.C. § 1930 are included in the foregoing figures, and shall be paid in accordance with Article V.N of the Plan.

#### 2.    Allowed Accrued Professional Compensation Claims

15.    The Debtors are calculating that the amount of Allowed Accrued Professional Compensation Claims that have not previously been paid pursuant to an order of the Bankruptcy

Court, which (a) amounts shall be adjusted based on an estimate of each Professional for fees and expenses through the Effective Date to be provided to the Debtors, the Responsible Person, Liquidation Trustees, and the Creditors' Committee no later than five (5) Business Days before the Effective Date, and (b) such adjusted amounts held in reserve as of the Effective Date in a segregated account for the benefit of the Professionals holding Accrued Professional Compensation Claims.  The Accrued Professional Compensation Claims will be paid in full following Allowance by a Final Order.

### 3.    Allowed Priority Tax Claims

16.    The Debtors believe that certain Priority Tax Claims previously have been paid pursuant to orders of the Bankruptcy Court.  The Debtors estimate that the amount of Allowed Priority Tax Claims that have not previously been paid pursuant to an order of the Bankruptcy Court will aggregate approximately $1,837,220, and will reserve $2 million in connection with same.

### 4.    Allowed Other Priority Claims

17.    The Debtors believe that certain Other Priority Claims previously have been paid pursuant to orders of the Bankruptcy Court.  The Debtors estimate that the amount of Allowed Other Priority Claims that have not previously been paid pursuant to an order of the Bankruptcy Court will aggregate approximately $117,562, and will reserve $250,000 in connection with same.  An Allowed Administration Claims Allowed Accrued Professional Compensation Claims, Allowed Maturity Tax Claims and Allowed Other Priority Claims will be paid in full under the Plan as required by Section 1129(a)(9) of the Bankruptcy Code.

### 5.    Intercompany Claims

18.    An Intercompany Claim is a Claim relating to an intercompany transfer of value to a Debtor by another Debtor in these jointly administered Chapter 11 Cases (a "Debtor

Affiliate") or to a Debtor by an affiliated non-Debtor entity within the Abengoa Group (a "Non-Debtor Affiliate").  The Intercompany Claims are calculated by netting intercompany payables and receivables against each other.

19.     There are multi-million dollar Intercompany Claims between and among the Debtors and between the Debtors and their Non-Debtor Affiliates or Debtor Affiliates.  How these Claims are treated can alter dramatically the recovery to the stakeholders.  Prior to the Petition Date, the Abengoa Group maintained a complex corporate structure consisting of hundreds of entities, which engaged in numerous and often complex intercompany transactions. The Debtors reviewed and analyzed intercompany transactions prior to the Petition Date. Further, the Debtors, in order to provide detail on the components of the intercompany balances, made significant efforts to identify intercompany journal entries made prior to the Petition Date.

20.     Recognizing the nature and extent of these intercompany claims, the Debtors have determined to either have these claims waived as provided for under the Plan, or treated under the Master Restructuring Agreement (the "MRA").

**B.     Distributable Value**

21.     Under the Plan each group of Proponents are partially[4] substantively consolidated, where applicable.  Reorganization Distributions, therefore, are presented with respect to each Sub-Plan.

22.     Under each of the Sub-Plans:

- Holders of Allowed Claims in *Class 1 – Secured Claims,* in full and final satisfaction, settlement, release, and discharge of each Allowed Secured Claim in Class 1, except to the extent that a Holder of an Allowed Secured Claim and the applicable Debtor or Responsible Person agree in writing to a less

---

[4]     The Debtors are partially substantively consolidated under the Plan in that only certain of the Debtors are substantively consolidated.  The substantively consolidated Debtors are organized into the following distinct Debtor groups: the EPC Reorganizing Debtor Group, the EPC Liquidating Debtor Group and the Bioenergy and Maple Liquidating Debtor Group.  The Solar Reorganizing Debtor is not substantively consolidated with any other Debtor.

favorable treatment for such Allowed Secured Claim, on or as soon as practicable after the Effective Date, to the extent any Secured Claims exist, will either be paid in full or they will receive the Debtors' assets in which the Holder of an Allowed Secured Claim has an interest.

• Holders of Allowed Claims in *Classes 2A and 2B – Priority Tax Claims* and *Other Priority Claims*, respectively, in full and final satisfaction, settlement, release, and discharge of each Allowed Priority Tax Claim and Allowed Other Priority Claim, will be paid in full on or as soon as practicable after the Effective Date, except to the extent that a Holder of an Allowed Priority Tax Claim or the Allowed Other Priority Claim and the applicable Debtor, Responsible Person, or Liquidating Trustee agree in writing to a less favorable treatment.

