IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ABEINSA HOLDING, INC., *et al.,*[1] | ) | Case No. 16-10790 |
| | ) | (D.I. 991) |
| Debtors | ) | |
| | ) | |

**OPINION ON CONFIRMATION OF THE DEBTORS' MODIFIED
FIRST AMENDED PLANS OF REORGANIZATION AND LIQUIDATION**

Before me for consideration is confirmation of the Debtors' Modified First Amended

Plans of Reorganization and Liquidation (the "Plan"), a critical component to the global

reorganization of Abengoa, S.A. ("Abengoa" or "Parent").[2]  The debtors have resolved virtually

all objections to confirmation of the Plan.  Only two remain: the United States Trustee's

objection concerns the breadth of the "debtor releases" and the "third-party releases;" the other is

by Portland General Electric Company ("PGE"), an Oregon public utility, who has raised almost

every conceivable classic confirmation objection to the Plan.[3]

For the reasons that follow, the Plan will be confirmed.

---

[1] The debtors in these chapter 11 cases are: Abeinsa Holding Inc.; Abeinsa EPC LLC; Abencor USA, LLC;
Abener Construction Services, LLC; Abener North America Construction, LP; Abengoa Solar, LLC;
Inabensa USA, LLC; Nicsa Industrial Supplies LLC; Teyma Construction USA, LLC; Abeinsa Abener
Teyma General Partnership; Abener Teyma Mojave General Partnership; Abener Teyma Inabensa Mount
Signal Joint Venture; Teyma USA & Abener Engineering and Construction Services General Partnership;
Abengoa US, LLC; Abengoa US Operations, LLC; Abengoa Bioenergy Biomass of Kansas, LLC; Abengoa
Bioenergy Hybrid of Kansas, LLC; Abengoa Bioenergy Technology Holding, LLC; Abengoa Bioenergy
New Technologies, LLC.
[2] The latest revised version of the Plan is filed at docket item number *991.*
[3] The only thing missing from the PGE objection is the proverbial kitchen sink.

## Background

Abeinsa Holding, Inc. and certain affiliated debtors filed voluntary chapter 11 petitions on March 29, 2016. Additional affiliated entities filed chapter 11 petitions on April 6, April 7 and June 12, 2016. The chapter 11 cases are jointly administered for procedural purposes.

On April 13, 2016, the Office of the United States Trustee formed the Official Committee of Unsecured Creditors (the "Creditors' Committee").

Abengoa, S.A.

The Debtors are ultimately owned by Abengoa, S.A., which is "a Spanish company founded in 1941 [that is] a leading engineering and clean technology company, which together with its consolidated subsidiaries, has operations in more than 50 countries."[4] As of the end of 2015, Abengoa was the parent company of approximately 700 other companies around the world, including 577 subsidiaries, 78 associates, 31 joint ventures, and 211 Spanish partnerships, employing 35,000 people (collectively, the "Abengoa Group").[5]

With investments of $3.3 billion, the United States has become one of Abengoa's largest markets in terms of sales volume, particularly from developing solar, bioethanol and water projects.[6] The Debtors' business operations can be categorized into (i) bioenergy projects; (ii) engineering, procurement and construction companies; and (iii) a solar company.[7]

The Spanish Proceeding

Abengoa and certain affiliates (the "5 bis Companies") filed notices with the Mercantile Court of Seville, Spain (the "Spanish Court") that they had commenced negotiations with their principal creditors to reach a global settlement on the refinancing and restructuring of their

---

[4] Runge Decl., ¶ 5.
[5] *Id.*
[6] *Id.,* ¶ 9.
[7] *Id.,* ¶ 10.

liabilities to achieve the viability of the Abengoa Group in the short and long term.[8]  The Spanish
Court issued orders admitting the notices and granting the Article 5 bis Companies protection
under the Spanish Insolvency Law.[9]

Abengoa negotiated with creditors to restructure the financial indebtedness and
recapitalize the Abengoa Group (the "Restructuring Proposal").  To provide the Abengoa Group
with sufficient time to solicit and obtain the requisite supermajority votes with respect to the
Restructuring Proposal, several Abengoa Group companies asked financial creditors to adhere to
a standstill agreement, under which the financial creditors agreed to stay certain rights and
actions vis-à-vis the relevant Abengoa Group companies during a period of several months.[10]
When the standstill agreement was signed by at least 60% of the Company's various financial
creditors, the Abengoa Group applied for judicial approval (or homologation) of the standstill
agreement pursuant to the Spanish Insolvency Law, so that the standstill agreement would
become binding upon all relevant financial creditors of the 5 bis Companies.[11]  On April 6, 2016,
the Spanish Court issued the Homologation Order.

Due to the passage of time, a new homologation request was made and the process taking
place in Spain was, essentially, restarted. On September 24, 2016, Abengoa and certain
subsidiaries entered into a Master Restructuring Agreement (the "MRA") with certain creditors
in Spain.[12]  The MRA provides that certain "Go Forward Companies" will be reorganized,
including the "Go Forward Chapter 11 Companies."[13]  The MRA also provides that the Non-Go

---

[8] Disclosure Statement, III.C.3.a.
[9] *Id.*
[10] Disclosure Statement, III.C.3.b.
[11] *Id.*
[12] Disclosure Statement, III.C.3.d.
[13] Disclosure Statement at III.C.3.d.

Forward Chapter 11 Companies will be liquidated under chapter 11 plans of liquidation.[14] Various creditors have challenged the Homologation Order, which Spanish Court will consider and then determine whether the Abengoa Group should proceed with the restructuring.[15]

### The Chapter 15 Cases

On March 28, 2016, Abengoa and twenty-four affiliated Spanish companies filed chapter 15 petitions in this Court. On April 27, 2016, I entered an order recognizing the Spanish Proceeding as a foreign main proceeding.[16] On December 8, 2016, I entered an Order recognizing the Spanish Court's Homologation Order.[17]

### The Debtors' Chapter 11 Plans and Disclosure Statement

On September 26, 2016, the Debtors filed a Disclosure Statement and the Debtors' Plans of Reorganization and Liquidation. On September 29, 2016, the Debtors filed the Motion for Entry of an Order (A) Approving the Disclosure Statement, (B) Establishing Procedures for the Solicitation and Tabulation of Votes to Accept or Reject the Plan, (C) Approving the Forms of Ballot and Solicitation Materials, (D) Establishing Voting Record Date, (E) Scheduling Confirmation Hearing and Setting the Deadline for Filing Objection to Confirmation of the Plan, and (F) Approving the Related Forms of Notice (the "Disclosure Statement Motion").

