## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Abeinsa Holding, Inc., *et al.*,[1] | Case No. 16-10790 (LSS) |
|      Reorganizing and Liquidating Debtors. | (Jointly Administered) |
| | **Obj. Deadline:  February 12, 2020 at 4:00 p.m. (ET)** |
| | **Hearing Date: February 19, 2020 at 10:00 a.m. (ET)** |

### MOTION OF THE RESPONSIBLE PERSON FOR AUTHORITY TO MAKE
### FIRST INTERIM DISTRIBUTION UNDER EPC REORGANIZING DEBTORS' PLAN

> ***THE EXHIBITS TO THIS MOTION SET OUT CLAIMS SCHEDULED OR FILED AGAINST THE EPC REORGANIZING DEBTORS.  CREDITORS ARE ENCOURAGED TO REVIEW THE EXHIBITS THAT PROPOSE AMOUNTS TO BE PAID TO ALLOWED CREDITORS IN ACCORDANCE WITH A CONFIRMED PLAN.  ANY CREDITOR THAT BELIEVES ITS PROPOSED TREATMENT IS INACCURATE IS ENCOURAGED TO CONTACT UNDERSIGNED COUNSEL OR SUBMIT AN OBJECTION BY THE OBJECTION DEADLINE.***

Jeffrey Bland, in his dual capacities as Responsible Person (the "**Responsible Person**") and Disbursing Agent ("**Disbursing Agent**"), under *Debtors Modified First Amended Plans of Reorganization and Liquidation* [D.I. 1033] (the "**Plan**"),[2] by and through his undersigned counsel, DLA Piper LLP (US), submits this Motion to the Court for entry of an order that authorizes the Responsible Person to make an interim distribution to the EPC Reorganizing

---

[1]     The Reorganized Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Abeinsa Holding Inc. (9489) and Abengoa Solar, LLC (6696).  The Liquidating Debtors in these chapter 11 cases, together with the last four digits of each Liquidating Debtor's federal tax identification number, are as follows: Inabensa USA, LLC (2747); and Abengoa Bioenergy Holdco, Inc. (8864).

[2]     Undefined, capitalized terms in this Motion have the meaning given to them in the Plan.  A copy of the Plan and Confirmation Order are attached hereto as **Exhibit A**.

Debtors'[3] creditors.  The Responsible Person respectfully submits the following in support of this Motion:

## JURISDICTION AND VENUE

1.    This Court has jurisdiction over this contested matter under 28 U.S.C. § 1334. The Plan has specific retention of jurisdiction provisions to address the issues raised in this motion – namely, the Plan provides that the Court retained jurisdiction, relevant here, (i) to ensure that Distributions to Holders of Allowed Claims are accomplished under the provisions of the Plan; and (ii) to enter such order as may be necessary or appropriate to implement or consummate the Plan.  *See* Plan, Art. X.4 & 6.

2.    This contested matter is a core proceeding under 28 U.S.C. § 157.  *See generally* 11 U.S.C. §§ 157(b)(2)(A) & 157(b)(2)(O).  The Responsible Person consents to this Court's entry of a final order with respect to this Motion irrespective of whether or not the matter is determined to be a core matter.  Venue is also proper with respect to this contested matter in this district under 28 U.S.C. § 1409.

## FACTUAL BACKGROUND[4]

### A.    These Delaware Cases in the Context of Abengoa S.A.'s Global Restructuring.

3.    On November 25, 2015, Abengoa, S.A. ("**Abengoa**" or the "**company**"), a global company that builds large green energy projects like solar power and bioenergy plants, filed a

---

[3]    Under the Plan, the EPC Reorganizing Debtors are: Abener Teyma Mojave General Partnership; Abener North American Construction, LP; Abeinsa Abener Teyma General Partnership; Teyma Construction USA, LLC; Teyma USA & Abener Engineering and Construction Services General Partnership; Abeinsa EPC LLC; Abeinsa Holding, Inc.; Abener Teyma Hugoton General Partnership; Abener Bioenergy New Technologies, LLC; Abener Construction Services, LLC; Abengoa US holding, LLC; Abengoa US, LLC; and Abengoa US Operations, LLC (now known legally as Abengoa North America, LLC).

[4]    This factual background is intended as a summary to set the context in which the Responsible Person, as Disbursing Agent, is proposing the Interim Distribution, as defined herein.  For the Debtors' history, their affiliation with Abengoa, the pre-petition operations and capital structure, and the various aspects of this case please refer to the *Debtors' Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code* [D.I. 748] ("**Disclosure Statement**").

notice of its intent to restructure under a then-newly enacted Spanish insolvency law.  This started a multi-year process of Abengoa reshaping its businesses and capital structure.  At the time of the filing, Abengoa's businesses were aligned by division, with focuses on solar energy, bioenergy, water, and engineering, procurement, and construction ("**EPC**").  The company had global operations and its decision to pursue a pre-insolvency workout in Spain had ripple effects around the globe, leading to a number of insolvency proceedings throughout the world, including in Peru, Mexico, and the United States, where creditors commenced involuntary cases against the bioenergy group of companies, leading to separate chapter 11 cases in St. Louis, Missouri and Wichita, Kansas (both of which resulted in confirmed plans of liquidation).[5]

4.       While not all of Abengoa's US companies filed bankruptcy most of the Solar and EPC companies and a second generation of bioenergy companies did file cases as the various Debtors here in Delaware, with the voluntary bankruptcy cases filed between March 29, 2016 and June 12, 2016.  Abengoa also filed a chapter 15 case in this district around the same time as coordination within the corporate group was an important part of the process.[6]  Ultimately, Abengoa was the proponent of the Plan, making a multi-million dollar new value contribution that enabled the Plan to be confirmed and allowed for portions of the Debtors' businesses to be restructured and emerge from chapter 11.  Other parts of Abengoa's businesses were liquidated as no longer necessary to Abengoa's businesses or not material to the revised capital structure, resulting in liquidation plan for some of the Debtors in these cases.