• Holders of Claims in *Class 3A – EPC Reorganizing MRA Affected Debt Claims,* on or as soon as practicable after the Effective Date, each Holder of a MRA Affected Debt Claim will receive (i) a Replacement Guarantee based upon the application pursuant to the MRA of the Standard Restructuring Terms to the Existing Notes or Existing Loans in respect of which the guarantee obligation of the relevant Debtor arose, or (ii) such other treatment as agreed upon in writing by the Holder of the MRA Affected Debt Claim and the applicable EPC Reorganizing Debtor or Responsible Person.

• Holders of Allowed Claims in *Class 4 – EPC Reorganizing General Unsecured Claims, Class 3 – EPC Liquidating General Unsecured Claims, Class 3 – Bioenergy and Maple Liquidating General Unsecured Claims, Class 3B – EPC Reorganizing US Debt Claims, Class 3A – EPC Liquidating US Debt Claims, and Class 3A – Bioenergy and Maple Liquidating US Debt Claims*, in full and final satisfaction, settlement, release, and discharge of each Allowed US Debt Claim, on or as soon as practicable after the Effective Date, a Pro Rata share of the applicable Reorganization Distribution or a Distribution from the Liquidating Trust, as applicable, or such less favorable treatment as agreed upon in writing by the Holder of the US Debt Claim and the applicable Debtor, the applicable Responsible Person, or the applicable Liquidating Trustee.

• Holders of Allowed Claims in the following Classes of Claims will, on or as soon as practicable after the Effective Date, receive their Pro Rata share of the applicable Reorganization Distribution, or such less favorable treatment as agreed upon in writing by the applicable Debtor, the applicable Responsible Person, and the Holder of the Claim:

o Class 3B – EPC Reorganizing US Debt Claims

o Class 3 – Solar Reorganizing US Debt Claims

o Class 4 – EPC Reorganizing General Unsecured Claims

- o Class 4 – Solar Reorganizing General Unsecured Claims

- o Class 5 – EPC Reorganizing Litigation Claims

- o Class 5 – Solar Reorganizing Litigation Claims

- o Class 6 – EPC Reorganizing Debt Bonding Claims

- o Class 6 – Solar Reorganizing Debt Bonding Claims

The charts below expand on the amount anticipated to be distributed to or on account of such Allowed Unsecured Claims.

- Holders of Allowed Claims in *Class 7A – EPC Reorganizing Intercompany Claims* by Non-Debtor Affiliates and *Class 7A – Solar Reorganizing Intercompany Claims* by Non-Debtor Affiliates in full and final satisfaction, settlement, release, and discharge of each Allowed Intercompany Claim By Non-Debtor Affiliates, on or as soon as practicable after the Effective Date, will receive the Standard Restructuring Terms, or such other less favorable treatment as agreed upon in writing by the Holder of an Intercompany Claim by Non-Debtor Affiliates and the applicable Debtor or the applicable Responsible Person.

- Holders of Allowed Claims in the following Class of Claims will receive no distribution on the Effective Date of the Plan:

  - o Class 4 – EPC Liquidating Intercompany Claims;

  - o Class 4 – Bioenergy and Maple Liquidating Intercompany Claims;

  - o Class 7B – EPC Reorganizing Intercompany Claims by Debtor Affiliates;

  - o Class 7B – Solar Reorganizing Intercompany Claims by Debtor Affiliates

  - o Class 5 – EPC Liquidating Equity Interests; and

  - o Class 5 – Bioenergy and Maple Liquidating Equity Interests.

- The Holders of Equity Interests in *Class 8 – EPC Reorganizing Equity Interests* and *Class 8 – Solar Reorganizing Equity Interests* shall have their Equity Interests retained or reinstated.

23. The following chart sets forth the Debtors' estimate of the value held by the Proponents as of the Effective Date to be distributed to Holders of Allowed General Unsecured Claims.

24.     The chart lists by Proponents, the Debtors' best estimates of the total General Unsecured Claims pending against each Proponent and the Debtors' estimate of the likely amount of Allowed General Unsecured Claims, with and without postpetition interest, each of which is subject to adjustment and Allowance.

25.     The allocations and estimates set forth in the chart are based on a large number of assumptions and judgments both factual and legal and are subject to the Risk Factors described in the Disclosure Statement.

**Allocation to General Unsecured Claims - Reorganizing Debtor Groups:**

| Class of Claims | Estimated Distributable Value (net of estimated wind down expenses)[5] | Total Pending Claims | Estimate of Allowed Claims[6] |
|---|---|---|---|
| EPC Reorganizing | $60,350,927.10 | $30,755,763,247.24 | $428,982,372.10[7] |
| Solar Reorganizing | $39,509,067.87 | $633,225,841.97 | $6,292,778.00 |
| *Total* | $99,859,994.97 | $31,388,989,089.21 | $435,275,150.10 |

---

[5]    Distributable value includes the Cash component of the New Value Contribution of the Parent in the amount of $23 million.  Reorganization reserves are currently estimated at $3.85 million and $1.5 million respectively.