Various creditors and the United States Trustee filed numerous objections to the Disclosure Statement Motion. After negotiations, a series of hearings (some held in Court and some held telephonically), and revisions to the documents, the Debtors presented the Court with revised documents and a consensual Order approving the Disclosure Statement Motion.

---

[14] *Id.*
[15] *Id.*
[16] Disclosure Statement, III.C.3.c.
[17] Case No. 16-10754, D.I. 169.

4

I entered that Order on October 31, 2016 (D.I. 746).  Thereafter, the Debtors sent the solicitation

packages to Holders of Claims.[18]

More than twenty parties filed objections and informal comments to the Debtors' Plan.

The votes were received and tallied and, prior (some *just* prior) to the hearing on confirmation,

the Debtors resolved most of the objections to the Plan, so that only the PGE and the U.S.

Trustee objections remained.  The confirmation hearing was held on December 6, 2016. At the

hearing, the Debtor submitted into evidence five of six declarations in support of plan

confirmation:[19]

(1)    Declaration of Christina Pullo of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on Debtor's Modified First Amended Plans of Reorganization and Liquidation (D.I. 944);

(2)    Declaration of Sebastian Felicetti in Support of Confirmation of the Debtors' Modified First Amended Plans of Reorganization and Liquidation (D.I. 957);

(3)    Declaration of Jeffrey Bland in Support of Confirmation of the Debtors' Modified First Amended Plans of Reorganization and Liquidation (D.I. 967);

(4)    Declaration of William H. Runge III in Support of Confirmation of the Debtors' Modified First Amended Plans of Reorganization and Liquidation (D.I. 972);

(5)    Declaration of Samuel E. Star in Support of Confirmation of the Debtors' Modified First Amended Plans of Reorganization and Liquidation (D.I. 975); and

(6)    Supplemental Declaration Christina Pullo of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on Debtor's Modified First Amended Plans of Reorganization and Liquidation (D.I. 981).

The Declarants were subject to cross-examination by the objecting parties.  No other evidence

was submitted by PGE or the U.S. Trustee in support of their objections.  At the Court's request,

---

[18] Unless defined herein, capitalized terms are defined in the Plan.
[19] Tr. (12/6/2016) at 50 - 54.  The first declaration of Christina Pullo was filed on December 2, 2016 at D.I. 944.

the parties filed post-hearing submissions in support of their positions for and against confirmation.

## The Plan

The Plan is a single document composed of four different plans: two are plans of reorganization and two are plans of liquidation. The following four debtor groups each will be partially substantively consolidated:

(1)     EPC Reorganizing Debtors:[20]

(2)     Solar Reorganizing Debtor:[21]

(3)     EPC Liquidating Debtors:[22]

(4)     Bioenergy and Maple Liquidating Debtors:[23]

The classes in the EPC Reorganizing Debtor Plan (which are set forth here because most of the objections pertain to this plan) are as follows:

- EPC Reorganizing 1 - Secured Claims
- EPC Reorganizing 2A - Priority Tax Claims
- EPC Reorganizing 2B - Other Priority Claims
- EPC Reorganizing 3A - MRA Affected Debt Claims
- EPC Reorganizing 3B - US Debt Claims
- EPC Reorganizing 4 - General Unsecured Claims
- EPC Reorganizing 5 - Litigation Claims
- EPC Reorganizing 6 - Debt Bonding Claims

---

[20] The EPC Reorganizing Debtors are: Abener Teyma Mojave General Partnership; Abener North America Construction, LP; Abeinsa Abener Teyma General Partnership; Teyma Construction USA, LLC; Teyma USA & Abener Engineering and Construction Services General Partnership; Abeinsa EPC LLC; Abeinsa Holding, Inc.; Abener Teyma Hugoton General Partnership, Abengoa Bioenergy New Technologies, LLC; Abener Construction Services, LLC; Abengoa US Holding, LLC; Abengoa US, LLC; and Abengoa US Operations, LLC.

[21] The sole Solar Reorganizing Debtor is Abengoa Solar, Inc.

[22] The EPC Liquidating Debtors are: Abenecor USA LLC, Abener Teyma Inabensa Mount Signal Joint Venture; Inabensa USA, LLC; and Nicsa Industrial Supplies, LLC.

[23] The Bioenergy and Maple Liquidating Debtors are: Abengoa Bioenergy Hybrid of Kansas, LLC; Abengoa Bioenergy Technology Holding, LLC; Abengoa Bioenergy Meramec Holding, Inc. and Abengoa Bioenergy Holdco, Inc.

- EPC Reorganizing 7A - Intercompany Claims by non-debtor affiliates
- EPC Reorganizing 7B - Intercompany Claims by Debtor affiliates
- EPC Reorganizing 8 - Equity Interests

As part of the MRA, and in order to continue with the global restructuring, and to facilitate the Debtors' exit from chapter 11, Abengoa is proposing to fund the Plans for the Debtors' reorganization and liquidation, as applicable, as follows: [24]

(i)        With respect to the EPC Reorganizing Debtors, Abengoa will contribute $23 million in Cash, which is anticipated to be provided by the New Money Financing Providers in connection with the MRA.  Of that amount, $20 million will be contributed to the EPC Reorganization Distribution, and $3 million will fund an advance to the Litigation Fund to prosecute claims, provided that the $3 million will revert back to Abengoa after the Litigation Trust has obtained a net recovery of more than $28 million;

(ii)        Abengoa will gift the proceeds of Solar as follows (i) $65 million for a Surety Reserve for beneficiaries of Holders of Allowed Claims in EPC Reorganizing Debtors Class 6 (Debt Bonding Claims) and Solar Reorganizing Debtor Class 6 (Debt Bonding Claims), and (ii) an additional $4 million with respect to the EPC Reorganizing Debtors;

(iii)        Abengoa will contribute $750,000 under each of the EPC Liquidating Plan and the Bioenergy and Maple Liquidating Plan; and, from the proceeds of Solar, Abengoa will gift an additional $1 Million for the EPC Liquidating Plan.[25]

Plans of Reorganization

From and after the Effective Date, the Reorganizing Debtors and the Creditors' Committee will consult and select a "Responsible Person," to act in the name of the Reorganized

---

[24] Runge Decl., ¶28.
[25] Runge Decl., ¶28.

Debtors and administer the Reorganizing Plan. The EPC Reorganizing Debtors, in consultation with the Creditors' Committee, will also establish a Litigation Trust for the purpose of prosecuting, compromising, and resolving the Litigation Causes of Action.