---

[5]      *See In re Abengoa Bioenergy US Holding, LLC*, Case No. 16-41161-659; pending in the United States Bankruptcy Court for the Eastern District of Missouri (Eastern Division) and *In re Abengoa Bioenergy Biomass of Kansas, LLC*, Case No. 16-10446; pending in the United States Bankruptcy Court for the District of Kansas.

[6]      *See In re Abengoa S.A.,* Case No. 16-10754 (LSS); which was filed in this district but has since been closed.

**B.      The Claim and Plan Voting Process in Delaware**.

5.      As part of these cases, there was an effort to coordinate the timing and processes of the various Abengoa proceedings.   Indeed, as part of its chapter 15 case, Abengoa first obtained recognition of a standstill agreement to ensure the agreements of various financial obligations, like bank and bond debt with a so-called "debt perimeter," abided by that standstill agreement within the United States.   The Debtors then moved for a deadline for creditors to file proofs of claims in these cases and the Court entered an order setting September 26, 2016 as a general bar date (and set November 7, 2016 as the governmental unit bar date) and establishing October 17, 2016 as an administrative claims bar date (the Confirmation Order later provided a further date for claims that arose between this date and the effective date of the Plan).   *See Order Establishing Deadlines and Procedures for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof* [D.I. 443] (the "**Bar Date Order**").   There were thousands of claims filed against the many Debtor estates in these cases.   Many creditors filed similar claims against a number of separate debtors.   Like many orders establishing deadlines for Proofs of Claims, persons or entities whose claims were on the Debtors' Schedule F and not described as disputed, contingent, or unliquidated, were not obligated to file a claim.   *Id*. at 4.   For those scheduled creditors that did file a proof of claim, that claim supersedes the amounts on the schedules.   *See* Bankruptcy Rule 3003(c)(4).

6.      The EPC Reorganizing Debtors then proposed that this Court authorize the Debtors that would become the EPC Reorganizing Debtors authority to enter into the Master Restructuring Agreement proposed by Abengoa in the Spanish Proceedings so that those US Debtors could, among other things, provide various guarantees thereunder.[7]   The Master

---

[7]      *See Order Approving Debtors' Motion for Authority to Enter Into Master Restructuring Agreement and Related Power of Attorney* [D.I. 679].

Restructuring Agreement, which was an agreement among various companies affiliated with Abengoa and its creditors for resolution of their debt claims, provided that Abengoa would reorganize and that reorganization would include certain "Go Forward Chapter 11 Companies," which would have their debts restructured under the proposed chapter 11 Plan subject to the rules and regulations governing US chapter 11 proceedings. *See* Disclosure Statement at 28. The Disclosure Statement also advised Creditors that their claims against those Go-Forward Companies would be implemented by the Plan. *Id*. at 30 ("Regarding the United States, the Master Restructuring Agreement provides in sub-clause 7.1.1(a) that with respect to the Go Forward Chapter 11 Companies, the relevant terms of the Master Restructuring Agreement, including applying the Standard Restructuring Terms to all Non-Consenting Creditors with respect to their Non-Spanish Debt to be restructured, ***will be implemented pursuant to the Plan***.") (emphasis added). The Plan contained an appropriate implementation provision in Article IV.A:

> The Plan is sponsored by the Parent and is part of an integrated global restructuring (the "Global Restructuring") in which the Parent has negotiated with certain Holders of Affected Debt and Non-Spanish Debt to be Restructured and others for the compromise of their claims in exchange for the treatment provided to them and others under the Master Restructuring Agreement, namely, either the Standard Restructuring Terms, which is the treatment afforded to the Holders of MRA Affected Debt Claims and Holders of Intercompany Claims by Non-Debtor Affiliates under this Plan, or the Alternative Restructuring Terms, which the Existing Creditors may elect outside of and in addition to the provisions of this Plan. As a matter of private contract law, Existing Creditors may accede to the Master Restructuring Agreement and elect the Alternative Restructuring Terms or the Standard Restructuring Terms. This Plan has not proposed and does not provide the Alternative Restructuring Terms; rather, as a means of implementing the Global Restructuring, the Go Forward Chapter 11 Companies will provide the Replacement Guarantees.

7.     The Plan thus proposed that Creditors of the EPC Reorganizing Debtors' Plan defined as "MRA Affected Debt Claims" could elect defined "Alternative Restructuring Terms"

under the Master Restructuring Agreement and receive a combination of debt and equity in exchange for those MRA Affected Debt Claims, which debt would be guaranteed by the EPC Reorganizing Debtors, or those Holders could opt out of that treatment and instead elect to receive the described "Standard Restructuring Terms," which in general terms, resulted in their MRA Affected Debt Claims being written down to three percent of their face amount to be paid in ten years without interest. The Disclosure Statement described all of this in detail and even identified those creditors that filed claims in these cases that were listed as creditors under the Master Restructuring Agreement. *Id.* at 29.[8] Indeed, as a result of this approach, the Debtors engaged with several creditors regarding their right to elect to accede to the Master Restructuring Agreement and whether as a result they would have an Allowed Claim against the EPC Reorganizing Debtors. This led to a variety of negotiated outcomes, all approved in the Confirmation Order. *See, e.g.,* Confirmation Order at 36-37 (providing creditor Liberty/Zurich with a $200 million claim under the Master Restructuring Agreement and that Liberty/Zurich would accede to the MRA with respect to that claim and granting Liberty/Zurich claims against the EPC Reorganizing Debtors but also giving RLI an allowed claim against the EPC Reorganizing Debtors and reserving creditor RLI's rights not to accede to the Master Restructuring Agreement so it could challenge the Master Restructuring Agreement in Spain).