[6]    Does not include Intercompany Claims.

[7]    Includes $1.65 million in Priority Tax Claims and Other Priority Claims, in the aggregate.

**Allocation to General Unsecured Claims – Liquidating Debtor Groups:**

| Class of Claims | Estimated Distributable Value(net of estimated wind down expenses)[8] | Total Pending Claims | Estimate of Allowed Claims[9] |
|---|---|---|---|
| EPC Liquidating | $2,507,966.38 | $2,469,288,268.01 | $15,437,774.00[10] |
| Bioenergy and Maple Liquidating | $252,046.83 | $216,036,090.38 | $60,740,186.00 |
| *Total* | $2,760,013.21 | $2,685,324,358.39 | $76,177,960.00 |

C.    **Reserves**

26.        The Plan contemplates that the Debtors establish and fund reserves in support of meeting the requirements under Section 1129(a) of the Bankruptcy Code.

- **Reorganizing Post-Confirmation Reserves:** Effective upon the Confirmation Date, the EPC Reorganizing Debtors and the Solar Reorganizing Debtor, respectively, shall each establish and fund a reserve in the amount of $3,850,000 and $1,500,000, respectively, to fund the fees and costs anticipated to be incurred following the Confirmation Date through the completion of the Responsible Person's duties under the Plan, which reserves may be increased, as necessary, by the Responsible Person after the Effective Date. Each such reserve shall be funded on or before the Confirmation Date. Each such reserve shall be used to pay the costs of the reconciliation of and objections to Claims, downsizing staffing needs to transition payroll and books and records to the Responsible Person, ordinary course Allowed Administrative Claims, including the Administrative Claims and estimated Administrative Claims to be incurred through to the Effective Date. Any excess funds in either of such reserves shall be turned over to the control of the Responsible Person promptly following the effectiveness of his appointment, but shall remain segregated and shall be utilized for such purposes.

---

[8]    Distributable value includes a $750,000 payment from the Parent to the EPC Liquidating Trust, a $750,000 payment from the Parent to the Bioenergy and Maple Liquidating Trust, and a $1 million gift from the proceeds of Solar to the EPC Liquidating Plan, to be used for Effective Date required disbursements. These payments are net of estimated wind-down budgets of $1.5 million for the EPC Liquidating Debtors and $500,000 for the Bioenergy and Maple Liquidating Debtors.

[9]    Does not include Intercompany Claims.

[10]    Includes $69,659.00 in Priority Tax Claims and Other Priority Claims.

- **Disputed Claims Reserve:**  After the Effective Date, separate Disputed Claims reserves shall be created for each of the following: (i) the EPC Reorganizing Debtors; (ii) the Solar Reorganizing Debtor; (iii) the Bioenergy and Maple Liquidating Debtors; and (iv) the EPC Liquidating Debtors.  The Disputed Claims reserves for the Reorganizing Debtors shall be managed by the respective Reorganizing Debtors or Responsible Person, as applicable, and the Disputed Claims reserves for the Liquidating Debtors shall be managed by the respective Liquidating Debtors or the respective Liquidating Trustee, as applicable; provided, however, that with respect to the Reorganizing Debtors, the Responsible Person and the Litigation Trustee shall cooperate with respect to the resolution of Disputed Claims.  On each Distribution date after the Effective Date in which the respective Responsible Person or respective Liquidating Trustee (as applicable) makes Distributions to Holders of Claims (including without limitation, General Unsecured Claims), the respective Responsible Person or the respective Liquidating Trustee (as applicable) shall retain on account of Disputed Claims an amount the respective Responsible Person or the respective Liquidating Trustee (as applicable) estimates is necessary to fund the Pro Rata Share of such Distributions to Holders of Disputed Claims if such Claims were Allowed, with any Disputed Claims that are unliquidated or contingent being reserved in an amount reasonably determined by the respective Responsible Person or the respective Liquidating Trustee (as applicable). Cash retained on account of such Disputed Claims shall be retained in the respective Disputed Claims reserve for the benefit of the Holders of Disputed Claims pending a determination of their entitlement thereto under the terms of the Plan.  If any Disputed Administrative or Priority Claim is disallowed or Allowed in an amount that is lower than the aggregate assets retained on account of such Disputed Claim, then the respective Responsible Person or the Liquidating Trustee (as applicable) shall within fifteen (15) days after such disallowance or allowance return the assets that exceed the Allowed amount of such Claim to the applicable Debtors' Estates or to the respective Reorganizing Debtors or Liquidating Debtors.