Plans of Liquidation

By the Effective Date, the EPC Liquidating Debtors and the Bioenergy and Maple Liquidating Debtors, in consultation with the Creditors' Committee, will execute the respective Liquidating Trust Agreements, appointing the respective Liquidating Trustees.

Voting

The Supplemental Declaration of Christina Pullo, which reports the tabulation of votes for the Plans, reflects the changes that occurred after the Debtors resolved the objections filed by sureties RLI Insurance Company, Zurich American Insurance Company, and Liberty Mutual Insurance Company, who then changed their votes from "rejecting" to "accepting" the Plans. As a result of the change, all classes entitled to vote have now accepted the Plans, *except* for the EPC Reorganizing Class 5 (Litigation Claims), which rejected the Plan. Although the votes of Class 5 (Litigation Claims) were cast 8 to 5 (or 61.54%) in favor of the Plan, the class clearly rejected the Plan based on the claim amounts, *i.e.,* $4.1 million in claims accepted, but over $134.9 million (or 97% of the claim amounts, dominated by the claim of Portland General Electric Company for $102 million) rejected the EPC Reorganizing Plan.

The EPC Liquidating Plan, the Bioenergy Liquidating Plan and the Solar Reorganizing Plan were each accepted by all classes entitled to vote on those plans.

8

### The Objections

I address first the objections of PGE.

(A)    PGE Objections

As the result of a pre-petition competitive bidding process, PGE selected four of the EPC Reorganizing Debtors for the construction of the Carty Project, which consists of an energy generation facility in Oregon.[26]  After a dispute over progress and payment milestones on the project, PGE terminated the contract on December 18, 2015.  Abengoa, as guarantor, commenced arbitration against PGE and joined the relevant EPC Reorganizing Debtors (the "Carty Debtor-Contractors") and Sureties.  On February 29, 2016 PGE commenced an action in the United States District Court for the District of Oregon against Abengoa, accompanied by a motion for a preliminary injunction to bar Abengoa from pursuing the arbitration. The District Court action was stayed, first on a provisional basis, then on a final basis, in accordance with Orders entered in Abengoa's Chapter 15 case.[27]  On October 6, 2106, I granted PGE's motion for relief from the stay to commence and prosecute to final judgment an action against the Carty Debtor-Contractors.  On October 21, 2016, PGE commenced litigation in the United States District Court for the District of Oregon against those debtors.

The Creditors' Committee asserts that PGE's plan objections are part of its litigation strategy designed, in part, to force the Debtors into concessions by increasing the cost and the time the Debtors are required to devote to confirmation, and the inconvenience they must incur as a result.  Counsel said it this way:

> I think the reason PGE is the only party here today still left to object is that everybody else who is involved in this case had something to lose. . . . The Debtors obviously have an incentive to confirm their plan and to try to preserve businesses,

---

[26] Disclosure Statement, Section III.D.7.a.1.
[27] Case No. 16-10754, D.I. 20; D.I. 71.

so everybody had something to lose, but I don't think PGE really did.  Here's why that is.

PGE . . . is prosecuting claims.  You're well aware of those, I won't belabor them but . . . what's behind them?  So, they've got . . . a bond from Liberty Zurich that's somewhere north of $140 million dollars.  So, worse case for them, they're getting, you know, 140 if they're right.  On top of that, they've got claims against Spain directly.  Those claims against Spain directly are - - looks like they're going to be treated as non-financial claims.  They're trade claims.  Under the terms of the Spanish restructuring, those trade claims are not affected.  They've actually made some good progress in Spain trying to make sure that that is, in fact, the case.  If that's right, they're going to recover, either from the surety bonds or from Spain or from some combination of the two, and they're going to get out in whole with whatever their actual exposure is, and we don't have to debate what that exposure is, but they get paid off.

[I]t strikes me that . . . they have nothing to lose, if they object to the plan and because it's so important that the US plans get confirmed as part of - - as a key part of the MRA going forward, it gives them some leverage, and maybe that leverage makes somebody give them something to make them stop arguing.[28]

PGE's claims are classified as part of the EPC Reorganizing Class 5 Litigation Claims.

Therefore, I will review the objections in relation to the EPC Reorganizing Plan.

(1)    Gerrymandering.

PGE alleges that the Plan violates Bankruptcy Code § 1122, arguing that the Debtors gerrymandered the classification of unsecured claims in the EPC Reorganizing Plan to create an impaired consenting class.  The Debtors responded that the Plan separately classifies claims and equity interests based on differences in the legal nature and/or priority of the claims or equity interests.[29]

Section 1122(a) of the Bankruptcy Code provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122(a). Section 1122(a) is mandatory in one

---

[28] Transcript of Confirmation Hearing, Dec. 6, 2016, at 125 - 27 (D.I. 1017).
[29] Runge Decl. ¶ 49.

10

respect: only substantially similar claims may be classified together. Yet, section 1122(a) is permissive in this respect: it does *not* provide that *all* similar claims must be placed in the same class.[30]

Although plan proponents have discretion to classify claims, they do not have complete freedom to place substantially similar claims in separate classes.[31] The classification of claims or interests must be reasonable and cannot be grouped together for arbitrary or fraudulent purposes. [32]

The Debtors' classification scheme is neither arbitrary nor fraudulent. It is reasonable for the Debtors to place claims related to significant, on-going litigation in a separate class. Moreover, the record does not support a finding that the classes were established with the intent to create an impaired accepting class. Even before the sureties changed their votes, there were three impaired classes that accepted the EPC Reorganizing Plan. With the sureties' resolution, there are currently four impaired classes accepting the Plan.

(2)    Best interests of creditors test

PGE argues that the Debtors have failed to prove that the Plans meet the best interests of creditors test under Bankruptcy Code § 1129(a)(7)(A) by demonstrating that each non-accepting creditor will receive at least as much under the Plan as it would receive in a chapter 7 liquidation. The Debtors provided a liquidation analysis for each group of Debtors attached as Exhibit C to

---

[30] *In re Tribune Co.*, 476 B.R. 843, 854-55 (Bankr. D. Del. 2012) *aff'd as modified* 2014 WL 2797042 (D. Del. June 18, 2014) *aff'd, in part, rev'd, in part*, 799 F.3d 272 (3d Cir. 2015) (citing *In re AOV Indus., Inc.*, 792 F.2d 1140, 1150 (D.C.Cir.1986); *In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1061 (3d Cir.1987) ("[W]e agree with the general view which permits the grouping of similar claims in different classes."); *In re Coram Healthcare Corp.*, 315 B.R. 321, 348 (Bankr. D. Del.2004) (the Code "does not expressly prohibit placing 'substantially similar' claims in separate classes.")).