8.     The Debtors then proposed voting on the Plan according to the classes into which each claim would be classified, with creditors voting under the EPC Plan in Class 3 if they held an MRA Affected Debt Claim or a US Debt Claim (the "**MRA Voting Classes**") and creditors

---

[8] This section of the Disclosure Statement identifying those Creditors by name that were subject to Master Restructuring Agreement, most of whom have been included in Class 3A for purposes of the proposed distribution. Those specific creditors provided on page 29 of the Disclosure Statement are: Liberty Mutual Insurance Company, Zurich American Insurance Company, Banco Finantia, S.A., Bank of America, N.A., HSBC Bank Plc, Spain Branch, Royal Bank of Scotland, Nationwide Mutual Insurance Company, RLI Insurance Company, Societe Generale, Sucursal en Espana, Caixa Bank, and Banco Popular España.

voting in Class 4 or 5 if they held a General Unsecured Claim or a Litigation Claim.  There was also a Class 6 for Debt Bonding Claims, which consisted of companies that had provided surety bonds to many of the Debtors.  These claims in Class 6 were allocated a special fund to be distributed to them based on various conditions and which amounts have now been distributed to satisfy Class 6.

9.    Regarding the MRA Voting Classes, the Debtors' solicitation agent, coordinated the distribution of solicitation materials to noteholders based on common procedures for serving public debt securities, which included providing court approved master ballots to brokers within the securities trading industry who then collected votes from the beneficial owners.[9]  The Debtors' solicitation agent received thirteen master ballots that reflected votes on account of public securities in excess of $3.6 billion but those master ballots do not reveal the identity of the voting creditor, but only the security held by the brokers on account of which the vote was cast.

10.    Ultimately, the voting on the Plan reflected that the creditors had accepted it and the Court found, after an evidentiary hearing at which objections were presented, that the Plan satisfied the requirements of the Bankruptcy Code.  *See In re Abeinsa Holding, Inc.*, 562 B.R. 265 (Bankr. D. Del. 2016).  The Court entered an *Order Confirming Debtors' Modified First Amended Plans of Reorganization and Liquidation* [D.I. 1042] on December 15, 2016.  During this time and continuing post-confirmation, Lucid Issuer Services Limited, which was acting as tabulation agent under the Master Restructuring Agreement, certified to Abengoa that €4,016,400,790 in aggregate amount of Notes representing 96.34% of then outstanding Notes had acceded to the Master Restructuring Agreement.

---

[9]    *See Supplemental Declaration of Christina Pullo of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Case on the debtors Modified First Amended Plans of Reorganization and Liquidation* [D.I. 981] at ¶ 6.

### C.    The Delaware Plans Restructure Abengoa's US Businesses.

11.    The Plan acted as a motion for substantive consolidation with respect to the EPC Reorganizing Debtors.  *See* Plan, Art. IV.HH.  As stated by the Court in its Memorandum Opinion confirming the Plan, one consequence of substantive consolidation is that "claims of creditors against separate debtors morph to claims against the consolidated survivor."  *In re Abeinsa Holding, Inc.*, 562 B.R. at 279.  This substantive consolidation was based on "a careful analysis of ownership, operational entanglements, and creditor expectations based on their pre-petition dealings with the Debtors' groups."  *Id*. at 281.  The Plan thus consolidated all the estates into the liquidation of two groups of Debtors and for the reorganization of two other groups of Debtors.  As of the Effective Date, the Debtors' cases were substantively consolidated for all purposes under the following cases: (i) Abeinsa Holding Inc., for the EPC Reorganizing Debtors, (ii) Abengoa Solar, LLC, for the Solar Reorganizing Debtor, (iii) Inabensa USA, LLC, for the EPC Liquidating Debtors, and (iv) Abengoa Bioenergy Holdco, Inc. for the Bioenergy and Maple Liquidating Debtors.  Relevant here, the EPC Reorganizing Debtors is the group of Debtors on whose behalf the Responsible Person moves to obtain certain classification and treatment of each proof of claim filed in these cases so that the EPC Reorganizing Debtors can make an initial distribution to Creditors as it has been almost three years since the Effective Date.  This Motion seeks no relief with respect to the Solar Reorganizing Debtors, which is also administered by the Responsible Person and for which most distributions have already been made.  The Motion also seeks no relief with respect to the EPC Liquidating Debtors or the Bioenergy and Maple Liquidating Debtors, which are administered by Drivetrain, LLC, as a liquidation trustee under separate trust agreements.  Drivetrain, LLC, is also the Litigation

Trustee (the "**Litigation Trustee**") under a Litigation Trust Agreement between the EPC Reorganizing Debtors and the Litigation Trustee, dated as of the Effective Date.

12.     Under the Plan, all of the assets of the EPC Reorganizing Debtors' Estates vested in the EPC Reorganizing Debtors, excepting only specified limited causes of action that vested in the Litigation Trust.  Plan, Art. IV.L.  The Plan delegated the limited role of administering these Litigation Trust Causes of Action and the proofs of claims associated with them (defined in the Plan as "Retained Claims") to the Litigation Trustee.[10]  Administration of all other proofs of claims related to the EPC Reorganizing Debtors was placed within the purview of the Responsible Person.  *Id.*, Art. IV.R.1(vi) ("in the Responsible Person's reasonable business judgment, to reconcile and object to Claims . . . and manage, control, prosecute and/or settle on behalf of the Estates objections to claims . . ..").

13.     Accordingly, as of the Effective Date, each EPC Reorganizing Debtors retained their assets and each was authorized to "operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Equity Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules."  *Id.*  The Plan then provides that the Responsible Person would represent the EPC Reorganizing Debtors.  *Id.*, Art. IV.B.  The Plan also granted the Responsible Person the power to act on behalf of the EPC Reorganized Debtors without supervision of the Bankruptcy Court because "[t]he Plan further provides that the EPC Reorganized Debtors shall have unlimited rights, powers, and duties, among other things, in the Responsible Person's ***reasonable business judgment,*** to investigate, prosecute, settle, liquidate, dispose of, or abandon

---

[10]     A list of the Litigation Trust Causes of Action were provided as a Schedule 1 to the Litigation Trust Agreement, filed as Exhibit A-1 to *Notice of Filing of Trust Agreements* [D.I. 1254].

the Reorganized Debtor's assets."[11]   Included within the Responsible Person's power are the right to distribute the Reorganizing Debtors' assets as Disbursing Agent.  *Id.*, Art. IV.R(ii), (vi) & (VIII); *id.*, Art. IV.F.1.