- **Professional Fee Reserve:**  In addition to the Reorganizing Post-Confirmation Reserves, the Responsible Person shall maintain a professional fee reserve in the amount of $1,750,000, which reserve shall be funded on or before the Confirmation Date.  The professional fee reserve may be increased in the discretion of the Responsible Person, as necessary. Any excess funds in either of such reserve shall be turned over to the control of the Responsible Person promptly following the effectiveness of his appointment, but shall remain segregated and shall be utilized to pay professional fees related to the Reorganizing Debtors.

- **Surety Reserve:**  Pursuant to the terms of the Plan, a reserve in the amount of $6.5 million shall be established on the Effective Date from the

funds being retained under the Plan by Holders of Equity Interests in Solar Reorganizing Debtors Class 8 (Equity Interests), of which the Parent is the ultimate beneficiary, and which the Parent is gifting to beneficiaries of Holders of Allowed Claims in EPC Reorganizing Debtors Class 6 (Debt Bonding Claims) and Solar Reorganizing Debtor Class 6 (Debt Bonding Claims). In exchange for the amounts contained in the Surety Reserve, the Surety Reserve Beneficiaries shall not be entitled to share in the EPC Reorganizing Distribution or the Solar Reorganizing Distribution, as applicable. In the event that an insufficient number of Sureties fail to elect the Alternative Surety Treatment in each of EPC Reorganizing Debtors Class 6 (Debt Bonding Claims), Solar Reorganizing Debtors Class 6 (Debt Bonding Claims), and EPC Liquidating Debtors Class 3 (General Unsecured Claims), the Surety Reserve shall, upon the Confirmation Date, become part of the EPC Reorganizing Distribution, to be distributed to all Holders of Allowed Claims entitled to a portion of the EPC Reorganizing Distribution, including the Sureties, as applicable, and the Sureties shall receive the Original Surety Treatment under the Plan.

**D.      Best Interests of Holders of Claims and Equity Interests**

27.      Confirmation of the Plan will provide each creditor and Equity Interest holder with a recovery that is not less than it would receive in a liquidation of the Debtors under chapter 7 of the Bankruptcy Code. As described in <u>Exhibit C</u> to the Disclosure Statement in the event of a liquidation under chapter 7, the New Value Contribution will not be available. Thus, if the Plan is not confirmed, then creditors would only (a) have cash on hand (which will be minimal), and (b) the right to pursue claims belonging to the Debtors. The prosecution of these claims will take considerable time, and consume extensive resources, and the likelihood of realizing affirmative recoveries on account of these claims is speculative at best. Indeed, certain of these claims are either against affiliates of the Debtors that are undergoing restructuring proceedings in Spain, or other against non-US entities. While it cannot be predicted with any certainty what, if any value will emanate from these claims after the expenditure of the significant amounts to prosecute them, the certainty from the New Value Contribution makes it highly likely that creditors will receive more under the Plan than through chapter 7 liquidation.

**E.      Funding of Amounts Comprising Reorganization Distributions**

28.      As part of the MRA and in order to continue with the global restructuring and facilitate the Debtors' exit from Chapter 11, I understand the Parent is proposing to fund the Plan for the restructuring and/or liquidation, as applicable, of the Debtors.  I understand that the Parent shall contribute:  $23 million in Cash with respect to the EPC Reorganizing Debtors, which funding stems from the financing that is anticipated to be provided by the New Money Financing Providers in connection with the MRA, which includes the following: (i) Cash to fund the EPC Reorganization Distribution in the amount of $20 million, (ii) the first $28 million of Litigation Trust Causes of Action, following an advance of a $3 million Litigation Fund to prosecute such claims; *provided, however*, that the $3 million of recoveries resulting from the prosecution of the Litigation Trust Causes of Action will revert back to the Parent at such time as the Litigation Trust has obtained a net recovery on the Litigation Trust Causes of Action of more than $28 million dollars ($28,000,000).  In addition, the Parent is gifting from the proceeds of Solar, (i) $6.5 million for a Surety Reserve to beneficiaries of Holders of Allowed Claims in EPC Reorganizing Debtors Class 6 (Debt Bonding Claims) and Solar Reorganizing Debtor Class 6 (Debt Bonding Claims) and (ii) and additional $4 million with respect to the EPC Reorganizing Debtors.  Additionally, the Parent will contribute $750,000 under each of the EPC Liquidating Plan and the Bioenergy and Maple Liquidating Plan, and shall gift from the proceeds of Solar an additional $1,000,000 for the EPC Liquidating Plan.