[31] *Tribune*, 476 B.R. at 855 (citing *John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs. (In re Route 37 Bus. Park Assocs.)*, 987 F.2d 154, 158 (3d Cir. 1993).

[32] *In re W.R. Grace & Co.*, 475 B.R. 34, 110 (D. Del. 2012) (citing *Jersey City*, 817 F.2d at 1061; *Route 37*, 987 F.2d at 159).

the Disclosure Statement. With respect to the EPC Reorganizing Debtors, the liquidation analysis projects that unsecured creditors could expect a distribution of approximately only 1.0% of their claims in a chapter 7 liquidation, whereas the unsecured creditors are projected to receive a distribution of approximately 12.5% of their claims under the chapter 11 Plan.[33]

PGE asserts that the Debtors' liquidation analyses do not contain a meaningful discussion of intercompany claims and, therefore, do not present sufficient facts to determine whether the requirements of § 1129(a)(7)(A) are met. Further, PGE claims that Solar is 100% owned by Abengoa U.S. Operations, LLC (one of the EPC Reorganizing Debtors) and has a net worth of approximately $30 million that is not accounted for in the liquidation analysis.

The notes to the liquidation analysis for the EPC Reorganizing Debtors state that the chapter 7 analysis assumes a recovery on intercompany receivables and cash deposited in the Central Treasury to be between 0% and 3%. The chapter 11 analysis does not include any recovery on intercompany claims, but the chapter 11 analysis assumes a cash injection of $20 million that would not be available in a chapter 7 liquidation.[34]

The big difference in the liquidation analysis comes from the estimated amount of unsecured claims. The chapter 7 analysis includes estimated unsecured claims of $8,499,853,000; while the chapter 11 analysis estimates unsecured claims of $427,332,000. The notes explain that the chapter 7 analysis includes "intercompany liabilities and guarantees on multiple tranches of Parent company debt amounting to approx. $6.8 billion."[35] Certain EPC Reorganizing Debtors are guarantors on Notes issued by Abengoa, Abengoa Finance, S.A.U.,

---

[33] At the confirmation hearing, Debtors' counsel asserted that with the most recent increase in the New Value Contribution, projected recoveries for unsecured creditors are "somewhere around 15.9%." Tr. (12/6/2016) at 115.

[34] Runge Decl. ¶27.

[35] Disclosure Statement, Appendix C "Restructuring EPC - Liquidating Analysis," n. 7.

and Abengoa Greenfield, S.A.[36]  If the partial substantive consolidation as set forth in the Plan is not approved, then the intercompany claims will not be discharged and will have to be addressed along with all other claims against the applicable Debtor.[37]  The magnitude of the intercompany claims is significant and clearly affects the liquidation analysis.[38]

No evidence has been offered to rebut or cast any doubt on the chapter 7 liquidation analysis. The liquidation analysis shows that creditors of the EPC Reorganizing Debtors will receive more under the proposed Plan than in a chapter 7 liquidation.  The Debtors have satisfied the requirement of Bankruptcy Code § 1129(a)(7).

(3)      Feasibility

Bankruptcy Code § 1129(a)(11) requires the Court to determine that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." "Feasibility does not require that success be guaranteed but rather only a 'reasonable assurance of compliance with plan terms.'"[39]

In his Declaration, Runge testified that the EPC Reorganizing Plan is feasible because the distributions to creditors will be made from the EPC Reorganizing Distribution, which consists of the New Value Contribution from Abengoa, together with interests in existing assets and litigation claims.[40]  The distributions to creditors are not in any way dependent on the future operations of the EPC Reorganizing Debtors, which will continue on a smaller scale.

---

[36] Disclosure Statement, III.B.2.
[37] Felicetti Decl. ¶ 19.
[38] *Id.*
[39] *In re Tribune Co.,* 464 B.R. 126, 185 (Bankr. D. Del. 2011), *modified on recon.* 464 B.R. 208 (Bankr. D. Del. 2011) (citing *In re Washington Mutual, Inc.,* 2011 WL 4090757, *41 (Bankr. D. Del. Sept. 13, 2011).
[40] Runge Decl. ¶38.

PGE's feasibility objection, however, asserts that the Plan does not contain any protections to ensure that the funds designated for the prepetition creditors will not be subject to claims arising out of the EPC Reorganizing Debtors' post-confirmation operations or will not be used by the Debtors to fund their post-confirmation operations.

However, the EPC Reorganizing Plan establishes a Disputed Claim Reserve, managed by the Responsible Person, who retains an amount estimated as necessary to fund the pro rata share of distributions to Holders of Disputed Claims, if such claims are allowed.[41]  An unliquidated or contingent Disputed Claim will be reserved in an amount reasonably determined by the Responsible Person.[42]  Further, Star's Declaration states that the Committee's negotiations resulted in increased oversight and control over the Responsible Person.[43]  PGE argues that the Disputed Claim Reserve should hold the full face amount of the claim until an estimation proceeding can be held.  In my experience, that would be highly unusual.  Moreover, there is no basis in the record that would make such a requirement necessary.  I conclude that the provisions for a Disputed Claim Reserve set forth in the EPC Reorganizing Plan are reasonable and provide protection to the Holders of Disputed Claims.  The record before me supports the feasibility of the Plan.

(4)    Cram Down/Absolute Priority Rule

Bankruptcy Code § 1129(a)(8) requires that the Debtors' plan may be confirmed only if each class of claims that is impaired under the plan, accepts the plan.  The EPC Reorganizing Debtors Class 5 (Litigation Claims) is impaired and has not voted to accept the Plan.

---

[41] Runge Decl. ¶26.
[42] *Id.*
[43] Star Decl. ¶8.

14

However, the Bankruptcy Code allows a plan proponent to "cram down" the plan on non-accepting impaired classes under § 1129(b)(1), which provides that:

> [I]f all applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

To determine whether a plan is "fair and equitable" to the dissenting class of impaired unsecured creditors, Bankruptcy Code § 1129(b)(2) requires that the claims be paid in full or, in the alternative, the holder of any claim or interest that is junior to the claims of such [impaired unsecured] class will not receive or retain under the plan on account of such junior claim any property.[44] The latter condition is known as the "absolute priority rule."[45] Because the EPC Reorganizing Debtors' Plan provides that Holders of Allowed Equity Interests will retain or have their equity interests reinstated without paying unsecured creditors in full, the Plan violates the absolute priority rule of § 1129(b)(2)(B)(ii).