14.    The Plan provides that the costs and expenses of the Responsible Person shall be paid from the applicable Reorganizing Debtors.  *Id.*, Art. IV.W.  The Responsible Person is also entitled to be paid reasonable compensation and reimbursement of expenses for performing of its duties after the Effective Date.  *Id.*, Art. IV.R.2.  The Plan also provided that the EPC Reorganizing Debtors shall establish and fund a reserve of $3,850,000 from Cash on hand at the EPC Reorganizing Debtors to fund the fees and costs anticipated to be incurred following Confirmation Date through the completion of the Responsible Person's duties under the Plan, which may be increased, as necessary, by the Responsible Person after the Effective Date.  *Id.*, Art. IV.F.5.  To do so, the Responsible Person is entitled to request Controlled Funds to fund his duties under the Plan in accordance with the procedures for requesting Controlled Funds set forth in the Plan.  *See id.* Art. IV.F.3.  The Plan and the Litigation Trust Agreement also provided $7 million to fund the Litigation Trust's pursuit of the Litigation Trust Causes of Action, consisting of $3 million from Abengoa and $4 million from the EPC Reorganizing Distribution.  *See id.*, Art. IV.D; *See also* Litigation Trust Agreement, § 1.4.

15.    The EPC Reorganizing Distribution and all proceeds therefrom must be delivered to the Litigation Trustee.  *Id.*, Art. IV.F.3.  These funds are denominated as Controlled Funds under the Plan.  *Id.*  In order for the Responsible Person to obtain those Controlled Funds for Distribution, the Plan requires that the Responsible Person, acting as the Disbursing Agent, make a request to the Litigation Trustee for the transfer of Controlled Funds to the Disbursing Agent.

---

[11]    *See* Memorandum Order [D.I. 1975] at 3 (holding that the Responsible Person's reasonable business judgment need not be explained because the Plan does not require it and the Plan must be enforced as written).

*Id*.  The Plan provides that Distributions to Holders of Claims shall be made as provided in the Plan section on classification and treatment of claims (Articles II and III) not later than the first full quarter ended after the Effective Date and quarterly thereafter, unless the Responsible Person determines in the exercise of his reasonable discretion that there are not sufficient available proceeds to fund a Distribution.  *Id*. Art. V.B.  To date, the Responsible Person has not made any distributions as the Claim amounts were such that distribution of the available assets would have resulted in a *de minimus* distribution.  The Responsible Person, however, has now resolved a substantial volume of Claims against the EPC Reorganizing Debtors through eighteen different Omnibus Objections.  As a result, an interim distribution would now be more significant and thus justifies undertaking the process to seek approval of a distribution from the Court by this Motion.

16.     Article V of the Plan provides detailed procedures for Distributions, including that the Responsible Person, as Disbursing Agent, will make all Distributions.  *Id*., Art. V.C.  The Plan provides that the Responsible Person should retain on account of Disputed Claims "an amount the Responsible Person reasonably estimates is necessary to fund the Pro Rata share of such Distributions to holders of Disputed Claims if such Disputed Claims were Allowed . . . with any Disputed Claims that are unliquidated or contingent being reserved in an amount reasonably determined by the Responsible Person."  *Id*., Art. VI.A(a).

17.     In making Distributions, the Responsible Person is empowered to take all necessary actions to make the Distributions as may be necessary and proper or as may be approved by this Court.  *Id*., Art. VI.C.  The Plan provides in Article VI.A(c) as follows regarding the funds deposited into the Disputed Claims Reserve:

> If any Disputed Claim is disallowed or Allowed in an amount that is lower than the aggregate assets retained in Disputed Claims Reserve on account of

such Disputed Claim, then within fifteen (15) days after such a determination, such funds in the Disputed Claims Reserve shall revest in the EPC Reorganizing Debtors and thereafter shall be used to pay any fees and expenses of the Responsible Person in accordance with this Plan with any balance to be distributed to other Holders of Allowed Claims in the same Class as part of the final Distribution to Holders of Allowed Claims in that Class. Such funds shall not escheat to any federal, state, or local government or other Entity for any reason.

The Plan then provides in Article VI.A.(d) that holders of Disputed Claims shall be paid as follows:

Payments on any Disputed Claim that becomes an Allowed Claim shall be distributed by the Responsible Person from the Disputed Claims Reserve on the next scheduled Distribution date after the Claim is Allowed. Distributions shall be made only to the extent of the aggregate distributions that the Holder of any such Allowed Claim would have received had such Claim been Allowed as of the Effective Date (less any taxes paid with respect to amounts held in the Disputed Claims Reserve). Distributions to each Holder of a Disputed Claim that has become an Allowed Claim (and to the extent that the Holder of the Disputed Claim has not received prior distributions on account of that Claim) shall be made in accordance with the provisions of the Plan.

18.    The Record Date for a Distribution is the Voting Record Date, November 24, 2016; however, to the extent there have been transfers of claims under Bankruptcy Rule 3001 that are reflected in the claims registry maintained by Prime Clerk, the Responsible Person requests authority to make distributions in accordance with the Claims Register as of December 31, 2019. *Id*.

### THE PROPOSED DISTRIBUTION

19.    Under the EPC Reorganizing Debtors' Plan, there were unclassified categories of Claims for Administrative Claims and Professional Fees incurred prior to entry of the Confirmation Order.    All of these unclassified claims have been administered and the Administrative Claims have been resolved as reflected on **Exhibit B**.    As such, those Administrative Claims may now be paid in accordance with the Plan in the amounts on that Exhibit B.