**F.      Cram Down**

29.      I understand that a plan may be confirmed notwithstanding that all Classes do not vote to accept or are deemed to accept the Plan, and that the Debtors seek to confirm the Plan over the rejection of the Rejecting Impaired Classes.

30.    The New Value Contribution is new and consists of Cash and non-Cash contributions.    Additionally, the EPC Reorganizing Debtors believe that the New Value Contribution is substantial standing alone and because it is necessary to the success of the reorganization.  The New Value Contribution represents approximately 8 percent of the amount of Allowed General Unsecured Claims against the EPC Reorganizing Debtors.   The EPC Reorganizing Debtors believe that the New Value Contribution is not only necessary for the successful reorganization of the EPC Reorganizing Debtors, but it is essential, as this is the only source of material Cash consideration available to provide recoveries to creditors.

31.    Finally, as to the value of the New Value Contribution relative to the Equity Interests, the EPC Reorganizing Debtors believe that New Value Contribution far exceeds any potential value of the Equity Interests, which likely have little or no economic value.  I understand that substantial structural support following the Effective Date will be required and has been committed by the Parent.  Indeed, my review of the books and records of the EPC Reorganizing Debtors and their operating histories leaves me with the impression that, without the New Value Contributions and going forward financial and operating support from the Abengoa Group, the EPC Reorganizing Debtors would have no value, and should be liquidated.  As such, absent the New Value Contribution, the Equity Interests in the EPC Reorganizing Debtors have no or *de minimis* market value, because without remaining part of the Abengoa Group, the EPC Reorganizing Debtors' Estates would have little or no value and would be liquidated.

32.    As indicated in the Liquidation Analyses contained in the Disclosure Statement, the Bioenergy and Maple Liquidating Plan and the EPC Liquidating Plan both provide for greater distributions to creditors than would be the case were either the EPC Liquidating Debtors

or the Bioenergy and Maple Debtors to be liquidated under chapter 7 of the Bankruptcy Code. From a very high level, the EPC Liquidating Plan benefits from $1.75 million, and the Bioenergy and Maple Liquidating Plan benefits from $750,000, allocated from the New Value Contribution, These amounts are at least sufficient to pay Allowed Administrative, Priority, and Priority Tax Claims in full, without which such Debtor would be incapable of confirming a plan in their Chapter 11 Cases.

33.     The Debtors believe that such funding is only upon confirmation of such Plan. Without such New Value Contribution allocation, the EPC Liquidating Debtors and the Bioenergy and Maple Liquidating Debtors would have insufficient funds to confirm the Plan, let alone to pay such Allowed Claims in full and provide a distribution to unsecured creditors.

34.     The Holders of Allowed Claims to be treated under the Solar Reorganizing Plan are to be paid in full whether such Plan is confirmed or the case is converted to chapter 7. However, such creditors will receive their treatment sooner under such Plan than if such creditors received distributions from a chapter 7 trustee and without any risk of waste or delay.

35.     The same principal applies to the cases of the EPC Reorganizing Debtors.  As shown in Appendix C to the Disclosure Statement regarding the EPC Reorganizing Debtors, in light of the benefits of the New Value Contribution, the Causes of Action to vest in the Litigation Trust, and the other components of the EPC Reorganization Distribution, creditors of the EPC Reorganizing Debtors will receive and retain under the Plan greater recoveries than if the Estates of such Debtors were liquidated.

36.     Accordingly, the Debtors believe that the Plan satisfies the "cram down" requirements of the Bankruptcy Code.

### G.    Feasibility

37.    I am generally familiar with the "feasibility" requirement of Bankruptcy Code section 1129(a)(11).  As discussed in greater detail below, I believe that the Plan is feasible because, among other things, Parent will provide the New Value Contribution, which will be the primary source of funds used to make distributions to creditors.  As a result of the New Value Contribution, as well as the fact that the other components of value that will be used to make distributions to creditors under the Plan are assets that the Debtors already have on hand, the Debtors believe that, as of the Effective Date the Debtors will have sufficient funds and assets to satisfy Claims pursuant to the treatment set forth in the Plan, as well as to implement the Plan.

*EPC Reorganizing Debtors*

38.    Under the EPC Reorganizing Plan, distributions to creditors will come from the EPC Reorganizing Distribution (i.e., the $24 million New Value Contribution from Parent, together with the interests in various existing assets and litigation claims).  Accordingly, these distributions are not in any way dependent upon the future operations of the EPC Reorganized Debtors.  Meanwhile, the EPC Reorganized Debtors will continue operations on a smaller scale, as shown in the projections ("EPC Projections") attached as Exhibit D to the Disclosure Statement and incorporated herein by reference.