Some courts have recognized the "new value exception" or "new value corollary" to the absolute priority rule, which allows junior interests to receive property, not "on account of" their interests, but in exchange for some other value.[46] To invoke the new value exception to the absolute priority rule, the contribution must be (1) new, (2) substantial, (3) money or money's worth, (4) necessary for a successful reorganization, and (5) reasonably equivalent to the value or interest received.[47]

---

[44] 11 U.S.C. § 1129(b)(2)(B)(i) and (ii).

[45] *Bank of America Nat. Trust and Sav. Ass'n v. 203 North LaSalle Street P'ship,* 526 U.S. 434, 442, 119 S. Ct. 1411, 1416, 143 L. Ed. 2d 607 (1999); *In re G-I Holdings, Inc.,* 420 B.R. 216, 268 (Bankr. D. N.J. 2009).

[46] *G-I Holdings,* 420 B.R. at 269.

[47] *In re Brown,* 498 B.R. 486, 497 (Bankr. E.D .Pa. 2013) citing *Bonner Mall P'ship v. U.S. Bancorp Mtg. Co. (In re Bonner Mall P'ship),* 2 F.3d 899, 908 (9th Cir. 1993).

The Debtors argue that the Holders of Allowed Equity Interests are providing the New

Value Contribution in exchange for retaining or reinstating their Equity Interests.   As a result of

negotiations between the Debtors and the Creditors' Committee (which were protracted, arms-

length and, at times, contentious), the New Value Contribution has increased from $21.5 million

in the initial plan to $38 million.[48]   The Runge Declaration describes the New Value

Contribution:

> The Parent will contribute $23 million in Cash, with respect to the EPC
> Reorganizing Debtors, which funding stems from the financing that is anticipated
> to be provided by the New Money Financing Providers in connection with the
> MRA, which includes the following: (i) Cash to fund the EPC Reorganization
> Distribution in the amount of $20 million, (ii) the first $28 million of Litigation
> Trust Causes of Action, following an advance of $3 million to the Litigation Fund
> to prosecute such claims (*provided, however,* that the $3 million of recoveries
> resulting from the prosecution of the Litigation Trust Causes of Action will revert
> back to the parent at such time as the Litigation Trust has obtained a net recovery
> on the Litigation Trust Causes of Action of more than $28 million dollars
> ($28,000,000).)  In addition, the Parent is gifting proceeds of Solar (i) $6.5 million
> for a Surety Reserve to beneficiaries of Holders of Allowed Claims in EPC
> Reorganizing Debtors Class 6 (Debt Bonding Claims) and Solar Reorganizing
> Debtor Class 6 (Debt Bonding Claims); and (ii) an additional $4 million with
> respect to the EPC Reorganizing Debtors.  Additionally, the Parent will contribute
> $750,000 under each of the EPC Liquidating Plan and the Bioenergy and Maple
> Liquidating Plan, and shall gift from the proceeds of Solar an additional $1 million
> dollars for the EPC Liquidating Plan.[49]

PGE argues that the New Value Contribution is not "new," claiming that $30 million of

the funds used to pay the New Value Contribution come from Solar, which is 100% owned by

EPC Reorganizing Debtors.  Therefore, PGE argues, the funds already belong to the EPC

Reorganizing Debtors. This argument has no support in the record.  First, the record reflects that

Solar, which (as previously pointed out) is not an EPC Reorganizing Debtor, but is the subject of

a separate, stand-alone plan, is contributing only $11.5 million of new value.  Second, even if

---

[48] Star Decl. ¶¶ 10, 14.
[49] Runge Decl. ¶ 28.

this portion of the New Value Contribution were excised, the remaining portion of the contribution is sufficient to satisfy the exception.[50]

Mr. Runge's Declaration provides that the New Value Contribution represents approximately eight percent of the amount of Allowed General Unsecured Claims against the EPC Reorganizing Debtors.[51] It is essential to the successful reorganization of the EPC Reorganizing Debtors, as it is the only source of material cash consideration available to provide recoveries to creditors.[52] He further testified that the New Value Contribution exceeds any potential value of the Equity Interests, which likely have little or no economic value.[53] Mr. Runge further testified that:

> [M]y review of the books and records of the EPC Reorganizing Debtors and their operating histories leaves me with the impression that, without the New Value Contributions and going forward financial and operating support of the Abengoa Group, the EPC Reorganizing Debtors would have no value, and should be liquidated. As such, absent the New Value Contribution, the Equity Interests in the EPC Reorganizing Debtors have no or *de minimis* market value, because without remaining part of the Abengoa Group, the EPC Reorganizing Debtors' Estates would have little or no value and would be liquidated.[54]

The New Value Contribution must be viewed in the context of the Plan, including all four of the sub-plans, and the Spanish proceedings as a whole. Without it, the Plan cannot be confirmed and (as discussed in the Best Interests of Creditors Test of § 1129(a)(7)), liquidation of the EPC Reorganizing Debtors would result in less than 1% payment, especially when holders of the guaranty claims of approximately $6.8 billion would be entitled to share in the distribution to holders of unsecured claims.[55] No contrary evidence was offered by PGE.

---

[50] Runge Decl. ¶ 31.
[51] Runge Decl. ¶ 30.
[52] Runge Decl. ¶ 30.
[53] Runge Decl. ¶ 31.
[54] Runge Decl. ¶ 31.
[55] Star Decl. ¶ 6 ("Another key provision of the Initial Plan was the treatment of the MRA Affected Debt Claims of approximately $6.8 billion. These are claims held by entities that lent billions of dollars to

The record here supports a conclusion that the New Value Contribution meets the requirements for the new value exception; that is, it is new, substantial, money or money's worth, necessary for a successful reorganization and reasonably equivalent to the interest being retained.

(5)    Substantive Consolidation

Substantive consolidation "treats separate legal entities as if they were merged into a single survivor left with all the cumulative assets and liabilities (save for inter-entity liabilities, which are erased). The result is that claims of creditors against separate debtors morph to claims against the consolidated survivor."[56] Consolidation restructures (and thus revalues) rights of creditors, and for certain creditors this may result in significantly less recovery.[57]

Section 1123(a)(5)(C) of the Code provides that a plan shall "provide adequate means for the plan's implementation," which may include "merger or consolidation of the debtor with one or more persons." The Third Circuit has instructed:

> In our Court what must be proven (absent consent) concerning the entities for whom substantive consolidation is sought is that (i) prepetition they disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity, or (ii) postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors. Proponents of substantive consolidation have the burden of showing one or the other rationale for consolidation.[58]

---

Abengoa S.A., or its affiliates in Spain, receiving guarantees from a number of Debtors, including almost all of the members of the EPC Reorganizing Debtors. These guarantees were issued in connection with a series of obligations entered into over a period of time extending back to 2010. Under the MRA, and as carried through in the Initial Plan, the MRA Affected Debt Claims will receive replacement guarantees, but do not share in the distribution of existing assets, or of the new value contribution being provided. If any meaningful portion of the MRA Affected Debt Claims are allowed to share in the consideration being made available to satisfy claims of other creditors, the unsecured creditors would receive significantly lower recoveries.")