20.    The Plan further provided for the following category of Claims would each receive in full and final satisfaction, settlement, release, and discharge a specified treatment summarized in the table below, unless any Holder of a specified Claim has agreed in writing to different treatment than that proposed in the Plan:[12]

| **Class** | **Claim** | **Estimated Amount of Allowed Claims not yet Satisfied** | **Treatment Under the Plan** |
|---|---|---|---|
| EPC Reorganizing 1 | Secured Claims | $0 | Payment in full or the Debtors' assets in which the Holder of a Secured Claim has an interest. |
| EPC Reorganizing 2A and 2B and Scheduled Priority Claims | Priority Tax Claims and Other Tax | $828,962.10 | Payment in full. |
| EPC Reorganizing 3A | MRA Affected Debt Claims | $0 | Replacement Guarantee based on the Master Restructuring Agreement. |
| EPC Reorganizing 3B | US Debt Claims | $10,158,623.36 | Pro Rata share of the EPC Reorganizing Distribution. |
| EPC Reorganizing 4 | General Unsecured Claims | $217,771,367.82 | Pro Rata share of the EPC Reorganizing Distribution |

---

[12]    This summary does not modify the terms of the Plan, which terms expressly govern the treatment of each Class of Claims.  The summary is provided here to put the request for distributions sought in this Motion in the proper context.  All parties are encouraged to review the Plan attached as Exhibit A for a full description of the treatment afforded each Class of Claims in that Plan.

| **Class** | **Claim** | **Estimated Amount of Allowed Claims not yet Satisfied** | **Treatment Under the Plan** |
|---|---|---|---|
| EPC Reorganizing 5 | Litigation Claims | $9,691,151.08 | Pro Rata share of the EPC Reorganizing Distribution |
| EPC Reorganizing 6 | Debt Bonding Claims | $0 | Distributions from the Surety Reserve. |
| EPC Reorganizing 7A | Intercompany Claims By Non-Debtor Affiliates | -- | The Standard Restructuring Terms |
| EPC Reorganizing 7B | Intercompany Claims By Debtor Affiliates | -- | No distribution under the Plan. |
| EPC Reorganizing 8 | Equity Interests | -- | Equity Interest in the EPC Reorganizing Debtors retained or reinstated. |

21.     The Debtors have already satisfied Class 1, some of Class 2, and all of Class 6.[13]

Class 7A,[14] Class 7B, and Class 8 are not entitled to distribution from the EPC Reorganizing

Distribution under the Plan as the Plan provides for treatment for those three classes that has

already been provided.  The Responsible Person requests authority to make a distribution to the

Allowed Holders of Priority Claims in Class 2, identified on **Exhibit C**.  The remaining Classes

---

[13]     *See Order Approving Motion of the Responsible Person to Approve Distribution of the Surety Reserve to the Surety Reserve Beneficiaries*  [D.I. 2040] (approving payment of the full $6.5 million in the Surety Reserve established under the Plan to the Surety Reserve Beneficiaries).

[14]     Technically, under the Plan, the Reorganized Debtor is obligated to pay the Class 7A Claims 10 years after the effective date without interest.  These claims have not yet been paid; however, for the purpose of this distribution motion, the creation of the obligation to pay in 10 years satisfied the pre-petition obligation.

relevant to this distribution Motion are Class 3A, Class 3B, Class 4, and Class 5.  Each is discussed below.

**A.     The Proposed Treatment of Class 3A and Class 3B under the Plan.**

22.     Classes 3A and 3B relate to the Master Restructuring Agreement.  Class 3A consists of MRA Affected Debt Claims against the EPC Reorganizing Debtors.  *Id,* Art.II.  The Plan defines MRA Affected Debt Claims as Non-Spanish Debt to be Restructured and Compromised Debt.  *Id*., Art. I.A(96).  The Plan then provides that both of these terms have the meaning given to them in the Master Restructuring Agreement.   Id., Art.I.A(106) and Art.I.A(28).

23.     The relevant portion of the definition of "Non-Spanish Debt to be Restructured" in the Master Restructuring Agreement is "Financial Indebtedness owed by non-Spanish Obligors as debtors and guarantors and which is listed in Part D (*Non-Spanish Debt to be Restructured*) of Schedule 6 (*Existing Financial Indebtedness: Obligors*)."   *See* Master Restructuring Agreement at 36 (D.I. 577-1 at p. 40 of 446).[15]  Several Creditors in these cases are listed on Part D of Schedule 6 to the Master Restructuring Agreement.[16]

24.     The term "Compromised Debt" is defined in the Master Restructuring Agreement to mean "Financial Indebtedness listed in Part C (*Affected Debt Compromised Debt)* of Schedule 6 (*Existing Financial Indebtedness: Obligors*), excluding any Liquidating Entity Debt."  *Id*. at 16 (D.I. 577-1 at p. 20 of 446).  Certain publicly traded debt securities were included on Schedule 6, Part C (xi).   On account of these claims, the Debtors sent master ballots into the securities

---

[15]     The Master Restructuring Agreement was attached as Exhibit H to the Disclosure Statement and was also attached to the *Debtors' Motion for Authority to Enter Into Master Restructuring Agreement and Related Power of Attorney* [D.I. 577].  It is a lengthy document and thus is not attached hereto.

[16]     These creditors consist of, Banco Popular Espanol, S.A., Caixabank, S.A., Bank of America, N.A., the Royal Bank of Scotland, Bankia, S.A, Banco Finantia, SA, Banco Santander, S.A., HSBC Bank Plc, Societe Generale, and Banco Sabadell, S.A.

clearing system and the votes on the Plan that arose from these were included in the Class 3A vote tabulation.[17]

25.    Class 3A consists of Creditors that acceded to the Master Restructuring Agreement and thus received various consideration from Abengoa thereunder, which included Replacement Guarantees provided by the EPC Reorganizing Debtors as of the Effective Date. Abengoa has provided the Responsible Person with its records of those parties that acceded to the Master Restructuring Agreement listed as Creditors in these cases.  Based on his review of the Master Restructuring Agreement, the records provided by Abengoa of accession, and the voting and tabulation materials provided by Prime Clerk in its capacity as solicitation agent, the Responsible Person submits that those Creditors holding claims filed by an Indenture Trustee or Fiscal Agent identified on **Exhibit D** as well as those Creditors on **Exhibits E** and **Exhibits F** constitute MRA Affected Debt Creditors.  These creditors are either listed on the Schedule 6, Part D to the Master Restructuring Agreement or are part of the Schedule 6, Part C (*e.g.,* Existing Notes) claims filed by Indenture Trustees of fixed-income securities the Holders of which elected in writing to receive the Alternative Restructuring Terms.  Based on the Plan and those written accession agreements, Holders of Class 3A Claims are not entitled to any further consideration from the EPC Reorganizing Debtors in their cases as those Holders have been satisfied under the Plan and the Master Restructuring Agreement.   Indeed, the Disclosure Statement indicated that the Estimated Total of Claims in this Class 3A was $6.86 billion and that these Creditors would receive a Replacement Guarantee.  *See* Disclosure Statement at 12.