39.    Based on my work in these Chapter 11 Cases, I am familiar with the EPC Reorganizing Debtors' historic operations and results of operations.

40.    I have reviewed the revised EPC Projections filed as part of the Plan Supplement and have discussed the assumptions of the EPC Reorganizing Debtors underlying the EPC Projections with the EPC Reorganizing Debtors.

41.    Based on my review and my investigation of the assumptions underlying the EPC Projections and my review of the EPC Projections, and my opinion that the assumptions are

reasonable and the EPC Projections are reasonable, I believe that the operation of the EPC Reorganizing Debtors' business following the Effective Date is not likely to be followed by the liquidation or need for further financial reorganization of the EPC Reorganizing Debtors. However, to the extent that the EPC Reorganizing Debtors' operations fall short of the Projections, I understand that the EPC Reorganizing Debtors will be able obtain further support from Parent.

42.     The EPC Reorganizing Debtors believe that, with respect to the EPC Reorganizing Debtors, the Plan is feasible in light of the substantial New Value Contribution, EPC Reorganizing Debtors' projections and the Parent's commitment financially and operationally to support the EPC Reorganizing Debtors following the Effective Date as an engineering, procurement and construction enterprise. Moreover, even if the Debtors' operating cash flow changes from the EPC Projections, distributions to creditors under the Plan would remain unaffected, because, among other things, the Plan does not rely on future operations for distributions; rather, distributions will come from the New Value Contribution, including the Litigation Trust Proceeds. As a result, as of the Effective Date, the EPC Reorganizing Debtors believe they will have sufficient funds to satisfy Claims pursuant to the treatment set forth in the Plan as well as to implement the Plan.

*Solar Reorganizing Debtor*

43.     Based on my review and my investigation of the assumptions underlying the Solar Projections and my review of the Solar Projections, and my opinion that the assumptions are reasonable and the Solar Projections are reasonable, I believe that the operation of the Solar Reorganizing Debtor's business following the Effective Date is not likely to be followed by the liquidation or need for further financial reorganization.

44.     The Solar Reorganizing Debtor has historically operated profitably and will have substantial cash reserves as of the Effective Date, in an amount at least sufficient to adequately capitalize and provide liquidity for the Solar Reorganizing Debtor.  Taken together with the Parent's commitment financially and operationally to support the Solar Reorganizing Debtor, the Solar Reorganizing Debtor believes that it will have sufficient funds to satisfy Claims pursuant to the treatment set forth in the Plan as well as to implement the Plan.

*EPC Liquidating Plan and Bioenergy and Maple Liquidating Plan.*

45.     Each of the EPC Liquidating Plan and Bioenergy and Maple Liquidating Plan are liquidating plans.  All of the assets of the EPC Liquidating Debtors and the Bioenergy and Maple Liquidating Debtors, including, without limitation, the Causes of Action, will be liquidated under the respective Plan.

46.     Because the Plan expressly provides for the liquidation of those Debtors' Estates and only under the Plan will the EPC Liquidating Debtors receive $1.75 million and the Bioenergy and Maple Liquidating Debtors receive $750,000 to satisfy Allowed Administrative Claims, Allowed Priority Tax Claims and Allowed Other Priority Claims consistent with the treatment set forth in the Plan, the Liquidating Debtors will be able to implement the Plan.

47.     As such, the EPC Liquidating Debtors and the Bioenergy and Maple Liquidating Debtors following the Effective Date will not further liquidate or reorganize.

## II.    SATISFACTION OF PLAN CONFIRMATION REQUIREMENTS.

48.     I understand from the Debtors' legal advisors and the Debtors believe, based on their review of the Plan and related materials, that the Plan satisfies all applicable provisions of the Bankruptcy Code and should be confirmed.

A.    **Compliance with Section 1129(a)(1) of the Bankruptcy Code.**

1.    **Compliance with Section 1122 of the Bankruptcy Code.**

49.    I understand that section 1122 of the Bankruptcy Code permits a plan to classify various claims and Equity Interests into different classes, so long as all the claims and Equity Interests in a particular class are substantially similar.  With the exception of the Administrative Expense Claims and Priority Tax Claims, which I have been informed by the Debtors' legal advisors need not be classified, the Plan provides for the separate classification of Claims against and Equity Interests in the Debtors based upon differences in the legal nature and/or priority of such Claims and Equity Interests.

50.    The Debtors believe that valid business, factual, and legal reasons exist for classifying the Claims and Equity Interests into separate Classes under the Plan and that the Claims or Equity Interests in each particular Class are substantially similar.  Furthermore, the Debtors believe the classification scheme created by the Plan is based on the similar nature of Claims or Equity Interests contained in each Class and not on an impermissible classification factor.