[56] *Genesis Health Ventures, Inc. v. Stapleton* (*In re Genesis Health Ventures, Inc.*), 402 F.3d 416, 423 (3d Cir. 2005).

[57] *In re Owens Corning*, 419 F.3d 195, 205 (3d Cir. 2005), *as amended* (Aug. 23, 2005), *as amended* (Sept. 2, 2005), *as amended* (Oct. 12, 2005), *as amended* (Nov. 1, 2007).

[58] *Owens Corning*, 419 F.3d at 211-12.

18

Less often discussed are the principles articulated by the *Owens Corning* Court which underlie the often-quoted holding. In summary, they are:

1.     Absent compelling circumstances, courts should respect corporate separateness.

2.     Substantive consolidation is a tool to remedy harms caused by debtors (and entities they control) who disregard separateness.

3.     Mere benefit alone to case administration is not a harm calling substantive consolidation into play.

4.     The "rough justice" occasioned by substantive consolidation should be avoided if more precise remedies are available.

5.     Substantive consolidation may be used to remedy identifiable harms; it may not be used to disadvantage tactically a group of creditors or to alter creditor rights.[59]

PGE argues that the Debtors cannot meet the Third Circuit's requirements to allow substantive consolidation because the Debtors conceded that they observed corporate formalities and separateness prepetition. PGE claims that it is not enough to argue that substantive consolidation is more convenient or practical for the Debtors.

The Debtors provided the Declaration of Sebastian Felicetti, the Treasurer of EPC Reorganizing Debtors Abeinsa EPC LLC and Teyma Construction USA, LLC, in support of the Plans' partial substantive consolidation with respect to EPC Debtors.[60] He testified that the partial consolidation structure of the Plan is the result of a lengthy and wide-ranging analysis of the Debtors' organizational, operational, and financial history.[61] This analysis revealed that many of the significant creditors conducted business (including extending credit) with certain

---

[59] *Id.*

[60] The Debtors also provided the Declaration of Jeffrey Bland in support of the partial substantive consolidation of the Bioenergy Debtors. PGE's attorney cross-examined Mr. Bland, but did not provide any basis to challenge the analysis in favor of partial substantive consolidation of the Bioenergy Debtors.

[61] Felicetti Decl. ¶11.

groups of Debtors as consolidated entities, while other creditors extended credit to a single entity.[62] However, the partial substantive consolidation was designed to give effect to the reasonable expectations of the Debtors' creditors when they engaged in business with various members of the groups.[63] Mr. Felicetti noted that the analysis relied upon the following:

(a)    Legal Ownership.    In order to ensure that the substantive consolidation structure under the Plan is consistent with the legal rights of third parties and is not materially inconsistent with the recoveries attainable under a Separate Entity Plan, the Plan's partial substantive consolidation structure respects the Debtors' prepetition ownership structure. Thus, the residual equity of each Debtor group inures to the benefit of the Debtor group that owned the Debtor group prior to the Petition Date.[64]

(b)    Third Party Expectations.    The partial substantive consolidation structure provided for under the Plan is also designed to respect the reasonable third party expectations of creditors and third parties. The Debtor identified three principal sets of expectations that they sought to preserve in the partial substantive consolidation structure; (a) the expectations of the lenders under the Debtors' credit agreements, (b) the expectations of purchasers of Notes, and (c) the expectations of creditors of those Debtors that are project companies. The composition of certain Debtor groups is motivated as well by adherence to the expectations of more than one set of creditors.[65]

(c)    Prepetition Guarantee Obligations.    The Debtors' prepetition credit agreements are each based on the credit of different sets of legal entities . . . . The lenders under these credit agreements received combined financial reports from the Debtors as to all obligors that were parties to the applicable credit agreements, and calculated financial covenant compliance based on the assets and liabilities of those entities. The restrictions imposed on the obligors by these credit facilities (e.g., restrictions on the ability to incur additional indebtedness, make certain payments, sell certain assets and grant certain security Equity Interests to third parties) indicate that the lenders under each of these facilities relied upon the collective identity of their respective borrowers and guarantors when extending credit.[66]

---

[62] *Id. See In re Lisanti Foods, Inc.,* No. CIV.A04-3868, 2006 WL 2927619, \*8 (D.N.J. Oct. 11, 2006) *aff'd* 241 F.App'x 1, 2 (3d Cir. 2007) (holding that substantive consolidation was appropriate under *Owens Corning* when "creditors did not render credit to each individual debtor, but rather as a combined entity."); *cf. Owens Corning,* 419 F.3d at 213 (holding that substantive consolidation was inappropriate when, *inter alia,* prepetition lenders relied on entity separateness).

[63] *Id.*

[64] Felicetti Decl. ¶ 12.

[65] Felicetti Decl. ¶ 13.

[66] Felicetti Decl. ¶ 14.

    (d)    <u>Consolidation Due to Operational Entanglement</u>.   Additional considerations support the Debtors' contention that certain Debtors are operationally entangled and present a level of integration that adds further support to the proposed partial consolidation structures.  For example, although the Debtors had individual management teams and professional resources, the Debtors' management teams ultimately report to a single entity - - the Parent (Abengoa).  Moreover, the AEPC Debtors, whose assets and operations comprise the bulk of the substantively consolidating EPC Reorganizing Debtors, while always under the ultimate control of Parent in Spain, in the U.S. were locally controlled out of the AEPC Debtors' offices in Phoenix, Arizona.[67]

    Additionally, with respect to certain Debtor groups, certain of the Debtors operated under very similar names and certain of the Debtors were formed as general partnerships under which the general partners are jointly and severally liable for certain obligations.  Such prepetition operational entanglements would also impede the formulation of Separate Entity Plans, and further justify the proposed partial consolidation structure provided for under the Plan.[68]

The proposed partial substantive consolidation of the EPC Reorganizing Debtors is supported by the *Owens Corning* principles.  The record reflects that no more precise remedy is available.  Neither is there any evidence that the Debtors are employing substantive consolidation to disadvantage a group of creditors (including EPC Reorganizing Class 5 (Litigation Claims)) or alter their rights, in particular, those of PGE, which did not demonstrate that it was "adversely affected and actually relied on [the Debtors'] separate existence."[69]  I agree with the Debtors that individual plans are not a viable option, in part, because otherwise there would be no $23 million New Value Consideration provided by the Parent (via the New Money Financing Providers) under the global financial restructuring.[70]  This is a harm (*i.e.,* possible liquidation with reduced distributions to creditors) avoided by the proposed partial substantive consolidation.