---

[17]    *See* Disclosure Statement at 6 (stating that "Holders of Claims in Class 3A (EPC Reorganizing Debtors MRA Affected Debt Claims) will receive a beneficial ballot from its Voting Nominee (as defined in the Solicitation Procedures Order [attached as Exhibit B to the Disclosure Statement]) separately and on or about the Voting Record Date."); *see also Supplemental Declaration of Christina Pullo of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Debtors' Modified First Amended Plans of Reorganization and Liquidation* [D.I. 981] at Ex. A (reporting voting of about $5.225 billion on Class 3A in the EPC Reorganizing Debtors Plan).

26.     Several Deutsche Bank entities filed a number of proofs of Claims, as either Indenture Trustee or Fiscal Agent.  Each of these claims relates to a specific debt issuance as identified on **Exhibit E**.  These Claims belong in either Class 3A or Class 3B depending on whether or not holders of the Existing Notes acceded to the Master Restructuring Agreement.  To determine those Claims that should be designated in Class 3B, the Responsible Person sought from Abengoa information indicating which Holders of Exiting Notes elected Standard Restructuring Terms and should be in Class 3B.  Abengoa provided the Responsible Person with information related to ten different issuances of Existing Notes demonstrating that €165,904,917 in Euro-denominated Existing Notes and $124,105,709 in dollar-denominated Existing Notes electing Standard Restructuring Treatment under the Master Restructuring Agreement.  When that amount is written down to 3% (e.g., given the Standard Restructuring Terms), the remaining dollar total of those Existing Note claims that should be should be classified in Class 3B under the Plan totals $10,158,623.36.[18]  The Holders' elections to receive the Standard Restructuring Terms under the Master Restructuring Agreement were made through the clearing systems in the process established by the Master Restructuring Agreement.  Consequently, the Responsible Person does not know which specific creditors are Class 3B Creditors.  Notwithstanding the foregoing, the Responsible Person proposes to make a distribution to the Indenture Trustee for each of the Existing Notes identified on and in the amounts identified on **Exhibit F**.  Proceeding in this manner will allow those parties that elected to be part of Class 3B to receive through the securities clearing system their applicable treatment for their Allowed Claims under the Plan, in

---

[18]     The Existing Notes denominated in Euros has been converted at the rate of €1 to $1.293 based on the exchange rate on March 29, 2016, the Petition Date.  *See generally In re Global Power Equipment Grp. Inc.*, No. 06-11045 (BLS), 2008 WL 435197 (Bankr. D. Del., Feb. 14, 2008) (discussing 11 U.S.C. § 502(b) and noting that claims in foreign currency are subject to conversion from Euros to United States dollars using the exchange rate that prevail as of the petition Date).

this case, their Pro Rata Share of the EPC Reorganizing Distribution. The details of the EPC Reorganizing Distribution are set forth below.

**B.      The Proposed Treatment of Class 4 and Class 5 under the Plan.**

27.      Class 4 under the Plan consists of the General Unsecured Claims against the EPC Reorganizing Debtors and Class 5 consists of Litigation Claims filed against the EPC Reorganized Debtors. Holders of Allowed Claims in both Classes 4 and 5, along with Class 3B, will receive a Pro Rata Share of the EPC Reorganizing Distribution. Allowed Claims in Class 4 are identified on **Exhibit G**. Litigation Claims is defined in the Plan to mean "those claims against the Debtors that the Reorganizing Debtors shall hold as of the Effective Date of the Plan, including, but not limited to, Claims arising out of the Carty Litigation." Those Claims in Class 5 of the EPC Reorganizing Debtors' Plan are identified on **Exhibit H**. Again, the Responsible Person has determined the Class 5 treatment largely based on the voting of various creditors but whether a creditor is in Class 4 or Class 5 is not material and does not prejudice any creditor as each of Class 4 and Class 5 receive the same distribution. Nonetheless, the Responsible Person has exercised some discretion in categorizing creditors but he has done so in good faith and in an effort to apply the Plan to ensure each creditor receives the distribution to which it is entitled.[19]

**C.      The EPC Reorganizing Distribution is Partially Funded but is now Significant Enough to Justify an Interim Distribution.**

28.      With respect to US Debt Claims (EPC Reorganizing Class 3B), General Unsecured Claims (EPC Reorganizing Class 4), and Litigation Claims (EPC Reorganizing Class

---

[19]      While Ms. Pullo's Declaration states that the Solicitation Agent, in consultation with the Debtors, sought to ensure creditors received the proper ballots. Some voted in multiple classes. One example shows the problem. HSBC Bank Plc voted similar claims (Claim Numbers 814, 562, 586, 695, 553, and 811), in the same amount ($14,900,829.77) against now substantively consolidated debtors, in Class 3A, Class 5, and Class 6. Upon review of the Master Restructuring Agreement schedules, HSBC's claims were listed on the relevant schedules and HSBC acceded to the Master Restructuring Agreement. As such, the Responsible Person has placed all of HSBC's claims in Class 3A under the Plan for which it has already received its treatment. This approach is more efficient than an objection that would merely "clean up the claims register" as listing HSBC on Class 3A is consistent with the Plan and there is no impact or consequence of there being duplicate claims there.

5), the Plan provides that each Holder of such Allowed Claim is to receive its Pro Rata share of the EPC Reorganizing Distribution, which consists of:

>   (a) $24 million of the New Value Contribution (of which $4 million shall be used to increase the funds in the Litigation Trust);

>   (b) the Litigation Trust Proceeds;

>   (c) Cash on hand net of the Reorganizing Post-Confirmation Reserve with respect to the EPC Reorganizing Debtors;

>   (d) the proceeds of inventory;

>   (e) the Pilot Plant;

>   (f) certain tax assets in connection with the California Board of Equalization;

>   (g) the Tax Attribute Contribution;

>   (h) twenty-five percent (25%) of the Fulcrum Asset; and

>   (i) twenty-five percent (25%) of the gross recovery of the Teyma Receivable.