2.    **Compliance with Section 1123(a) of the Bankruptcy Code.**

51.    The Plan (a) designates the different Classes of Claims and Equity Interests by Plan Proponent, (b) specifies the Classes of Claims that are unimpaired under the Plan, and (c) specifies the treatment of each Class of Claims and Equity Interests that is impaired.  In addition, the treatment of each Claim against or Equity Interest in the Debtors in each respective Class is the same as the treatment of every other Claim or Equity Interest in such Class, unless the holder of a particular Claim or Equity Interest has agreed to a less favorable treatment for such Claim or Equity Interest.

23

52.    The Debtors believe the Plan provides adequate means for its implementation, including, without limitation, (i) the implementation of the MRA, (ii) appointment of the Responsible Person and the Liquidating Trustees, (iii) establishment of the Liquidating Trusts, (iv) appointment of the Litigation Trustee and the application of Litigation Trust proceeds, (v) funding of the New Value Contribution by the Parent, (vi) procedures for making distributions to holders of Allowed Claims, and (vii) the partial substantive consolidation of certain of the Debtors to reflect the business enterprises through which the Debtors conducted their businesses. The Debtors believe that the proposed implementation steps have been carefully developed and designed to properly effect the Plan.

53.    Finally, the Debtors believe the appointment of the Responsible Person, the Litigation Trustees and Liquidation Trustees is consistent with the interests of creditors and with public policy.

### 3.    Compliance with Section 1123(b) of the Bankruptcy Code.

54.    I have been advised by Debtors' counsel that section 1123(b) of the Bankruptcy Code permits various discretionary provisions to be included in a plan.  In particular, (a) the Plan Impairs certain Claims and Equity Interests, (b) the Plan leaves Unimpaired other Claims, (c) the Plan provides for the retention of certain Causes of Action to be prosecuted by the Litigation Trustee in accordance with the terms of the plan and Litigation Trust Agreement, and (d)  the Plan governs the assumption and rejection of executory contracts and unexpired leases.

55.    Also, Article IX of the Plan includes (a) the release by the Debtors of certain parties in interest, (b) the release by holders of Claims entitled to vote on the Plan of certain non-Debtor third parties, (c) an exculpation provision, and (d) an injunction provision prohibiting parties from, among other things, pursing Claims or Equity Interests otherwise released under the Plan.

56.     The Debtors believe these provisions are appropriate because, among other things, they are the product of extensive good faith and arm's length negotiations, are in exchange for good, valuable, and reasonably equivalent consideration, and are supported by the Debtors and other various parties in interest.  In addition, I understand that the Ballots provided all creditors in the Voting Classes with the option to opt out of the third party releases in the Plan.

57.     The Debtors believe that each of the Released Parties played an important and active role in negotiating and formulating the Plan, has significantly contributed to the Plan and these Chapter 11 Cases, and the cooperation of each party is necessary to implement the provisions of the Plan.  The Debtors believe that without protection from liability, key constituents would have been unwilling to cooperate in connection with the formulation and distribution of the Plan, including, without limitation, providing the New Value Contribution.

58.     I have personal knowledge of the fact that the Plan is the result of extensive negotiations among the Debtors and various Released Parties.  Based on my involvement in the these negotiations, the Debtors' cases, and the global restructuring, I believe that there is an identity of interest between the Debtors and the Released Parties arising out of the shared common goal of confirming and implementing the Plan,

59.     The Debtors believe that the Released Parties all made important contributions to these Chapter 11 Cases.

60.     The Debtors believe the Released Parties' contributions and material concessions have allowed these Chapter 11 Cases to move expeditiously towards confirmation.  The Debtors believe that without these releases exculpation and injunctions, the Released Parties would not have been willing to contribute to the Plan process.

61.     The Debtors believe that the Plan presents the only opportunity for a recovery by creditors of the Liquidating Debtors and the best possible chance for an enhanced recovery for creditors of the Reorganizing Debtors

### 4.      Compliance with Section 1123(d) of the Bankruptcy Code.

62.     The Plan provides that, as of the Effective Date, all Executory Contracts not assumed prior to the Effective Date, or subject to a pending motion to assume as of the Effective Date, will be deemed rejected.

### B.      Compliance with Section 1129(a)(3) of the Bankruptcy Code.

63.     The Plan is the product of arm's length negotiations among the Debtors, the Committee and other key constituents.  The Debtors believe  the Plan allows Holders of Allowed Claims to realize the highest possible recovery under the circumstances from proceeds of liquidation of the Estate Assets and from the New Value Contribution.  As such, the Debtors believe the Plan was proposed with the legitimate and honest purpose of maximizing the value of the Debtors' assets and maximizing distributions to creditors.