---

[67] Felicetti Decl. ¶ 15.
[68] Felicetti Decl. ¶ 16.
[69] *Owens Corning*, 419 F.3d at 211.
[70] Felicetti Decl. ¶¶ 6, 10.

The partial substantive consolidation in the Plans is not an imprecise lumping of assets and creditors together, but the result of careful analysis of ownership, operational entanglements, and creditor expectations based on their pre-petition dealings with the Debtor groups. Attempting to determine each separate entity's fair share of material liability against debtor groups would be a "difficult, fact-intensive process that would be subject to challenge, and likely cost more than the distributions that could be made to creditors under a Separate Entity Plan."[71] Every class of creditors entitled to vote on the Plans accepted the terms, except EPC Reorganizing Class 5 (Litigation Claims), which is dominated by PGE. Accordingly, the creditors overwhelmingly consent to the partial substantive consolidation of the Debtor groups. PGE has provided no rebuttal to the Debtors' evidence showing that the partial substantive consolidation is unfair. PGE argues only that the Debtors' evidence is not sufficient. The Debtors' evidence is sufficient to meet their burden. Most parties consented to the partial substantive consolidation, and there is nothing in the record demonstrating that the partial substantive consolidation particularly harms any creditor or other stakeholder.

B.    U.S. Trustee Objections

The U.S. Trustee objects to the releases in the Plan, arguing that the releases are too broad, and the Debtors provided no evidentiary support for them. There are two types of releases at issue: (i) the Debtors' release of claims against a litany of related companies, the Creditors' Committee, and specific entities involved with (and defined in) the MRA, along with all of their "Representatives" and "Professionals" (the "Debtors' Releases"); and (ii) the creditors' release

---

[71] Felicetti Decl. ¶ 8. "Mere" ease of administration alone is insufficient to support substantive consolidation (*Owens Corning*, 419 F.3d at 211), but the potentially overwhelming cost and delay of the exercise of allocating liability here is meaningful and relevant.

of claims against a similar litany of the Debtors, Debtor-related companies, the Creditors'
Committee, and specific entities involved with (and defined in) the MRA.

(1)    The Debtors' Releases

Section 1123(b)(3)(A) of the Bankruptcy Code provides that a plan may provide for "the
settlement or adjustment of any claim or interest belonging to the debtor or to the estate."
A debtor may release claims under § 1123(b)(3)(A) if the release is a valid exercise of the
debtor's business judgment, is fair, reasonable and in the best interests of the estate.[72]

"Determining the fairness of a plan which includes the release of non-debtors requires the
consideration of numerous factors and the conclusion is often dictated by the specific facts of the
case."[73]  When deciding whether a plan may include a debtor's release of non-debtor third
parties, notwithstanding section Bankruptcy Code § 524(e),[74] bankruptcy courts in this district
have considered the following factors:

(1)    the identity of interest between the debtor and the third party, such that a
suit against the non-debtor is, in essence, a suit against the debtor or will
deplete assets of the estate;

(2)    substantial contribution by the non-debtor of assets to the reorganization;

(3)    the essential nature of the injunction to the reorganization to the extent that,
without the injunction, there is little likelihood of success;

(4)    an agreement by a substantial majority of creditors to support the injunction,
specifically if the impacted class or classes "overwhelmingly" votes to
accept the plan; and

---

[72] *In re Spansion*, 426 B.R. 114, 143 (Bankr. D. Del. 2010) (citing *In re DBSD North America, Inc.,* 419
B.R. 179, 217 (Bankr. S.D.N.Y. 2009), *aff'd* 2010 WL 1223109 (S.D.N.Y. March 24, 2010), *rev'd in part
on other grounds* 627 F.3d 496 (2d Cir. 2010).
[73] *In re Washington Mutual, Inc.,* 442 B.R. 314, 345 (Bankr. D. Del. 2011) (citing *Gillman v. Continental
Airlines (In re Continental Airlines),* 203 F.3d 203, 212-14 (3d Cir. 2000).
[74] 11 U.S.C. §524(e) provides in pertinent part that: "discharge of a debt of the debtor does not affect the
liability of any other entity on, or the property of any other entity for, such debt."

(5)      provision in the plan for payment of all or substantially all of the claims of the class or classes affected by the injunction.[75]

These factors are neither exclusive nor conjunctive requirements, but simply provide guidance in the Court's determination of fairness.[76]

The Debtors' releases at issue provide that the "Releasing Parties" include the "Debtors, the Estates, the Parent and each of the Debtors', Estates', and Parent's current and former affiliates and Representatives."[77] The "Released Parties" include:

(a)      The Debtors and their Representatives,

(b)      The Parent and its Representatives,

(c)      each of (i) the Note Agents,

     (ii)      the Creditors' Committee,

     (iii)     each of the Creditors' Committee's members (solely in their capacity as members),

     (iv)     the Restructuring Committee,

     (v)      the NM1 Committee,

     (vi)     each of the Consenting Existing Creditors,

     (vii)    each of the New Money Financing Providers,

     (viii)   each of the Consenting Other Creditors, and

     (ix)     with respect to each of the foregoing Entities or Persons in clause (c), their respective Representatives, professionals, affiliates, subsidiaries, principals, partners, limited partners, general partners, shareholders, members, managers, management companies,

---

[75] *Washington Mutual*, 442 B.R. at 346 (citing In re *Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999). *See also Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 937 (Bankr. W.D. Mo. 1994). These factors are sometimes referred to as the *Master Mortgage* standards. *See, e.g., Washington Mutual*, 442 B.R. at 347.

[76] *Washington Mut.*, 442 B.R. at 346.

[77] Plan, Art. IX.B.1.

investment managers, managed funds, as applicable, together with their successors and assigns.[78]

Moreover, the term "Representatives" is broadly defined in the Plan to mean "any current or former officers, directors, employees, attorneys, advisors, other Professionals, accountants, investment bankers, financial advisors, consultants, agents and other representatives (including their respective officers, directors, employees, independent contractors, members and professionals).[79]

The Releasing Parties are releasing all claims based upon acts or omissions existing or taking place prior to or on the Effective Date of the Plan, arising from or related in any way to the Debtor, including those related to the Chapter 11 Cases, the Plan, the Debtors' restructuring, the MRA and Disclosure Statement.[80]

The U.S. Trustee argues that the defined terms are so broad that parties who are related to the parties granting releases (for example, agents or shareholders of the Releasing Parties), may be granting releases of all of the Representatives of Released Parties without any notice of who they are releasing or what they are giving up. The U.S. Trustee also asserts that the Debtors have not met their burden of proving that the Debtors' Releases comply with factors cited above.