29.     With respect to these items, (a) and (c) were delivered to the Litigation Trust on or as of the Effective Date.  Items (d), (e), (f), and (i) have been administered and the resulting proceeds have been turned over to the Litigation Trust as Controlled Funds.  With respect to item (g) and (h), these assets have not yet been administered but will be in accordance with the terms and provisions of the Plan relevant to their administration.

30.     According to the Litigation Trust's Post-Confirmation Quarterly Operating Report for the Period from September 30, 2019 to December 31, 2019, the Litigation Trust has received or collected $60,498,648.49.  The Litigation Trust reports a cash balance after payment of expenses of $47,378,221.86.  *See* D.I. 2136 at 3.  From this total amount of cash on hand for distribution, it is appropriate to take into account future obligations under the Plan and the various other requirements thereunder (with the "use" amounts set forth below remaining as Controlled Funds and will not actually be earmarked or reserved but are set out here to ensure an

appropriate distribution is made while ensuring the ongoing viability of the administration of the

Plan):

| Source/Use | Amount |
|---|---|
| Cash Held by Litigation Trustee as of December 31, 2019 | $47,378,221.86[20] |
| Allowed Administrative Claims | ($179,199.96) |
| Priority Claims | ($828,962.10) |
| Abengoa, S.A.[21] Litigation Trust Proceeds | ($3,000,000) |
| Reorganized Debtor Litigation Trust Proceeds | ($3,000,000) |
| Responsible Person's Future Costs and Expenses Estimate | ($2,500,000) |
| Litigation Trustee's Future Costs and Expenses Estimate | ($2,500,000) |
| **SUBTOTAL AVAILABLE FOR DISTRIBUTION** | **$35,370,059.80** |

31.    Based on the foregoing presentation, the claims entitled to share in the EPC

Reorganizing Distribution consist of the following:

| Class of Claims | Amount |
|---|---|
| Classes 3B | $10,748,111.65 |
| Class 4 | $217,771,367.82 |
| Class 5 | $9,691,151.08 |

---

[20]    D.I. 2136 at 4.

[21]    In accordance with § IV.D. of the Plan, $3 million of the proceeds of the Litigation Trust shall revert back to Abengoa, S.A. once the Litigation Trust has obtained a net recovery on account of the Litigation Trust Causes of Action in excess of $28 million.  After that point, all net proceeds of the Litigation Trust shall be divided equally between the Reorganized Debtors and the Litigation Trust until the Reorganized Debtors have received $3 million. Thereafter, all proceeds of the Litigation Trust are to be paid to holders of Allowed Claims of the EPC Reorganizing Debtors. The Litigation Trustee reports that such $28 million threshold has not yet been met.

| | |
|---|---|
| Non-duplicative claims scheduled as non-duplicated, fixed, and liquidated identified on **Exhibit I** (the "**Scheduled Claims**")[22] | $45,971927.96 |
| **Total** | **$284,182,558.51** |

32.     In addition to these Allowed Claims in these Classes or the Scheduled Claims,

certain Claims will be subject to a dispute:

| Claims Subject to Dispute | Amount |
|---|---|
| Class 4 Claims Administered by the Responsible Person identified on **Exhibit J** (the "**EPC Disputed Claims**") | $1,923,232.88 |
| Class 4 Claims Administered by the Litigation Trustee identified on **Exhibit K** (the "**Litigation Trust Disputed Claims**" and with the EPC Disputed Claims, the "**Disputed Claims**") | $74,088,083.29 |
| **Total** | **$76,011,316.17** |

33.     The Responsible Person proposes to distribute $35,370,059.80 of the $47.4

million of the current cash on hand to holders of Classes 3B, 4, and 5 together with the

Scheduled Claims (the "**Initial Distribution**").   The Initial Distribution will be 9.8% and is

significant in light of the fact that the estimated total recovery percentage set forth in the

Disclosure Statement for Classes 3B, 4, and 5 was 12.5%.  *See* Disclosure Statement [D.I. 748]

---

[22]     This Exhibit reflects those claims that were scheduled without any designation that they were "contingent, unliquidated, or disputed".  From there, the claims have been further reconciled by removing any claims for which the creditor filed a proof of claim as the consequence of that under the Bankruptcy Rules is that the proof of claim supersedes the scheduled claim.  From there, the Responsible Person removed claims that were in duplicative amounts against the substantive consolidated estates as noted in the Court's memorandum decision in paragraph 11 above.  To the extent claims were scheduled for the same creditor in different amounts; however, those multiple scheduled claims have been provided for as many creditors had separate accounts with the various debtors.  The Responsible Person submits that this approach is consistent with the Bar Date Order, the Confirmation Order and Plan, the Court's memorandum decision regarding confirmation, and the Bankruptcy Rules.

at 12. This is especially true considering that this is the first distribution and there remains assets yet to be administered and realized that should increase the amount of the EPC Reorganizing Distribution. The percentage payout is calculated as follows:

| Claims | Amounts |
|---|---|
| Class 3B | $10,748,111.65 |
| Class 4 | $217,771,367.82 |
| Class 5 | $9,691,151.08 |
| Scheduled Claims | $45,971,927.96 |
| Disputed Claims | $76,011,316.17 |
| **Total Claims** | **$367,052,737.50** |
| **Amount to be Distributed** | **$35,370,059.80** |
| **Percent Distributed** | 9.8% <br><br> ($359,604,386.39 ÷ $35,370,059.80= |

34.     With respect to the Disputed Claims, the Responsible Person will segregate the funds that would have been distributed to those Holders (e.g., 9.8% of $75,349,938.02 or $7,297,086.35), but for the pending or future dispute that the Responsible Person has or will make against those Claims in the amount identified as Disputed Claims on **Exhibit J and K** to be distributed in the future in accordance with the terms of the Plan.[23]

---

[23]     For example if a hypothetical Creditor has a disputed claim in the face amount of $100, its distribution would have been $9.80 based on the percentage of distribution proposed herein. Those funds will be transferred into the Disputed Claims Reserve and held pending allowance. If the claim is ultimately allowed for the $100 that creditor will be entitled to receive that $9.80 from the Disputed Claims Reserve. If the Creditors' claim is disallowed, those funds will be transferred out of the Disputed Claims Reserve in accordance with the Plan.