### C.      Compliance with Section 1129(a)(4) of the Bankruptcy Code.

64.     In accordance with section 1129(a)(4) of the Bankruptcy Code, as it has been explained to me by counsel, the Plan provides that all payments made or to be made for services rendered and expenses incurred in connection with these Chapter 11 Cases, including, without limitation, all Accrued Professional Compensation Claims through the Effective Date, will be paid only after allowance of such Claims by the Bankruptcy Court.  The Parent has paid, and remains obligated to  pay the fees and expenses of Alvarez & Marsal, which performed substantial services for the Parent in support of the Debtors.

**D.      Compliance with Section 1129(a)(5) of the Bankruptcy Code.**

65.      The identity of the directors and officers, the Responsible Person, the Litigation Trustee and the Liquidating Trustee have been fully disclosed in the Plan Supplement, and the Debtors believe the appointment of each is consistent with the Equity Interests of holders of Claims against and Equity Interests in the Debtors and with public policy.

**E.      Compliance with Section 1129(a)(7) of the Bankruptcy Code.**

66.      As discussed above, the Debtors believe that each Holder of a Claim or Equity Interest in an Impaired Class will receive or retain under the Plan on account of such Claim or Equity Interest property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.

**F.      Compliance with Sections 1129(a)(8) and 1129(b) of the Bankruptcy Code.**

67.      I understand that (a) holders of Claims in Unimpaired Classes are, deemed to accept the Plan, (b) holders of Claims in Classes EPC Reorganizing Class 3A, 3B and 4, Solar Reorganizing Class 3 and 4, and Bio and Maple Liquidating Plan Class 3 (collectively, the "Impaired Accepting Classes") voted to accept the Plan, (c) holders of Claims or Equity Interests in Classes EPC Reorganizing Class 7B (Intercompany Claims by Debtor Affiliates), Solar Reorganizing Class 7B (Intercompany Claims by Debtor Affiliates), EPC Liquidating Class 4 (Intercompany Claims), EPC Liquidating Class 5 (Equity Interests) Bioenergy and Maple Liquidating Class 4 (Intercompany Claims) and Bioenergy and Maple Liquidating Class 5 (Equity Interests) (the "Deemed Rejecting Classes") are deemed to reject the Plan, and (d) holders of Claims in Classes EPC Liquidating Class 3, EPC Reorganizing Class 5, EPC Reorganizing Class 6 and Solar Reorganizing Class 6 (the "Rejecting Classes") voted to reject the Plan.

68.    It is my understanding that a chapter 11 plan may be confirmed notwithstanding the rejection or deemed rejection by a class of claims or Equity Interests if the plan does not discriminate unfairly and is fair and equitable as to that class.  It is my further understanding that (a) the "fair and equitable" requirement is satisfied if the holders of claims and Equity Interests in classes junior to the rejecting classes are not receiving any property under the plan, and (b) the plan does not discriminate unfairly if the legal rights of a dissenting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are substantial similar to those of that class.

69.    The Debtors believe the Plan's treatment of Rejecting Classes and the Deemed Rejecting Classes, which will not receive anything under the Plan, is proper because there is no similarly situated class of Claims or Equity Interests, as applicable, classified under the Plan. Thus, the Debtors believe the Plan does not discriminate unfairly.  In addition, no junior holder of a Claim or Equity Interest will receive any distribution unless the holders of higher priority Claims receive the full value of their Claims or the holders of such higher priority Claims have consented to such treatment, subject to the cram down discussed above.  As such, the Debtors believe the Plan is fair and equitable.

### G.    Compliance with Section 1129(a)(9) of the Bankruptcy Code.

70.    I understand that under the Plan, all Allowed Administrative, Allowed Priority Tax and Allowed Other Priority Claims against the Debtors will be satisfied in the manner required by section 1129(a)(9) of the Bankruptcy Code, as that section has been explained to me by counsel, unless such holder of a particular claim has agreed to different treatment of such claim.

28

**H.     Compliance with Section 1129(a)(10) of the Bankruptcy Code.**

71.     I understand that the Impaired Accepting Classes have voted to accept the Plan, which vote was determined without including any acceptances of the Plan by any Insider.

**I.     Compliance with Section 1129(a)(11) of the Bankruptcy Code.**

72.     I understand that, to satisfy the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code, the Debtors must demonstrate that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further reorganization, of the Debtors.   As discussed above, based upon my experience with the Debtors and a review of the proposed operations of the Reorganized Debtors, it is not likely that the confirmation of the Plan will be followed by a liquidation.

*[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the contents of the foregoing declaration are true and correct to the best of my information and belief.

December 5, 2016          */s/ William H. Runge III*
                          William H. Runge III
                          Managing Director, Alvarez & Marsal North America, LLC