In support of the Releases, the Debtors offer Mr. Runge's Declaration, which provides that:

> The Debtors believe these [Release] provisions are appropriate because, among other things they are the product of extensive good faith and arm's length negotiation, are in exchange for good, valuable, and reasonably equivalent consideration, and are supports by the Debtors and other various parties in interest. . . .[81]

---

[78] Plan, Art. I.A.123.
[79] Plan, Art. I.A.128.
[80] The foregoing sentence is a *brief* summary of the extensive terms of the Debtors' Release and not meant in any way to limit the effect of the Release.
[81] Runge Decl. ¶ 56.

The Debtors believe that each of the Released Parties played an important and active role in negotiating and formulating the Plan, has significantly contributed to the Plan and these Chapter 11 Cases, and the cooperation of each party is necessary to implement the provisions of the Plan. The Debtors believe that without the protection from liability, key constituents would have been unwilling to cooperate in connection with the formulation and distribution of the Plan, including, without limitation, the New Value Contribution.[82]

I have personal knowledge of the fact that the Plan is the result of extensive negotiations among the Debtors and various Released Parties. Based on my involvement in these negotiations, the Debtors' cases, and the global restructuring, I believe that there is an identity of interest between the Debtors and the Released Parties arising out the shared common goal of confirming and implementing the Plan.[83]

The Debtors believe that the Released Parties all made important contributions to these Chapter 11 Cases. The Debtors believe the Released Parties' contributions and material concessions have allowed these Chapter 11 Cases to move expeditiously towards confirmation. The Debtors believe that without these releases exculpation and injunctions, the Released Parties would not have been willing to contribute to the Plan process. The Debtors believe that the Plan presents the only opportunity for a recovery by creditors of the Liquidating Debtors and the best possible chance for an enhanced recovery for the creditors of the Reorganizing Debtors.[84]

I agree that reach of the Debtors' Releases is quite broad. I also agree with the U.S. Trustee that, except with respect to the Parent and New Money Financing Providers, the actual contribution of each Released Party in exchange for the Debtors' Release is imprecise. However, there is no doubt that the Plan before me is part of the overall global restructuring of the Abengoa Group. In reviewing whether this Plan meets the confirmation requirements, the U.S. Bankruptcy Code requires that my focus be directed to whether the Plan proposed here meets the § 1129 confirmation standards. But it is both relevant and consequential that confirmation of the Plan is a material component, and a condition, of the global restructuring of the Spanish companies. The evidence likewise demonstrates that the global restructuring is

---

[82] Runge Decl. ¶ 57.
[83] Runge Decl. ¶ 58.
[84] Runge Decl. ¶¶ 59 - 61.

essential to the Plan.  Based on the Liquidation Analysis, there would be little to no recovery for unsecured creditors without the parties' agreement to fund the New Value Contribution, and the agreement by holders of guaranty claims *not* to share in the Plan distribution.   I can conclude confidently from the accumulation of evidence in the record that the Plan and the Releases are the result of extensive negotiations and arm's length bargaining.

Another key consideration to approval of the Debtors' Release is the support of the Creditors' Committee, because that entity has the greatest incentive to limit the Debtors' Release to preserve any potential claims. Also, the classes entitled to vote on the Plan overwhelmingly voted to accept it.  No creditors have objected to the broad Debtors' Release.

Based on these specific facts and for this specific Plan, I conclude that the Debtors' Release is a valid exercise of the Debtors' business judgment and, based upon the agreement of the Committee and overwhelming support of creditors, I conclude that the Release is fair, reasonable and in the best interests of the estate.

(2)    The Third-Party Release

The U.S. Trustee argues that there are three methods typically used to effect third party releases:

1.    A creditor is deemed to grant releases to third parties when it votes in favor of a plan, although the U.S. Trustee would still prefer that such a creditor be able to "opt-out" of the releases.

2.    A creditor is deemed to grant releases to third parties when it votes "no" on its ballot, but fails to check the "opt-out" box.

3.      A creditor is deemed to grant releases to third parties when it is entitled to

vote, but fails to do so (and also fails to check the "opt-out" box), or when

it is considered unimpaired and does not vote.[85]

Here, the Plan falls under the first scenario. It provides that each Person who votes to

accept the Plan is deemed to completely release the Released Parties (as defined in the Plan and

discussed above) from claims existing before the Effective Date, related to the Debtors, the

Chapter 11 Cases, the Plan, the Debtors' restructuring, and the MRA - - *unless* the Person marks

the ballot to indicate their refusal to grant the release.[86] Courts in this jurisdiction have upheld

plan provisions that provide for third-party non-debtors to release other non-debtors upon the

consent of the party affected.[87] Consent to a third-party release is generally determined by

voting to accept the plan.[88]

The third-party release in Article IX.B.2. of the Plan only applies to persons who vote to

accept the Plan. The ballot also allows a person voting to accept the Plan to "opt out" of the

third-party release. Of the 390 ballots submitted, 191 creditors voted to opt out of the third-party

release, indicating that creditors understood the instructions. The third-party release in this Plan

is designed to apply only to parties who affirmatively consent and, thus, is fair and equitable.

---

[85] Tr. (12/6/2016) at 108-09.

[86] The foregoing sentence is a *brief* summary of the extensive terms of the Third-Party Release and not meant in any way to limit the effect of the Release.

[87] *In re Indianapolis Downs, LLC*, 486 B.R. 286, 305-06 (Bankr. D. Del. 2013).

[88] "Courts have determined that a third party release may be included in a plan if the release is consensual and binds only those creditors voting in favor of the plan." *In re Spansion, Inc.*, 426 B.R. 114, 144 (Bankr. D. Del. 2010) (citing *In re Specialty Equip. Cos., Inc.*, 3 F.3d 1043, 1047 (7th Cir. 1993)).

## Conclusion

Accordingly, I conclude that the Plan meets the requirements for confirmation and the objections filed by PGE and the U.S. Trustee are overruled. The parties are directed to confer and to submit an order confirming the Plan, under certification, consistent with this Opinion.


BY THE COURT:


KEVIN J. CAREY
UNITED STATES BANKRUPTCY COURT

DATED:  December 14, 2016