**RELIEF REQUESTED**

35.    By this Motion, the Responsible Person seeks authority to make the Initial Distribution and to establish reserves on account of the Disputed Administrative Claims and the Disputed Claims in the amounts proposed.  Attached as **Exhibit L** is a complete claim registry from the EPC Reorganizing Debtors that shows each Claim filed against the EPC Reorganizing Debtors and its current status.   While each of the Classes 3B, 4, and 5 receive the same distribution, a Pro Rata Share of the EPC Reorganizing Distribution, the Responsible Person seeks approval of the Claims identified in each of Class 3A, Class 3B, Class 4, Class 5, and the Scheduled Claims as claims properly classified and included in the Initial Distribution.

**ARGUMENT AND AUTHORITY**

36.    Under Bankruptcy Code section 105(a), bankruptcy courts have broad equitable powers to "issue any order, process, or judgment that is necessary or appropriate to carry out the provision" of the Bankruptcy Code. 11 U.S.C. § 105(a).   Similarly, section 1142 of the Bankruptcy Code provides that "the debtor and any entity organized . . . for the purpose of carrying out the plan shall carry out the Plan and shall comply with any orders of the court," 11 U.S.C. § 1142(a), and that the court may direct any necessary party to perform any other act necessary for the consummation of the plan. *Id*., § 1142(b).  *Colliers on Bankruptcy* notes that subsection (b) "is considerably broader than merely ministerial acts" and that the court may issue any order "necessary for the implementation of the plan."   16 Collier's on Bankruptcy ¶ 1142.03[1] (16th ed. 2019).

37.    Bankruptcy Rule 3021, which provides that "after a plan is confirmed, distribution shall be made to creditors whose claims have been allowed[,]" grants further authority for the Court to approve the proposed Interim Distribution and approve the

classification of Claims to effect that Interim Distribution.  In fact, Bankruptcy Rule 3021 provides that distributions can be made to Indenture Trustees that have filed claims under Bankruptcy Rule 3003(c)(5), which permits an Indenture Trustee to file a claim on behalf of holders of debt that may not all be known.  As such, the Responsible Person's request to ensure that the Holders of claims that should be classified in Class 3A or Class 3B are in fact so treated will mean those claims are Allowed as they will not be subject to an objection.  Additionally, entry of an order that approves that classification will be beneficial to Holders of the General Unsecured Claims in Class 4 because the Class 3A claims would otherwise dilute the Class 4 recovery if they are allowed to be treated in that Class 4.  As such, approval of the classification proposed in this Motion will assist in the administration of the estate and the Court has the authority to enter the requested order as doing so is well within the spirit of the Bankruptcy Code distribution mechanism. *See generally* Fed. R. Bankr. Pro. 3020(d) ("[n]otwithstanding the entry of the order of confirmation the court may issue any other order necessary to administer the estate.")

38.     Following the Effective Date, the Plan gives the Responsible Person the authority to make, and cause the Disbursing Agent (or the Responsible Person acting as such) to make, various payments or distributions necessary to effectuate the Plan.  The Responsible Person has largely completed the review and reconciliation of Claims in these cases.  Attached as Exhibit C are the Claims of financial creditors that the Responsible Person has included in Class 3A based on those Creditors decision to accede to the Master Restructuring Agreement.  These Class 3A creditors have received the treatment to which they are entitled under the Plan by electing to accede to the Master Restructuring Agreement as the EPC Reorganizing Debtors were authorized to enter into the Master Restructuring Agreement and provide guarantees of debt instruments

issued thereunder.  Holders of certain US Debt Claims that elected not to accede to the Master Restructuring Agreement and thus are treated as Class 3B under the Plan have been identified on Exhibit F.  Allowed Claims against the EPC Reorganizing Debtors in Classes 4 and 5 have been identified on Exhibits G and H.

39.     The Responsible Person intends to make a Distribution to Allowed Creditors of the EPC Reorganizing Debtors in accordance with the Interim Distribution and with respect to the Holders of Classes 3B, 4, and 5 and the Scheduled Claims in accordance with the attached Exhibits.  The Interim Distribution is appropriate at this time as the Creditors of the EPC Reorganizing Debtors (other than the Surety Beneficiaries) have not yet received any Distribution.  Making the Interim Distribution at this time is both prudent and contemplated by the Plan.

## NOTICE

40.     Notice of this Motion will be provided to: (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to the Liquidating Trustee; (c) each person identified on Exhibit L to this Motion; and (d) all other parties that have otherwise requested notice under Bankruptcy Rule 2002 as of the date of filing of this Motion.  Under the circumstances, the Responsible Person submits that this notice is sufficient and reasonable, and that no further notice is required.

## CONCLUSION

41.     For the reasons set forth in this Motion, the Responsible Person requests that the Court enter the form of Order proposed as **Exhibit M** to this Motion.

Dated: January 24, 2020

**DLA PIPER LLP (US)**

By: /s/ R. Craig Martin
R. Craig Martin (DE 005032)
Maris J. Kandestin (DE 005294)
1201 North Market Street, Suite 2100
Wilmington, Delaware 19801
Telephone: (302) 468-5700
Facsimile: (302) 394-2341
E-mail: craig.martin@dlapiper.com
          maris.kandestin@dlapiper.com

- and -

Richard A. Chesley (admitted pro hac vice)
444 W. Lake Street, Suite 900
Chicago, Illinois 60606-0089
Telephone: (312) 369-4000
Facsimile: (312) 236-7516
E-mail: richard.chesley@dlapiper.com

*Attorneys for Jeffrey Bland,*
*Responsible Person*